**EXHIBIT A: PLAN OF REORGANIZATION**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: Otter Tail Ag Enterprises, LLC, | Case No. 09-61250-DDO |
| Debtor. | Chapter 11 |

## DEBTOR'S PROPOSED CHAPTER 11 PLAN OF REORGANIZATION
## (SECOND AMENDED)

Dated: June 11, 2010        MACKALL, CROUNSE & MOORE, PLC


By: /e/ Timothy D. Moratzka
Timothy D. Moratzka (Atty No. 75036)
Mychal A. Bruggeman (Atty No 0345489)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, Minnesota 55402
(612) 305-1400

**ATTORNEYS FOR DEBTOR**

# TABLE OF CONTENTS

CHAPTER 11 PLAN OF REORGANIZATION FOR THE DEBTOR........................................ 1

ARTICLE I – DEFINITIONS AND RULES OF INTERPRETATION ....................................... 1

ARTICLE II – DESIGNATION, CLASSIFICATION AND TREATMENT............................... 4
OF CLAIMS AND EQUITY INTERESTS

    Section 2.01 – Treatment of Unclassified Claims ................................................ 4

    Section 2.02 – Designation of Classified Claims and Interests ......................... 6

    Section 2.03 – Treatment of Classified Claims and Interests ............................ 7

ARTICLE III – MEANS FOR IMPLEMENTATION OF THIS PLAN .................................... 17

    Section 3.01 – Continued Existence of Debtor .................................................. 17

    Section 3.02 – Revesting of Assets .................................................................... 17

    Section 3.03 – Funding of the Plan and Restructuring Transactions ................. 17

    Section 3.04 – Preservation, Assignment, Enforcement, .................................. 20
        and Settlement of Litigation Claims

    Section 3.05 – Exemption from Transfer Taxes ................................................ 20

ARTICLE IV – TREATMENT OF EXECUTORY CONTRACTS ........................................... 21
        AND UNEXPIRED LEASES

    Section 4.01 – Assumed Executory Contracts and Leases ................................ 21

    Section 4.02 – Approval of Assumption or Rejection Executory Contracts .................... 21

    Section 4.03 – Cure of Default for Assumed Executory Contracts .................. 21

    Section 4.04 – Bar to Rejection Damages ......................................................... 22

    Section 4.05 – Assumption of D & O Insurance .............................................. 22

ARTICLE V – ALLOWED CLAIMS AND PROCEDURES FOR RESOLVING.................... 22
DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

    Section 5.01 – Allowance and Disallowance of Claims and Interests.............................. 22

    Section 5.02 – Disputed Claims ........................................................................ 22

Section 5.03 – No Distributions Pending Allowance ........................................................ 23

Section 5.04 – Distributions After Allowance ................................................................. 23

Section 5.05 – Alternative Treatment .............................................................................. 23

Section 5.06 – Post-Petition Interest ............................................................................... 23

ARTICLE VI – PROVISIONS GOVERNING DISTRIBUTIONS ............................................. 24

Section 6.01 – Distributions for Claims Allowed as of the Effective Date ..................... 24

Section 6.02 – Disbursing Agent ..................................................................................... 24

Section 6.03 – Delivery of Distributions and Undeliverable or ....................................... 24
                Unclaimed Distributions

Section 6.04 – Record Date for Distributions .................................................................. 25

Section 6.05 – Means of Cash Payment .......................................................................... 25

Section 6.06 – Withholding and Reporting Requirements ............................................... 25

Section 6.07 – Setoffs ...................................................................................................... 26

Section 6.08 – Fractional Dollars; De Minimis Distributions ......................................... 26

ARTICIE VII – CONFIRMATION AND CONSUMMATION OF THE PLAN ....................... 26

Section 7.01 – Conditions to Effective Date of the Plan ................................................. 26

Section 7.02 – Effective Failure of Conditions................................................................ 27

Section 7.03 – Waiver of Conditions ............................................................................... 27

ARTICLE VIII – EFFECT OF PLAN CONFIRMATION ...................................................... 27

Section 8.01 – Binding Effect ......................................................................................... 27

Section 8.02 – Discharge of Claims and Termination of ................................................. 27
                Claims and Equity Interests

Section 8.03 – Permanent Injunction .............................................................................. 28

Section 8.04 – Term of Bankruptcy Injunction or Stays ................................................. 28

Section 8.05 – Release of Avoidance Actions ................................................................. 29

ARTICLE IX – RETENTION OF JURISDICTION ...................................................................... 29

    Section 9.01 – Retention of Jurisdiction ......................................................................... 29

ARTICLE X – MISCELLANEOUS PROVISIONS .................................................................. 31

    Section 10.01 – Payment of Statutory Fees ...................................................................... 31

    Section 10.02 – Amendment or Modification of the Plan ................................................. 31

    Section 10.03 – Severability of Plan Provisions ............................................................... 31

    Section 10.04 – Successors and Assigns ........................................................................... 32

    Section 10.05 – Revocation, Withdrawal or Non-Consummation ................................... 32

    Section 10.06 – Notice ...................................................................................................... 32

    Section 10.07 – Governing Law ....................................................................................... 33

    Section 10.08 – Section 1125(e) of the Bankruptcy Code ................................................ 33

# CHAPTER 11 PLAN OF REORGANIZATION FOR THE DEBTOR

Otter Tail Ag Enterprises, LLC (the "Debtor"), proposes the following plan of reorganization (the "Plan") for the resolution of the Debtor's outstanding claims and equity interests.

**ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ THIS PLAN IN ITS ENTIRETY. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN THIS PLAN, THE PLAN PROPONENT RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## ARTICLE I

## DEFINITIONS AND RULES OF INTERPRETATION

The following terms used in the Plan shall have the respective meanings defined below:

**(1)    Administrative Claim** means a claim for a cost or expense of administration of the Chapter 11 Case allowed under Section 503(b) of the Bankruptcy Code.

**(2)    Allowed Claim** means a claim that is identified by its holder and the amount in this Plan or is a claim that is filed prior to any applicable Bar Date and the applicable Claims Objection Deadline has expired without any objection filed.

**(3)    AgStar** means AgStar Financial Services, PCA.

**(4)    AgStar Credit Agreements** means the (a) Construction and Term Note dated March 28, 2007; (b) an Amended and Restated Term Revolving Note dated June 23, 2008; (c) an Amended and restated Revolving Line of Credit Note dated June 23, 2008; (d) the Master Loan Agreement dated March 28, 2007; (e) the First Supplement to the Master Loan Agreement dated as of March 28, 2007; (f) the Amended and Restated Master Loan Agreement dated as of June 23, 2008; (g) the Amended and Restated Second Supplement to the Master Loan Agreement dated as of June 23, 2008; (h) the Second Amended and Restated Third Supplement to the Master Loan Agreement dated as of June 23, 2008; (i) a Mortgage, Security Agreement and Assignment of Rents and Leases dated March 28, 2007; (j) an Amended and Restated Mortgage, Security Agreement, and Assignment of Rents and Leases dated June 23, 2008; (k) a Security Agreement dated March 28, 2007; and (l) all other agreements, instruments, notes, guarantees, and other documents executed in connection therewith, including without limitation, all collateral and security documents executed by the Debtor in favor of AgStar.

**(5)    AgStar Secured Obligations** means all obligations of the Debtor arising under the AgStar Secured Credit Agreements, including all loans, advances, debts, liabilities, fees, charges, expenses, and obligations for the performance of covenants, tasks or duties, of any kind or nature, whether or not evidenced by an note agreement or other instrument, and whether

arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner.

(6) **Avoidance Actions** means any actions, causes of action, claims, demands, suits or rights, created or arising in favor of the Debtor or its estate under the Bankruptcy Code, including all claims, rights and causes of action arising under Section 510 or under any of Sections 542 through 553 of the Bankruptcy Code, in each case regardless of whether such actions, causes of action, claims, demands, suits or rights are commenced prior to or after the Effective Date.

(7) **Bar Date** means March 15, 2010, the date established by the Court as the last date for all creditors, other than governmental entities, to file proofs of claim against the Debtor, and April 28, 2010, the date established by the Court as the last date for governmental entities to file proofs of claim against the Debtor. The term "Bar Date" also includes the deadline for filing Administrative Claims, including Twenty-Day Goods Claims, and the deadline for filing claims arising from rejection of executory contracts and unexpired leases, which deadlines will occur thirty (30) days after the Confirmation Date.

(8) **Claims Objection Deadline** means the last day for filing objections to claims against the Debtor, which date shall be fourteen (14) days after the later of: (a) the Effective Date; or (b) the date on which the claim subject to objection is filed.

(9) **Confirmation Date** means the date that the Court enters an Order confirming this Plan.

(10) **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(11) **County Bond Documents** means the (a) Lease Agreement as of May 1, 2007 between Otter Tail County, whose interest in payments there under was partially assigned to the Revenue Bond Indenture Trustee, and the Debtor dated May 1, 2007; (b) Mortgage, Security Agreement and Assignment of Rents and Leases dated May 1, 2007 granted by Debtor to the Otter Tail County in the original principal amount of $6,010,000; and (c) all other agreements, instruments, notes, guarantees, and other documents executed in connection therewith, including without limitation, all collateral and security documents executed by the Debtor in favor of Otter Tail County.

