UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

---

In re:                                                    Case No. 09-61250

Otter Tail Ag Enterprises, LLC,
                                                          Chapter 11
        Debtor.

---

**NOTICE OF MOTION AND MOTION FOR ORDERS (I) APPROVING FORM OF ASSET PURCHASE AGREEMENT AND DESIGNATING STALKING HORSE BID; (II) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (III) APPROVING BIDDING AND AUCTION PROCEDURES; (IV) AUTHORIZING DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (V) APPROVING THE SOLID WASTE AGREEMENT RELATING TO THE SALE OF DEBTOR'S SOLID WASTE FACILITIES (ON AN <u>EXPEDITED</u> BASIS); (VI) AUTHORIZING ASSUMPTION AND ASSIGNMENT OR REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS (VII) APPROVING FORM OF NOTICE OF SALE; AND (VIII) SETTING ADDITIONAL HEARING**

---

TO: The Parties in Interest as Specified in Local Rule 9013-3(a)(2).

1.      The above-referenced Debtor moves the Court for the relief requested below and give notice of hearings. Debtors request that the Court enter the proposed Orders : (I) Approving Form of Asset Purchase Agreement and Designating Stalking Horse Bid; (II) Approving Break-Up Fee and Expense Reimbursement; (III) Approving Bidding and Auction Procedures (IV) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (V) Expedited Approval the Solid Waste Agreement relating to the sale of the Debtor's Solid Waste Facilities (on an expedited basis); (VI) Authorizing Assumption  and Assignment or Rejection of Unexpired Leases and Executory Contracts; (VII)  Approving Form and Notice of Sale; and (VIII) Scheduling Further Sale Hearing (the "Sale Motion").

2.      The Court will hold a hearing (the "<u>Sale Procedures Hearing</u>") with respect to items (I), (II), (III), (V), (VII), and (VIII) of this Sale Motion at 11:30 a.m. on January 27, 2011, in

Courtroom No. 2B, United States Courthouse, 316 North Robert Street, St. Paul, Minnesota,

with respect to items in the caption of this motion. In addition, it is anticipated that the Court

will hold a further hearing (the "Sale Approval Hearing") with respect to items (iv) and (vi) of

this Sale Motion at 1:30 p.m. on February 17, 2011 at the same location.

3.      Local Rule 9006-1(b), in coordination with Bankruptcy Rule 9006, provides

deadlines for responses to this Sale Motion. Any response to the relief sought at the Sale

Procedures Hearing must be filed and served by delivery or by mail not later than January 21,

2011, which is the last business day at least five days before the time set for the hearing. Any

response to the relief sought at the Sale Approval Hearing must be filed and served by delivery

or by mail not later than February 11, 2011, which is the last business day at least five days

before the time set for the hearing. **UNLESS A RESPONSE OPPOSING THE SALE
MOTION IS TIMELY FILED, THE COURT MAY GRANT THE SALE MOTION
WITHOUT A HEARING.**

4.      The Debtor believes that the relief requested at the Sales Procedures Hearing (Items

I, II, III, V, VII, and VIII) scheduled on January 27, 2011 may be requested by motion on 14 days

notice under Local Rule 9006-1, except that approval of (V) the Solid Waste Agreement relating to

the sale of the Debtor's Solid Waste Facilities, is a motion under Bankruptcy Rule 9019, which

by operation of Bankruptcy Rule 2002(a)(3) requires 21 days notice. This motion, served on

January 7, 2011, was served on 20 days notice. Because of the need to promptly complete the

sale and the limited hearing dates, Debtor requests for item (V) of this motion to be heard on an

expedited basis.

5.      This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157

and 1334, Fed. R. Bankr. P. 5005 and Local Rules 1070-1 and 1073-1. This is a core

2

proceeding. The petition commencing the above-captioned chapter 11 cases was filed on October 30, 2009 (the "Filing Date"). The case is now pending in this Court.

6.     The relief sought in this Sale Motion is based upon 11 U.S.C. § 105(a), § 363, § 363(b), § 363(f), § 363(m), § 365, § 365(a), § 365(b), § 365(f), § 365(g), § 503, § 507, § 541, and § 554(a) and Fed. R. Bankr. P. 2002(a)(2) 6004, 6004(h), 6006, 6006(d) and 9019. Debtor proposes to sell substantially all of its assets (except for cash, cash equivalents, and accounts receivable and certain other excluded assets) and to assign related unexpired leases and executory contracts to the highest and best bidder determined in accordance with the Bidding Procedures (defined below) and approved by the Court.

7.     The Asset Purchase Agreement with the Stalking Horse (as defined below) is an important step to achieve the ultimate goal of the chapter 11 process — maximizing value available to stakeholders, by selling the assets of the Debtor for their going concern value. To that end, the Debtor seeks this Court's approval of the proposed sale Stalking Horse transaction and related bidding procedures to enable the Debtor with the assistance of a qualified investment banker and financial advisory, Carl Marks Advisory Group, LLC, to solicit competing offers for substantially all of its assets and if appropriate conduct and auction therefore.  To secure the benefits of the Stalking Horse Bid and to maximize the Debtor's chances of success in a competitive bidding process, it is imperative that the Sale Motion be approved and implemented expeditiously.

## BACKGROUND

6.     On the Filing Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

7.     The Debtor has continued in possession of its ethanol plant located in Fergus Falls, MN, and the management of its ethanol production business as a debtor-in-possession

3

pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

## A.    Debtor's Operations and Reasons for Bankruptcy

8.    The Debtor is a Minnesota Limited Liability Company, which was formed on January 27, 2005. Debtor owns and operates an ethanol production facility in Otter Tail County, Minnesota, just outside the city of Fergus Falls. The Debtor began producing ethanol and distillers grains in May 2008. The plant has a nameplate ethanol production capacity of 55 million gallons per year. Ethanol is blended with gasoline as a motor vehicle fuel that is sold to consumers in the United States. In addition, using certain solid waste facilities at its plant, the Debtor also produces marketable distillers grains from the residual mash left over from the fermentation and distillation processes. When operating at full capacity, the plant employs over 33 full time employees. The plant, which is also the site of Debtor's business office, is located at 24096 170th Avenue, Fergus Falls, MN 56537-7518.

9.    As of November 30, 2010, the Debtor had cumulative obligations to its lenders in the aggregate amount of $82,790,792 arising from prepetition secured loan transactions described below. There are approximately $300,000 of prepetition claims relating to trade indebtedness that remain unpaid at this time.

10.    The Debtor's bankruptcy primarily resulted from instable commodity markets. During the summer of 2008, the industry experienced record corn prices, which in the Debtor's case caused significant losses in its first year of operations. To mitigate the rising corn costs and secure product for fiscal year 2009, the Debtor executed a number of forward purchase contracts to lock-in its future corn prices. The global financial crisis that began in 2008 led to a steep reduction in commodity prices (including ethanol and corn), leaving a shortfall between the market price of corn and the amounts that the Debtor contracted to purchase the corn. The market negatively impacted not only the Debtor's input costs, but also its output prices, as the

4

price of ethanol steeply declined as the global financial crisis slowed demand. This gave rise to a

situation whereby the Debtor had supply commitments that it was required to honor but could

not obtain the required sales to prevent a significant loss.

### B.    Debtor's Secured Debt Structure.

11.    The Debtor's largest secured creditor is AgStar Financial Services, PCA

("AgStar").  The aggregate outstanding principal balance of the Construction Term Loan and the

Fixed Rate Loan totals $31,656,137.  In addition, the Debtor is obligated to AgStar for post-

petition default interest and attorneys' fees pursuant to Section 506(b) and various Cash

Collateral orders entered throughout the case.  As of the date hereof, the total claim by AgStar is

estimated to exceed $34,189,310, which the Debtor acknowledges is an allowed secured claim.

12.    In March 2007, Debtor entered into the agreement with MMCDC New Markets

Fund II, LLC ("NMF") to borrow an additional $19,175,000.  The NMF loan is divided into two

portions: a term loan with an outstanding balance of $14,480,500 (the "Term Loan") and

subordinated note with an outstanding balance of $4,694,500 (the "Subordinated Note").  AgStar

is the administrative agent of the NMF loans.

13.    Debtor also financed the construction of its processing plant and acquisition of its

equipment through bonds issued by Otter Tail County.  Pursuant to a certain Trust Indenture

between Otter Tail County and U.S. Bank, National Association, as Indenture Trustee, dated as

of May 1, 2007, the County issued Subordinate Exempt Facility Revenue Bonds Series 2007A,

in the aggregate principal balance of $20,000,000, the proceeds from the sale of which were used

to finance the acquisition and installation of certain equipment comprising a solid waste disposal

facility at the Plant and other permitted purposes.  In April 2007, Debtor entered into a long-term

lease agreement with the County for the equipment comprising the solid waste disposal facility

(the "Solid Waste Facilities"). Certain rights in this lease were assigned to U.S. Bank as Indenture Trustee. In addition, the Debtor guaranteed payment of the Bonds and granted a mortgage on its plant and equipment to the Bond Trustee and the County as collateral therefore.

14.    The County further financed the construction of Debtor's Plant through issue of General Obligation Tax Abatement Bonds Series 2007B in the aggregate principal balance of $5,245,000, and Taxable General Obligation Tax Abatement Bonds Series 2007C in the aggregate principal balance of $765,000.

15.    The following mortgages are filed against the Debtor's Real Property:

| Recording Date | Mortgagee | Amount | Recording Number (Otter Tail County Recorder) |
|---|---|---|---|
| March 30, 2007 | AgStar Financial Services, PCA | $39,000,000 | Doc. No. 1016602 |
| March 30, 2007 | MMCDC New Market's Fund II, LLC | $14,480,500 | Doc. No. 1016603 |
| May 3, 2007 | U.S. Bank National Association, | $20,000,000 | Doc. No. 1018511 |
| May 22, 2007 | Otter Tail County | $6,010,000 | Doc. No. 1019565 |
| June 27, 2008 | AgStar Financial Services, PCA | $41,000,000 (Amended and Restated from Doc. No. 1016602) | Doc. No. 1041045 |

16.    The following security interests over Debtor's personal property, including buildings, structures, equipment, fixtures, improvements, building supplies, materials, and, in the case of AgStar, deposit accounts, cash collateral, accounts and inventory, have also been filed at the Minnesota Secretary of State's Office:

| Filing Date | Lender | Filing Number |
|---|---|---|
| March 30, 2007 | AgStar Financial Services, PCA | 200716138783 |
| March 30, 2007 | MMCDC New Market's Fund II, LLC | 200716249828 |
| May 4, 2007 | U.S. Bank National Association, | 200716648665 |

17.    AgStar, NMF, U.S. Bank, and Otter Tail County have also executed an Intercreditor Agreement and an Amended and Restated Intercreditor Agreement (collectively the "ICA").

18.    The ICA establishes AgStar and NMF's priority over U.S. Bank and Otter Tail County with respect to any collateral held by the bonds.  The ICA also provides that the indebtedness of AgStar and NMF are prior in right to payment to the Debtor's respective obligations to U.S. Bank as Indenture Trustee, the holders of the Bonds, and Otter Tail County. That Agreement also contemplates that U.S. Bank and Otter Tail County would be paid proportionally after payment or satisfaction of the senior debt obligations to AgStar and NMF.

### C.    Debtor's Activities while in Chapter 11.

19.    The Debtor initially proposed a plan of reorganization on February 25, 2010, which was further amended by subsequent plans, the last being filed on June 11, 2010.  Between February and June, 2010, the Debtor undertook extensive negotiations with AgStar, NMF, U.S. Bank as Indenture Trustee, and Otter Tail County, which resulted in a consensual plan between those parties as filed on June 11, 2010.  The plan required AgStar and NMF to refinance the great majority of existing senior debt, for U.S. Bank as Indenture Trustee to receive $6.5 million as payment in full of the revenue bond debt, and for Otter Tail County to accept an equity stake in the reorganized Debtor.  The Debtor's proposed plan was contingent upon the Debtor raising at least $12 million of new equity for a reorganized entity.  The Debtor was ultimately unsuccessful in raising the required new equity by the deadline of mid-August, 2010 and the Debtor did not seek confirmation of the Plan.  After discussing various options in the wake of the failure of the first plan with its creditors, the Debtor decided to retain CMAG as a financial

advisor to pursue primarily a Section 363 sale strategy with the goal of making it consensual as among its creditors.

20.     During the bankruptcy case, the Debtor has reduced its debt to AgStar substantially by paying principal payments in connection with stipulations for the continued use of cash collateral, including a complete pay down of the Debtor's $6 million revolving line of credit.  The Debtor enjoyed positive cash flow during most of 2010, especially during the last half of the year.  Both of these developments have substantially improved the prospects for recovery by creditors.

## MARKETING AND SALE PROCESS

21.     The Debtor has been open and accommodating throughout the bankruptcy (and even prior to the bankruptcy) to consider all potential investors in the Debtor or potential purchasers of the Debtor's assets.  Prior to filing the bankruptcy, the Debtor received a number of inquiries from interested parties including: EcoSystem Corporation; Murphy Oil; Osage Energy; REX Stores; GRL Resources / Illinois River Energy; Bunge North America; Hawkeye Energy; and Millennium Capital Advisors (on behalf of an unknown buyer).  From among these parties, the only written proposal received by the Debtor came from EcoSystem Corporation, on or about September 14, 2009, before it retained CMAG.  The proposal provided for a recovery to U.S. Bank as Indenture Trustee and Otter Tail County of only $1.5 million.

22.     The EcoSystems' offer was not acceptable to the Debtor's creditor classes.

23.     After filing its Plan, the Debtor also received an inquiry from TPG Credit Management, L.P., which led to the Debtor permitting TPG to conduct substantial due diligence. TPG did not make a formal offer.

24.     Pursuant to Court order after failure of the proposed Plan, the Debtor engaged Carl Marks Advisory Group, LLC ("CMAG"), to help the Debtor determine how best to

8

maximize the value of its assets for the benefit of the estate and the Debtor's creditors. CMAG and the Debtor undertook an intensive effort to identify and seek out entities interested in purchasing the Debtor's businesses, facilitate potential buyers' due diligence, and assist in negotiating an asset purchase agreement. This included gathering financial, industry and corporate information, which were used to prepare an Offering Presentation dated October, 2010 ("Memorandum") to market the Debtor's business. In support of this motion, Christopher Wu, of CMAG, has prepared and filed an affidavit, which is attached.

25.    The Debtor and CMAG considered, as third-party purchasers; other ethanol producers; gasoline refiners; and other investor groups known by CMAG to have a potential interest in acquiring ethanol assets. CMAG identified potential buyers whose investment criteria and track record made them likely to pursue a transaction with the Debtors. Potential buyers were sent copies of the Memorandum upon execution of a confidentiality agreement. Copies of the Memorandum were received by twelve potential purchasers.

26.    Officers and employees of the Debtor and CMAG participated in due diligence conference calls and in-person meetings with approximately sixteen potential purchasers. CMAG contacted an additional five parties, but those calls did not materialize in active discussions.

27.    On or before January 5, 2011, six bids to purchase some or all of the Debtor's assets were submitted to CMAG. A description of these bids was provided to AgStar, NMF, and the Bondholders. CMAG subsequently entered into negotiations with several potential purchasers chosen by the Debtor with the advice of CMAG. The negotiations advanced to the point that the Stalking Horse became the focus.

28.    These marketing efforts are described in the accompanying Affidavit of Christopher Wu. As a result of these efforts, the Debtor believes there may be parties in addition to the Stalking Horse interested in pursuing a transaction with respect to the Debtor by becoming Qualified Bidders and participating in the Auction as contemplated by the Bidding Procedures.

## STALKING HORSE BID AND ASSET PURCHASE AGREEMENT

29.    The Debtor's and its professionals' efforts have culminated in an Asset Purchase Agreement ("APA"), which is attached to this Motion as **Exhibit A**, with OTAV LLC (the "Stalking Horse").[1]

30.    The Stalking Horse is a subsidiary of Green Plains Renewable Energy, Inc. ("GPRE"). The Stalking Horse is not an "insider" or "affiliate" (as defined in the Bankruptcy Code) and the APA is the result of vigorous arm's-length negotiations.   GPRE is North America's fourth largest ethanol producer, operating a total of eight ethanol plants in Indiana, Iowa, Michigan, Nebraska and Tennessee with annual expected operating capacity totaling approximately 657 million gallons. GPRE also markets and distributes ethanol for four third-party ethanol producers with annual expected operating capacity totaling approximately 360 million gallons. GPRE owns 51% of Blendstar, LLC, a biofuel terminal operator which operates nine blending or terminaling facilities with approximately 495 million gallons per year of total throughput capacity in seven states in the south central United States. GPRE operates grain storage facilities and complementary agronomy and petroleum businesses in Iowa, southern Minnesota and western Tennessee.

---

[1] This Sale Motion contains only a summary description of the terms of the APA. The parties are directed to the APA attached to the Sale Motion for a full recitation of its terms. To the extent there are inconsistencies between the APA and the terms set forth in this Sale Motion, the terms of the APA shall control. Capitalized terms not otherwise defined in the Sale Motion, shall have the meaning ascribed to them in the APA.

31.     The assets to be sold consist of the real property, buildings, process equipment, including the Solid Waste Facility, and other fixed assets of the Debtor's ethanol manufacturing plant. The purchased assets will also include input, product, and parts inventories.  As of November 30, 2010, Debtor's primary assets consisted of its ethanol plant, the process equipment, inventories of input commodities as well as manufactured product, a parts inventory, other personal property, cash, and accounts receivable summarized as follows:

| Assets | Estimated Value |
|---|---|
| Real Property | $9,000,000 |
| Plant and Equipment | $36,000,000 |
| Inventory (as of 11/30/2010) | $6,866,050 |
| Prepaid Accounts and Deposits (as of 11/30/2010) | $678,436 |
| Restricted Cash (BP security) (as of 11/30/2010) | $984,847 |
| Cash (as of 11/30/2010) | $6,629,485 |
| Accounts Receivable (as of 11/30/2010) | $4,224,835 |
| **Estimated Total Assets** | **$64,851,719** |
| **Current Available Assets** | **$19,851,719** |

32.     A summary terms of the APA is as follows:

(i)     **Purchase Price**:   (a) A base purchase price of  $55,000,000 comprised of assumed indebtedness and a cash payment, (b) payment for prepaid expenses at closing; and (c) payment for inventories.  The estimated total purchase price is $62,544,486. A partial source of the buyer's funds will be from financing from AgStar and a portion of the purchase price will include the assumption of the NMF indebtedness.

(ii)    **Purchase Assets**:  OTAV will purchase substantially all of the assets used in Debtor's business as it is currently conducted, including real property, buildings, fixtures, process equipment, the Solid Waste Facility, inventory, prepaid accounts and certain contracts and leases; a detailed description of the purchased assets is contain in Sections 2.1 and 2.4 of the APA.