(12) **Effective Date** means the first business day following the later of the following dates: (1) the date on which an order confirming this Plan becomes a Final Order; or (2) the Debtor files notice with the Bankruptcy Court that it has received payment of the full amount of the $12,000,000.00 of new equity under the Plan.

(13) **Final Order** means an order of the Court which has not been timely appealed or, if appealed, no stay of the order's effectiveness has been entered.

(14) **Intercreditor Agreement** means the Amended and Restated Intercreditor Agreement, dated as of June 4, 2008 by and among Agstar, NMF, the Revenue Bond Indenture Trustee and Otter Tail County, Minnesota.

**(15)    Lease Agreement** means that Lease Agreement for lease of the solid waste disposal facility dated May 1, 2007 between Debtor and Otter Tail County, whose interest was assigned to the Revenue Bond Indenture Trustee.

**(16)    Litigation Claims** means the Claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its bankruptcy estate may hold against any person, including but not limited to, (a) any claims, rights of action, suits or proceedings arising under or resulting from contractual subordination or section 510(b) of the Bankruptcy Code;  or (b) any claims under sections 544, 545, 547 and 548 of the Bankruptcy Code that may exist.

**(17)    NMF** means MMCDC New Markets Fund II, LLC

**(18)    NMF Credit Agreements** means the (a) a Senior Loan Note dated March 30, 2007; the (b) a Subordinated Note dated March; (c) the Construction and Term Loan Agreement dated March 30, 2007; (d) a Mortgage, Security Agreement and Assignment of Rents and Leases dated March 30, 2007; and (e) all other agreements, instruments, notes, guarantees, and other documents executed in connection therewith, including without limitation, all collateral and security documents executed by the Debtor in favor of NMF.

**(19)    NMF Secured Obligations** means all obligations of the Debtor arising under the NMF Secured Credit Agreements, including all loans, advances, debts, liabilities, fees, charges, expenses, and obligations for the performance of covenants, tasks or duties, of any kind or nature, whether or not evidenced by an note agreement or other instrument, and whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner.

**(20)    Old Equity Interests** mean the equity interests represented by the equity units of the Debtor, duly authorized, validly issued, and outstanding prior to the Effective Date, together with all options, warrants, or rights to acquire such membership units existing or any other equity or ownership in the Debtor at any time before the Effective Date.

**(21)    Petition Date** means October 30, 2009.

**(22)    Priority Tax Claim** means any allowed unsecured claim of a governmental unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

**(23)    Professional** means (a) any professional employed in the Chapter 11 Cases pursuant to section 327 or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

**(24)    Professional Fee Claim** means any claim for the fees and expenses relating to services performed on and after the Petition Date and before and including the Effective Date by a Professional and submitted to the Bankruptcy Court for compensation and reimbursement of expenses in accordance with Section 330, 331, or 503(b) of the Bankruptcy Code.

**(25)    Reorganized Debtor** means the Debtor or Debtor in Possession from and after the Effective Date.

**(26)     Revenue Bondholders** means the holders of the Revenue Bonds.

**(27)     Revenue Bonds** means the Otter Tail County, Minnesota Subordinate Exempt Facility Revenue Bonds, Series 2007A in the outstanding principal amount of $20,000,000 issued under the Revenue Bond Indenture.

**(28)     Revenue Bond Claim** means the claim held by the Revenue Bond Indenture Trustee on behalf of the Revenue Bondholders under the Revenue Bond Documents.

**(29)     Revenue Bond Documents** means the (a) Revenue Bond Indenture; (b) Lease between Otter Tail County, whose interest in payments thereunder was partially assigned to the Revenue Bond Indenture Trustee and the Debtor dated May 1, 2007; (c) Guaranty Agreement dated May 3, 2007; (d) Mortgage, Security Agreement and Assignment of Rents and Leases dated May 1, 2007 granted by Debtor to the Revenue Bond Indenture Trustee in the amount of $20,000,000; and (e) all other agreements, instruments, notes, guarantees, and other documents executed in connection therewith, including without limitation, all collateral and security documents executed by the Debtor in favor of the Revenue Bondholders or the Revenue Bond Indenture Trustee.

**(30)     Revenue Bond Indenture** means the Trust Indenture, dated as of May 1, 2007, by and between the Revenue Bond Indenture Trustee, as indenture trustee, and Otter Tail County, Minnesota, as issuer of the Revenue Bonds.

**(31)     Revenue Bond Indenture Trustee** means U.S. Bank National Association in its capacity as indenture trustee under the Revenue Bond Documents.

**(32)     Twenty-Day Goods Claim** means any claim (whether secured or unsecured) for the value of any goods received by the Debtor within twenty (20) days before the Petition Date in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business.

## ARTICLE II

## DESIGNATION, CLASSIFICATION, AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

This Plan places all claims against or interests in the Debtor within either an unclassified administrative claim under Section 2.01 or a classified claim under Section 2.02.

**Section 2.01     Treatment of Unclassified Claims**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims Priority Tax Claims, and Professional Fee Claims are not classified and are not entitled to vote on the Plan.

**(a)     Administrative Claims**

Each holder of an Administrative Claim, including a Twenty-Day Goods Claim, will receive payment equal to the unpaid portion of such allowed Administrative Claim, without

interest, on the later of (1) the Effective Date; (2) seven (7) days after the Administrative Claim becomes an Allowed Claim; or (3) a later date agreed upon by the Reorganized Debtor and the claimant.

Each holder of an Administrative Claim incurred in the ordinary course of Debtor's operations during the bankruptcy shall not be required to file a proof of claim. Such claim shall be paid by the Reorganized Debtor in accordance with either: (i) the terms and conditions of the particular transaction and any agreements relating thereto under which such claim arose; or (ii) in the ordinary course of Debtor's business; and in either case, without application by or on behalf of any such parties to the Bankruptcy Court, and without notice and a hearing, unless specifically required by the Bankruptcy Court.

**(b)** **Priority Tax Claims**

Each holders of an allowed Priority Tax Claim against Debtor shall receive payment in full on the Effective Date.

**(c)** **Professional Fee Claims**

**(1) Pre-Confirmation Professional Fees**

The holders of Professional Fee Claims shall file their respective final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by no later than thirty (30) days after the Confirmation Date. If granted by the Bankruptcy Court, such Professional Fee Claim shall be paid in full in such amount as is Allowed by the Bankruptcy Court either (a) within ten (10) business days after the Court enters an order allowing such claim, or (b) upon such other terms as may be mutually agreed upon between such holder of an allowed Professional Fee claim and the Reorganized Debtor.

**(2) Post-Confirmation Professional Fees**

All professional fees for services rendered in connection with the Chapter 11 Case and the Plan after the Confirmation Date including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of any Litigation Claims, and the resolution of disputed claims, are to be paid by the Reorganized Debtor upon receipt of an invoice for such services, or on such other terms as the Reorganized Debtor may agree to, without the need for further Bankruptcy Court authorization or entry of an order. If the Reorganized Debtor and any Professional cannot agree on the amount of post-Confirmation Date fees and expenses to be paid to such Professional, such amount is to be determined by the Bankruptcy Court.

**(3) Professional Fee Claims of the Senior Lenders**

As part of the proposed plan treatment Debtor has agreed to pay certain reasonable professional fees incurred by each its senior secured lenders, AgStar and NMF, in a manner consistent with the pre-petition credit agreements of both lenders. AgStar and NMF shall each submit their respective request for payment of professional fees to the Reorganized Debtor

within thirty days of the Effective Date of any Plan, and the Reorganized Debtor shall pay all reasonable fees. All disputes over the professional fees shall be governed by the existing credit agreements between Debtor, and AgStar and NMF.

## Section 2.02   Designation of Classified Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of claims against and interests in the Debtor. A claim or interest is placed in a particular class for the purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such claim or interest is an Allowed Claim or allowed interest in that class and such claim or interest has not been paid, released, or otherwise settled prior to the Effective Date.

**(a)      Class One – AgStar Claim**

Class One consists of the secured claim of AgStar. Class One is an impaired class and is entitled to vote on the Plan.

**(b)      Class Two – NMF Claim**

Class Two consists of the secured claim of NMF. Class Two is an impaired class and is entitled to vote on the Plan.

**(c)      Class Three – Caterpillar Financial Services Corporation Claim**

Class Three consists of the secured claim of Caterpillar Financial Services. Class Three is not an impaired class and is not entitled to vote on the Plan.

**(d)      Class Four – Revenue Bond Claim**

Class Four consists of the Revenue Bond Claim. Class Four is an impaired class and is entitled to vote on the Plan.

**(e)      Class Five – Otter Tail County Claim**

Class Five consists of the claim of Otter Tail County. Class Five is an impaired class and is entitled to vote on the Plan.

**(f)      Class Six – General Unsecured Claims**

Class Six consists of the general unsecured claims in excess of $2,500. Class Six is an impaired class and is entitled to vote on the Plan.

**(g)      Class Seven – Rejection Damages Claims**

Class Seven consists of parties that claim rejection damages related to the Debtor or Reorganized Debtor's rejection of an executory contract or lease. Class Seven is an impaired class and is entitled to vote on the Plan.