(iii)   **Excluded Assets**:  Assets to be excluded from the sale are described in Section 2.3 of the APA and include cash and cash equivalents, certain accounts receivable, certain contracts and leases, and substantially all causes of action, including causes of

action arising in favor of Debtor or its estate under Chapter 5 of the
Bankruptcy Code.

(iv)    **Assumed Liabilities and Excluded Liabilities**:  OTAV assumes
only those liabilities described in Sections 2.4 and 2.5 of the APA,
which, in general, include liabilities under any contracts that are
assumed by Debtor and assigned to OTAV under the APA, as well
as liabilities for amount that must be paid under Section 365(b) of
the Bankruptcy Code in connection with the assumption and
assignment of such contracts.  Other than those liabilities expressly
assumed under the APA, OTAV assumes no liabilities of the
Debtor.

(v)    **Conditions to Closing**: The obligation of OTAV to close the sale
is conditioned upon the matters set forth in Article 6 of the APA,
which include (a) the execution of appropriate instruments of sale,
transfer, and assignment of the purchased assets and release and
discharge of any non-assumed liens or encumbrances against the
purchased assets; (b) entry of the Sale Approval Order (which will
include approval of assumption or rejection of executory
contracts), in form and substance reasonably acceptable to OTAV;
(c) receipt of all permits and licenses to conduct the seller's
business; (d) expiration of waiting period for consummation of
transactions under the HSR Act; and (e) execution of any loan
documents with NMF required to complete the transaction.
However, OTAV's obligation to close is not conditioned upon its
completion of any due diligence.

(vi)    **Closing Date**:  To be determined, subject to satisfaction or waiver
of conditions to closing; however, under Section 10.1 of the APA,
the parties may terminate the APA (subject to the conditions set
forth in that section) if OTAV is not the successful bidder at the
Auction, provided, however, that if it is the only back-up bidder
after the Auction, OTAV may not terminate the APA under
Section 10.1 until the earlier of 48 hours after the closing of an
Alternative Transaction or 30 days after entry of the Sale Order.
OTAV may terminate the APA (subject to the conditions set forth
in that section) if it is the successful bidder at the Auction and the
closing does not occur on or before April 15, 2011.

## BREAK-UP FEE AND EXPENSE REIMBURSEMENT

33.    The APA also provides a Break-Up Fee of $1,000,000 as described in Section 8.6

of the APA. The Break-Up Fee is payable to the Stalking Horse in the event a competing bid is

approved by the Bankruptcy Court on or before April 15, 2011; the Debtor withdraws its motion

12

for approval of the transaction contemplated in the APA; or Seller fails or refuses to close the transaction contemplated in the APA after receiving Court approval. The Break-Up Fee shall be deemed an allowed administrative expense claim in this chapter 11 case, which will have priority over all other expenses of the Debtor.

34.     The APA also provides an Expense Reimbursement of up to $100,000. The Expense Reimbursement is limited to certain documented out-of-pocket expenses incurred negotiating the APA and related documents, appearing and participating in the Bankruptcy Case, and participating in the Auction. As more specifically described in Section 8.6, the Expense Reimbursement is payable to the Stalking Horse under the same conditions in which the Break-Up Fee will become payable.

35.     The Debtor believes that the amount of the Break-Up Fee and Expense Reimbursement and the conditions under which they are payable to the Stalking Horse are reasonable under the circumstances. The Break-Up Fee is approximately 1.59% of the stated purchase price of the Stalking Horse Bid. Additional monetary value is also provided through the contemplated assumed liabilities, assumption of contracts and associated cure costs,  continued operation of the businesses and attendant preservation of the relationships with commodity suppliers, utility providers, product marketers, employees and other business partners.  The Break-Up Fee and Expense Reimbursement are also necessary to ensure that the Stalking Horse will continue to pursue its proposed acquisition of the Acquired Assets. Such continued participation allows for the maximization of value of the Debtor's estate by, among other things, establishing a bid standard and minimum bid for other bids and to attract additional bidders. The amounts of the Break-Up Fee and Expense Reimbursement are also commensurate with the substantial efforts that have been and will be expended by the Stalking Horse, the size of the

transaction, and benefits to the Debtor's estate. Finally, as described in the Affidavit of Christopher Wu, the Break-Up Fee and Expense Reimbursement are customary in both nature and amount.

36.     The Debtor seeks authority to sell the Acquired Assets to the Stalking Horse pursuant to section 363 of the Bankruptcy Code, subject to higher and better bids received through an auction ("Auction") and by a process described in the proposed Bidding Procedures. Because the Stalking Horse does not have any interest materially adverse to the Debtor or its estate, the Debtor submits that the Stalking Horse is entitled to the protections afforded a good faith buyer under section 363(m), as the APA is a product of good-faith, arm's-length negotiations. The Stalking Horse Bid (as defined in the Bidding Procedures) would be subject to any overbid at the Auction.

## PROPOSED BIDDING PROCEDURES AND AUCTION

37.     To maximize the value of the Debtor's assets, by this Sale Motion the Debtor requests authority to conduct the Auction for the Debtor's business operations and related properties and assets, including the Debtor's leases of personal property and executory contracts.

38.     The Debtor has determined, in the exercise of its sound business judgment, that the sale of its assets to the highest bidder at the Auction is appropriate and in the best interests of the Debtor's estate and creditors. The sale of the assets at the Auction will afford the Debtor's estate an opportunity to attempt to capture the substantial going concern value of the Debtor's business operations and maximize the recoveries for all constituents.

39.     The Debtor believes it is in the best interests of the Debtor and its estates to conduct the Auction in accordance with the procedures described in the Sale Motion and the Bidding Procedures attached as **Exhibit B** and substantially on the terms and conditions

14

described in the Stalking Horse APA. The Debtor has consulted with its creditors regarding the
proposed bidding procedures. Such Sales and Bidding Procedures are summarized as follows:[2]

(i)         **Qualified Bidder**

To participate in the sale process, conduct due diligence and be entitled to submit a bid, a
party must deliver to CMAG:

(a) A signed confidentiality agreement reasonably satisfactory to CMAG and the Debtor;
and

(b) A written acknowledgment that it agrees to all of the terms set forth in these Bidding
Procedures and agrees that the bid constitutes an irrevocable offer and is binding on
the Qualified Bidder until the earlier of 48 hours after the sale of the assets has closed
or thirty (30) days after the Sale Approval Hearing.

(c) Audited financial statements and/or written evidence of a financing commitment or
other evidence, satisfactory to CMAG, of the financial ability to close under its asset
purchase agreement within the deadline described above (provided, however, that the
closing of the sale shall not be contingent in any way on the Qualified Bidder's
financing).

A party who submits those documents and is determined by CMAG to be reasonably
likely to submit a Qualified Bid (as defined below) is a Qualified Bidder, but (other than
the Stalking Horse Bidder) only those Qualified Bidders who submit Qualified Bids in
accordance with these Bidding Procedures will be permitted to participate in the Auction.

(ii)         **Due Diligence**

Qualified Bidders may be offered the opportunity to conduct reasonable due diligence so
long as the sale process is ongoing until the Bid Deadline.

(iii)         **Bid Deadline**

The deadline for submission of Qualified Bids (as defined below) is February 11, 2011 at
3:00 p.m. CST or such later date to which the Bid Deadline may be extended by CMAG;
provided that such date shall be no later than February 14, 2011. The Qualified Bid must
be submitted to Carl Marks Advisory Group, LLC, 900 Third Avenue, 33rd Floor, New
York, NY 10022, Attn: Christopher Wu, cwu@carlmarks.com, (212) 752-9753 (fax); to
Mackall, Crounse & Moore, PLC, 901 Marquette Avenue, Suite 1400, Minneapolis, MN
55402, Attn: Timothy D. Moratzka, tdm@mcmlaw.com, (612) 305-1414 (fax), Mychal
A. Bruggeman, mab@mcmlaw.com, (612) 305-1414 (fax) and to Green Plains
Renewable Energy, Inc., 9420 Underwood Avenue, Suite 100, Omaha, Nebraska 68114,
Attn: Michelle Mapes, michelle.mapes@gpreinc.com, (402) 884-8776 (fax).

---

[2] Parties are encouraged to review the Bidding Procedures in full in Exhibit B.

**(iv)**         **Qualified Bid**

(a) To be eligible to participate at the Auction, a Qualified Bid:

(1) Must contain an executed confidentiality agreement;

(2) must be for all or substantially all of the Assets;

(3) must propose a purchase price for the Assets that (x) provides cash at closing, in a sum equal to the Cash Consideration provided for under the APA, plus (y) additional cash at closing in the amount of the Break-Up fee, plus (z) additional value, in the form of cash, Non-Cash Consideration, or a combination of the two, equal in value to the sum of $1,000,000, provided, however, that for the purposes of determining the aggregate value of a Qualified Bid, cash shall be valued at face value

(4) must include an executed assets purchase agreement in the form of the APA containing, with the exception of the requirement of an increased purchase price set forth above, substantially all of the terms and conditions contained in the APA, provided, however, (i) that a proposed Qualified Bid may not include any provisions for a break-up fee, expense reimbursement, or similar payment; and (ii) material variations to the APA must be acceptable to CMAG. A proposed Qualified Bid must also include a redlined or blacklined version of the APA, showing all changes made to the APA by the party submitting the proposed Qualified Bid;

(5) must fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with the proposed Qualified Bid, and the complete terms of any such participation;

(6) must be irrevocable until the earlier of (x) 48 hours after the closing of a sale of the Assets; and (y) thirty (30) days after the Sale Approval Hearing;

(7) must not be contingent upon any conditions other than those specified in the APA;

(8) must include information sufficient to establish to the satisfaction of AgStar Financial Services, PCA; MMCDC New Markets Fund II, LLC ("NMF"); U.S. Bank National Association, as the Bond Trustee; and Otter Tail County (collectively, the "Consulting Parties"), that the proposed Qualified Bidder is financially able to consummate its proposed transaction, including that it is able to provide

16

adequate assurance of future performance (within the meaning of Bankruptcy Code § 365(b)) under any executory contracts or unexpired leases such Qualified Bidder proposes to have assigned to it;

(9) must be accompanied by an all-cash deposit, in immediately available funds, actually delivered on or before the Qualified Bid Deadline in the amount of $1,000,000.00 (the "Deposit"), which amount shall be held in escrow.

(b) AgStar and NMF have not agreed to waive their rights under Section 363(k) of the Bankruptcy Code to credit-bid for the Assets if an Auction is held.

(c) Except as set forth in Paragraph 1 above, Qualified Bids may – but are not required to – provide for consideration in forms other than cash (any such consideration, "Non-Cash Consideration") at the discretion of the Qualified Bidder, provided, however, that, for the purpose of designated Qualified Bidders and an initial Qualified Bid (as defined below), the value of such Non-Cash Consideration shall be determined by AgStar and NMF, in their sole discretion, but after consultation with Debtor, CMAG, and the other Consulting Parties, provided, however, that AgStar and NMF must provide evidence at the Sale Hearing to support the value placed upon any Non-Cash Consideration included in a Prevailing Bid, or any Back-Up Prevailing Bid (each as defined below). If AgStar and NMF are to be paid in cash in full under the Qualified Bid in question and the noncash consideration is economically relevant only to other creditors, then CMAG in consultation with the Debtor shall make such determination. Nothing in this provision shall impair AgStar or NMF's ability, in their sole discretion, to make decisions as to creditworthiness of a potential bidder or determine credit terms extended to a potential bidder.

(v)   **Auction Process**

Qualified Bidders who are deemed to have submitted a Qualified Bid will convene on February 16, 2011 at 10:00 a.m. CDT at the offices of Mackall, Crounse & Moore, PLC, Suite 1400, 901 Marquette Avenue, Minneapolis, Minnesota, 55402 or at such other location selected by Mackall, Crounse & Moore, PLC, with written notice to each party that has submitted a Qualified Bid for the Auction (the "Auction"). If no Qualified Bid is received other than the Stalking Horse Bid, no Auction will take place. The Auction may be postponed by announcement by CMAG by not more than two (2) business days. CMAG may establish and announce rules for the conduct of the Auction and may modify those rules in its discretion; provided that

17

such rules are in all material respects consistent with these Bidding Procedures. Bidding shall proceed with the Stalking Horse Bid and all Qualified Bidders offered the opportunity to increase their bids as to assets that are in all material respects the same in an initial increment of at least $1,000,000 and thereafter subsequent increments of at least $250,000 with the Stalking Horse being permitted to credit bid its Break-Up Fee as part of any subsequent bidding.

The amount of such bids will be made known to all other Qualified Bidders. When such bidding has ceased, the bids that are deemed by CMAG, on behalf of the Debtor, the highest and best bid(s) will be announced at the close of the bidding. The highest and best bid(s) is referred to herein as the "Prevailing Bid(s)" and the maker(s) of such bid(s) the "Prevailing Bidder(s)." The next highest and best bid will be the "Back-Up Bid(s)" and the maker of the bid(s) will be the "Back-Up Bidder(s)." If the Stalking Horse Bid is not a Prevailing Bid or the Back-Up Bid which ultimately becomes the successful buyer or as otherwise provided in the APA, the Break-Up Fee shall be paid and the Stalking Horse shall be entitled to the return of its deposit as described in the APA. No additional bids will be considered after the end of the Auction.

In determining which bid constitutes the "Prevailing Bid" or "Prevailing Bids" and the "Back-Up Bid" or "Back-Up Bids," the Debtor in consultation with CMAG will use reasonable judgment and may consider, among other things: (i) the purchase price offered in the Qualifying Bid; (ii) the Qualified Bidder's financial situation and wherewithal; (iii) the probability of prompt closing; (iv) ability to demonstrate adequate assurance of future performance for all contracts to be assumed; and (v) the best interests of holders of claims and interest. The Debtor may also consider different combinations of bids.

Debtor and CMAG in consultation with the Consulting Parties will inform the parties identified in Local Rule 9013-3(a)(2) concerning the sale process and the foregoing decision.

(vi)    **Closing**

The closing (the "Closing") shall occur after the Bankruptcy Court has approved the sale and other conditions are met, all as consistent with the APA, subject to the right of Debtors and the Prevailing Bidder, or the Back-Up Bidder as the case may be, to extend such date as consistent with the applicable APA(s). The estimated closing time will be thirty days after approval of the Sale.

Each deposit submitted pursuant to these Bidding Procedures will be held in escrow until: (a) as to all other bidders, the selection of the

18

Prevailing Bidder(s) and the Back-Up Bidder(s), or (b) as to the Back-Up Bidder(s), the earlier of forty-eight (48) hours after closing of the sale of the assets to the Prevailing Bidder(s) or thirty (30) days after the Sale Approval Hearing. The deposit received from Prevailing Bidder(s) or the Back-Up Bidder(s), as the case may be, shall be liquidated damages in the event that the Bankruptcy Court approves the Asset Purchase Agreement to which the Prevailing Bidder(s) or Back-Up Bidder(s), as applies, is a party, but the sale is not consummated and the applicable APA provides for liquidation of the Deposit.

(vii)   **Terms of Sale**

The sale of the assets shall be on an "AS IS, WHERE IS" basis and without representation or warranties of any kind, nature or description by Debtor or its agents, except as provided in an asset purchase agreement accepted by the Debtor and approved by the Bankruptcy Court in the Sale Order. All of the Debtor's right, title and interest in and to the assets shall be sold free and clear of all liens and encumbrances, claims, interests to the full extent available under Bankruptcy Code section 363, including, without limitation, the interests of any secured creditor, unsecured creditor, equity interest holder or any other Person holding an interest in said assets with such interest to attach to the net proceeds of the sale.

40.     In conjunction with the conduct of the Auction, the Debtor will continue its efforts to generate interest in its assets. The Debtor, through its professionals including CMAG, will solicit each party known by the Debtor to have indicated an interest in the Acquired Assets. The Debtor will also publish notice of this Sale Motion, the Bidding Procedures, and the Sale Approval Hearing, the time and place of the Auction, and the deadlines for filing objections in the *Minneapolis Star-Tribune* and the *Wall Street Journal*. The solicitation and notice of the Auction will provide cost effective and sufficient publicity to apprise interested parties of the Auction. The Debtor will also continue to afford all interested parties an opportunity to conduct due diligence with respect to the assets.

41.     The Debtor believes good cause exists to approve the fact of, and the terms and conditions of the Auction and the Bidding Procedures. The terms and conditions of the Auction

19

and Bidding Procedures are reasonable and will enable the Debtor and its creditors to realize the

maximum value for the assets. The Debtor further believes that the bidding process will yield the

highest and best bids for the assets.

42.    In addition, the Debtor requests that an order approving the sale to the Stalking

Horse or any other higher and better bidder include the protections as provided in section

363(m). The Debtor submits, and will demonstrate at the Sale Approval Hearing, that the

Stalking Horse and any such higher and better bidder does not have an interest clearly adverse to

the Debtor, its estate, or its creditors. Further, the final agreement to be approved is a product of

arm's-length, good-faith negotiations.

## SALE OF THE ASSETS FREE AND CLEAR OF LIENS

43.    In accordance with Section 363(f) of the Bankruptcy Code, a debtor in

possession may sell property under Section 363 "free and clear of any interest in such property of

an entity other than the estate" if one of the following conditions is satisfied:

> (1)    applicable nonbankruptcy law permits sale of such property
>        free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to
>        be sold is greater than the aggregate value of all liens on such
>        property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable
>        proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

44.    Because the Debtor expects it will satisfy one or more of the requirements of

Section 363(f), as will be demonstrated at the Sale Approval Hearing, approval of the sale of the

Debtor's assets free and clear of all interests is warranted.

45.     To the extent that any of the Debtor's pre-petition lenders assert liens or other interests against or in the assets to be sold, the Debtor believes that it will obtain the consent of such parties to the sale of such assets free and clear of all liens, claims and encumbrances.  The Debtor believes that it has or will have the consent of AgStar, NMF, U.S. Bank, and Otter Tail County to the relief sought in this Sale Motion. If such consent is not obtained, the Debtor requests that the liens, claims and encumbrances asserted against the affected assets by any creditor be transferred and attached to the net proceeds from any sale received by the Debtor, subject to the rights, claims, defenses and objections, if any, of any and all interested parties with respect thereto.

46.     The Debtor proposes to use the proceeds of sale to pay the administrative costs of the sale, including the Break-Up Fee, and Expense Reimbursement, the payment of any reasonable Transaction Fee to CMAG, and payment of other Professional Fees specifically incurred in connection with the Sale. The Net Proceeds (i.e. those amount remaining after payment of the administrative expenses above) from the sale shall be paid to AgStar on its own behalf and as administrative agent for NMF.   The balance of any sales proceeds, as well as Excluded Assets under the APA, will be subject to the Solid Waste Agreement, described below, and a Plan of Liquidation to be filed as an amended plan to the existing Chapter 11 Plan on file by the Debtor, the terms of which shall not be inconsistent with this motion.