**(h)**     <u>Class Eight – Convenience Claims</u>

Class Eight consists of the general unsecured claims under $2,500. Class Eight is not an impaired class and is not entitled to vote on the Plan.

**(i)**     <u>Class Nine – Equity Interests</u>

Class Nine consists of the holders of Old Equity Interests including pre-petition equity members. Class Nine is presumed to reject the Plan as the class receives no distribution under the Plan nor acquires any property interest in the Reorganized Debtor.

## Section 2.03    <u>Treatment of Classified Claims and Interests</u>

The treatment with respect to each class of claims and interests provided for in this Section shall be in full and complete satisfaction, release and discharge of such claims and interests. The Reorganized Debtor shall only make distributions on account of Allowed Claims. A claim that is disputed by the Debtor or the Reorganized Debtor as to its amount only shall be deemed allowed in the amount the Debtor or the Reorganized Debtor admits owing and disputed as to the remainder.

**(a)**     <u>Class 1 – AgStar Secured Claim</u>

Notwithstanding any provision to the contrary herein, upon entry of the confirmation order, the AgStar secured claim shall be allowed in full in the aggregate amount of the AgStar Secured Obligations, including principal of $35,656,137, plus any interest, attorneys' fees, and default charges that have accrued as of the Effective Date under the AgStar Credit Agreement, and shall constitute an Allowed Claim for all purposes of this Plan and the Chapter 11 Case, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtor, the Reorganized Debtor, or any party in interest.

The AgStar secured claim shall be reinstated as of the Effective Date, which shall include payment over time and payment in accordance with the terms and conditions of the AgStar Credit Agreements, except as amended and extended as provided herein. On the Effective Date, the Debtor and AgStar shall reaffirm, or amend and restate, the AgStar Credit Agreements as of the Effective Date, in their entirety, with the material provisions set forth below:

**(1)**     <u>Amount of Outstanding Principal Balance</u>: As of the Effective Date, the aggregate principal balance owing under the AgStar Credit Agreements shall be set at an amount equal to aggregate principal amount of the AgStar secured claim. The AgStar claim shall consist of a term loan and revolving line of credit. The principal balance of the term loan shall be $31,656,137 and the principal balance of the revolving line of credit shall be reduced to $4,000,000. The maximum amount that the Debtor may borrow on the revolving line of credit will be reduced from $6,000,000 to $4,000,000.

**(2)**     <u>Retention of Liens</u>: AgStar shall retain the liens securing AgStar's Allowed Claim and any future amounts advanced pursuant to the AgStar Credit Agreements until full and final payment of such Allowed Claim and any additional

amounts advanced under the AgStar Credit Agreements. Upon such full and final payment, such liens shall be deemed null and void and shall be unenforceable for all purposes.

**(3)** **Exclusivity of Liens:** The Reorganized Debtor's assets shall be free from any and all subordinate mortgages, liens, and encumbrances, including any lessor's interest, except for the liens of NMF and any other liens as may be accepted by AgStar.

**(4)** **Amendment of Credit Agreements:** The Reorganized Debtor shall execute and deliver to AgStar any amended and restated AgStar Credit Agreement together with such other notes, mortgages, security agreements, control agreements, documents and agreements as may be required by AgStar which amended and restated loan documents will contain representations, warranties, covenants, events of default, and remedies acceptable to AgStar.

**(5)** **Loan Covenants:** To the extent not amended or modified, Debtor's existing loan covenants with AgStar will be reaffirmed. The working capital covenant shall be amended so that the Debtor shall maintain $7,500,000 of working capital at all times. Working capital means the current assets of the Debtor (including amounts held in any debt service reserve account maintained for the benefit of AgStar), less restricted cash (other than the amounts held in any debt service account for the benefit of AgStar), less current liabilities of the Debtor (including the current portion of long term liabilities of the Debtor but excluding the current portion of long term liabilities owing to NMF), each as determined in accordance with GAAP.

**(6)** **Repayment of AgStar Term Loan**: The AgStar term loan is repayable as follows:

**(i)** *Interest Rate***:** As of the Effective Date, the interest rate accruing on the principal balance of the term loan shall be fixed at 6.5% per annum through May 31, 2013, provided, however, that such rate will be adjusted to reflect any changes in the three-year U.S. Treasury bond rate of interest prior to the Effective Date of the Plan.

**(ii)** *Maturity Date***:** The term loan shall mature on June 1, 2013, with final payment of all unpaid principal and interest due and payable on that date. The term loan may be prepaid in part or in full on or before its maturity date with penalty or service charge. If the Reorganized Debtor performs the provisions of this Plan, it anticipates that AgStar and the Reorganized Debtor will reach an agreement to refinance the term loan on its maturity date, and that the Reorganized Debtor will not fully repay the outstanding principal balance of the term loan at that time.

**(iii)** *Amortization***:** The term loan will be payable as follows: (a) the Reorganized Debtor will make interest only payments for the first three months following the Effective Date; (b) beginning with the first day of the fourth

calendar month following the Effective Date of the Plan, the balance of the term loan becomes payable in equal monthly installments of principal and interest sufficient to fully amortize the term loan over ten (10) years from the Effective Date of the Plan; These first three monthly payments will be approximately $172,000 per month. Thereafter, monthly payments will be approximately $397,000 through the maturity date.

      **(iv)** *Payment of Accrued Delinquent Interest***:** On the Effective Date of the Plan, the Reorganized Debtor will pay to AgStar all accrued and unpaid non-default interest on the pre-petition term loans, which is estimated to be $802,057.78 as of May 31, 2010.

      **(7)** <u>**Repayment of AgStar Revolving Line of Credit**</u>: The revolving line of credit is payable as follows:

      **(i)** *Payment of Interest*: Accrued interest on the revolving line of credit will be paid in arrears monthly on the first day of each calendar month beginning with the first calendar month following the Effective Date.

      **(ii)** *Interest Rate*: As of the Effective Date, the interest rate accruing on the principal balance of the revolving line of credit shall be fixed at 6.5% per annum through May 31, 2013, provided, however, that such rate will be adjusted to reflect any changes in the three-year U.S. Treasury bond rate of interest prior to the Effective Date. The monthly payment on the line of credit when fully advanced to $4,000,000 would be $21,666.67.

      **(iii)** *Maturity Date*: The Revolving Loan will mature 364 days following the Effective Date.

      **(iv)** *Amortization*: The Revolving Loan will be payable in full on its applicable maturity date.

      **(v)** *Payment of Accrued Delinquent Interest***:** On the Effective Date of the Plan, the Reorganized Debtor will pay to AgStar all accrued and unpaid non-default interest on the Revolving Loan, which is estimated to be $144,420.64 as of May 31, 2010.

      **(vi)** *Reduction of Revolving Line of Credit Balance to $4,000,000***:** On the Effective Date of the Plan, the Reorganized Debtor will pay to AgStar an amount sufficient to reduce the outstanding principal balance of the revolving line of credit to an amount not greater than $4,000,000.

      **(8)** <u>**Accrued Default Interest**</u>. All default interest provided by the AgStar Credit Agreements will be deferred until June 1, 2013. Provided that the Reorganized Debtor does not default in the performance of its obligations under the Plan and AgStar

Credit Agreements, the amended loan documents will provide that such default interest will be waived by AgStar on June 1, 2013.

(9) **Debt Service Reserve Account**. The Reorganized Debtor shall fund a debt service reserve account for the benefit of AgStar in an amount not to exceed six months of principal and interest on the term loan. The reserve account shall be funded from excess cash flow, if any, as calculated under the amended and restated AgStar Credit Agreements based on the annual audited financial statements of the Reorganized Debtor and paid within ten business days following the delivery of such financial statements. Funding of the debt reserve account shall occur after any tax distribution is declared to the Reorganized Debtor's unit holders but before any other excess cash flow payment or excess distribution is allowed under the amended and restated AgStar Credit Agreements.

(10) **Payment of AgStar Professional Fees**. On the Effective Date or at a later time if agreed upon by the Reorganized Debtor and AgStar, the Reorganized Debtor shall reimburse AgStar for all reasonable costs and expenses, including legal fees, consultant fees, appraisal fees, financial advisor fees, and other similar fees, costs and expenses in connection with the negotiation, documentation, execution, syndication and delivery of the amended loan documents and this Bankruptcy Case. AgStar may advance under the AgStar Credit Agreements an amount equal to such costs and expenses.

(11) **Consent to Treatment of Classes 4 and 5**. Notwithstanding any subordination rights or other rights AgStar may have pursuant to the Intercreditor Agreement or any other agreement, at law or in equity, AgStar shall be deemed to consent to the distributions to Classes 4 and 5 under this Plan and to waive any right to assert any right or claim, regardless of the source of such right or claim, to said distributions or any part thereof.

(12) **Continued Effectiveness of the Intercreditor Agreement as Between AgStar and NMF**. The Intercreditor Agreement shall remain effective as between AgStar and NMF following the Effective Date, except as amended through the mutual agreement of AgStar and NMF.