47.     Accordingly, the Debtor requests that the order approving the sale of the assets provide that such sale is free and clear of all liens, claims and encumbrances in accordance with Section 363(f) of the Bankruptcy Code.

21

## APPROVAL OF SOLID WASTE AGREEMENT

48.     In order to facilitate the consensual sale of substantially all of the Debtor's assets

pursuant to the APA, the Sale Motion and the Bidding Procedures, free and clear of all liens and

claims that may be asserted and to provide for the prompt distribution of sales proceeds and other

amounts subject to the liens of AgStar and NMF, the Debtor expects to enter into a Stipulation

and Agreement For Sale and Liquidation of Assets of Otter Tail Ag Enterprise, LLC (the "Solid

Waste Agreement") with U.S. Bank as Indenture Trustee and with Otter Tail County respecting

the Solid Waste Facilities which are located at the Debtor's plant and are part of the assets to be

sold in the APA to the Stalking Horse or pursuant to the Sale Order and the Bidding Procedures

to another successful bidder substantially in the form attached hereto as **Exhibit C**.  It requires

approval by the Court by its terms at the same time as the Court approves the rest of the Sale

Motion, and therefore approval thereof is hereby requested as a settlement and agreement in the

best interests of the Debtor's bankruptcy estate.

49.     The Solid Waste Agreement includes the express consent by U.S. Bank as

Indenture Trustee and Otter Tail County to a sale by the Debtor of the Solid Waste Facilities (as

well as the rest of the Debtor's property subject to the APA) free and clear of all their liens,

claims, and interests.   This is important as the Stalking Horse seeks to own the Solid Waste

Facilities outright under the APA and U.S. Bank as Indenture Trustee has asserted that the Solid

Waste Facilities are owned by Otter Tail County and subject to a true lease arrangement that has

been assigned to it by Otter Tail County under the Trust Indenture for the revenue bonds to

support payment of the revenue bonds.  The Debtor asserts that the lease for the Solid Waste

Facilities is a security interest, and not a true lease, but seeks in the Solid Waste Agreement to

eliminate this potential issue.

50.     The Solid Waste Agreement provides for the payment of sales proceeds and certain other amounts held by the Debtor as of the closing of the sale and again 17 business days thereafter, after the full payment or satisfaction of the senior lenders, to U.S. Bank and Otter Tail County pro rata based on the principal amount of their respective claims.  It provides for the payment of administrative expenses relating to the sale and for retention by the bankruptcy estate of assets having an aggregate value of $2.5 million in the Debtor's estimation for subsequent distribution in accordance with the Bankruptcy Code.  The Debtor believes that the claims in this case, excluding AG Star and NMF (whose claims will be paid at that sale closing) and U.S. Bank as Indenture Trustee and Otter Tail County, will be substantially less than $2.5 million.

51.     The Debtor has agreed to the Solid Waste Agreement because of the need to promptly consummate a sale with the proposed stalking horse, or with a higher and better bid that will be received at an Auction.  The uncertainties surrounding the bonds' claims could delay that process causing the Debtor to lose its potential stalking horse.  The potential litigation costs are also better reserved for distribution to the Debtor's creditors since the bondholders will recover almost all of that money regardless of the outcome of any litigation with the bondholders.  If the Bonds' arguments were successful, they could prevent consummation of the sales transaction, and also eliminate any recovery for the unsecured creditors.  The Solid Waste Agreement preserves recovery for the unsecured creditors, whose claims total a very small fraction ($300,000), as compared with the bond claims ($26,010,000). As a result, the Debtor believes that the Solid Waste Agreement is necessary in order to complete this transaction with the stalking horse or an alternate purchaser.

52.     The Solid Waste Agreement is attached in an unexecuted form, and the Debtor believes that it will be executed in substantially that form prior to the date of the hearing.

## ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS

53.     Pursuant to Section 541 of the Bankruptcy Code, the Acquired Contracts and

Assumed Leases (each as defined in the APA) constitute property of the Debtor's estate that may

be sold consistent with section 363 of the Bankruptcy Code.  In accordance with the provisions

of Section 365(f) of the Bankruptcy Code, the Debtor may assume and assign the Acquired

Contracts and Assumed Leases and recover value from such assets.  In pertinent part, Section

365 of the Bankruptcy Code provides:

> (f)(1) Notwithstanding a provision in an executory contract or unexpired
> lease of the debtor, or in applicable law, that prohibits, restricts, or
> conditions the assignment of such contract or lease, the trustee may
> assign such contract or lease under paragraph (2) of this
> subsection.
>
> • • •
>
> (2)     The trustee may assign an executory contract or unexpired lease of
> the debtor only if-
>
> (A)     the trustee assumes such contract or lease in accordance with the
> provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such
> contract or lease is provided, whether or not there has been a
> default in such contract or lease.
>
> 11 U.S.C. § 365(f).

54.     In connection with the sale of its business operations, the Debtor proposes to sell,

assume and assign one or more of the Acquired Contracts and Assumed Leases to the highest

bidder at the Auction. The Debtor believes cause exists to approve the sale, assumption and

assignment of the Acquired Contracts and Assumed Leases pursuant to Sections 363 and 365(f)

of the Bankruptcy Code.  As noted previously, the Debtor has determined, in the exercise of its

sound business judgment, and with the concurrence of the Secured Lender Parties, that the sale

of its business operations is in the best interests of the Debtor and its estate. The Acquired

Contracts and Assumed Leases are an integral part of those business operations.

55.    The proposed assumption and assignment of the Acquired Contracts and Assumed

Leases complies with section 365 of the Bankruptcy Code in all respects. Upon the assumption

and assignment of the Leases, the Debtor (and/or the purchaser of such Acquired Contracts or

Assumed Lease(s)) will promptly cure, except where waived by the counterparty, any and all

defaults under the terms of the Acquired Contracts or Assumed Leases to be assumed, and

compensate the corresponding party for its actual pecuniary loss(es), if any, as a result of such

defaults, in each case as determined by the Court at the hearing to consider approval of the sale,

assumption and assignment of the Acquired Contracts or Assumed Leases (the Sale Approval

Hearing), or, alternatively, at a subsequent hearing. In addition, where required, the Debtor will

provide adequate assurance of future performance at such hearings.

56.    The Debtor is aware of only limited costs to cure existing executory contracts.

With the exception of the Trinity Leasing Company rail contract, the Debtor is not delinquent

with respect to any other executory contracts. *See Docket Entry 125*.   The cure amount is

approximately $42,000. Accordingly, the Debtor requests authority pursuant to sections 363 and

365(f) of the Bankruptcy Code for the sale, assumption and assignment of the Acquired

Contracts or Assumed Leases to the Stalking Horse or the highest and best acceptable bidder for

the assets at the Auction.

57.    The Debtor requests authority to assume/assign and reject certain of their

executory contracts and unexpired leases in accordance with the following procedures:

       a.    In accordance with the APA and Bidding Procedures, the
Stalking Horse shall identify (i) the Acquired Contracts and
Assumed Leases it wishes the Debtor to assume and assign
and (ii) certain contracts it wishes the Debtor to reject. Upon

receiving this information, the Debtor shall promptly give notice (the "Initial Contract and Lease Notice") to the counter-parties of the contracts or leases it proposes to reject and to the counter-parties of the Acquired Contracts or Assumed Leases it proposes to assume and assign, including as to the latter any cure amount ("Cure Amount") associated with such assumption an assignment. Such notice shall be given at least **twenty days** prior to the time set for the Sale Approval Hearing. Except as provided below, at the Sale Approval Hearing, the Debtor will seek approval of the assumption and assignment of Acquired Contracts and Assumed Leases and rejections of any other contracts or leases as set out in such notice.

b.   In the event the Debtor's proposal regarding rejection or assumption and assignment of unexpired leases or executory contracts changes, whether due to change by the Stalking Horse, Prevailing Bidder or Back-Up Bidder or for any other reason, the Debtor will promptly give notice of such change to the affected counter-party to the contract or leases (the "Notice of Change"). The Notice of Change will be given at least **three days** (including weekends and holidays) prior to the date set of the Sale Approval Hearing (the "Notice of Change Deadline"). In the event of any change in the identity of the assignee after the Auction, such notice will be given as promptly as possible after the Auction. If a counter-party does not object to its treatment, including, if applicable, the Cure Amount, set forth on the Notice of Change within **ten (10) days** of service of such Notice of Change, the counter-party to such executory contract or unexpired lease shall be deemed to consent to such treatment. If necessary, the Debtor will request at the Sale Approval Hearing that the Court set a further hearing to consider any objections to the assumption-assignment or rejection proposed in the Notice of Change, so as to give affected counter-parties such notice.

58.   As part of this streamlined rejection process, the Debtor further requests, pursuant to Bankruptcy Rules 2002 and 3003(c), that the Court require that any proof of claim for damages arising from the rejection of a contract or lease must be filed by the respective lessor(s) on or before thirty (30) days after the effective date of rejection.

## APPROVAL OF NOTICE

59.    The Debtor seeks approval of notice of the Sale Notice in substantially the form attached on **EXHIBIT D**, which will be mailed to each entity listed on the creditor matrix maintained pursuant to Local Rule 1007-2, to the entities identified in Local Rule 9013-3(a)(2), to counterparties to executory contracts and leases, to each equity member (either directly or through the member's proxy) and to each entity identified by CMAG as a potential purchaser.

## REQUEST FOR FURTHER HEARING

60.    In the event that a party submits a Qualified Bid to the Debtor and the Debtor conducts an Auction, the Debtor requests that the Court hold a hearing to approve the sale of the Assets and the assumption and assignment of the Acquired Contracts and Assumed Leases to the highest bidder or bidders under Sections 363(b), (f) and (m) and 365 of the Bankruptcy Code — the Sale Approval Hearing.

## REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(g) AND 6006(d)

61.    Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale of a debtor's property or assumption/rejection of a lease or contract is stayed for a period of 14 days after entry of the order unless the court orders otherwise. The Debtor requests that any order approving the relief requested herein be effective immediately, by providing that the 14 day stay is inapplicable.   The failure to consummate the transactions expeditiously likely will have a significant adverse affect on the value to be realized upon the disposition of the assets at issue.

## CONCLUSION

62.    Pursuant to Local Rule 9013-2(a), this Sale Motion is accompanied by a memorandum of law, proposed orders, and proof of service.

27

63.    Pursuant to Local Rule 9013-2(c), Debtors give notice that they may, if necessary, call Anthony J. Hicks, Chief Executive Officer of the Debtor whose address is 24096 170th Avenue, Fergus Falls, MN 56537-7518; and Christopher Wu or C. Scott Chabina of Carl Marks Advisory Group, LLC, whose business addresses 900 Third Avenue, 33rd Floor, New York, New York, 10022-4775, about the factual matters raised in and relevant to this Sale Motion.

**WHEREFORE**, the Debtor respectfully requests that the Court enter its order:

A.    Authorizing, subject to a final hearing, the Debtor to sell substantially all of their assets in accordance with the Bidding Procedures, free and clear of all liens, claims, interests and encumbrances including, without limitation, the liens of the AgStar, NMF, U.S. Bank, and NMF, and any other secured creditors, which liens, claims, interests and encumbrances will attach to the proceeds of sale in the same order and priority that existed at the commencement of the case;

B.    Authorizing, subject to a final hearing, Debtor to assume and assign or to reject in connection with the above-described sale, those executory contracts and leases identified prior to the Sale Approval Hearing, free and clear of all liens, claims, interests and encumbrances including, without limitation, the liens of AgStar, NMF, the Bondholders, and any other secured creditors, which liens, claims, interests and encumbrances will attach to the proceeds of sale in the same order and priority that existed at the commencement of the case;

C.    Approving the Bidding Procedures;

D.    Approving the Notice of Sale and the parties to be served;

E.    Approving the Break-Up Fee and Expense Reimbursement;

F.    Approving the Solid Waste Agreement;

28

G.     Scheduling the Sale Approval Hearing for February 17, 2011 at 1:30 p.m. at which the sale and assignment to the Stalking Horse or to the Prevailing Bidder and to the Back-Up Bidder may be approved and at which the assumption and assignment or the rejection of Acquired Contracts and Assumed Leases, and other relief requested in the Sale Motion may also be approved; and

H.     Granting such other and further relief as the Court may deem just and equitable

Dated: January 7, 2011                    MACKALL, CROUNSE & MOORE, PLC

                                          By:/e/Timothy D. Moratzka_____
                                          Timothy D. Moratzka (Atty No. 75036)
                                          Mychal A. Bruggeman (Atty No 0345489)
                                          1400 AT&T Tower
                                          901 Marquette Ave
                                          Minneapolis, Minnesota 55402
                                          Phone: (612) 305-1400
                                          Fax: (612)305-1414

                                          ATTORNEYS FOR DEBTOR

_____

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

---

In re:                                          Case No. 09-61250

Otter Tail Ag Enterprises, LLC,

                                                Chapter 11
        Debtor.

---

**AFFIDAVIT OF CHRISTOPHER K. WU**

---

STATE OF NEW YORK          )
                           ) ss.
COUNTY OF NEW YORK         )

I, Christopher K. Wu, duly sworn, state as follows according to the best of personal
knowledge and belief:

1.      I am a partner of Carl Marks Advisory Group, LLC ("CMAG"), which has been
appointed by Court Order dated October 12, 2010 (docket entry 137) as the financial advisor for
the Debtor, Otter Tail AG Enterprises, LLC.  A copy of my biography as published on CMAG's
website is attached.  I submit this Affidavit in support of the Debtor's Sale Motion.

2.      The Court appointed CMAG to market the Debtor's assets to parties interested in
pursuing a transaction with the Debtor, either in contributing new equity to the Debtor or in
purchasing substantially all of the Debtor's assets.  CMAG also was tasked with facilitating
interested parties' due diligence, assisting in negotiating an asset purchase agreement, evaluating
competing bids, and working with the Debtor, in consultation with its primary creditor
constituencies, to select a stalking horse and reach a consensual sales process.  I have spent
considerable time on this sale engagement, along with other CMAG personnel under my
supervision, including C. Scott Chabina, a vice president of CMAG, since CMAG's retention in

1

October, 2010. CMAG has substantial experience representing ethanol producers nationwide, as well as their creditors across the capital structure in a wide range of circumstances (both in and out of bankruptcy court) and has advised on numerous engagements in the sector including: VeraSun Energy Corporation, BioFuel Energy Corporation, White Energy Inc. and Hawkeye Growth.

3.     After its retention, CMAG first focused on gathering financial, industry, and company information which were used to create a Confidential Descriptive Memorandum for the purpose of marketing the Debtor's assets and related investment opportunity.  The Confidential Descriptive Memorandum (the "CDM") and other key documents for evaluating the purchase or investment opportunity were subsequently posted on a secure website in a virtual data room that was controlled by CMAG personnel.  Interested parties could review all pertinent documents, including the Confidential Descriptive Memorandum in the virtual data room after successfully executing a confidentiality agreement with the Debtor.  During this first stage of our retention, I became familiar with the Debtor's officers, employees, finances, and overall condition.

4.     CMAG next focused on identifying potential purchasers or investors who may be interested in pursuing a transaction with the Debtor based on their involvement in the ethanol industry or previous investment track record.  CMAG focused on parties that had the appropriate qualifications, resources and experience to serve as a stalking horse bidder, including parties that had previously expressed an interest in the investment opportunity to the Debtor prior to CMAG's retention.  CMAG estimates that it distributed 12 copies of the CDM to various interested parties that executed the confidentiality agreement and that over 50 distinct professionals, representing these 12 interested parties, were provided access to the virtual data

room in order to review the CDM and various other due diligence documents in connection with the investment opportunity..

5.      In addition, copies of the CDM and access to the virtual data room were provided to the attorneys and other involved client representatives of the Debtor's primary lenders including AgStar Financial Services, PCA, Mackall, Crounse & Moore PLC ("Mackall"), Pemberton, Sorlie, Rufer & Kershner, PLLP and Gray, Plant, Mooty. . Scott Chabina and I have conducted and participated in regular conference calls with the bondholders and other creditor constituencies, attorneys and client representatives of these parties to keep all parties informed of the sale process.

6.      Immediately after its retention and completion of initial steps in the marketing process, the Debtor's Chief Executive Officer, Anthony Hicks, Mr. Chabina, myself, and on occasion other employees of CMAG, participated in active discussions with approximately twenty different interested parties, of which not all elected to proceed with the investment opportunity and subsequently did not receive a copy of the CDM or access to the virtual data room.

7.      The Debtor and CMAG began negotiations with several potential buyers, and ultimately received six bids, a portion of these in the form of a formal asset purchase agreement with the remainder more informal.

8.      The highest and best bid was clearly set forth by OTAV, LLC.  OTAV, LLC is a subsidiary of Green Plains Renewable Energy, Inc. ("GPRE").  GPRE is North America's fourth largest ethanol producer, operating a total of eight ethanol plants in Indiana, Iowa, Michigan, Nebraska and Tennessee with current annual expected operating capacity totaling approximately 657 million gallons. GPRE also markets and distributes ethanol for four third-party ethanol

3

producers with current annual expected operating capacity totaling approximately 360 million gallons. GPRE owns 51% of Blendstar, LLC, a biofuel terminal operator which operates nine blending or terminaling facilities with approximately 495 million gallons per year of total throughput capacity in seven states in the south central United States. GPRE operates grain storage facilities and complementary agronomy and petroleum businesses in Iowa, southern Minnesota and western Tennessee.

9.     After substantial negotiations and numerous iterations that ensued over the subsequent months, particularly following the Thanksgiving holiday and throughout the Christmas holiday timeframe, the Debtor, in consultation with CMAG and Mackall, have finalized an Asset Purchase Agreement, bidding procedures, Sale Order, and other sale motion documents with OTAV. Throughout this consensual process, the secured lenders played a critical role in providing financing terms to OTAV, as well as to other qualified parties whom expressed an interest in potentially serving as the stalking horse bidder. CMAG strongly believes that such financing assistance played a critical role in the Debtor successfully maximizing value for the estate throughout the stalking horse selection process. Notably, the Section 363 sale process the Debtor has run to date, with CMAG's assistance, has demonstrably created substantially more value for the estate than the previously contemplated plan of reorganization.

10.     Under the APA, OTAV would become the stalking horse bidder. This will enable an auction process in which other parties can submit bids for the same assets as OTAV, provided that it results in higher and better value to the estate. Following the filing of the APA and bid procedures as part of the Sales Motion to sell the Debtor's assets free and clear under Section 363 of the Bankruptcy Code, CMAG will continue to seek out potential buyers to compete in the

4

auction process, and facilitate due diligence with those potential competitors. Several parties in the initial marketing process were reluctant to pursue being the stalking horse bidder, but expressed an interest in participating in the court auction once a stalking horse bidder was selected.