**(b)** **Class 2 – NMF Secured Claim**

Notwithstanding any provision to the contrary herein, upon entry of the Confirmation Order, the NMF secured claim shall be allowed in full in the aggregate amount of the NMF Secured Obligations, including principal of $19,175,000, plus any interest, attorneys' fees, and default charges that have accrued as of the Effective Date under the NMF Credit Agreements, and shall constitute an Allowed Claim for all purposes of this Plan and the Chapter 11 Case, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtor, the Reorganized Debtor, or any party in interest.

The NMF secured claim shall be reinstated as of the Effective Date, which shall include payment over time and payment in accordance with the terms and conditions of the NMF Credit

Agreements. On the Effective Date, the Debtor and NMF shall reaffirm, or amend and restate, the NMF Credit Agreements, in their entirety, unaltered except as provided below:

(1) **Amount of Outstanding Principal Balance:** As of the Effective Date, the aggregate principal balance owing under the NMF Credit Agreements shall be set at an amount equal to aggregate principal amount of the NMF secured claim. The principal balance of the NMF term loan shall be $14,480,500 and the principal balance of the NMF subordinated loan shall be $4,694,500.

(2) **Retention of Liens:** NMF shall retain the liens securing NMF's Allowed Claim and any future amounts advanced pursuant to the NMF Credit Agreements until full and final payment of such Allowed Claim and any additional amounts advanced under the NMF Credit Agreements. Upon such full and final payment, such liens shall be deemed null and void and shall be unenforceable for all purposes.

(3) **Exclusivity of Liens:** The Reorganized Debtor's assets shall be free from any and all subordinate mortgages, liens, and encumbrances, including any lessor's interest, except any other liens as may be accepted by AgStar and NMF.

(4) **Repayment of NMF Loans:** The NMF term loan and the NMF subordinated loan shall be repaid in the same manner as provided in the NMF Credit Agreements with the maturity and amortization unchanged by the Plan, but modified as follows:

(i) **Interest Rate:** The interest rate applicable to the NMF secured claim is modified from the interest rate under the NMF Credit Agreements. After the Effective Date, the interest rate applicable to the NMF term loan will be a variable rate equal to 150 basis points above the Wall Street Journal prime rate. Beginning on the February 28, 2014, the interest rate applicable to the NMF term loan will be a variable rate equal to 200 basis points above the Wall Street Journal prime rate. Under the Plan, NMF will receive payment of $67,140 per month, based on the present interest rate.

(ii) **Loan Covenants:** To the extent not amended or modified, the Detor's existing loan covenants with NMF will be reaffirmed. The working capital covenant shall be amended so that the Debtor shall maintain $7,500,000 of working capital at all times. Working capital means the current assets of the Debtor (including amounts held in any debt service reserve account maintained for the benefit of AgStar), less restricted cash (other than the amounts held in any debt service account for the benefit of AgStar), less current liabilities of the Debtor (including the current portion of long term liabilities of the Debtor but excluding the current portion of long term liabilities owing to NMF), each as determined in accordance with GAAP.

     **(iii)**     **Amendment of Credit Agreements:** The Reorganized Debtor shall execute and deliver to NMF an Amendment to the NMF Credit Agreements which will reflect the modifications set out in this Section.

     **(5)**     **Accrued Default Interest:** All default interest provided by the NMF Credit Agreements will be deferred until September 1, 2018. Provided that the Reorganized Debtor does not default in the performance of its obligations under the Plan and NMF Credit Documents, such default interest will be waived by NMF on September 1, 2018.

     **(6)**     **Debt Service Account:** The Reorganized Debtor will establish on the Effective Date of the Plan and thereafter maintain a segregated deposit account, identified as the NMF Debt Reserve Account, which shall at all times have a balance equal to at least six months of interest payable on the NMF loans, which is approximately $400,000. The Reorganized Debtor shall provide evidence of compliance with this covenant on a monthly basis. Default interest will become immediately due and payable if the Reorganized Debtor fails to adhere to this covenant. The Reorganized Debtor and the financial institution at which the deposit account is located will execute a Deposit Account Control Agreement in favor of NMF.

     **(7)**     **Payment of Accrued Regular Interest:** On the Effective Date of the Plan, the Reorganized Debtor will pay to NMF all accrued and unpaid interest, which was approximately $558,230.09 as of May 31, 2010.

     **(8)**     **Payment of NMF Professional Fees:** On the Effective Date or at a later date if agreed upon by the Reorganized Debtor and NMF, the Reorganized Debtor shall reimburse NMF for all reasonable costs and expenses, including legal fees, consultant fees, appraisal fees, financial advisor fees, and other similar fees, costs and expenses in connection with the negotiation, documentation, execution, syndication and delivery of the amended loan documents and this Bankruptcy Case. NMF may advance from the loans an amount equal to such costs and expenses.

     **(9)**     **Consent to Treatment of Classes 4 and 5**. Notwithstanding any subordination rights or other rights NMF may have pursuant to the Intercreditor Agreement or any other agreement, at law or in equity, NMF shall be deemed to consent to the distributions to Classes 4 and 5 under this Plan and to waive any right to assert any right or claim, regardless of the source of such right or claim, to said distributions or any part thereof.

     **(10)**     **Continued Effectiveness of the Intercreditor Agreement as Between AgStar and NMF**. The Intercreditor Agreement shall remain effective as between AgStar and NMF following the Effective Date, except as amended through the mutual agreement of AgStar and NMF.

(c)     **Class 3 - Caterpillar Financial Services Corporation**

Caterpillar Financial Services Corporation financed the Debtor's purchase of a wheel loader and a skid steer loader under Installment Sale Contracts (Security Agreements) dated as of March 28, 2008 and April 10, 2008, respectively (the "Installment Sale Contracts").

The amount owed under the wheel loader installment sale contract is $79,900.88, which is repayable in the amount of $2,468.18 per month. The amount owed under the skid steer loader installment sale contract is $22,256.27, which is repayable in the amount of $678.52 per month. Repayment of the Installment Sale Contracts began on May 10, 2008 and will continue for a term of 60 months, until April 2013.

The CAT Financial Secured Claim shall be reinstated as of the Effective Date, which shall include payment in accordance with the terms and conditions of the Installment Sale Contracts.

Notwithstanding any provision to the contrary herein, Caterpillar Financial Services Corporation shall retain the liens securing the CAT Financial Secured Claim and the Installment Sale Contracts as of the Effective Date, until full and final payment of the CAT Financial Secured Claim is made as provided herein, and upon such full and final payment, such liens shall be deemed null and void and shall be unenforceable for all purposes.

(d)     **Class 4 –Revenue Bond Claim**

Notwithstanding any provision to the contrary herein, upon entry of the Confirmation Order, the Revenue Bond Indenture Trustee, on behalf of the Revenue Bondholders, shall have an Allowed Claim in the amount of $20,000,000.00.

In full satisfaction of the Allowed Claim held by the Revenue Bond Indenture Trustee, the Reorganized Debtor will pay the Revenue Bond Indenture Trustee $6,500,000.00, which is 32.5% of its Allowed Claim, without any accrued interest, professional fees, or costs, on the Effective Date of the Plan.

The Debtor and Reorganized Debtor do not claim ownership over any funds deposited for the benefit of the Revenue Bondholders in a reserve fund or account held by the Revenue Bond Indenture Trustee pursuant to an agreement between Otter Tail County and the Revenue Bond Indenture Trustee; and no portion of the funds held in this interest reserve account may be used to satisfy the Reorganized Debtor's obligation to pay the Revenue Bond Indenture Trustee $6,500,000 on account of its Allowed Claim. The remaining balance of that interest reserve account is estimated to be $565,046.00 as of April 30, 2010, and may be withdrawn by the Revenue Bond Indenture Trustee at any time in accordance with the agreement between Otter Tail County and the Revenue Bond Indenture Trustee. For all purposes of this Plan, the payments to Revenue Bond Indenture Trustee of the $6,500,000 in cash and the balance of the interest reserve account in settlement of the Indenture Trustee's Allowed Claim shall not be subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtor, the Reorganized Debtor, or any party in interest.

Simultaneous with the Revenue Bond Indenture Trustee's receipt of the $6,500,000 indefeasible payment and interest-reserve and subject to Sections 2.03(e) and 3.03(g) hereof, the Revenue Bond Documents, including the Lease Agreement dated as of May 1, 2007, and the Guaranty Agreement dated as of May 1, 2007 shall be terminated and cancelled as of the Effective Date, and Debtor and Reorganized Debtor shall thereafter have no further obligations under the Lease or Guaranty. After the Effective Date and simultaneous with the Revenue Bond Indenture Trustee's receipt of the $6,500,000 indefeasible payment and interest reserve payment, the Revenue Bondholders and the Revenue Bond Indenture Trustee shall have no interest in any property of the Debtor or the Reorganized Debtor, including improvements and equipment used as the solid waste facility by reason of the Revenue Bond Documents.