11.     Under certain circumstances as noted in the APA, OTAV would receive a break-up fee of $1,000,000 representing approximately 1.59% of the estimated sales proceeds under the APA. A break-up fee is a customary element of a stalking horse asset purchase agreement that offsets the substantial investment necessary to become the stalking horse bidder, and compensates the stalking horse for providing a floor on value in the auction. Break up fees generally range between 1% to 4% depending on the size and complexity of the transaction under consideration. The stalking horse is also entitled to an expense reimbursement of up to $100,000. The break-up fee and the expense reimbursement are well within the expected range for this size of the transaction contemplated in the APA, and are therefore customary both in nature and amount.

12.     In my opinion, entry into the APA, an agreement to pay the break-up fee or expense reimbursement, and the sale process described in the motion and bidding procedures are in the best interest of the bankruptcy estate.

FURTHER YOUR AFFIANT SAITH NOT

_____
Christopher K. Wu

Subscribed and sworn to before me this 6th day ~~WARREN UH FEDER~~ 11.
~~Notary Public, State of New York~~
~~No. 31-4897143~~
~~Qualified in New York County~~
~~Commission Expires May 4, 20~~ 11

NOTARY PUBLIC

5



INVESTMENT BANKING

FIRM OVERVIEW | PRINCIPAL INVESTING    ADVISORY SERVICES    PROFESSIONALS    TRANSACTIONS    NEWS    CONTACT

CARL MARKS

Overview

Management Team

Services

Experience

Case Studies

Announcements

Articles

CMAG News

Contact



Corporate Revitalization

Real Estate Advisory

Advisory Services • Investment Banking • Management Team • Executive Bio



**CHRISTOPHER K. WU**
**Partner**

Christopher K. Wu has more than 15 years of investment banking, financial restructuring, and principal investment experience. Mr. Wu has advised a significant number of public and private companies in a wide range of industries, advising boards of directors, management teams, investors, and creditor groups on various aspects of mergers and acquisitions, capital sourcings, corporate reorganizations, insolvency, and strategic matters.

Mr. Wu's experience spans many industries, including real estate, hospitality, alternative energy, ethanol, gaming, consumer products, financial services, manufacturing, marketing services, and media. He has provided M&A, corporate financing, and restructuring services in over 50 transactions encompassing a wide variety of complex situations, including recapitalizations, debt-to-equity conversions, fairness opinions, valuations, spin-offs, corporate defense, public mergers, corporate sales, reorganizations, equity and junior capital financings, as well as asset purchases and sales, in and out of bankruptcy. Additionally, Mr. Wu has been deemed an expert witness in various bankruptcy courts and has testified in contested matters.

Recent bankruptcy and restructuring engagements include: VeraSun Energy (secured lenders); General Growth Properties ("Howard Hughes heirs"); Innkeepers USA Trust (special servicer for the mortgage lenders); Hawkeye Growth (secured lenders); Holley Performance Inc. (debtors); Otter Tail Ag Enterprises (debtor); FX Luxury Las Vegas I (backstop investors and plan sponsor); American Community Newspapers (debtor); Elite Model Management Inc. (debtor); Metabolife International (debtor); White Energy Inc. (creditors committee); SunTimes Media Group (creditors committee); Biofuels Energy Inc. (secured lenders); American Wood Mouldings; Ascendia Brands (debtor); National Steel (acquirer - US Steel).

Representative M&A clients and financing engagements include: Galileo International (sale to Cendant); Lucent Technologies (sale of Kenan Systems to CSG Systems); Deutsche Telekom (acquisition of debis Systemhaus); Electronic Data Systems (unsolicited offer for Policy Management Systems); Burlington Industries (white knight for Barrett Resources); Investcorp/Cinven (LBO of Zeneca Specialties, Inc); Williams Telecommunications (spin-off); Western Resources, Inc. (reverse Morris Trust merger); Equilease (mezzanine and equity raise); Dr. Miracles (sale to Catterton Partners); Aspen Marketing Inc. (sale to KRG Capital); ES Originals (sale to Totes Isotoner); Acordis (sale to CVC Capital); Huntsman Chemicals (acquisition of ICI's Tioxide business).

Prior to joining Carl Marks Advisory Group LLC (CMAG) in 2003, Mr. Wu was a Vice President in J.P. Morgan's Global Mergers and Acquisitions Group in New York and London. Before joining J.P. Morgan in 1997, he

Japan's Ministry of International Trade and Industry (MITI) in Tokyo and
as a Manager in Itochu International's Machinery Group in New York,
where he had responsibility for its Ceramic Refractory and Industrial
Machinery business units.

Mr. Wu earned a BA in English Language and Literature from the
University of Chicago and an MBA in Finance from the Stern School of
Business at New York University. He serves on the Board of Directors for
the Turnaround Management Association's New York Chapter. Mr. Wu also
serves as Vice Chairman of the Board and Trustee of the International
Center for the Disabled (ICD) in New York City and chairs its Program
Committee.

212-909-8400 | cwu@carlmarks.com



© Copyright 2011 Carl Marks & Co. Inc. All rights reserved. Carl Marks® is the registered trademark of Carl Marks & Co. Inc.

## <u>VERIFICATION</u>

I, Anthony J. Hicks, am the Chief Executive Officer of Otter Tail AG Enterprises, LLC.  Based upon my personal information, knowledge, and belief, I declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct.

Dated: __1\7\11__

Anthony J. Hicks

1312775.1-MAB

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

---

In re:                                              Case No. 09-61250

Otter Tail Ag Enterprises, LLC,
                                                    Chapter 11
        Debtor.

---

## MEMORANDUM OF LAW IN SUPPORT OF THE DEBTOR'S MOTION FOR HEARINGSAND FOR ORDERS (I) APPROVING FORM OF ASSET PURCHASE AGREEMENT AND DESIGNATING STALKING HORSE BID; (II) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (III) APPROVING BIDDING AND AUCTION PROCEDURES; (IV) AUTHORIZING DEBTORTO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (V) APPROVAL OF THE SOLID WASTE AGREEMENT RELATING TO THE SALE OF DEBTOR'S SOLID WASTE FACILITIES (ON AN <u>EXPEDITED BASIS</u>) (VI) AUTHORIZING ASSUMPTION AND ASSIGNMENT OR REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS (VII) APPROVING FORM OF NOTICE OF SALE; AND (VIII) SETTING ADDITIONAL HEARING

---

### <u>INTRODUCTION</u>

Debtor submits this Memorandum of Law in support of their Sale Motion. Debtors request that the Court enter the proposed Orders : (I) Approving Form of Asset Purchase Agreement and Designating Stalking Horse Bid; (II) Approving Break-Up Fee and Expense Reimbursement; (III) Approving Bidding and Auction Procedures (IV) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (V) Approving the Solid Waste Agreement relating to the sale of the Debtor's Solid Waste Facilities (on an expedited basis); (VI) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (VII) Approving Form and Notice of Sale; and (VIII) Scheduling Further Sale Hearing (the "Sale Motion").

### <u>BACKGROUND</u>

The facts in support of the relief requested are set forth in the verified Sale Motion and

accompanying Affidavit of Christopher Wu. All capitalized terms have the meaning ascribed to them in the Sale Motion.

**ARGUMENT**

**I.     A GOING CONCERN SALE IS IN THE BEST INTERESTS OF THE ESTATE AND ITS CREDITORS**

The Court should approve a sale of substantially all of the Debtor's assets under Section 363 of the Bankruptcy Code.  To those ends, the Court should approve the Stalking Horse APA and designate the bid therein as the Stalking Horse Bid.  The Court should further approve the bid procedures, form of notice, provision of a Break-Up Fee and Expense Reimbursement unde the APA, and authorize the Debtor to assume executory contracts to assign to the buyer and reject others.

**a.   The Court Should Approve a Sale of Substantially All of the Debtor's Assets under Section 363,**

Section 363(b)(1) of the Bankruptcy Code requires court approval, after notice and hearing, for sales outside of the ordinary course of business. 11 U.S.C. § 363(b)(1). In interpreting section 363(b)(1), courts have held that a transaction involving property of the estate generally should be approved so long as the debtor can demonstrate "some articulated business justification for using, selling, or leasing property outside of the ordinary course of business." *In re Continental Airlines, Inc.,* 780 F.2d 1223, 1226 (5th Cir. 1986); *accord Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.),* 107 F.3d 558, 567 n. 16 (8th Cir. 1997); *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Crystalin LLC,* 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003). The court should give deference to a debtor's application of its sound business judgment in the use, sale or lease of property. *In re Moore,* 110 B.R. 924, 928 (Bankr. C.D. Cal. 1990); *In re Canyon Partnership,* 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).  Courts also have "wide

2

discretion" to accept or reject bids and conduct sales and auctions. *In re Payless Cashways, Inc.*,

281 B.R. 648, 652 (8th Cir. BAP, 2002); *Food Barn Stores, Inc.*, 107 F.3d 558, 565-66 (8th Cir.

2000). As stated by the Eighth Circuit Court of Appeals, courts "have ample latitude to strike a

satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization

of assets. [They] must be accorded sufficient discretion to decide truly close cases as best they can

in view of these competing considerations." *In re Wintz Co.*, 219 F.2d 807, 812 (8th Cir. 2000).

Many courts have set forth factors to consider when approving a sale outside of the

ordinary course, and most courts start with the factors set forth by the Second Circuit in *In re*

*Lionel.* Those factors are:

> the proportionate value of the asset to the estate as a whole, the amount of
> elapsed time since the filing, the likelihood that a plan of reorganization
> will be proposed and confirmed in the near future, the effect of the
> proposed disposition on future plans of reorganization, the proceeds to be
> obtained from the disposition vis-a-vis any appraisals of the property,
> which of the alternatives of use, sale or lease the proposal envisions and,
> most importantly perhaps, whether the asset is increasing or decreasing in
> value.

*In re Lionel,* 722 F.2d at 1071.

Other courts have simplified the factors to include, *inter alia,* the consideration to be

paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether

a risk exists that the assets proposed to be sold would decline in value if left in the debtor's

possession. *Equity Funding Corp. of America v. Financial Associates (In re Equity Funding*

*Corp.),* 492 F.2d 793, 794 (9th Cir. 1974); *In re Titusville Country Club,* 128 B.R. 396, 399

(Bankr. W.D. Pa. 1991) (setting forth four elements of a "sound business purpose" test: (1) a

sound business reason, (2) accurate and reasonable notice, (3) adequate price, and (4) good

faith).

In light of the plain language of 11 U.S.C. § 363(b)(1), which only requires "notice and

hearing" before a sale and does not set out factors to consider, the Second Circuit in *Lionel*

observed that:

> A bankruptcy judge must not be shackled with unnecessarily rigid rules
> when exercising the undoubtedly broad administrative power granted him
> under the code. As Justice Holmes once said in a different context, 'Some
> play must be allowed for the joints of the machine.'

*Lionel*, 722 F.2d at 1069 (quoting *Missouri, Kansas and Texas Ry. Company v. May*, 194 U.S.
267 (1904)).

The proposed sale process should be should be approved based on the factors set forth

above.

### b. The Stalking Horse APA and Proposed Bidding Procedures Are Supported by Sound Business Justifications.

The Debtor has determined, after careful evaluation of its business prospects, that the

proposed Auction and Bidding Procedures will yield the greatest return. The Debtor, with the

assistance of CMAG, has marketed and will continue to market the going concern sale to

prospective buyers. This opportunity was already marketed for several motions months and

culminated in the Asset Purchase Agreement with the Stalking Horse. The APA maximizes the

value of the Debtors' estates and potential recovery of the Debtor's creditors while

minimizing the estates' administrative expenses. This case has also been pending in this District

for more than a year, and the Debtor has attempted to consummate a plan of reorganization, but

was unsuccessful, notwithstanding that its plan had the support of all major creditor

constituencies, and also had support in the form of additional investment by existing equity

holders. To prevent this case from continuing indefinitely, the Debtor and its estate are now left

only with a process to expose its assets to the open market, and with the help of professional

marketing, seek the maximum value of such assets.

Generally, "the best way to determine the market value of property is to expose the

property to the marketplace." *In re Mama's Original Foods, Inc.,* 234 B.R. 500, 504 (Bankr. C.D. Cal. 1999) (citing *Bank of America NT & SA v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 119 S. Ct. 1411, 1423 (1999)). The Debtor has negotiated an APA with the Stalking Horse.   Prior to the bankruptcy, during the bankruptcy, and even after the proposed plan failed, a number of potential purchasers have expressed an interest in purchasing substantially all of the Debtor's assets. Because of the interest shown, the Bidding Procedures have been developed to encourage a competitive bidding process in order to yield the highest price possible for these assets at the conclusion of the Auction. The Bidding Procedures will provide an additional procedural safeguard that will test the value of the Acquired Assets and competitive bidding process and provide potentially interested parties with another opportunity to step forward and provide greater value to the Debtor. The Debtor and its financial advisor CMAG believe that the Bidding Procedures will encourage active bidding from interested parties who possess the financial and operational capacity to purchase the Acquired Assets.

Furthermore, this sale is proposed in good faith. Potential purchasers were and will continue to be widely solicited from entities that have already expressed an interest as well as other potential buyers. The Bidding Procedures and Auction are being presented to the market as a whole and are designed to create an open bidding process which all parties in interest can monitor to ensure that the highest possible price is received for the Debtor's assets.

Indeed, the Bidding Procedures provide for oversight and input from the Debtor's primary creditor constituencies including AgStar, MMCDC New Markets Fund, II ("NMF"), U.S Bank National Association, and Otter Tail County. *See e.g., Bidding and Auction Procedures,* ¶¶ G.1.h; G.2; G.7; & H.  Thus, the proposed Bidding Procedures will allow the Debtor to conduct an auction in a controlled, fair and open fashion that will serve to dispel any doubt as to the best and

highest offer reasonably available for the Acquired Assets. Accordingly, the sale should be allowed to proceed under the terms outlined in the Sale Motion and Bidding Procedures.

There are limited alternatives to the Auction process. This bankruptcy has now been pending in this District for over one year. The Debtor has also already sought to raise capital internally to confirm a Plan of Reorganization and failed in that process. The liquidation of the Debtor's assets will either occur through the orderly process navigated by experienced professionals, will take place in a less-predictable setting of a Chapter 7 proceeding, or the senior lenders will lift the stay or dismiss the case and proceed to foreclose on their collateral under Minnesota law, which will potentially further impair any recoveries for subordinate or unsecured creditors. The 363 Sale process, under the supervision of the Bankruptcy Court and assisted by a reputable financial advisor, is the best chance to maximize value for the Estate.

**c.  The Court Should Approve the Form of the Sales Notice.**

Bankruptcy Rules 2002 and 6004 provide the requirements for the Sales Notice, which includes requiring a disclosure of the time and date of any public sale, the time and dates for hearings, and any objection dates. In this case, the sales notice proposed provides this information and should be approved.

**d.  The Court Should also Approve the Break-Up Fee and Expense Reimbursement in the APA.**

Break-up fees provisions are a normal and, in many cases, a necessary component of significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets .... In fact, because the... corporation ha(s) a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values.

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.),* 147 B.R. 650, 659-60 (S.D.N.Y. 1992).

Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted). *See also Integrated Resources,* 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.,* 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

As a consequence, courts frequently approve break-up fees provisions in connection with proposed bankruptcy sales. Courts considering the propriety of a proposed break-up fee typically evaluate: "(1) whether the relationship of the parties who negotiated the fee is marked by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is reasonable in relation to the proposed purchase price." *In re Twenver, Inc.,* 149 B.R. 954, 956 (Bankr. D. Colo. 1992); accord, In re Bidermann Indus. USA., Inc., 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997); Integrated Resources, 147 B.R. at 657. Samjens Partners I v. Burlington Indus., Inc., 663 F. Supp. 614, 624 (S.D.N.Y. 1987).*

The Debtor believes that the willingness of the Stalking Horse to commit to the proposed sale transaction, subject to higher and better offers, will encourage third parties to submit higher bids and will encourage customers and vendors to support operations during this case. Also, considering the factors traditionally considered by courts in analyzing proposed break-up fees prior to a sale (as set forth above), it is clear that the Break-Up Fee of $ 1 million proposed in this case, which is less than 1.49% of the purchase price of the Stalking Horse Bid and a much smaller portion of the overall consideration that the Stalking Horse has committed to the

transaction. As such, the Break-Up Fee and Expense Reimbursement will not act as a discouragement to the bidding process. Instead, they will preserve the opportunity to sell the Acquired Assets on a going concern basis without delay to a contractually-committed bidder at a fair and reasonable price, while providing the Debtor with the opportunity of obtaining even greater benefits for its Estate through a competitive bidding process. Finally, as described in the Affidavit of Christopher Wu, the Break-Up Fee and Expense Reimbursement are customary in both nature and amount. Thus, the Break-Up Fee and Expense Reimbursement are appropriate and reasonable under the circumstances to compensate the Stalking Horse for the time, effort, expense, and risk that it has incurred and will incur in negotiating, documenting, and seeking to consummate the proposed sale transaction.

**e.** **The Court Should Authorize The Debtors To Assume And Assign Certain Unexpired Executory Contracts And Unexpired Leases To The Purchaser And To Reject Others.**

Bankruptcy Code section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(f)(2) provides the authority for the trustee, or debtor in possession, to assign executory contracts and leases as follows:

> The trustee may assign any executory contract or unexpired lease of the debtor only if: (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

In considering whether to approve a proposed assumption and assignment of an executory contract or unexpired lease, the court uses a business judgment test. "Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval." *Four B. Corp v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.),*

8

107 F.3d 558, 567 n.16 (8th Cir. 1997) (quoting *Richmond Leasing Co. v, Capital Bank NA.,* 762 F.2d 1303 (5th Cir. 1985)).

In this case there are only limited costs to cure all existing executory contracts and unexpired leases, and those charges will not be material to the Estate. With the exception of the Trinity Leasing Company rail contract, the Debtor is not delinquent with respect to any other executory contracts. *See Docket Entry 125.* The cure amount is approximately $42,000. In addition, pursuant to Bankruptcy Code section 365(k), the estate will have no liability under the assumed and assigned contracts following the assignment to the purchasers.

Having certain executory contracts and unexpired leases available is necessary to obtain the highest and best price for the Debtor's assets, as much of the Debtor's income arises under certain of the marketing contracts which are necessary for the Debtor. Therefore, assumption of certain contracts and leases will be necessary to sell the business assets. Because the Debtor may do so without uncompensated detriment to the estate, the Debtor is willing to do so and request that the Court approve the assumption and assignment of the executory contracts and unexpired leases that will be assumed as part of the sale.