Simultaneous with the indefeasible payment to the Revenue Bond Indenture Trustee of the $6,500,000 and interest-reserve, (i) the Mortgage, Security Agreement and Assignment of Rents and Leases dated May 1, 2007 granted by the Debtor to the Revenue Bond Indenture Trustee in the amount of $20,000,000, and recorded in the Office of the County Recorder in an for Otter Tail County as Document Number 1018511 shall be satisfied; (ii) all liens, security interests, rights, and obligations arising thereunder shall be extinguished; and the UCC Financing Statement filed as Filing Number 200716648665 shall be satisfied or otherwise extinguished. Upon the Debtor's request and expense, simultaneously with the $6,500,000 and interest-reserve referenced above being indefeasibly paid to the Revenue Bond Indenture Trustee, the Revenue Bond Indenture Trustee shall (i) file a satisfaction of such mortgage in the Office of the County Recorder in and for Otter Tail County (ii) file a release of the UCC Financing Statement in the Minnesota Secretary of State's Office; and (iii) deliver to the Debtor a bill of sale for all equipment and property described in the Lease Agreement. The Revenue Bond Indenture Trustee shall further execute or provide any other such documents as reasonably requested by the Senior Lenders.

The $6,500,000 and interest-reserve payment to the Revenue Bond Indenture Trustee shall not be subject to the Intercreditor Agreement or any subordination or sharing provisions contained therein or to any other agreements to which AgStar, NMF, Otter Tail County and/or Debtor, or any of them, are parties or to any other rights or claims of AgStar, NMF, Otter Tail County and/or Debtor, and simultaneous with the Revenue Bond Indenture Trustee's indefeasible receipt of the $6,500,000 payment and the interest-reserve referenced above, the Revenue Bond Indenture Trustee and Revenue Bondholders consent to and waive any rights under the Intercreditor Agreement to the distributions to Class 5 hereunder.

**(e)      Class 5 – Otter Tail County Claim**

Notwithstanding any provision to the contrary herein, upon entry of the confirmation order, Otter Tail County shall have an Allowed Claim in the amount of $6,010,000.00.

In full satisfaction of its Allowed Claim, the Reorganized Debtor shall grant to Otter Tail County on the Effective Date 4,500,000 membership units in the Reorganized Debtor valued at $0.50 per unit, for an equity interest worth an estimated $2,250,000.00, which would represent a 15.79% ownership interest in the Reorganized Debtor, and payment of 37.44% of its Allowed

Claim. Otter Tail County will be credited with a $2,250,000 capital account in connection with the issuance of the 4,500,000 membership units in the Reorganized Debtor. The membership units will be Class B units (or such other class of membership unites designated by the Reorganized Debtor as carrying the most governance and financial rights). Otter Tail County will also have the right to appoint one seat on the Debtor's Board of Governors, so long as it holds at least 4,500,000 Class B membership units of the Reorganized Debtor. The member control agreement of the Reorganized Debtor shall be in form and substance reasonably acceptable to Otter Tail County on the effective date of the Debtor's offering registration with the Minnesota Department of Commerce pursuant to the Debtor's efforts to raise new equity as described in Section 3.03(b) of this Plan.

The Debtor and Reorganized Debtor do not claim ownership over any funds deposited for the benefit of Otter Tail County in a reserve fund or account pursuant to an agreement between Otter Tail County and the Revenue Bond Indenture Trustee; and no portion of the funds held in this interest reserve account may be used to satisfy the Reorganized Debtor's obligation to grant to Otter Tail County 4,500,000 membership units in the Reorganized Debtor on the Effective Date. The remaining balance of that interest reserve account is estimated to be $601,708.33 as of April 30, 2010.

In consideration for the equity grant, and subject to fulfillment of the terms of Sections 2.03(d) and 3.03(g) hereof, the County Documents, including the Lease Agreement dated May 1, 2007, shall be terminated and cancelled as of the Effective Date, and the Debtor and the Reorganized Debtor will have no further obligations under the Lease. After the Effective Date and subject to fulfillment of the terms of Sections 2.03(d) and 3.03(g) hereof, Otter Tail County disclaims any interest in any property of the Debtor or the Reorganized Debtor, including improvements and equipment used as the solid waste facility.

After the Effective Date of the Plan and fulfillment of the terms of Section 2.03(d) hereof, (i) that certain Mortgage, Security Agreement and Assignment of Rents and Leases dated May 1, 2007 granted by Debtor to the Otter Tail County in the amount of $6,010,000, and recorded in the Office of the County Recorder in an for Otter Tail County as Document Number 1019565 shall be satisfied; and (ii) all liens, security interests, rights, and obligations arising there under shall be extinguished. Otter Tail County shall file a satisfaction of such mortgage in the Office of the County Recorder in and for Otter Tail County and deliver a bill of sale to the Debtor for all property and equipment described in the Lease Agreement. Otter Tail County shall further execute or provide any other such documents as reasonably requested by the Senior Lenders.

The distribution to Otter Tail County under the Plan shall not be subject to the Intercreditor Agreement or any subordination or sharing provision contained therein. Otter Tail County shall be deemed to consent to the distributions to Class 4 under this Plan and to waive any right to assert any right or claim, regardless of the basis for such right or claim, to said distributions.

**(f)**     **Class 6 – General Unsecured Claims**

Except to the extent that General Unsecured Claims have been paid prior to the Effective Date or agree to a different treatment, General Unsecured Claims shall be paid 32.5% of their respective Allowed Claims within 60 days after the Effective Date. Nothing precludes the Debtor or Reorganized Debtor from objecting to the validity or amount of any General Unsecured Claims filed.

**(g)**     **Class 7 – Rejection Damages Claims**

Except to the extent that rejection damages claimants have been paid prior to the Effective Date or agree to a different treatment, rejection damages claimants shall be paid 32.5% of their respective Allowed Claims within 60 days after the Effective Date. Nothing precludes the Debtor or Reorganized Debtor from objecting to the validity or amount of any rejection damages claims filed.

**(h)**     **Class 8 – Unsecured Convenience Claims**

Except to the extent that holders of unsecured convenience claims been paid prior to the Effective Date or agree to a different treatment, holders of unsecured convenience claims shall be paid in full their respective Allowed Claims within 60 days after the Effective Date. Nothing precludes the Debtor or Reorganized Debtor from objecting to the validity or amount of any unsecured convenience claims filed.

**(i)**     **Class 9 – Equity Interests**

The holders of equity interests shall neither receive any distribution nor retain any property under the Plan on account of such claims.

**Section 2.04**     **Acceptance or Rejection of the Plan**

**(a)**     **Classes Deemed to Accept the Plan**

Classes 3 and 8 are unimpaired under the Plan, and are deemed to accept the Plan.

**(b)**     **Acceptance by Impaired Classes**

Classes 1, 2, 4, 5, 6 and 7 are impaired under the Plan and thus the votes of holders of claims in such classes must vote on the Plan. An impaired class of claims has accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such class that have timely and properly voted to accept or reject the Plan.

**(c)  Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

To the extent that any impaired class votes to reject the Plan or is deemed to have rejected it, the Debtor may request confirmation of the Plan under Section 1129(b) of the Bankruptcy Code.

## ARTICLE III

### MEANS FOR IMPLEMENTATION OF THIS PLAN

**Section 3.01  Continued Existence of Debtor**

Except as otherwise stated below, the Debtor shall continue to exist as the Reorganized Debtor after the Effective Date in accordance with the laws of the State of Minnesota and under its Articles of Organization and its Operating and Member Control Agreement, each as in effect before the Effective Date, except to the extent such organizational documents may be amended pursuant to this Plan or otherwise. To the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

**Section 3.02  Revesting of Assets**

The property of Debtor's bankruptcy estate shall vest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all claims, encumbrances, Old Equity Interests, charges and liens, except as provided or contemplated in the Plan.

**Section 3.03  Funding of the Plan and Restructuring Transactions**

**(a) Funding of the Plan.**

The Reorganized Debtor will obtain the funds necessary for the payment of Allowed Claims that are to be paid in cash as provided in the Plan through new capital contributed by new investors, and cash on hand from Debtor's and Reorganized Debtor's operations.

**(b) Restructure of Debtor's Capital Structure**

The following described restructuring transactions are contemplated to strengthen Debtor's capital position and governance following Debtor's reorganization.

On the Effective Date, the equity capitalization of the Debtor will be reorganized. Old Equity Interests (Class A Units) will be cancelled in their entirety. Prior to the Confirmation Date, the Debtor will solicit at a minimum $12,000,000 of new cash investment to be 100% funded after the Confirmation Date but before the Effective Date. Part of this $12,000,000 will be provided by CHS Inc., which will provide a minimum of $2,000,000 up to a maximum of

$4,000,000. In addition, Otter Tail County will receive equity in the Reorganized Debtor in the amount of $2,250,000 in satisfaction of its Allowed Claim. As noted in Section 7.01, the complete funding of the new equity raise is a condition precedent to this Plan becoming effective, and the Effective Date will only occur after the full equity raise occurs.

On the Effective Date, Debtor will issue 28,500,000 new units of Class B and Class C units valued at $0.50 per unit. Class B and Class C units will be distributed pro rata consistent with the investment by each person and entity as a percentage of $14,250,000 of total equity in the Reorganized Debtor. New equity holders will have voting power equal to their percentage of total ownership, except on election of Governors for the Board of Governors of the Reorganized Debtor. New equity members that make an investment for more than $10,000 will receive Class B units, which may vote for three Governors. New equity members that make an investment of less than $10,000 will be Class C units and will vote for two Governors.