Whether there exists "adequate assurance of future performance" as required under Bankruptcy Code section 365(b)(1)(C) involves a factual inquiry, requiring case-by-case consideration. *Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1309-10 (5th Cir. 1985). In the event the other parties to unexpired executory contracts challenge the purchaser's ability to provide adequate assurance of future performance, the purchaser will provide such parties and/or the Bankruptcy Court with supplemental evidence of its financial ability to perform executory contracts or unexpired leases to be assumed.

In determining whether a debtor may be permitted to reject an executory contract or

9

unexpired lease, courts apply the "business judgment test." *In re G. Survivor Corp.,* 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994). Generally, absent a showing of bad faith or an abuse of business discretion, the debtor's business judgment will not be altered. *In re Bildisco,* 682 F.2d 72, 79 (3d Cir. 1982), *aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 104 S. Ct. 1188, 79 L.Ed2d 482 (1984); *Lubrizol Enterprises v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1048 (4th Cir. 1985); *Control Data Corporation v. Zelman (In re Minges),* 602 F.2d 38 (2d Cir. 1979). "Transposed to the bankruptcy context, the rule as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankruptcy retained business discretion." *In re Richmond Metal Finishers, Inc.,* 756 F.2d at 1047. Furthermore, as a matter of business judgment, rejection of the burdensome contract may benefit the estate." *In re Minges,* 602 F.2d at 43; *In re Chipwich, Inc.,* 54 B.R. 427, 431 (Bankr. S.D.N.Y. 1985).

The Debtor has determined that rejection of the executory contracts and leases at the final sale hearing represents an exercise of sound business judgment as these executory contracts and leases do not benefit the estate. In fact, as exhibited by the marketplace's rejection of their terms to be evidenced by the final asset purchase agreement, the contracts and unexpired executory contracts are a burden on the estate. Therefore, the Debtor will seek an order as to rejected claims at the Sale Approval Hearing.

Pursuant to Fed. R. Bankr. P. 3003(c)(3), the Debtor will also seek an order setting a deadline for filing any rejection damage claims and requesting that such deadline be no more than thirty (30) days after the date of entry of the rejection order.

## II.   DEBTOR CAN SELL THE BUSINESS ASSETS FREE AND CLEAR OF LIENS.

The Debtor seeks to sell its Assets free and clear of all liens, claims and interests of all

claimants and lienholders. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section
> free and clear of any interest in such property of an entity other than the
> estate, only if --
>
> (i)     applicable nonbankruptcy law permits sale of such property free
>         and clear of such interest;
>
> (ii)    such entity consents;
>
> (iii)   such interest is a lien and the price at which such property is to be
>         sold is greater than the aggregate value of such interest;
>
> (iv)    such interest is in bona fide dispute; or
>
> (v)     such entity could be compelled, in a legal or equitable proceeding, to
>         accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Any one of the five conditions, including the "consent" of the lienholders, provides

authority to sell free and clear of liens. *Citicorp Homeowners Services, Inc. v. Elliot (In re*

*Elliot),* 94 B.R. 343, 345 (ED. Pa. 1988). To the extent a secured creditor or lienholder that

receives notice does not file a written objection to the Sale Motion, such party should be deemed

to have consented to the sale. *In re Shary,* 152 B.R. 724, 725-26 (Bankr. N.D. Ohio 1993).

The Debtor believes that each of the secured creditors with an interest in the assets to be

sold have or will consent to such a sale. In fact, the sale process was established with the input

from AgStar, NMF, U.S Bank, and Otter Tail County. One of the consequences for failing to

raise capital for the reorganization plan was for the Debtor to seek a sale of substantially all of

its assets under Section 363. *See Disclosure Statement,* p. 29. Thus, Debtor believes that its

secured lenders will consent to the sale. In any event, the sale of Debtor's assets may occur over

their objections, or any other creditors' objection, so long as their respective liens attached to the

11

sale proceeds or there are sufficient sale proceeds to pay such claims in full.

The Debtor expects that in the sale, its senior lenders, AgStar and NMF, will be paid in full, or will have their debt assumed by the purchaser on terms acceptable to each lender. Thus, each party has consented to the sale, and for each senior lender the sales price will exceed the amount of their lien from which the assets from be sold from free and clear.

**III.    THE COURT SHOULD APPROVE THE CONDITIONS FOR THE CONSENT OF THE BOND TRUSTEE AND COUNTY APPROVAL FOR THE SALE AS MEMORIALIZED IN THE SOLID WASTE AGREEMENT.**

U.S Bank National Association as indenture trustee of the revenue bonds (the "Bond Trustee") and Otter Tail County (the "County") have advised the Debtor as to specific terms under which it will consent to the Sale, and, after some negotiation, the Debtor has agreed to those terms, which terms are reflected in the Solid Waste Agreement.

The Debtor has sought to make this a consensual process. To this end, the Debtor has reached the Solid Waste Agreement with the Bond Trustee and the County regarding their right to distributions from the sales proceeds and other assets of the Debtor. The Bond Trustee and the County otherwise refuse to consent to the sale absent the Debtor agreeing to the Solid Waste Agreement, and would force the Debtor's sale motion into a contested matter. As standing to contest the Sale, the Bond Trustee and the County would likely claim: (1) that it holds security interests in the Debtor's real property, fixed assets, and equipment (all of which is proposed to be sold under this motion), that it does not consent to the sale, and that the sales price otherwise does not exceed the amounts of those liens; (2) that they are the lessor and owner of the Solid Waste Facility, and that the Debtor has no right to sell this asset; (3) that the sale and any liquidation plan consistent therewith are not fair and equitable, notwithstanding the terms of the inter-creditor agreement, and cannot be approved or confirmed; and (4) that the proposed sale

and any liquidation of assets consistent therewith, absent the Solid Waste Agreement, would violate the legal principal of marshalling.

The Debtor has contested several of the arguments by the Bond Trustee and the County throughout the bankruptcy case, nonetheless the Debtor believes that this settlement is in the best interests of the estate. The aggregate principal amount of the claims of the Bond Trustee and Otter Tail County is $26,010,000, as compared with unsecured creditor proof of claims totaling approximately $300,000. Thus, even if the bondholders were completely unsecured and held no interest in the assets to be sold, they would still recover approximately 98.8% of any distribution to unsecured creditors. In addition, if the bondholders were correct in any of the arguments asserted above, the general unsecured creditors could be precluded from any recovery.

The salient terms of the Solid Waste Agreement are:

a. The Bond Trustee and County consent to the sale of the Debtor's Assets, including the Solid Waste Facility, free and clear of any further interest by the Bond Trustee, the County, or the bondholders.

b. The Bond Trustee and County have agreed to the entry of the Final Sales Order attached to this motion, under which the Bond Trustee and County agree to a full release of their claims in the Solid Waste Facility and related equipment.

c. The Bond Trustee and County will each have allowed claims of $20,000,000 and $6,000,000 respectively.

d. After full payment of the senior lienholders, AgStar and NMF, the Debtor shall pay 70% of the remaining proceeds and any cash on hand at the time of closing to the Bond Trustee and the County, pro rata, based on the principal amount of each party's claim.

e. Seventeen days after the closing, the Debtor will distribute all remaining assets on hand, except $2,500,000, to the Bond Trustee and County, pro rata, based on the principal amount of each party's claim.

f. The remaining $2,500,000 will be distributed to the Debtor's creditors, pro rata, based on a liquidation plan which the Debtor shall propose and which shall not be inconsistent with the Solid Waste Agreement.

13

The Debtor has agreed to the Solid Waste Agreement because of the need to promptly consummate a sale with the proposed stalking horse, or with a higher and better bid that will be received at an Auction. The Debtor believes that there is sufficient uncertainties and potential litigation delay surrounding the bonds' claims, and the result could delay that process causing the Debtor to lose its potential stalking horse. The potential litigation costs are also better reserved for distribution to the Debtor's creditors since the bondholders will recover almost all of that money regardless of the outcome of any litigation with the bondholders. As a result, the Debtor believes that the Solid Waste Agreement is necessary in order to complete this transaction with the stalking horse or an alternate purchaser.

The court should approve the Solid Waste Agreement pursuant to Bankruptcy Rule 9019, which requires, "on motion by the trustee and after notice and a haring, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct."[1]

In this case, the proposed settlement assures that the sales process, which will benefit the entire estate, will move forward, and will eliminate the risk of a contested matter initiated by the fulcrum creditor classes (the bonds) stalling the approval of the sale. Therefore, the settlement is in the best interests of the estate, and should be approved under Rule 9019.

## CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that this Court enter the orders granting the relief requested in the Motion. The court should first grant the specific order

---

[1] With respect to approval of the Solid Waste Agreement, it is a motion under Bankruptcy Rule 9019, which by operation of Bankruptcy Rule 2002(a)(3) requires 21 day notice. This motion, served on January 7, 2011, was served on 20 days notice. Because of the need to promplty complete the sale and hearing dates available, the Debtor requests for item (V) of this motion to be heard on an expedited basis.

filed by the Debtor outlining the Sales Procedures.  Upon completion of the Auction, and after

the Sale Approval Hearing, the Court should approve the sale of assets free and clear and

assumption and assignment of the executory contracts and unexpired leases.


Dated: January 7, 2011 _____          MACKALL, CROUNSE & MOORE, PLC

                                          By:/e/Timothy D. Moratzka_____
                                          Timothy D. Moratzka (Atty. No. 75036)
                                          Mychal A. Bruggeman (Atty. No 0345489)
                                          1400 AT&T Tower
                                          901 Marquette Ave
                                          Minneapolis, Minnesota  55402
                                          Phone: (612) 305-1400
                                          Fax: (612)305-1414


                                          ATTORNEYS FOR DEBTOR

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                              Case No. 09-61250

Otter Tail Ag Enterprises, LLC,
                                                    Chapter 11
            Debtor.

**ORDER (I) APPROVING FORM OF ASSET PURCHASE AGREEMENT AND
DESIGNATING STALKING HORSE BID; (II) APPROVING BREAK-UP FEE
AND EXPENSE REIMBURSEMENT; (III) APPROVING BIDDING AND
AUCTION PROCEDURES; (IV) AUTHORIZING DEBTOR TO CONDUCT
AN AUCTION FOR SALE OF ITS ASSETS; (V) AUTHORIZING DEBTOR
TO OFFER ASSIGNMENT OF ITS UNEXPIRED EXECUTORY
CONTRACTS AND LEASES; (VI) APPROVING FORM AND NOTICE OF
SALE; (VII) APPROVING SOLID WASTE AGREEMENT; AND (VIII)
SCHEDULING FURTHER SALE HEARING**

The motion of above-referenced Debtor seeking an Order: (I) Approving Form of Asset Purchase Agreement and Designating Stalking Horse Bid; (II) Approving Break-Up Fee and Expense Reimbursement; (III) Approving Bidding and Auction Procedures; (IV) Authorizing Debtor to conduct an Auction for Sale of its Assets; (V) Authorizing Debtor to offer Assignment of its Unexpired Executory Contracts and Leases; (VI) Approving Form and Notice of Sale; (VII) Approving Solid Waste Agreement; and (VIII) Scheduling Further Sale Hearing ("Sale Motion") came before the undersigned on January 27, 2011. Appearances were noted on the record.

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the Court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

1

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.[1]

B.      The Debtor has articulated good and sufficient reasons for approving the Sale Motion.

C.      Due and proper notice of the Sale Motion was provided and no other or further notice need be provided.

D.      The process for selection of the Stalking Horse (as defined herein) was fair and appropriate under the circumstances and is in the best interests of the Debtor's estate.

E.      The form of the Asset Purchase Agreement (the "APA"), attached as **<u>Exhibit A</u>** to the Sale Motion, is reasonable and is approved solely to the extent of its use as a form which all entities wishing to submit Qualified Bids for the Assets must follow.

F.      The Debtor has demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee and the Expense Reimbursement, each as set forth in the APA.

G.      The Break-Up Fee and Expense Reimbursement are fair and reasonable and provide a benefit to the Debtor's estate and parties in interest in these cases.

H.      The Debtor's obligation to the Stalking Horse (under the conditions and as set forth in the APA) for the Break-Up Fee and Expense Reimbursement: (a) is the result of arm's length negotiations among the parties that were not tainted by self-dealing or manipulation; (b) is reasonably tailored to encourage, rather than hamper, bidding for the Debtor's assets; (c) is an actual

---

[1] Findings of Fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

and necessary cost and expense of preserving the Debtor's assets, within the meaning of section 503(b) of the Bankruptcy Code; (d) is of substantial and commensurate benefit to the Debtor's estate; (e) is reasonable and appropriate, in light of the size and nature of the transaction and the substantial efforts that have been and will be expended by the Stalking Horse and the benefits the Stalking Horse is providing to the Debtor's estate, creditors and all parties in interest; (f) is necessary to ensure that the Stalking Horse will continue to pursue its proposed acquisition of the Acquired Assets; (g) is necessary to establish a bid standard and minimum bid for other bidders and attract additional bidders; and (h) is necessary to maximize the value to the Debtor's estate.

I.     The Break-Up Fee and Expense Reimbursement and the circumstances under which they become payable under the APA were material inducements for and conditions of, the Stalking Horse's entry into the APA.

J.     The Bidding Procedures, substantially in the form attached as **Exhibit B** to the Sale Motion, are fair, reasonable, appropriate and represent the best method for maximizing the value of the Debtor's assets.

K.     The Stipulation and Agreement for Sale and Liquidation of Assets of Otter Tail AG Enterprises, LLC (the "Solid Waste Agreement"), attached as **Exhibit C** to the Sales Motion, as between the Debtor, U.S. Bank National Association as indenture bond trustee, and Otter Tail County is fair and reasonable and in the best interest of the Estate to consummate a sale of the Debtor's assets to the Stalking Horse or a subsequent bidder.

L.     The entry of this Order is in the best interests of the Debtor and its estate, creditors and interest holders and all other parties in interest herein.

**IT IS HEREBY ORDERED:**

1.     The Sale Motion is granted to the extent set forth herein.

3

2.     The transaction contemplated by that certain Asset Purchase Agreement Pursuant, dated as of January 5, 2011, attached to the Sale Motion as **Exhibit A** among Otter Tail AG Enterprises, LLC, named therein as Sellers and OTAV, LLC (together with any of its affiliates or designees for purposes of consummation of the Asset Purchase Agreement, the "Stalking Horse") is designated as the Stalking Horse Bid.

3.     All objections filed in response to the Sale Motion are resolved as set forth herein and to the extent not resolved, are hereby overruled.

4.     The Debtor is authorized to conduct an Auction for the sale of all or substantially all of its assets free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the sale proceeds in the same order and priority as existed at the commencement of the case, subject to a further hearing and final court approval following the Auction (the "Sale").

5.     The Debtor is hereby authorized to offer the assignment of unexpired leases and executory contracts and to determine Cure Amounts in connection with the Sale authorized above, subject to further hearing and final court approval of the assignment or assignments (the "Assignment") and to give notice of proposed rejections of unexpired leases and executory contracts.

6.     The Bidding Procedures, substantially in the form attached as **Exhibit B** to the Sale Motion, are hereby incorporated herein and approved in their entirety;

7.     The Solid Waste Agreement between the Debtor, U.S. Bank National Association, and Otter Tail County, as attached as **Exhibit C**, is approved, and the Final Sale Order and any Chapter 11 Plan shall include terms consistent with the Stipulation.

8.     The Notice of Sale, substantially in the form attached as **Exhibit D** to the Sale

4

Motion, is hereby approved and the Debtor is authorized and directed to serve said Notice of Sale in the manner and upon the parties specified in the Sale Motion.

9.    Pursuant to Sections 105, 363, 503 and 507 of the Bankruptcy Code, the Debtor is hereby authorized, empowered and directed to pay an amount equal to the Break-Up Fee or the Expense Reimbursement, as applicable, to the Stalking Horse Bidder in accordance with the terms of the APA and without further order of this Court. The dollar amount of the Break-Up Fee and Expense Reimbursement and the circumstances under which the Break-Up Fee or Expense Reimbursement are payable, as set forth in Section 8.6 of the APA are approved. The Break-Up Fee and Expense Reimbursement shall be allowed as administrative expense claims in each of the Debtor's Chapter 11 Case pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, without further order of the Court. In addition, the right of the Stalking Horse Bidder to receive payment of the Break-Up Fee or Expense Reimbursement, as applicable, to the extent payable under the APA, shall be senior to any other expenses of the Estate.

10.    To the extent payable under the APA, the Seller's obligation to pay the Break-Up Fee or Expense Reimbursement, as applicable, shall survive termination of the APA and shall be payable by the Estate.

11.    If the Debtor is required pursuant to the terms of the APA to pay the Break-Up Fee or Expense Reimbursement, the Debtor is hereby authorized, empowered and directed to pay such applicable amount (a) from the proceeds of any Alternative Transaction giving rise to the Debtor's obligation to pay the Break-Up Fee, or (b) from the Debtor's available cash or proceeds of the Debtor's assets free and clear of all liens, claims, interests, encumbrances and administrative expenses of any and all of the Debtor's Secured Lenders or otherwise, and (c) to make such payments in accordance with the time frames and other terms and conditions set forth in the APA.

The Debtor's obligation to pay the Break-Up Fee or Expense Reimbursement, as applicable, shall be joint and several, absolute and unconditional and not subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever and shall not be amended, discharged, expunged or released in any respect pursuant to any plan of reorganization for the Debtor.

12.    This Court will hold a hearing on or after 1:30 p.m. February 17, 2011 (the "Sale Approval Hearing") to consider final approval of the Sale and Assignment. The Sale Approval Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than by announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

13.    Objections, if any, to those aspects of the Sale Motion not approved by this Order, but which will be approved at the Sale Approval Hearing (i.e. approval of the sale, and assumption / rejection of executory contracts) must be in writing and: (a) set forth the name of the objecting party and the nature and amount of any claims or interests held by such party against or in the Debtor's estate or property; (b) state with particularity the legal and factual bases for the objection and specific grounds therefor; (c) in conformance with Local Rule 9006-1(c) and Bankruptcy Rule 9006, must be mailed to the Clerk of the Bankruptcy Court by February 11, 2011, which is the last business day which is at least five days prior to the hearing, and must be mailed to the following counsel of the below-listed parties by that same date: (i) Debtor, to Mackall, Crounse & Moore, PLC, 901 Marquette Avenue, Suite 1400, Minneapolis, MN 55402; FAX: (612) 305-1414, attention to: Timothy D. Moratzka, Esq.; (ii) United States Trustee, to U.S. Trustee's Office, 1015 U.S. Courthouse, 300 South Fourth Street, Minneapolis, 55415; FAX: (612) 664-5516, attention to: Michael Fadlovich, Esq.; (iii) AgStar Financial Services, PCA, to Gray Plant Mooty Mooty Bennett, 1010 West Street Germain, #600, St. Cloud, MN 56301-0966; FAX: (320) 252-

4482, attention to: Phillip L. Kunkel, Esq.; (iv) <u>MMCDC New Markets Fund II, LLC</u>, to Rinke Noonan Ltd., 1015 West Street Germain, #300, St. Cloud, MN 56302-1497; FAX (320) 656-3500, attention to: James L. Wiant, Esq.; (v) <u>U.S. Bank National Association</u>, to Maslon, Edelman, Borman, and Brand, Ltd., 90 South Seventh Street, #3300, Minneapolis, MN 55402-4140; FAX: (612) 672-8397, attention to Clark T. Whitmore, Esq.; (vi) <u>Otter Tail County</u>, to Lindquist & Vennum, PLLP, 80 South Eighth Street, #4200, Minneapolis, MN 55402-2205; FAX: (612) 371-3207, attention to George H. Singer, Esq.