After the Debtor receives approval of its Disclosure Statement it will publicly solicit commitments to invest, conditional only upon the proposed plan becoming confirmed and effective. Prior to confirmation, prospective investors will be required to make a refundable deposit of 10% of their proposed investment amount into an escrow account maintained at Bremer Bank. If the minimum cash investment of $12,000,000 is not met, the 10% refundable deposits will be returned to the investors. Upon making a 10% refundable deposit, each investor must also execute and deliver to the Debtor a subscription agreement which would obligate such investor to fully fund its commitment if the Debtor receives its required commitments of $12,000,000. The subscription agreement will provide that the Debtor or its Senior Lenders may have a claim against any investor that fails to fully fund its commitment, but such claim will only arise if the total level of unfunded commitments reaches $12,000,000. After confirmation of the Plan, but before the Plan becomes effective, investors will need to fully fund the remaining portion of their investment, which will remain fully refundable until the escrow is funded to $12,000,000.

**(c) Management of the Reorganized Debtor.**

Unless otherwise stated in the Plan, the Debtor's current Board of Governors shall serve for a period of thirty days after the Effective Date after which time the new equity members shall elect new members of the Board of Governors. After that time, the Reorganized Debtor will be governed by a Board of Governors consisting of five elected members and two appointed members. Class B members shall elect three members of the Board of Governors and Class C members shall elect two members of the Board of Governors. CHS will have the right to appoint one seat on the Board of Governors so long as it holds 4,000,000 Class B units. If CHS's membership interest falls below 4,000,000 Class B units, its appointed Governor shall cease to be a Governor and the vacancy will be filled by the Board's selection. Otter Tail County will also have the right to appoint one seat on the Board of Governors so long as it holds at least 4,500,000 Class B membership units. If Otter Tail County's membership interest falls below 4,500,000 Class B units, its appointed Governor shall cease to be a Governor and the vacancy will be filled by the Board's selection.

The members of the Debtor's existing management team shall maintain their current positions, including those also serving as executive officers, in the Reorganized Debtor.

**(d) New Service Agreement Provider**

In consideration of its investment in the Reorganized Debtor, within 30 days of the Effective Date, but after completion of the terms of Section 2.03(d) hereof, CHS Inc. (or a subsidiary) and the Reorganized Debtor will enter into exclusive service agreements, subject only to certain limited exceptions, pursuant to which CHS Inc. will provide the Reorganized Debtor with corn procurement, ethanol marketing, DDGS marketing, truck transportation, hedging, and insurance services. The terms and conditions of the agreements will be mutually agreed upon, however will be based upon market terms. The term of the agreements will last for so long as CHS Inc. has an equity investment of at least $2,000,000 in the Reorganized Debtor and for five (5) years thereafter.

**(e) Modification of Operating and Member Control Agreement.**

The Operating and Member Control Agreement governing Debtor will be amended and restated and will include terms and conditions mutually agreed upon among the new equity members. It will include, among other things, the provision for appointment of Governors, supermajority voting requirements to take certain action, and rights of first refusal by the Reorganized Debtor if a member proposes to transfer their interest in the Reorganized Debtor.

**(f) Issuance of New Equity Interests**

The issuance of new membership units by the Reorganized Debtor on the Effective Date is hereby authorized without further act by the Board of Governors or action under applicable law, regulation, order, or rule.

**(g) Cancellation of Claims and Certificates Representing Old Equity Interests.**

Except as otherwise provided in the Plan, after the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, the promissory notes, share certificates (including treasury stock), other instruments evidencing any claims or interests in or against the Debtor, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such interests shall be deemed automatically extinguished, canceled and of no further force and effect. The Revenue Bond Indenture shall remain in effect solely for the purpose of preserving the right of the Revenue Bond Indenture Trustee thereunder to pay expenses and make distributions in accordance therewith and to preserve all rights of the Revenue Bond Indenture Trustee and Revenue Bondholders thereunder relative to their respective rights and obligations with respect to each other, including any priority and lien rights against distributions to the holders of the Revenue Bonds. The Revenue Bond Indenture Trustee shall cause the Revenue Bonds to be canceled after the Effective Date and payment of expenses and distribution to holders of Revenue Bonds in accordance with the Revenue Bond Indenture.

**(h) Effectuating Documents and Further Transactions.**

On and after the Effective Date, the Reorganized Debtor, its Board of Governors and the officers of the Reorganized Debtor are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

**Section 3.04**        **Preservation, Assignment, Enforcement, and Settlement of Litigation Claims**

The Debtor and its bankruptcy estate shall retain any Litigation Claims. Entry of the Confirmation Order shall not constitute a waiver or release by the Debtor or its Estates of any cause of action except as expressly provided for by the Plan. On and after the Effective Date, the Reorganized Debtor shall be assigned all Litigations Claims. The Reorganized Debtor, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims, in accordance with the obligations of the Plan and the best interests of all of the beneficiaries of the Plan.

At any time after the Confirmation Date and before the Effective Date, the Debtor may settle any or all of the Litigation Claims with the approval of the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 9019. After the Effective Date, the Debtor may settle any and all Litigation Claims without the approval by the Bankruptcy Court.

**Section 3.05**        **Exemption from Transfer Taxes**

Pursuant to Section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax or other similar tax. The Confirmation Order shall direct the appropriate state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

# ARTICLE IV

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Section 4.01**          **Assumed Executory Contracts and Leases**

Executory contracts are those contracts as scheduled by Debtor in Schedule G of its Bankruptcy Petition and Schedule including the following parties: (1) Ag States Group; (2) Bilden Farms, LLC; (3) BP Canada Marketing Corp.; (4) CHS Inc.; (5) De-Lage Landen; (6) Delta-T Corporation; (7) Herc-U-Lift; (8) Lake Region Electrical Coop; (9) Lakes Area Network Solutions; (10) MN Special Liquids Inc.; (11) New Horizons Ag Services; (12) Renewal Products Marketing Group; (13) Willis Insurance; and (14) Trinity Industries Leasing Co.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts that exist between the Debtor and any entity shall be deemed assumed by the Debtor, as of the Effective Date except for any executory contract that (a) is not included in the list of executory contracts above; (b) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (c) as to which a motion for approval of the rejection of such executory contract has been filed and served prior to the Confirmation Date, or (d) that is specifically designated as a executory contract to be rejected as set forth in Schedule 4.01 attached to the Plan, and by this reference incorporated herein.

Debtor reserves the right, on or prior to the Confirmation Date, to amend Schedule 4.01 to delete any executory contract from or add any executory contract to, in which event such executory contract(s) shall be deemed to be, respectively, assumed or rejected. The Debtor shall provide notice of any amendments to Schedule 4.01 to the parties to the executory contracts affected thereby. The listing of a document on Schedule 4.01 shall not constitute an admission by the Debtor that such document is an executory contract.

**Section 4.02**          **Approval of Assumption or Rejection Executory Contracts**

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code, of the executory contract assumptions or rejections pursuant to Section 4.01 of the Plan.

**Section 4.03**          **Cure of Default for Assumed Executory Contracts.**

Subject to fulfillment of the terms of Sections 2.03 hereof, any monetary amounts by which any executory contract to be assumed under the Plan is in default shall be cured, under Section 365(b)(1) of the Bankruptcy Code, by the Debtor (a) on or before the Effective Date or (b) upon such other terms as may be mutually agreed upon between the Debtor and the entity that is party to the executory contract to be assumed; provided, however, if there is a dispute regarding: (a) the nature or amount of any cure; (b) the ability of the Reorganized Debtor or any

assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the executory contract to be assumed; or (c) any other matter pertaining to assumption, cure shall occur following the entry of a final order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

**Section 4.04**          **Bar to Rejection Damages**

If the rejection of an executory contract pursuant to Section 4.01 above gives rise to a claim for rejection damages by the other party or parties to such contract, such claim shall be forever barred and shall not be enforceable against the Debtor, its bankruptcy estate, or the Reorganized Debtor unless a Proof of Claim is Filed and served on the Debtor and counsel for the Debtor within thirty (30) days after the Confirmation Date.

**Section 4.05**          **Assumption of D & O Insurance**

All directors' and officers' liability insurance policies maintained by the Debtor are hereby assumed. Entry of the Confirmation Order shall constitute approval of such assumptions pursuant to Section 365(a) of the Bankruptcy Code. The Reorganized Debtor shall maintain for a period of not less than six (6) years from the Effective Date coverage for the individuals covered, as of the Petition Date, under policies on terms not substantially less favorable to such individuals than the terms provided for under the policies assumed pursuant to this Plan.

## ARTICLE V

## ALLOWED CLAIMS AND PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

**Section 5.01**          **Allowance and Disallowance of Claims and Interests**

The Debtor or Reorganized Debtor shall only make distributions on account of Allowed Claims. Subject to Section 2.03 hereof, a claim that is disputed by the Debtor as to its amount only shall be deemed allowed in the amount the Debtor admits owing and disputed as to the remainder. The Debtor intends to make distributions, as required by the Plan, in accordance with the Schedules, if any, and the books and records of the Debtor. Unless disputed by a holder of a claim or equity interest, the amount determined from the books and records of the Debtor shall constitute the amount of the Allowed Claim or Allowed Equity Interest of such holder.