14.    The procedures for determining Cure Amounts through the Closing Date of the Sale of the Acquired Assets in accordance with the APA (including amounts of compensation for actual pecuniary loss) and the deadline for objections to the assumption and/or assignment of the Acquired Contracts and Assumed Leases set forth herein are approved.

15.    At least twenty (20) days prior to the Sale Approval Hearing, the Debtor shall distribute to non-Debtor parties to any Acquired Contracts, Assumed Leases, Excluded Contracts or Excluded Leases, a list of executory contracts and unexpired leases the Debtor intends to reject or assume and assign to the Stalking Horse in connection with the Sale (the "<u>Initial Contract and Lease Notice</u>"), setting forth including, as to the latter, any Cure Amount necessary to compensate such non-Debtor parties for actual pecuniary loss associated with such Acquired Contract or Assumed Lease.

16.    In the event Debtor's proposal regarding rejection or assumption and assignment of leases or contracts changes, whether due to change by the Stalking Horse or a Prevailing Bidder or Back-Up Bidder or for any other reason, Debtor shall promptly give notice of such change to the affected counter-party to the contract or leases (the "<u>Notice of Change</u>"). The Debtor's Notice of Change shall be given at least three days (including weekends and holidays)

7

prior to the date set for Sale Approval Hearing or any subsequent hearing. In the event of any change in the identity of the assignee after the Auction, such notice shall be given as promptly as possible after the Auction.  If the Debtor is unable to give such notice prior to the Sale Approval Hearing, then Debtor shall request at the Sale Approval Hearing that the Court set a hearing to consider any objections to the assumption and assignment or rejection proposed in the Notice of Change, so as to give affected counter-parties such notice.

17.    The non-Debtor parties to the Acquired Contracts or Assumed Leases set forth on the Initial Contract and Lease Notice shall have until three days before the Sale Approval Hearing at 4:00 p.m. prevailing Central Time (the "Contract Objection Deadline"), which deadline may be extended by the Debtor, with written consent of Stalking Horse or the Prevailing Bidder, to object to (a) the proposed assumption and assignment of such Acquired Contracts or Assumed Leases in connection with the Sale and/or (b) the proposed Cure Amounts set forth on the Initial Contract and Lease Notice; provided, however, if the Debtor otherwise provides a Notice of Change to a non-Debtor party to an Acquired Contract or Assume Lease, except where such proposed change in treatment was upon mutual agreement of the parties, the non-Debtor party shall have an additional ten (10) days after service of such notice (the "Amended Contract Objection Deadline").

18.    Any party objecting to (a) the proposed assumption and assignment of an Acquired Contract or Assumed Lease to which it is a non-Debtor counterparty and/or (b) the proposed Cure Amounts set forth on the Initial Contract and Lease Notice shall be required to file and serve such objection (each, a "Contract Objection"), in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the applicable Acquired Contract or Assumed Lease and/or all objections to the

8

potential assumption and assignment of such agreements, together with all documentation

supporting such cure claim or objection, so that the objection is received no later than 4:00 p.m.

prevailing Central Time on the Contract Objection Deadline or the Amended Contract Objection

Deadline, as applicable. If such objection is timely filed, the Bankruptcy Court shall hear any

such objection and determine the amount of any disputed Cure Amount or objection to

assumption and assignment not settled by the parties at the Sale Hearing or such later date as the

Court may deem appropriate.  Objections shall be served on the counsel for the following parties:

(i) Debtor, to Mackall, Crounse & Moore, PLC, 901 Marquette Avenue, Suite 1400, Minneapolis,

MN 55402; FAX: (612) 305-1414, attention to: Timothy D. Moratzka, Esq.; (ii) United States

Trustee, to U.S. Trustee's Office, 1015 U.S. Courthouse, 300 South Fourth Street, Minneapolis,

55415; FAX: (612) 664-5516, attention to: Michael Fadlovich, Esq.; (iii) AgStar Financial Services,

PCA, to Gray Plant Mooty Mooty Bennett, 1010 West Street Germain, #600, St. Cloud, MN

56301-0966; FAX: (320) 252-4482, attention to: Phillip L. Kunkel, Esq.; (iv) MMCDC New

Markets Fund II, LLC, to Rinke Noonan Ltd., 1015 West Street Germain, #300, St. Cloud, MN

56302-1497; FAX (320) 656-3500, attention to: James L. Wiant, Esq.; (v) U.S. Bank National

Association, to Maslon, Edelman, Borman, and Brand, Ltd., 90 South Seventh Street, #3300,

Minneapolis, MN 55402-4140; FAX: (612) 672-8397, attention to Clark T. Whitmore, Esq.; (vi)

Otter Tail County, to Lindquist & Vennum, PLLP, 80 South Eighth Street, #4200, Minneapolis,

MN 55402-2205; FAX: (612) 371-3207, attention to George H. Singer, Esq.

19.    Notwithstanding the inclusion of an executory contract or unexpired lease on any

list of Acquired Contracts and Assumed Leases, the Stalking Horse or Prevailing Bidder, as

applicable, shall have authority, in its sole discretion, to remove any contract or lease from the

list of Acquired Contracts and Assumed Leases either (i) at any time prior to the Court's entry of

an order approving assumption and assignment of such executory contract or unexpired lease, or (ii) within five (5) business days after the Bankruptcy Court sustains, in whole or in part, such non-Debtor party's objection to either the assumption and assignment or the proposed cure amount; in either such case, the Debtor shall not assume and assign such executory contract or unexpired lease to the party who removed such contract or lease from such list.

20.     In the event that no Contract Objection is timely filed with respect to an Acquired Contract or Assumed Lease, the applicable non-Debtor party shall be deemed to consent to the Cure Amount proposed by the Debtor and shall be forever enjoined and barred from seeking an additional amount on account of the Debtor's cure obligations under section 365 of the Bankruptcy Code or otherwise from the Debtor, its estate or the Prevailing Bidder on account of the assumption and assignment of such executory contract or unexpired lease and shall be deemed to have consented to the proposed assignment and assumption. In addition, if no timely Contract Objection is filed, the Prevailing Bidder shall enjoy all the rights and benefits under all Acquired Contracts and Assumed Leases, as applicable, without the necessity of obtaining any party's written consent to the Debtor's assumption and assignment of such rights and benefits, and each such party shall be deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment.

21.     The Stalking Horse shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to terminate or otherwise enforce any of its rights under the APA in accordance with the terms of the APA. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

22.     The Debtor is authorized and empowered to take such steps, expend such sums of

money and do such other things as may be necessary to implement and effect the terms and requirements established under this Order.

23.     The Stalking Horse and/or the Prevailing Bidder are hereby deemed to be parties-in-interest under 11 U.S.C. § 1109(b) for purposes of this Sale Motion, the Bidding Procedures, the Auction, the Sale Approval Hearing, any Contract Objection, and any other hearing or matters arising in connection with the APA and the Sale.

24.     This Order shall be binding upon and inure to the benefit of the Stalking Horse, Prevailing Bidder and its affiliates, successors and assigns, and the Debtor, including any Chapter 7 or Chapter 11 trustee or other fiduciary appointed for the estate of the Debtor, whether in these cases or subsequent bankruptcy cases or upon dismissal of any of these cases.

25.     As provided by Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon its entry.

26.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Break-Up Fee, the Expense Reimbursement, the Bidding Procedures, the Solid Waste Agreement, and the implementation of this Order.

Dated: _____ , 2010         _____
                                        Dennis D. O'Brien
                                        United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

---

In re:                                                    Case No. 09-61250

Otter Tail Ag Enterprises, LLC,
                                                          Chapter 11
        Debtor.

---

**ORDER (I) AUTHORIZING DEBTOR, TO SELL ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO BUYER IN ACCORDANCE
WITH ASSET PURCHASE AGREEMENT; (II) APPROVING THE ASSUMPTION AND
ASSIGNMENT OR REJECTION OF CERTAIN UNEXPIRED LEASES AND
EXECUTORY CONTRACTS; AND (III) GRANTING OTHER AND FURTHER RELIEF**

---

The Sale Motion of above-referenced Debtors for Order (I) Approving Form of Asset
Purchase Agreement and Designating Stalking Horse Bid; (II) Approving Break-Up Fee and
Expense Reimbursement; (III) Approving Bidding and Auction Procedures (IV)
Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, Interests, and
Encumbrances; (V) Approving the Solid Waste Agreement relating to the sale of the
Debtor's Solid Waste Facilities (on an expedited basis); (VI) Authorizing Assumption and
Assignment or Rejection of Unexpired Leases and Executory Contracts; (VII) Approving
Form and Notice of Sale; and (VIII) Scheduling Further Sale Hearing (the "Sale Motion").[1]
came before the undersigned on January 27, 2011, and this Court entered its Order dated
January 27, 2011 approving the Motion (the "Sale Procedure Order.")

In accordance with the 363 Sale Order and the Bidding Procedures approved therein by
the Court, the Debtor now, having followed said Bidding Procedures, has sought in a subsequent
hearing held on February 17, 2010, final authority by this court order to sell its assets to the

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Asset
Purchase Agreement, the Sale motion and/or the Bidding Procedures, as applicable, unless the context
requires otherwise.

1

Prevailing Bidder and to distribute certain proceeds thereof and assets of the estate in accordance with the 363 Sale Order and the agreement approved thereby.

Based on the Sale Motion, the 363 Sale Order, the arguments of counsel, all the files, records and proceedings herein, including the Affidavit of Christopher Wu, the Court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

**IT IS HEREBY FOUND THAT:**

A.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

B.    Venue of these cases ("Chapter 11 Cases") in this district is proper pursuant to 28 U.S.C. § 1409(a).

C.    Approval of the Sale is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N). The statutory predicates for the relief requested herein are Sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

D.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

E.    Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that (i) time is of the essences; (ii) there is no just reason for delay in the implementation of this Order; and (iii) the Court expressly directs entry of judgment as set forth herein.[2]

F.    An initial hearing (the "Sale Procedures Hearing") on the Sale Motion was held by this Court on January 27, 2011, and, on that date, the Court entered the Sales Procedure Order.

---

[2] Findings of Fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

2

G.      The Debtor and OTAV LLC, a wholly owned subsidiary of Green Plains Renewable Energy, Inc., (collectively, "Buyer") have complied with the Sale Procedures Order in all respects.

H.      Pursuant to the Sale Procedures Order, the Debtor timely received Qualified Bids on or before February 11, 2011, and an Auction was conducted on February 16, 2011 by the Debtor in consultation with their investment banker, Carl Marks and Associates ("CMAG"). The Sale Procedures Order set February 17, 2011 as the date of the hearing ("Sale Approval Hearing") for an order to approve the Sale ("Sale Approval Order").

I.      On January 7, 2011, the Debtor filed the Sale Motion and served copies of the Sale Motion in compliance with Local Rule 9013-3(a)(2). On January 27, 2011, Debtor served the Notice of Sale and Bidding Procedures in compliance with the Sale Procedures Order. Specifically, Notice of this Motion has been given to: (i) the United State Trustee; (ii) counsel for the Potentially Secured Parties; (iii) the SEC; (iv) the United States Attorneys' Office for the District of Minnesota and the Department of Justice in Washington, D.C.; (v) the Internal Revenue Service; (vi) all relevant federal, state and local taxing authorities at their statutory addresses; (vii) all parties who have filed a request for service of all pleadings pursuant to and in accordance with Bankruptcy Rule 2002 as of the day prior to service of the Motion; (viii) Buyer; (ix) all non-Debtor parties to executory contracts, unexpired leases, and other agreements with the Debtor (entered into before or after the Petition Date; (x) the Back-Up Bidder; (xi) all known creditors of the Debtor.[3]

J.      On January 27, 2011, the Debtor served Notice Concerning Unexpired Leases and Executory Contracts on the counterparties to such leases and contracts.

K.      The Debtor published notice of the Sale Motion, the Bidding Procedures, the

---

[3] To the extent the Debtor has previously served any party identified herein via electronic mail, such service of the Sale Notice constitutes good and sufficient notice thereof.

hearing(s) seeking approval of the Sale Motion, the time and place of the proposed Auction of the Acquired Assets, and the time for filing objections to the Sale Motion in the *Minneapolis Star Tribune* and *Wall Street Journal Midwest Edition* on [_____], 2011.

   L. Based upon the foregoing and the certificates of service and publication filed with the Court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the initial hearing on the Sale Motion, the Auction, the Sale Approval Hearing, the Sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts and the proposed rejection of the contracts has been provided in accordance with Section 102(1), Section 363(b) and Section 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008, due process of law and in compliance with the Sale Procedures Order and no other or further notice of the Sale Motion, the initial hearing on the Sale Motion, the Auction, the Sale Approval Hearing, the Sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts, the proposed rejection of the contracts or the entry of this Sale Approval Order is required or necessary.

   M. All parties in interest, including, without limitation, all parties who claim an interest in or lien upon the Acquired Assets, all equity members of the Debtor, all U.S. or foreign federal, state and local governmental taxing authorities who have, or as a result of the Sale of Acquired Assets may have, claims, contingent or otherwise against the Debtor, have been given a reasonably opportunity to object and be heard, regarding the relief requested in the Sale Motion. All objections to the Sale Motion were resolved, withdrawn or overruled at the Sale Approval Hearing.

   N. As demonstrated by the testimony or other evidence proffered or adduced at the Sale Approval Hearing: (i) the offer from the Buyer constitutes the highest and best offer(s) for the Acquired Assets; (ii) the Debtor conducted an auction process in accordance with, and have

otherwise complied in all respects with, the Sale Procedures Order; (iii) the auction process set forth in the Sale Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets; and (iv) the Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.

O.     In accordance with the Sale Procedures Order, the Asset Purchase Agreement was deemed a Qualified Bid (as defined in the Bidding Procedures) and was eligible to participate at the Auction.

P.     After consultation with the Consulting Parties in accordance with the Bid Procedures, the Debtor has determined that the APA constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Debtor's determination that the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtor's business judgment.

Q.     The APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Cases. No other Person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtor's estate than the Buyer.

R.     The purchase price as set forth in the APA (the "Purchase Price") for the Acquired Assets is fair and reasonable, and constitutes reasonable consideration and reasonably equivalent and fair market value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and Section 548 of the Bankruptcy Code) under the

5

Bankruptcy Code and under the laws of the United States, any state, territory, possession or the

District of Columbia.  Approval of the APA and the Sale of the Acquired Assets in accordance

with this Order and the APA are in the best interests of the Debtor's estate, creditors and other

parties in interest.  The terms of the APA were negotiated at arms'-length, in good faith, and are

fair and reasonable.

      S.     The APA was not entered into for the purpose of hindering, delaying, or

defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state,

territory, possession or the District of Columbia. Neither the Debtor nor the Buyer is entering

into the transaction contemplated by the APA fraudulently for the purpose of statutory and

common law fraudulent conveyance and fraudulent transfer claims.

      T.     The Debtor has demonstrated compelling circumstances and good, sufficient and

sound business purposes for the Sale of the Acquired Assets pursuant to Section 363(b) of the

Bankruptcy Code outside of a plan of reorganization and, in that, among other things:

> (1) To maximize the value of the Acquired Assets, a Sale must be accomplished within the time constraints set forth in the APA, the Sale Procedures Order and the Bidding Procedures because the value of the Acquired Assets may decrease during the time it would otherwise take to propose and confirm a plan of reorganization, and, in any event, a plan may not be necessary or confirmable in these Chapter 11 Cases;

> (2) Claims against the Debtor's estate will be minimized as a result of the prompt consummation of a Sale of Acquired Assets. The Buyer will be assuming certain Assumed Liabilities. To the extent that the Buyer assumes the Assumed Liabilities, the holders of such Assumed Liabilities will have no further recourse against the Debtor or its estate and the rights of the holders of such claims to pursue the Debtor or its estates for liability arising from such Assumed Liabilities will be extinguished; and

> (3) The Sale does not constitute a de facto plan of reorganization or liquidation or an element of such a plan for any of the Debtor, as it does not and does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtor; (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtor; (iii) circumvent

chapter 11 plan safeguards, such as those set forth in Sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests, compromise controversies or extend debt maturities.

U.      The Debtor (i) has full corporate or other power to execute, deliver, and perform its obligations under the APA and all other documents contemplated thereby or entered into in connection therewith, and the Sale of the Acquired Assets by the Debtors has, in each case, been duly and validly authorized by all necessary corporate or similar action, and (ii) has taken all action necessary to authorize and approve the APA and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into connection therewith.  No third-party approvals, other than those expressly provided in the APA, if any, are required by the Debtor to consummate such transaction.

V.      The Debtor is authorized and directed to sell and transfer the Acquired Assets free and clear of all Claims (as that term is defined in paragraph 7 hereof) because it has satisfied the requirements of Section 363(f) of the Bankruptcy Code.

W.      Except for the Assumed Liabilities and except as otherwise provided in the APA, the transfer of the Acquired Assets to the Buyer, and assumption and assignment to the Buyer of the Assumed Leases and Acquired Contracts, will not subject the Buyer to any liability whatsoever with respect to the operation of the Debtor's businesses prior to the Closing Date, including, without limitation, any liability arising from any of the following: (i) any employment or labor agreements, consulting agreements, severance arrangements, change in control agreements or other similar agreements to which any Debtor is or was a party, (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtor, (iii) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or

7

pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Family Medical Leave Act or the Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims; (v) environmental liabilities, debts, claims or obligations which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any other environmental, health and safety requirements, (vi) any bulk sales or similar law, and (vii) any litigation by or against the Debtor.