**Section 5.02**          **Disputed Claims**

A claim or equity interest shall be deemed a disputed claim or a disputed equity interest to the extent: (i) any holder of a claim or equity interest advises the Debtor in writing that such holder disagrees with the Debtor's determination of the amount of such claim or equity interest; and (ii) the Debtor objects to the allowance of a claim or equity interest, or any portion thereof, with respect to which the Debtor disputes liability, priority, and/or amount, including, without

limitation, objections to claims or equity interests which have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.

The Debtor intends to attempt to resolve any such disputed claims consensually; provided, however, that the Debtor may, in its discretion, file with the Bankruptcy Court (or any other court of competent jurisdiction) an action relating to the allowance of any claim or equity interest, or any other appropriate motion or adversary proceeding with respect thereto. All objections, affirmative defenses, and counterclaims shall be litigated to a final order; provided, however, that the Debtor shall have the authority to file, compromise and settle, withdraw or resolve by any other method, without requirement of Bankruptcy Court approval, any objections to claims or equity interests. Unless otherwise ordered by the Bankruptcy Court, the Debtor shall file and serve all objections to claims and equity interests no later than the Claims Objection Deadline.

**Section 5.03**     **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with respect to all or any portion of a disputed claim unless and until all objections to such disputed claim have been settled or withdrawn or have been determined by a final order, and the disputed claim, or some portion thereof, has become an Allowed Claim.

**Section 5.04**     **Distributions After Allowance**

To the extent that a disputed claim ultimately becomes an Allowed Claim, a distribution shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan.

**Section 5.05**     **Alternative Treatment**

Notwithstanding any provision herein to the contrary, any holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it, the Debtor and the holder may agree to in writing; provided, however, that such other distribution or treatment shall not provide a return having a present value in excess of the present value of the distribution or treatment that otherwise would be given such holder pursuant to this Plan.

**Section 5.06**     **Post-Petition Interest**

Except as otherwise explicitly provided in the Plan, in Section 506(b) of the Bankruptcy Code, or by Final Order, no holder of a prepetition claim shall be entitled to or receive interest or fees relating to such claim.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

**Section 6.01**  **Distributions for Claims Allowed as of the Effective Date**

Distributions to be made in exchange for or on account of Allowed Claims as of the Effective Date shall be made as provided in Article II. All cash distributions shall be made by the Reorganized Debtor from available cash on hand from the Reorganized Debtor's operations, as the case may be.

**Section 6.02**  **Disbursing Agent**

The Reorganized Debtor shall make all distributions required under the Plan, except with respect to a holder of a claim whose distribution is governed by an indenture or other agreement and is administered by an indenture trustee, agent, or servicer, which distributions shall be delivered to the holders of such Allowed Claims at the direction of the appropriate indenture trustee, agent, or servicer in accordance with the provisions hereof and the terms of the relevant indenture or other governing agreement.

**Section 6.03**  **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**(a) Delivery of Distributions in General**

Distributions to holders of Allowed Claims shall be made at the addresses set forth in the Schedules unless such addresses are superseded by proofs of claim or transfers of claims filed pursuant to Bankruptcy Rule 3001 (or at the last known addresses of such holders if the Debtors or the Reorganized Debtor has been notified in writing of a change of address). The distribution to Class 4 shall be made to the Revenue Bond Indenture Trustee.

**(b) Holding and Investment of Undeliverable and Unclaimed Distributions.**

If the distribution to any holder of an Allowed Claim is returned to the Reorganized Debtor as undeliverable or is otherwise unclaimed, no further distributions shall be made to such holder unless and until the Reorganized Debtor is notified in writing of such Holder's then-current address. Undeliverable and unclaimed distributions shall be deposited in a segregated account, designated as an "unclaimed distribution reserve" (the "Unclaimed Distribution Reserve"), for the benefit of all such similarly situated persons until such time as a distribution becomes deliverable or is claimed. The account for the Unclaimed Distribution Reserve may be an interest-bearing account, provided that any interest accruing on funds in the Unclaimed Distribution Reserve shall be transferred to the Reorganized Debtor for distribution in accordance with the terms of the Plan.

### (c)  Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within six months after the applicable date of distribution shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined, notwithstanding any federal or state escheat laws to the contrary, from asserting any such claim for an undeliverable or unclaimed distribution against the Debtor, its Estate, the Reorganized Debtor, or its property. In such cases, any cash in the Unclaimed Distribution Reserve, for distribution on account of such claims for undeliverable or unclaimed distributions shall revest in the Reorganized Debtor. This provisions shall not apply to Class 4 distributions.

### Section 6.04  Record Date for Distributions

The Reorganized Debtor will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Effective Date, and will be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims who are holders of such claims, or participants therein, as of the Effective Date. The Reorganized Debtor shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register or the transfer books and records as maintained by its agents, as the case may be, as of the Effective Date. Distributions by the Revenue Bond Indenture Trustee to the holders of Revenue Bonds shall be made in accordance with the Revenue Bond Indenture.

### Section 6.05  Means of Cash Payment

Payments of cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtor, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Reorganized Debtor. Checks issued by the Reorganized Debtor shall be null and void if not negotiated within ninety days after issuance, at which time the distribution shall revest to the Debtor. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### Section 6.06  Withholding and Reporting Requirements

In connection with the Plan and all distributions there under the Reorganized Debtor is authorized to take any and all actions that may be necessary or appropriate to comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

**Section 6.07**          **Setoffs**

The Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any claim and the payments or other distributions to be made pursuant to the Plan in respect of such claim, or claims of any nature whatsoever that the Debtor or Reorganized Debtor may have against the holder of such claim (except to the extent that such claims have been waived by the Debtor in the Plan or otherwise).  In no event shall any holder of claims or interests be entitled to setoff any claim or interest against any claim, right, or cause of action of the Reorganized Debtor, unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Effective Date.

**Section 6.08**          **Fractional Dollars; De Minimis Distributions**

Notwithstanding any other provision of the Plan the Reorganized Debtor shall not be required to make distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

## ARTICLE VII

## CONFIRMATION AND CONSUMMATION OF THE PLAN

**Section 7.01**          **Conditions to Effective Date of the Plan**

The following are conditions precedent to the occurrence of the Effective Date of the Plan, each of which must be satisfied or waived in accordance with Article 7.03 below:

**(a)**     The Confirmation Order shall have been entered by the Bankruptcy Court.

**(b)**     The Confirmation Order shall have become a Final Order.

**(c)**     All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained.

**(d)**     New equity members must have completed payment of new equity contributions in an amount not less than $12,000,000.

**(e)**     The Debtor shall have executed and delivered all documents necessary to effectuate the issuance of the new equity membership interests and cancel the Old Equity Interests.

**(f)**     All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed.

**(g)**     No stay of the consummation of this Plan shall be in effect.

**(h)** The Revenue Bond Indenture Trustee shall have received the $6,500,000 cash payment required by the Plan on the Effective Date for Class 4.

**(i)** The execution and delivery of all documents required as of the Effective Date from the Revenue Bond Indenture Trustee and Otter Tail County as well as the amended and restated AgStar and NMF credit agreements.

**Section 7.02**        **Effect of Failure of Conditions.**

In the event that one or more of the conditions specified in Article 7.01 hereof shall not have occurred or been waived pursuant to Article 7.03 on or before 14 days after the Confirmation Date, (a) the Debtor will file a notice with the Bankruptcy Court indicating that its equity raise failed and that the Debtor will move for permission to conduct a Section 363 sale auction of its assets based upon sales procedures, filed with the motion, acceptable to AgStar and NMF; (b) no distributions under this Plan shall be made, (c) the Debtor and holders of claims and equity interests shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Order had never been entered, and (d) the Debtor's obligations with respect to claims and equity interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any claims or equity interests by or against the Debtor or any person or governmental entity or to prejudice in any manner the rights of the Debtor or any person or governmental entity in any other or further proceedings involving the Debtor.

**Section 7.03**        **Waiver of Conditions**

Each of the conditions set forth in Article 7.01 above, other than as set forth in Article 7.01 (a), (b) (c), (d), (e), (h) and (i) may be waived in whole or in part by the Debtor without any other notice to parties in interest or the Bankruptcy Court and without hearing.

## ARTICLE VIII

### EFFECT OF PLAN CONFIRMATION

**Section 8.01**        **Binding Effect**

The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of claims and interests in and against the Debtor, and their respective successors and assigns, including, but not limited to, the Reorganized Debtor.

**Section 8.02**        **Discharge of Claims and Termination of Claims and Equity Interests**

Except as otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the distributions to be made hereunder shall be in exchange for and in complete satisfaction, discharge, and release of all existing debts and claims, and shall terminate all equity interests, of any kind, nature, or description whatsoever, including any interest accrued on such claims from and after the Petition Date, against or in the Debtor or any of its assets or properties to the fullest extent permitted by Section 1141 of the Bankruptcy Code.