X.      Those holders of Claims against the Debtor, its estate or any of the Acquired Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to the Sale pursuant to Section 363(f)(2) of the Bankruptcy Code. The Debtor has met the requirements of Section 363(f)(5) with respect to all other holders of Claims as such Claim holders will have their Claims, if any, in each instance against the Debtor, its estate or any of the Acquired Assets, attach to the net cash proceeds of the Sale ultimately attributable to the Acquired Assets, in which such creditor alleges a Claim, in the same order of priority, with the same validity, force and effect that such Claims had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

Y.      U.S. Bank, National Association, and Otter Tail County hold a claim against the Debtor pursuant to a Solid Waste Facility Lease Agreement (defined in the APA as the "SWF Lease") which is repayable in total by Debtor in the same amount of three bond issuances.  The

8

first bond issuance consisted of $20,000,000 of subordinate exempt facility revenue bonds (Series 2007A)(the "Revenue Bonds").  U.S. Bank National Association (the "Revenue Bond Indenture Trustee") is the indenture trustee for the holders of the Revenue Bonds.  The Debtor has also executed a related Guaranty Agreement in favor of the Revenue Bond Indenture Trustee, whereby it guaranteed repayment of the $20,000,000 with respect to the Revenue Bonds.  The payments under the Guaranty Agreement are secured by a mortgage and security interest in favor of the Revenue Bond Indenture Trustee covering the Debtor's ethanol plant, related real property, and equipment.  Otter Tail County further completed two issuances of general obligation tax abatement bonds (Series 2007B and 2007C) totaling $6,010,000 (the "General Obligation Bonds").

Z.     The SWF Lease (as defined in the APA) is not a true lease but rather a security agreement.  The Debtor owned of all property covered by the SWF Lease, and may transfer that property free and clear of the claims of U.S. Bank, National Association, Otter Tail County, and the holders of the Revenue Bonds and the holders of the General Obligation Bonds.

AA.    By reason of the Debtor's legal rights and/or the Stipulation and Agreement for Sale and Liquidation of Assets of Otter Tail AG Enterprises, LLC (the "Solid Waste Stipulation") the Debtor has the right to convey title to the Acquired Assets free and clear of any liens or claims of the Revenue Bond Indenture Trustee, the holders of the Revenue Bonds and the County.

BB.    The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate and their creditors, if the sale of the Acquired Assets to the Buyer, the assumption of liabilities and obligations as set forth in the APA by the Buyer and the assignment of the Assumed Leases and Acquired Contracts

9

were not free and clear of all Claims including, but not limited to, successor liability.

CC.     The APA was negotiated, proposed and entered into by the parties in good faith, from arm's-length bargaining positions and without collusion. The Debtor has followed in good faith the procedures for notice and sale of the Acquired Assets as set forth in the Sale Procedures Order. The Buyer is not an "insider" or "affiliate" of the Debtor (as each such term is defined in the Bankruptcy Code). Neither the Debtor nor the Buyer have engaged in any conduct that would prevent the application of Section 363(m) of the Bankruptcy Code or cause the application of Section 363(n) of the Bankruptcy Code to the Sale and the transactions contemplated by the APA. Specifically, the Buyer has not acted in a collusive manner with any person and the aggregate price paid by Buyer for the Acquired Assets was not controlled by any agreement among the bidders. The Buyer is entitled to the protections afforded under Section 363(m) of the Bankruptcy Code because the Buyer is a good faith purchaser in that, *inter alia:* (a) except as set forth in the Sale Procedures Order, the Buyer recognized that the Debtor was free to deal with any other party interested in acquiring the Acquired Assets; (b) the Buyer complied with the provisions in the Sale Procedures Order; (c) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Sale Procedures Order; (d) the Buyer in no way induced or caused the chapter 11 filings by the Debtor; (e) all payments to be made by the Buyer in connection with the Sale have been disclosed; (f) no common identity of directors or controlling stockholders exists between the Buyer and the Debtor (g) the Buyer has not entered into any agreements that have not been disclosed to the Court; and (h) the negotiation and execution of the APA was at arms' length and in good faith.

DD.     Carl Marks Advisory Group, LLC acted as the Debtor's financial advisor for the sale of the Acquired Assets and worked with the Debtor and the Buyer to negotiate and finalize the

APA and the conveyance of the Acquired Assets to the Buyer pursuant hereto. To the extent that CMAG or any other Person is entitled to any fees in connection with negotiation and consummation of the Sale, Buyer shall not be liable in any way for such fees. The Debtor and its estate shall be solely liable to CMAG or any other Person for any such fees.

EE.    In the absence of a stay pending appeal, if any, if the Closing occurs at any time after entry of this Sale Approval Order, then, with respect to the APA, the Buyer, as a purchaser in good faith of the Acquired Assets, shall be entitled to the protections of Section 363(m) of the Bankruptcy Code if this Sale Approval Order or any authorization contained herein is reversed or modified on appeal.

FF.    The Debtor has the right and power to convey the Acquired Assets as the sole and lawful owner of the Acquired Assets. Effective as of the Closing, the transfer of the Acquired Assets is or will (i) be legal, valid and effective transfers of property of the Debtor's estate to the Buyer, as more particularly set forth in the APA, and (ii) vest the Buyer with all right, title, and interest of the Debtor and the Debtor's estate in and to the Acquired Assets free and clear of all Claims (as defined in Paragraph 7 herein) under Sections 363(f) and 105 of the Bankruptcy Code.

GG.    Adequate notice and opportunity to be heard was provided to parties to executory contracts and unexpired leases to be rejected or assumed and assigned pursuant to this Sale Approval Order. Further, parties received adequate notice and an opportunity to object to the amount of any cure owed by the Debtor's estates on account of any executory contract or unexpired lease to be assumed and assigned to the Buyer under the APA.

HH.    The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign those Assumed Leases and Acquired Contracts, as defined in the APA and described on Schedule 2.1(J) to the APA, including any amendments or modifications to

11

such Exhibits as agreed to by the Debtor and Buyer pursuant to the APA (collectively, the "Assumed Contracts"), in connection with the consummation of the Sale of Acquired Assets, and the assumption and assignment of the Assumed Leases and Acquired Contracts is in the best interests of the Debtor, its estate, its creditors and its members.  The Assumed Leases and Acquired Contracts being assigned to the Buyer as set forth in the APA are an integral part of the Debtor's business being purchased by the Buyer and, accordingly, such assumption and assignment of Assumed Leases and Acquired Contracts is reasonable, enhances the value of the Debtor's estate, and does not constitute unfair discrimination.

II.     The Debtor has obtained a waiver or paid or will pay all amounts it is required to pay in connection with the assumption and assignment of the Assumed Leases and Acquired Contracts, if any (the "Cure Amounts"), due or owing under Sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to (i) cure any defaults under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date or (ii) pay all actual or pecuniary losses that have resulted from such defaults (except with respect to those liabilities expressly assumed by Buyer pursuant to the APA).  Accordingly, the Debtor has satisfied the requirements of Sections 365(b)(1)(A) and (B) and Section 365(f)(2)(A) of the Bankruptcy Code. The Assumed Leases and Acquired Contracts are unexpired leases or executory contracts within the meaning of the Bankruptcy Code. The promises of Buyer and the Debtor to pay the Cure Amounts and the Buyer's promise to perform the obligations under the Assumed Leases and Acquired Contracts after the closing date shall constitute adequate assurance of the Buyer's future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date being assigned to it within the meaning of Sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

JJ.     The assumption and assignment of the Assumed Leases and Acquired Contracts is integral to the APA, is in the best interests of the Debtor and its estate, creditors and equity members, and represents the exercise of the Debtor's sound business judgment. Any objections to the assumption and assignment of any of the Assumed Leases and Acquired Contracts to the Buyer are hereby overruled. Any objections to the Cure Amounts associated with such Assumed Leases and Acquired Contracts are resolved as set forth herein. To the extent that any counterparty failed to timely object to (i) the proposed assumption and assignment of the applicable Assumed Lease or Acquired Contract or (ii) the Cure Amount associated with the applicable Assumed Lease or Acquired Contract, such counterparty is deemed to have consented to such Cure Amount and the assumption and assignments of its respective Assumed Lease or Acquired Contract to the Buyer.

KK.     The Debtor has demonstrated that it is an exercise of its sound business judgment to reject the Excluded Leases and Excluded Contracts listed on Schedule 2.3(A) to the APA, including any amendments or modifications to such Exhibit as agreed to by the Debtor and Buyer pursuant to the APA (the "Rejected Contracts"), in connection with the consummation of the Sale of the Acquired Assets, and rejection of the Rejected Contracts is in the best interest of the Debtor, its estate, the creditors and the equity members.

LL.     Unless such liabilities constitute Assumed Liabilities of the Buyer pursuant to the APA or this Sale Approval Order, the transfer of the Acquired Assets does not and will not subject the Buyer to any liability for Claims (as defined in Paragraph 7 herein) against the Debtor or its estate under the laws of the United States, any state, commonwealth, territory or possession thereof or the District of Columbia applicable to such transactions by reason of such transfer of the Acquired Assets.

13

MM.   Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (1) be a successor (or other such similarly situated party) to the Debtor (other than with respect to the Assumed Liabilities as expressly stated in the APA); (2) have, *de facto* or otherwise, merged with or into the Debtor; (3) be a mere continuation of the Debtor or its estate (and there is no continuity of enterprise between the Buyer and the Debtor); or (4) be holding itself out to the public as a continuation of the Debtor. The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtor, except as expressly set forth in the APA with respect to the Assumed Liabilities. The Debtor and its estate, and all parties who claim by or through them, will release and forever discharge the Buyer and any of its affiliates, successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the Sale, except for liabilities and obligations under the APA.

NN.   The Debtor has good, valid and marketable title to all of the Acquired Assets. The Acquired Assets are to be transferred free and clear of any and all Claims. All of the Acquired Assets are, or will on the date of Closing, be owned by the Debtor and will be transferred under the APA.

**IT IS HEREBY ORDERED:**

**General Provisions**

1.    The Sale Motion is hereby granted to the extent provided herein.

2.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise provided for by this Sale Approval Order, are overruled on the merits.

## Approval of the APA

3.      Each and every term of the APA and all other ancillary documents is hereby approved.

4.      The Sale of the Acquired Assets to Buyer pursuant to the APA is hereby authorized under Section 363(b) of the Bankruptcy Code and the entry of the Debtor into the APA is hereby approved.  The proceeds of sale shall first be to pay the administrative costs of the sale, including (i) the Break-Up Fee, and Expense Reimbursement, (ii) the payment of any reasonable Transaction Fee to CMAG, and (iii) payment of other Professional Fees specifically incurred in connection with the Sale, provided that the payment of fees to CMAG and to Debtor's counsel shall be subject to that certain Stipulation and Agreement for Sale and Liquidation of Assets among the Debtor, the County and the Bond Indenture Trustee dated as of January __, 2011 (the "Solid Waste Agreement"). The Net Proceeds (i.e. those amount remaining after payment of the administrative expenses above) from the sale shall be paid first to AgStar Financial Services, PCA on its own behalf and as an Administrative Agent on behalf of MMCDC New Markets Fund II, LLC ("NMF"), until their secured claims are paid in full taking into account any portion of those secured claims that may have been assumed by the Buyer with the written consent of AgStar or NMF as the case may be or both, then, second to the Bond Indenture Trustee and the County as set forth in the Solid Waste Agreement to the extent and in the manner provided therein. The balance of any sales proceeds, as well as Excluded Assets under the APA, shall be deposited into an account of the Debtor's and will be subject to the Solid Waste Agreement to the extent set forth therein and to the extent not distributed there under, be available for treatment under a Chapter 11 Plan to be filed or amended by the Debtor or as otherwise may be provided by the Bankruptcy Code.  All

15

distributions made pursuant to this Order shall be final when made and no longer property of the Debtor or the bankruptcy estate.

5.      The Debtor, through any corporate officer, is authorized and directed to execute and deliver, and empowered to fully perform under, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement such agreements, including taking any actions that otherwise would require further approval by members or its board of governors (without the need of obtaining such approvals) and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations of the Debtor under the APA, including effectuating amendments to the APA in furtherance thereof.  All Persons necessary to effect the transactions contemplated by the APA are hereby ordered to execute any and all documents necessary to effect such transactions. If any Person fails to comply with the provisions of this paragraph 5 prior to the Closing Date, such Person (or Persons, as the case may be) shall nonetheless be deemed bound to any and all documents necessary to effect the transactions contemplated under the APA.

6.      The Buyer shall not be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Approval Order.

**Transfer of the Acquired Assets**

7.     Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 363(f), the Acquired Assets shall be transferred to the Buyer, in accordance with the APA, free and clear of any and all liens, encumbrances, claims, charges and interests thereon and there against of whatever type or description, including, without limitation, mechanics', materialmens' and other consensual or statutory liens), obligations, mortgages, demands, guaranties, options, rights (including, but not limited to, rights of first refusal, rights of way and rights of recovery), contractual commitments, pledges, restrictions (including, but not limited to, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership of the Acquired Assets and all debts arising in any way in connection with any acts of the Debtor), easements, encumbrances, covenants, defects, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, conditional sale or other title retention agreements, options, contracts, offsets, recoupment, rights of recovery, judgments, orders, and decrees of any court or governmental entity, (all such claims and interests described in this paragraph shall hereafter be referred to as the "Claim" or "Claims", *provided, however,* the term Claims shall not include Assumed Liabilities), having arisen, existed or accrued prior to and through the Closing Date, whether direct or indirect, monetary or non-monetary, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, absolute or contingent, matured or unmatured, liquidated or unliquidated, of, by or against Debtor or the Acquired Assets and further including, without limitation, the following:

a.     Claims arising through the Closing Date, if any, of any governmental unit for taxes; any Claim arising through the Closing Date relating to any executory contract or lease (whether of personal or real property, or otherwise) affecting or in any way related

17

to the Acquired Assets, without limitation, Claims of Debtor's vendors, suppliers and/or customers arising from Debtor's failure to perform its obligations to said parties whether such failure occurred prior to or on the Closing Date or whether such failure arose as a result of an election by Buyer on or before the Closing Date not to accept and/or perform such vendors', suppliers' or customers' account and/or orders subsequent to the Closing Date;

b.      Any Claim arising through the Closing Date relating to work performed by any contractor or materialman that would give rise to a mechanic's lien, or similar Claim, against the Acquired Assets;

c.      Any Claim arising through the Closing Date for attorney's fees or other costs or expenses claimed by lessors, lessees, licensees or any other non-debtor parties to executory contracts or any lease;

d.      Any Claim arising through the Closing Date based on acts or omissions of the Debtor arising in tort, contract or otherwise, including, without limitation, Claims for successor liability or products liability;

e.      Any Claim arising through the Closing Date relating to liability arising under any federal, state or local revenue or tax law or requirement;

f.      Any Claim arising through the Closing Date relating to liability arising under (i) any employment or labor agreements, consulting agreements, severance arrangements, change in control agreements or other similar agreements to which Debtor is or was a party, (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtor, (iii) the cessation of the Debtor's operations, dismissal of employees, or

18

termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Family Medical Leave Act or the Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims; (v) liabilities, debts, claims or obligations which may be asserted on any basis under any environmental laws, rules or regulations including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any other environmental, health and safety requirements, (vi) any bulk sales or similar law, and (vii) any litigation by or against the Debtor

g.     Any claim by an employee of the Debtor relating to their termination by the Debtor as a consequence of this Sale Order or the transactions contemplated by the APA.

h.     Any claim by any person or entity relating to any health or welfare benefit for the benefit of any current or former employee of Debtor or their dependents or beneficiaries.

In addition, Buyer and its parent and affiliates, successors or assigns or their respective property (including the Acquired Assets) shall not be liable, by operation of law or otherwise, for any Claim by virtue of the purchase of the Acquired Assets or subsequent operation of the Acquired Assets or performance of the Assumed Leases and Acquired Contracts including, without limitation, claims of the type set forth in sub-paragraphs (a)-(h) above.

8.     All such Claims released, terminated and discharged as to the Acquired Assets

19

shall attach to the sale proceeds with the same validity, force and effect which they now have as against the Debtors, the estates or the Acquired Assets.  The sole and exclusive right and remedy available to purported creditors, equity members, including, without limitation, equity members of the Debtor, holders of Claims, and parties in interest shall be a right to assert Claims against the Debtor's estate.

9.     Any and all obligations, liens or rights related to the SWF Lease and Guaranty Agreement are hereby extinguished, and it is hereby further confirmed that the Acquired Assets include the assets previously covered by the SWF Lease and Guaranty Agreement and that such Acquired Assets are transferred free and clear of any and all interests of the mortgage and security interest securing the SWF Lease and related Guaranty Agreement, any interests of the Revenue Bond Indenture Trustee, Otter Tail County, holders of the Revenue Bonds, and holders of the General Obligation Bonds (all as defined in the APA).

10.     All persons and entities (including, but not limited to, the Debtor, creditors, equity members, including, without limitation, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials) and their respective successors or assigns and any trustees thereof, shall be and are hereby permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Acquired Assets or the Buyer and its successors or assigns as alleged successor or otherwise with respect to any Claims of any kind and nature with respect to the Acquired Assets, except for Assumed Liabilities.

11.     If the proposed Sale fails to close for any reason, then Claims shall continue against the Acquired Assets unaffected by this Sale Approval Order.

12.     The Buyer has any and all rights, claims, defenses and offsets held by Debtor and

20

the estate with respect to Assumed Liabilities.

13.    Except for Assumed Liabilities as set forth in the APA, the transfer of the Acquired Assets pursuant to this Sale Approval Order shall not subject the Buyer to any liability with respect to any obligations incurred in connection with, or in any way related to the Acquired Assets, prior to the date of Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability. The sole and exclusive right and remedy available to any Person who asserts any Claim or other liability with respect to any obligations incurred in connection with, or in any way related to the Acquired Assets, prior to the date of Closing or by reason of the Sale shall be a right to assert such Claim or other liability against the Debtor's estate.

**Assumption and Assignment to Buyer of Assumed Leases and Acquired Contracts**

14.    Pursuant to 11 U.S.C. §§ 105(a) and 365, and subject to and conditioned upon the Closing of the Sale, the Debtor's assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the APA [and the Assumption Order], of the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date is approved, and the requirements of 11 U.S.C. § 365(b)(1) with respect thereto are deemed satisfied.

15.    The Debtors is authorized and directed in accordance with 11 U.S.C. §§ 105(a) and 365 to (a) assume and assign to Buyer, effective upon the Closing of the Sale, the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date free and clear of all Claims, other than the Assumed Liabilities, and (b) execute and deliver to the

21

Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date to the Buyer.