**Section 8.03**　　　　　**Permanent Injunction**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or such other order of the Bankruptcy Court that may be applicable, all persons or entities who have held, hold, or may hold claims or other debt or liability that is discharged or equity interests or other right of equity interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such claim or other debt or liability or equity interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtor, the Debtor in Possession, the Reorganized Debtor, the Debtor's Estate, or properties or interests in properties of the Debtor or the Reorganized Debtor, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtor, the Debtor in Possession, the Reorganized Debtor, the Debtor's estate or properties, or interests in properties of the Debtor, the Debtor in Possession, or the Reorganized Debtor, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor, the Debtor in Possession, the Reorganized Debtor, the Debtor's Estate or properties, or interests in properties of the Debtor, the Debtor in Possession, or the Reorganized Debtor, (d) except to the extent provided, permitted, or preserved by Sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor, the Debtor in Possession, the Reorganized Debtor, the Debtor's estate or properties, or interests in properties of the Debtor, the Debtor in Possession, or the Reorganized Debtor, with respect to any such claim or other debt or liability that is discharged or equity interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, and (e) taking any actions to interfere with the implementation or consummation of the Plan; provided, however, that such injunction shall not preclude the United States of America, any State, or any of their respective police or regulatory agencies from enforcing their police or regulatory powers; and, provided, further, that except in connection with a properly filed proof of claim, the foregoing proviso does not permit the United States of America, any state, or any of their respective police or regulatory agencies from obtaining any monetary recovery from the Debtor, the Debtor in Possession, the Reorganized Debtor, or their respective property or interests in property with respect to any such claim or other debt or liability that is discharged or equity interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power. Such injunction shall extend to all successors of the Debtor, the Debtor in Possession, and their respective properties and interests in property.

**Section 8.04**　　　　　**Term of Bankruptcy Injunction or Stays**

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date or the date indicated in the Confirmation Order.

**Section 8.05**          **Release of Avoidance Actions**

The Debtor and its estate shall, on the Effective Date, be deemed to have released from any and all claims for Avoidance Actions, if any, that the Debtor or the Reorganized Debtor may have against AgStar, NMF, Otter Tail County, the Revenue Bond Indenture Trustee, and the holders of the Revenue Bonds as of the Effective Date.

## ARTICLE IX

## RETENTION OF JURISDICTION

**Section 9.01**          **Retention of Jurisdiction**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to Debtor's bankruptcy and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(i)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any claim or interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of claims or interests;

(ii)    Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or the Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any claims arising therefrom;

(iii)   Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(iv)    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(v)     Approve such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(vi)    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(vii) Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(viii) Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331 and 503(b) of the Bankruptcy Code, provided, however, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtor, including counsel fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(ix) Issue injunctions, approve and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(x) Hear and determine the causes of action by or on behalf of the Debtor or the Reorganized Debtor, including causes of action relating to the Litigation Claims, including avoidance actions under sections 544, 545, 547, 548, 549 and 553 of the Bankruptcy Code and turnover actions under sections 542 and 543 of the Bankruptcy Code;

(xi) Hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xii) Approve and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

(xiii) Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(xiv) Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case;

(xv) Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(xvi) Approve an order closing the Chapter 11 Cases.

# ARTICLE X

## MISCELLANEOUS PROVISIONS

**Section 10.01**          **Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C.§ 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date. The Debtor and the Reorganized Debtor shall remain liable for any quarterly fees validly due and owing to the United States Trustee under 28 U.S.C. § 1930 after the Effective but before the closing of the Chapter 11 case Shall be paid by the Reorganized Debtor.  Debtor will, after confirmation of this Plan, continue to provide the U.S. Trustee with sworn disbursement reports until such time as the case is closed.

**Section 10.02**          **Amendment or Modification of the Plan**

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtor may alter, amend or modify the Plan at any time prior to or after the Confirmation Date but prior to the Effective Date. A holder of a claim or interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the claim or interest of such holder.  The Debtor reserves the right to amend any exhibits or schedules to this Plan, whereupon each such amended exhibit or schedule shall be deemed substituted for the original of such exhibit. The Debtor shall provide notice of any amendments to any exhibit or schedule to the parties affected thereby. After the Confirmation Date, the Debtor or Reorganized Debtor may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies within or among this Plan, the Disclosure Statement, and the Confirmation Order, and to accomplish such matters as may be reasonably necessary to carry out the purposes and intent hereof. A holder of a claim or equity interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment, modification or remedy does not materially and adversely affect the treatment of the claim or equity interest of such holder hereunder.

**Section 10.03**          **Severability of Plan Provisions**

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**Section 10.04**             **Successors and Assigns**

The Plan shall be binding upon and inure to the benefit of the Debtor, and its respective successors and assigns, including, without limitation, the Reorganized Debtor. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity.

**Section 10.05**             **Revocation, Withdrawal or Non-Consummation**

The Debtor reserves the right to revoke or withdraw the Plan as to the Debtor prior to the Confirmation Date and to file subsequent plans of reorganization, unless such revocation is not allowed by those holders of claims and interests that have consented to this Plan prior to Debtor's filing. If those holders do not consent to revocation of this Plan, Debtor must seek confirmation of this Plan. If the Debtor revokes or withdraws the Plan as to any or all of the Debtor, or if confirmation or consummation of the Plan does not occur, then, with respect to such Debtor, (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person, or (iii) constitute an admission of any sort by the Debtor or any other Person.

**Section 10.06**             **Notice**

All notices, requests and demands to or upon the Debtor, or the Reorganized Debtor to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows (or at such other address for such entity as shall be specified by like notice):

    **(a) Debtor**

Otter Tail Ag Enterprises, LLC
24096 170th Avenue
Fergus Falls, MN 56537-7518
Attn: Anthony J. Hicks, CEO
Telephone: (218) 998-4301
Facsimile: (218) 998-4302
with a required copy to:

MACKALL CROUSE & MOORE, P.L.C.
ATTN: Timothy D. Moratzka
901 Marquette Avenue, Suite 1400 Minneapolis, MN 55402 Telephone: 612-305-1400
Facsimile: 612-305-1414
E-mail: tdm@mcmlaw.com

## SECTION 10.07     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Minnesota shall govern (a) the construction and implementation hereof and any agreements, documents, and instruments executed in connection with this Plan and (b) partnership or other governance matters with respect to such Debtor, in either case without giving effect to the principles of conflicts of law thereof.

## SECTION 10.08     Section 1125(e) of the Bankruptcy Code

As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances hereof in good faith and in compliance with the Bankruptcy Code. As of the Confirmation Date, the Debtor, the consenting holders, and each of their respective affiliates, agents, directors, managing partners, managers, officers, employees, investment bankers, financial advisors, attorneys, and other professionals shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and therefore are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for the violation of any law, rule or regulation governing the solicitation of acceptances or rejections hereof, or the distribution or dissemination of any information contained in the Plan, the Disclosure Statement, the Plan Supplement, and any and all related documents.

Dated: June 11, 2010                    MACKALL, CROUSE & MOORE, PLC


                                        By: /e/ Timothy D. Moratzka
                                        Timothy D. Moratzka (Atty No. 75036)
                                        Mychal A. Bruggeman (Atty No 0345489)
                                        1400 AT&T Tower
                                        901 Marquette Ave
                                        Minneapolis, Minnesota  55402
                                        (612) 305-1400

## CERTIFICATE OF SERVICE

On June 11, 2010, this document was served on parties who receive electronic notice through CM/ECF.

By: /e/ Timothy D. Moratzka
Timothy D. Moratzka (Atty No. 75036)

<u>**SCHEDULE 4.01**</u>
<u>**Schedule of Rejected / Modified Executory Contracts**</u>

<u>**Rejected Contracts**</u>

1.      **Ethanol Marketing Agreement with Renewal Products Marketing Group.**
This executory contract will be replaced by a new ethanol marketing agreement with CHS Inc.

<u>**Modified Contracts**</u>

1.      **Natural Gas Procurement Contract with BP Canada Energy Marketing Corp.**  Debtor renegotiated its Contract with BP Canada as part of this Bankruptcy.  The terms require Debtor to provide adequate protection in the form of a security deposit in the initial amount of $775,000 made directly with BP Canada.  In addition, Debtor must pay an additional $20,000 per week for the first ten weeks after the Bankruptcy Court approves the contract modification for a total of $200,000 of additional security.  As BP Canada's mark-to-market exposure on this contract reduces over time, it must return these deposits to Debtor.

1254857.1-MAB

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: Otter Tail Ag Enterprises, LLC,<br><br>Debtor. | Case No. 09-61250-DDO<br>Chapter 11 |

## SIGNATURE DECLARATION

I, Anthony Hicks, declare under penalty of perjury that I am the Chief Executive Officer of Otter Tail Ag Enterprises, LLC ("OTAE"), make the following declarations under penalty of perjury:

- The information that I have given my attorney in the electronically filed Debtor's Proposed Chapter 11 Plan of Reorganization (Second Amended) is true and correct.

Dated: June 11, 2010

OTTERTAIL AG ENTERPRISES, LLC

By _____
Anthony Hicks
Chief Executive Officer

Dated: June 11, 2010

MACKALL, CROUNSE & MOORE, PLC

By: /e/ Timothy D. Moratzka
Timothy D. Moratzka (Atty No. 75036)
Mychal A. Bruggeman (Atty No 0345489)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, Minnesota 55402
(612) 305-1400

**ATTORNEYS FOR DEBTOR**

1255065.1-MAB