16.     With respect to the Assumed Leases and Acquired Contracts: (a) each Assumed Lease and Acquired Contract, as applicable, is an unexpired lease or executory contract under Section 365 of the Bankruptcy Code; (b) the Debtor may assume each of the Assumed Leases and Acquired Contracts in accordance with Section 365 of the Bankruptcy Code; (c) the Debtor may assign each Assumed Lease and Acquired Contract in accordance with Sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Lease or Acquired Contract that prohibit or condition the assignment of such Assumed Lease or Acquired Contract or allow the party to such Assumed Lease or Acquired Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Lease or Acquired Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under Sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to Buyer of each Assumed Lease and Acquired Contract have been satisfied; (e) the Assumed Leases and Acquired Contracts shall be transferred and assigned to, and following the Closing remain in full force and effect for the benefit of Buyer, notwithstanding any provision in any such Assumed Lease or Acquired Contract (including those of the type described in Sections 365(b)(2), (c)(1) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to Section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assumed Leases and Acquired Contracts after such assignment to and assumption by Buyer; and (g) upon Closing, in accordance with

22

Sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Lease and Acquired Contract.

17.     Each of the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date shall, upon assignment to the Buyer, be deemed to be valid and binding on the Buyer and in full force and effect and enforceable in accordance with their terms, and following such assignment, the Debtor and the estate shall be relieved, pursuant to Section 365(k) of the Bankruptcy Code, any liability for any breach of such Assumed Leases and Acquired Contracts occurring after such assignment.

18.     Each non-Debtor party to an Assumed Lease and Acquired Contract specified in this Sale Approval Order or in a separate order of even date is hereby barred and enjoined from asserting against the Buyer, the Debtor or the Debtor's estate (i) any default existing as of the date of the Sale Hearing if such default was not raised or asserted in a timely manner prior to the entry of the Sale Approval Order or (ii) any objection to the assumption and assignment of such non-Debtor party's Assumed Leases and Acquired Contracts or the Cure Amount, if any, of which the non-Debtors party was given notice prior to the Sale Hearing. The assignment of each such Assumed Lease and Acquired Contract to the Buyer will not cause a default or otherwise allow the non-Debtor's party thereto to terminate or adversely affect the Buyer's rights thereunder. Unless expressly provided in the APA, in no event shall the Buyer be liable for any Cure Amounts or pre-Closing liabilities arising from or related to the Assumed Contracts with the exception of the Assumed Liabilities.

19.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtor as a result of the assumption, assignment and/or transfer of the Assumed Leases and Acquired Contracts.

23

20.    The Buyer's or its designated affiliate's promise to pay the Cure Amounts and to perform the obligations under the Assumed Leases and Acquired Contracts after the closing date shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date being assigned to it within the meaning of Sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

21.    Upon assignment of the Assumed Leases and Acquired Contracts to the Buyer at or subsequent to the Closing, no default shall exist under any Assumed Lease or Acquired Contract and no non-Debtor party to any Assumed Lease or Acquired Contract shall be permitted to declare a default by or against the Buyer under such Assumed Lease or Acquired Contract or otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Assumed Lease or Acquired Contract. Upon entry of this Order and assumption and assignment of the Assumed Leases and Acquired Contracts, the Buyer shall be deemed in compliance with all terms and provisions of the Assumed Leases and Acquired Contracts.

22.    Notwithstanding anything to the contrary in this Order, no executory contract or unexpired lease will be assumed and assigned unless and until approved by order of the Bankruptcy Court and until the Closing of the Sale.

23.    The failure of the Debtor or Buyer to enforce at any time one or more terms or conditions of any Assumed Lease or Acquired Contract shall not be a waiver of such terms or conditions, or of the Debtor's and Buyer's rights to enforce every term and condition of the Assumed Leases and Acquired Contracts.

**Rejection of Excluded Contracts**

24

24.     The Excluded Contracts shall be deemed rejected by the Debtor as of the date of Closing of the Sale pursuant to Section 365 of the Bankruptcy Code.

25.     Any person or entity that asserts a Claim against the Debtor's estate arising from the rejection of any of the Excluded Contracts shall be required to file a proof of claim with the Bankruptcy Court on or before thirty (30) days following service of this Sale Approval Order, or be forever barred from asserting such a Claim.

26.     Buyer shall not have any liability or other obligation arising from the Rejected Contracts or the rejection thereof. Any party to a Excluded Contract shall be forever and permanently enjoined, barred and estopped from asserting against the Buyer, any of its affiliates, its successors or assigns, their property or the Acquired Assets, any claim, lien or interest on account of any Excluded Contract or the rejection thereof.

**Additional Provisions**

27.     The transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Buyer. The Buyer is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code, and has otherwise acted in good faith with respect to the Debtor, the estate and the transaction contemplated by the APA.

28.     The consideration provided by the Buyer for the Acquired Assets under the APA (i) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the other laws of the United States, any state, territory, possession or the District of

Columbia and (ii) is fair and reasonable and may not be avoided under Section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

29.     Neither the Buyer, its parents nor affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (1) be a successor (or other such similarly situated party) the Debtor (other than with respect to the Assumed Liabilities as expressly stated in the APA); (2) have, *de facto* or otherwise, merged with or into the Debtor; (3) be a mere continuation of the Debtor or its estate (and there is no continuity of enterprise between the Buyer and the Debtor); or (4) be holding itself out to the public as a continuation of the Debtor.

30.     Each of the Debtor's creditors is hereby authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release such creditor's Claims in the Acquired Assets, if any, as such Claims may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens,* or other documents or agreements evidencing any Claims in, against or upon the Acquired Assets prior to the Closing Date of the Sale, in proper form for filing and executed by the appropriate parties, and has not executed termination statements, instruments of satisfaction, releases of all Claims which the person or entity has with respect to the Acquired Assets, then on the Closing Date, or as soon as possible thereafter, (i) the Debtor is hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (ii) the Buyer is hereby authorized on behalf of each of the Debtor's creditors, to file, register, or otherwise record a certified copy of this Sale Approval Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims in, against, or upon the Acquired Assets of any

26

kind or nature whatsoever.

31.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date, or as otherwise directed by Buyer, with the Claims of such entity to be satisfied solely from the proceeds of the Sale.

32.     The Buyer shall have no liability or responsibility for any liability or other obligation of the Debtor or its estate arising under or related to the Acquired Assets or other assets, operations, activities, or businesses of Debtor or its Affiliates other than for the Assumed Liabilities. Without limiting the generality of the foregoing, and except as otherwise specifically provided for herein and in the APA, the Buyer shall not be liable for any Claims, including any theory of successor or vicarious liability, of any kind or character whether known or unknown as of the date of Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Sale, the Debtor or its estate or any obligations of the Debtor or its Affiliates or the estate arising prior to the date of Closing, including but not limited to, liabilities arising, accruing, or payable under, out of, in connection with, or in any way relating to the Acquired Assets or the Acquired Business or the other assets, operations, activities, or businesses of the Debtor or its Affiliates.

33.     Subject to the APA, this Sale Approval Order (i) is and shall be effective as a determination that, at Closing, all Claims (except Assumed Liabilities) existing as to the Acquired Assets prior to the date of the Closing have been and hereby are unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyance described in this Sale Approval Order has been effected, (ii) is and shall be effective to cause all Claims (except Assumed Liabilities) to attach to and be perfected in the proceeds of the Sale of the

27

Acquired Assets, in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, without the need to file any financing statements or other evidence of perfection, and (iii) is and shall be binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

34.    The Debtor or the Buyer and any agent or representative of either of them, are each hereby authorized and empowered to serve upon all filing and recording officers a notice when filing or recording any instruments of transfer (including, without limitation, deeds, leases, and assignments, modifications and terminations of leases) in accordance with this Sale Approval Order and the APA to evidence and implement this paragraph of the Sale Approval Order. All filing and recording officers are hereby directed to accept, file and record all instruments of transfer including, without limitation, deeds, leases, and assignments, modifications and terminations of leases (if any) to be filed and recorded pursuant to and in accordance with this Sale Approval Order or the APA and the various documents related thereto, without the payment of taxes associated with the transfer of the Acquired Assets to the Buyer.

35.    This Court retains exclusive jurisdiction to (i) enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, (ii) compel delivery of the Acquired

Assets to the Buyer, (iii) resolve any disputes arising under or related to the APA and related agreements, except as otherwise provided therein, (iv) enjoin and adjudicate the assertion of any Claims against the Buyer or the Acquired Assets, and (v) interpret, implement and enforce the provisions of the APA or this Sale Approval Order.

36.     As of the Closing, all agreements and all orders of this Court entered prior to the date hereof shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this Sale Approval Order and the APA.

37.     Nothing contained (i) in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases, (ii) the order of confirmation confirming any plan of reorganization (or liquidation), (iii) any order dismissing the Chapter 11 Cases or converting it to a Chapter 7 liquidation or (iv) any order appointing an examiner or trustee in the case shall conflict with or derogate from the provisions of the APA or the terms of this Sale Approval Order and no such plan or order shall discharge the obligations of the Debtor under this Sale Approval Order or the APA or any documents or agreements delivered in connection therewith.

38.     The terms and provisions of the APA, together with the terms and provisions of this Sale Approval Order, shall be binding in all respects upon, and inure to the benefit of, the Buyer, the Debtor, the Debtor's estate, any of Debtor's affiliates, successors and assigns, the Debtor's creditors, equity members, including, without limitation, minority equity members of the Debtor, and third parties, including, but not limited to persons asserting a Claim against or interest in the Debtor's estate or any of the Acquired Assets to be sold to the Buyer pursuant to the APA or any persons that are party to any Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date, and their respective successors and assigns.  If a trustee or examiner is subsequently appointed in this Case, such trustee or

examiner shall likewise be bound, in all respects, to the terms and provisions of this Sale Approval Order. The Order and the APA shall not be subject to rejection pursuant to Section 365 of the Bankruptcy Code or otherwise.

39.    The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement is either not material or is not less favorable to the Debtor. In the event a modification is material and less favorable to the Debtor, the Debtor shall file and serve a notice of such material modification. If no party-in-interest objects within five (5) business days, the modification shall be deemed approved and the Court may enter any such further order as may be necessary.

40.    The failure specifically to include any particular provisions of the APA in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

41.    Upon Closing, the Debtor and its estate shall be deemed without further action or order of the Court to have released and discharged the Buyer and its affiliates, and their respective officers, directors, representative, agents, attorneys, investment bankers, and professionals, of and from any causes of action, legal or equitable, suits, debts, covenants, contracts, agreements, judgments, executions, claims, and demands whatsoever whether known or unknown, including in connection with the APA and the Sale of the Acquired Assets, except for obligations arising hereunder or under the APA.

39.    The provisions of Bankruptcy Rule 6004(h) and 6006(d) staying the effectiveness of this Order for fourteen (14) days are hereby waived, and this Order shall be effective

immediately upon entry thereof.

    40.    To the extent that this Order is inconsistent with any prior Order or pleading with respect to the Sale Motion in these Chapter 11 Cases, the terms of this Order shall govern.

Dated: _____

                                _____

                                Dennis D. O'Brien
                                United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

---

In re:                                                    Case No. 09-61250-DDO

Otter Tail AG Enterprises, LLC
                                                                Chapter 11

        Debtor.

---

UNSWORN DECLARATION FOR PROOF OF SERVICE

Jinah E. Finnes, employed by Mackall, Crounse & Moore, attorney(s) licensed to practice law in this court, with office address of 1400 AT&T Tower, 901 Marquette Avenue, Minneapolis, MN 55402-2859, declares that on the dates set forth below, she caused the following documents:

**Notice of Motion and Motion for 363 Sale, etc.; Affidavit of Christopher K. Wu; Exhibit A – Asset Purchase Agreement (executed); Exhibit B – Bidding Procedures; Exhibit C – Solid Waste Agreement; Exhibit D – Notice of Sale; Sales Procedure Order; Final Sales Order; and Unsworn Declaration for Proof of Service.**

to be filed electronically with the Clerk of Court through ECF, and that ECF will send an e-notice of the electronic filing to the following:

- Mychal A. Bruggeman    mab@mcmlaw.com, tmoratzka@ecf.epiqsystems.com;ldj@mcmlaw.com;mcm_trustee@mcmlaw.com;jef@mcmlaw.com
- Sara L. Bruggeman    sbruggeman@faegre.com
- Sonia A Chae    chaes@sec.gov
- Monica L. Clark    clark.monica@dorseylaw.com
- Michael Fadlovich    michael.fadlovich@usdoj.gov
- Lara O. Glaesman    lara.glaesman@leonard.com, ma.xiong@leonard.com
- Phillip Kunkel    phillip.kunkel@gpmlaw.com
- Kent D. Mattson    t.chaput@pemlaw.com
- Jessica A. Mitchell    jessica.mitchell@gpmlaw.com, terri.luzovich@gpmlaw.com
- Timothy D Moratzka    mcm_trustee@mcmlaw.com, tmoratzka@ecf.epiqsystems.com;ldj@mcmlaw.com
- Timothy D. Moratzka    tdm@mcmlaw.com, ldj@mcmlaw.com;jef@mcmlaw.com
- George H Singer    gsinger@lindquist.com, edaniels@lindquist.com
- Amy J Swedberg    amy.swedberg@maslon.com
- US Trustee    ustpregion12.mn.ecf@usdoj.gov
- James L. Wiant    jwiant@Rnoon.com

1

I further certify that I caused a copy of the foregoing documents and the notice of electronic filing to be e-mailed to the following non-ECF participants:

SEE ATTACHED LIST

And I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: January 7, 2011                    Signed: /e/ Jinah E. Finnes

1335456.1-JEF

2

OTTER TAIL AG ENTERPRISES, LLC
BKY NO. 09-61250-DDO

### SERVICE LIST

| | |
|---|---|
| Agstar Financial Services, PCA<br>1921 Premier Dr<br>Mankato, MN 56002 | Ag States Group<br>P O Box 64089<br>Saint Paul MN 55164-0089 |
| Boulay Heutmaker Zibell & Co<br>Attn: Jadin C. Bragg<br>7500 Flying Cloud Dr, Ste 800<br>Minneapolis, MN 55344 | BP Canada Energy Marketing Corp.<br>Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, NY  10178 |
| BP Canada Marketing Corp.<br>4211 South 143rd Circle<br>Omaha NE 68137 | Bilden Farms LLC<br>208988 Cty Hwy 24<br>Erhard MN 56534 |
| Bond Trust Services<br>Attn: Connie Kuck<br>3060 Centre Point Dr.,#110<br>Saint Paul MN 55113-1105 | Bremer Bank<br>2330 College Way<br>Fergus Falls MN 56537 |
| Carl Marks Advisory Group LLC<br>Attn: Christopher Wu<br>900 Third Ave<br>New York, NY 10022 | Carlton Industries, LP<br>Attn: Accounts Receivable<br>PO Box 280<br>La Grange, TX 78945 |
| Caterpillar Financial Services<br>2120 West End Avenue, 11th Fl<br>P O Box 34001<br>Nashville TN 37203-0001 | Cenex Harvest States Inc.<br>5500 Cenex Drive<br>Inver Grove Heights MN 55077 |
| Christianson & Associates PLLP<br>Attn: Marti Nieland<br>302 Fifth St SW<br>Willmar, MN 56201 | Danisco US Inc<br>c/o Stephen K. Dexter<br>Lathrop & Gage, LLP<br>370 17th St, Ste 4650<br>Denver, CO 80202-5607 |
| De-Lage Landen<br>P O Box 41602<br>Philadelphia PA 19101-1602 | De Lage Landen Financial Services, Inc.<br>1111 Old Eagle School Rd<br>Wayne, PA 19087 |

1

Delta-T Corporation
Jamie Haartzler & Mark Shmorhun
133 Waller Mill Rd
Williamsburg, VA 23185

Duncan Co.
425 Hoover St NE
Minneapolis, MN 55413

Fergus Falls
204 US Courthouse
118 S Mill St
Fergus Falls, MN 56537

Fredrikson & Byron PA
Attn: Todd Taylor
200 South Sixth St, Ste 4000
Minneapolis, MN 55402

Harris Mechanical
909 Montreal Circle
St. Paul, MN 55102

Hawkins, Inc.
3100 E Hennepin Ave
Minneapolis, MN 55413

Herc-U-Lift
5655 Highway 12 West
Maple Plain MN 55359-0069

Internal Revenue Service
30 E. 7th Street, Ste 1222
M/S 5700
St. Paul, MN 55101

Internal Revenue Service
Special Procedures Branch
389 US Courthouse--316 N Robert
St. Paul, MN 55101

Lakes Area Network Solutions
1115 Westside Drive
Fergus Falls MN 56537

Lake Regions Electrical Coop
PO 643
Pelican Rapids, MN 56572-0643

MMCDC New Markets Fund II, LLC
119 Graystone Plaza
PO Box 623
Detroit lakes, MN 56502

MN Dept. of Revenue
Collection Enforcement
551 Bky.Sec.-PO Box 64447
Saint Paul MN 55164

MN Pollution Control
520 Lafayette Rd No.
Saint Paul MN 55155-4194

MN Special Liquids Inc.
401 S. Kniss
Luverne MN 56156

Nationwide Agribusiness
Processing Ctr
PO Box 10491
Des Moines, IA 50306

Nationwide Agribusiness Insurance Co
Randall J Kramer, Managing Counsel
1100 Locust St D1-7c-0301
Des Moines IA 50391-0301

New Horizons Ag Services
P O Box 230
Herman MN 56248

2

Otter Tail County Bonds
520 W Fir Ave
Fergus Falls, MN 56537

Renewal Products Marketing Gr.
1157 Valley Park Dr S, Suite 100
Shakopee, MN 55379

Tim Enderson
625 W Lincoln
Fergus Falls, MN 56537

Trinity Leasing Customer Pmt.
W510131
PO Box 7777
Philadelphia, PA 19175-0131

US Bank National Association
Attn: Patricia J. Kapsch
60 Livingston Ave
St. Paul, MN 55107

U.S. Energy Services, Inc.
605 North Highway 169, Ste 1200
Minneapolis MN 55441

Zurich American Ins Co.
Attn Marc Ouimet
9th Flr Tower 2
1400 American Lane
Schaumburg IL 60196

Pemberton Sorlie Rufer Kershner, PLLP
110 N Mill St
Fergus Falls, MN 56537

Security State Bank
128 E Washington Ave
Fergus Falls, MN 56537

Trinity Industries Leasing Co.
2525 Stemmons Freeway
Dallas, TX 75207

U.S. Bank National Association
c/o Clark T. Whitmore, Esq.
Maslon Edelman Borman & Brand, LLP
3300 Wells Fargo Center
90 South 7th Street
Minneapolis, MN  55402

US Dept Transportation/Fra
Office Of The Chief Counsel
Mail Stop 10
1200 New Jersey Ave Se
Washington DC 20590

Willis Insurance
P O Box 93076
Chicago IL 60673-3076

United States Attorney's Office
District of Minnesota
U.S. Courthouse, Suite 600
300 South Fourth Street
Minneapolis, MN 55415