## EXHIBIT A: STALKING HORSE ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

OTTER TAIL AG ENTERPRISES, LLC

AND

OTAV LLC

# TABLE OF CONTENTS

Page

**ARTICLE 1. DEFINITIONS.** ................................................................................................................. 1

**ARTICLE 2. PURCHASE AND SALE** ..................................................................................................... 8

    2.1 ACQUIRED ASSETS. ........................................................................................................................ 8
        A.   Owned Tangible Personal Property. ............................................................................... 8
        B.   Leased Tangible Personal Property. ............................................................................... 8
        C.   Real Property. ................................................................................................................. 8
        D.   Business Papers and Lists. .............................................................................................. 9
        E.   Permits. .......................................................................................................................... 9
        F.   Intellectual Property Rights. .......................................................................................... 9
        G.   Warranties to Seller. ...................................................................................................... 9
        H.   Prepaid Expenses. ........................................................................................................ 10
        I.   Inventory. ..................................................................................................................... 10
        J.   Acquired Contracts. ...................................................................................................... 10
    2.2 TRANSFER OF ACQUIRED ASSETS. .................................................................................................. 10
    2.3 EXCLUDED ASSETS. ...................................................................................................................... 11
        A.   Excluded Contracts. ...................................................................................................... 11
        B.   Seller's Business Records ............................................................................................... 11
        C.   Benefit Plans. ................................................................................................................ 11
        D.   Rights Under This Agreement. ...................................................................................... 11
        E.   Actions under the Bankruptcy Code. ............................................................................ 12
        F.   Certain Tax Refunds. .................................................................................................... 12
        G.   Goodwill and Other Assets. .......................................................................................... 12
        H.   Excluded Cash. ............................................................................................................. 12
        I.   Accounts Receivable. .................................................................................................... 12
        J.   Excluded Personal Property. ......................................................................................... 12
    2.4 ASSUMPTION AND REJECTION OF CONTRACTS AND LEASES; CURE COSTS. ...................................... 12
        A.   Additional Contracts. ................................................................................................... 12
        B.   Provision of Materials to Buyer. .................................................................................. 13
    2.5 RETAINED AND ASSUMED LIABILITIES OF SELLER. .......................................................................... 13
        A.   Retained Liabilities. ...................................................................................................... 13
        B.   Assumed Liabilities. ...................................................................................................... 14
    2.6 PURCHASE PRICE. ........................................................................................................................ 15
        A.   Purchase Price. ............................................................................................................. 15
        B.   Good Faith Deposit. ...................................................................................................... 16
        C.   Payments on the Closing Date. ..................................................................................... 16
        D.   Discharge of Assumed Liabilities After Closing. ......................................................... 16
    2.7 INVENTORY ADJUSTMENT. ............................................................................................................ 16
        A.   Inventory Estimated Amount. ....................................................................................... 16
        B.   Inventory Count. ........................................................................................................... 17
        C.   Buyer Objections. ......................................................................................................... 17
        D.   Resolution of Disputes during Initial Resolution Period. ............................................ 17
        E.   Resolution of Disputes after Initial Resolution Period. ............................................... 17
        F.   Adjustment Amounts. .................................................................................................... 18
        G.   Payment of Adjustment Amounts. ................................................................................ 18
        H.   Fees and Costs. ............................................................................................................. 18
    2.8 CLOSING. .................................................................................................................................... 19
        A.   Buyer's Delivery of Balance of Purchase Price. ......................................................... 19
        B.   Other Deliveries by Buyer and Seller. ......................................................................... 19
    2.9 TITLE AND RISK OF LOSS. ............................................................................................................ 19

**ARTICLE 3. REPRESENTATIONS OF SELLER** ................................................................................... 20

i

3.1 ORGANIZATION AND GOOD STANDING. ............................................................................................20
3.2 AUTHORITY RELATIVE TO AGREEMENT. ..........................................................................................20
3.3 TITLE TO ACQUIRED ASSETS. ......................................................................................................20
3.4 COMPLIANCE WITH LAWS. ........................................................................................................20
3.5 LITIGATION. ..........................................................................................................................21
3.6 CONTRACTS AND LEASES. .........................................................................................................22
3.7 CORN CONTRACTS. ..................................................................................................................22
3.8 THE SWF LEASE. ...................................................................................................................22
3.9 BROKERS AND FINDERS. ...........................................................................................................23
3.10 REAL PROPERTY DISCLOSURES. ...................................................................................................23
3.11 RESTRICTIONS ON DOING BUSINESS. ...........................................................................................23
3.12 RECORDS. .............................................................................................................................24
3.13 PERMITS. ..............................................................................................................................24
3.14 TAXES. .................................................................................................................................24
3.15 EMPLOYMENT MATTERS. ..........................................................................................................24
3.16 NO OTHER REPRESENTATIONS OR WARRANTIES. ............................................................................24
3.17 ACQUIRED ASSETS "AS IS" ......................................................................................................25

**ARTICLE 4. REPRESENTATIONS OF BUYER** ...........................................................................................25

4.1 ORGANIZATION AND GOOD STANDING. ..........................................................................................25
4.2 AUTHORITY RELATIVE TO AGREEMENT. ..........................................................................................25
4.3 CONFLICTS AND PENDING ACTION. ...............................................................................................25
4.4 AVAILABILITY OF FUNDS. ..........................................................................................................26
4.5 BROKERS AND FINDERS. ...........................................................................................................26
4.6 BUYER'S KNOWLEDGE. .............................................................................................................26

**ARTICLE 5. PRECLOSING COVENANTS OF THE PARTIES** .........................................................................26

5.1 ACCURACY OF REPRESENTATIONS. ...............................................................................................26
5.2 NOTICES. ..............................................................................................................................26
5.3 INTERIM OPERATIONS BY SELLER. ...............................................................................................27
    A. *Conduct of Business.* ......................................................................................................27
    B. *Contractual Obligations.* .................................................................................................27
    C. *Material Changes.* ........................................................................................................27
    D. *Encumbrances or Transfers.* ...........................................................................................27
    E. *Agreements.* ...............................................................................................................28
    F. *Material Adverse Effect.* .................................................................................................28
    G. *Applicable Laws.* .........................................................................................................28
5.4 CLOSING CONDITIONS. .............................................................................................................28
5.5 BUYER'S ACCESS TO INFORMATION AND RECORDS BEFORE CLOSING. ....................................................28
5.6 GOVERNMENT FILINGS. ............................................................................................................28
5.7 HSR ACT. .............................................................................................................................28
5.8 EXCLUSIVE DEALING. ...............................................................................................................29
5.9 UPDATING OF SCHEDULES. ........................................................................................................29
5.10 INSURANCE POLICIES. ..............................................................................................................29
5.11 TAX ALLOCATION OF ASSETS. ....................................................................................................29
    A. *Allocation Statement.* ....................................................................................................29
    B. *Objection to Allocation Statement.* ..................................................................................29
    C. *Binding Effect of Allocation Statement.* .............................................................................30
5.12 ACCESS AFTER CLOSING. ...........................................................................................................30
    A. *Books and Records Acquired by Buyer.* ..............................................................................30
    B. *Books and Records Not Acquired by Buyer.* .........................................................................30

**ARTICLE 6. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER** ..........................................................31

| | | |
|---|---|---|
| 6.1 | REPRESENTATIONS AND WARRANTIES; CERTIFICATE. | 31 |
| 6.2 | PERFORMANCE BY SELLER; CERTIFICATE. | 31 |
| 6.3 | CERTIFIED RESOLUTIONS. | 31 |
| 6.4 | NO MATERIAL ADVERSE CHANGE. | 31 |
| 6.5 | INSTRUMENTS OF SALE, ETC. | 31 |
| 6.6 | SALE ORDER. | 32 |
| 6.7 | BANKRUPTCY ASSIGNMENT ORDER. | 32 |
| 6.8 | ASSUMED INDEBTEDNESS DOCUMENTS. | 32 |
| 6.9 | HSR ACT. | 32 |
| 6.10 | PERMITS. | 32 |
| **ARTICLE 7. CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER** | | **32** |
| 7.1 | REPRESENTATIONS AND WARRANTIES ACCURATE; CERTIFICATE. | 32 |
| 7.2 | PERFORMANCE BY BUYER; CERTIFICATE. | 32 |
| 7.3 | CERTIFIED RESOLUTIONS. | 33 |
| **ARTICLE 8. ADDITIONAL COVENANTS** | | **33** |
| 8.1 | MOTION IN BANKRUPTCY COURT. | 33 |
| 8.2 | SALE PROCEDURE ORDER. | 33 |
| 8.3 | BANKRUPTCY ASSIGNMENT ORDER. | 33 |
| 8.4 | THE SALE ORDER. | 34 |
| 8.5 | OBTAINING THE BANKRUPTCY ASSIGNMENT ORDER AND THE SALE ORDER. | 34 |
| 8.6 | BREAKUP FEE. | 34 |
| 8.7 | NO ASSUMPTION. | 35 |
| 8.8 | SELLER'S EMPLOYEES. | 35 |
| A. | *No Obligation to Hire.* | *35* |
| B. | *Severance Benefits.* | *35* |
| C. | *Seller's Employment Agreements.* | *35* |
| D. | *No Rights to Employment.* | *36* |
| E. | *Plant Closing Laws.* | *36* |
| 8.9 | FURTHER ASSURANCES. | 36 |
| 8.10 | COOPERATION WITH RESPECT TO REGULATORY MATTERS. | 36 |
| 8.11 | COOPERATION IN TAX PROCEEDINGS. | 36 |
| 8.12 | COOPERATION IN LITIGATION. | 37 |
| 8.13 | REMOVAL OF EXCLUDED PERSONAL PROPERTY. | 37 |
| 8.14 | FILING REPORTS AND MAKING PAYMENTS. | 37 |
| 8.15 | CONFIDENTIAL INFORMATION. | 37 |
| 8.16 | PRORATION. | 38 |
| A. | *Ad valorem Taxes.* | *38* |
| B. | *Tax Proration.* | *38* |
| C. | *Utilities and Other Trade Payables Proration.* | *38* |
| 8.17 | REJECTION OF EXCLUDED CONTRACTS AND EXCLUDED LEASES. | 39 |
| 8.18 | COSTS FOR COOPERATIVE OBLIGATIONS. | 39 |
| **ARTICLE 9. INDEMNIFICATION** | | **39** |
| 9.1 | INDEMNITY BY BUYER. | 39 |
| 9.2 | OTHER REMEDIES. | 39 |
| 9.3 | DEFENSE OF CLAIMS. | 40 |
| A. | *Notice of Claim.* | *40* |
| B. | *Cooperation by Indemnified Party.* | *40* |
| C. | *Participation in Defense by Indemnifying Party.* | *40* |
| D. | *Rights of Indemnifying Party.* | *40* |
| E. | *Indemnifying Party Bound.* | *41* |

1329243.11-RSL

     F.    *If the indemnifying party does not  assume the defense of a Claim:*.......................................41
     G.    *Attorney's fees.*...........................................................................................................41
     H.    *Defenses where there is a Breach by Buyer.*...................................................................41

**ARTICLE 10. TERMINATION**.........................................................................................................41

    10.1    TERMINATION EVENTS.................................................................................................41
     A.    *Mutual Consent.*............................................................................................................41
     B.    *Closing Not Occurred.*...................................................................................................42
     C.    *Third Party Transaction.*................................................................................................42
     D.    *Effectiveness of APA in the Event Buyer is Back-Up Bidder.*.............................................42
     E.    *Seller's Termination Rights.*...........................................................................................42
    10.2    NOTICE.....................................................................................................................42
    10.3    EFFECT OF TERMINATION.............................................................................................42

**ARTICLE 11. MISCELLANEOUS**....................................................................................................43

    11.1    SURVIVAL..................................................................................................................43
    11.2    WAIVER, DISCHARGE, ETC..........................................................................................43
    11.3    NO THIRD PARTY BENEFICIARY.....................................................................................43
    11.4    COMPLETE AGREEMENT..............................................................................................43
    11.5    NOTICES...................................................................................................................43
    11.6    EXPENSES.................................................................................................................44
    11.7    EXECUTION PARTIES/SUCCESSORS AND ASSIGNS............................................................44
    11.8    EXECUTION IN COUNTERPARTS....................................................................................44
    11.9    TITLES AND HEADINGS................................................................................................45
    11.10    SCHEDULES.............................................................................................................45
    11.11    GOVERNING LAW.....................................................................................................45
    11.12    JURISDICTION..........................................................................................................45
     A.    *Prior to the closing of the Bankruptcy Case.*.................................................................45
     B.    *Upon the closing of the Bankruptcy Case.*....................................................................45
    11.13    WAIVER OF JURY TRIAL.............................................................................................46

1329243.11-RSL

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of the 5th day of January, 2011 ("Effective Date"), by and between  Otter Tail Ag Enterprises, LLC, a Minnesota limited liability company ("Seller") and OTAV LLC, a Delaware limited liability company (collectively, with its successors and assigns "Buyer").

### <u>RECITALS:</u>

A.      Seller has been engaged in the business of producing ethanol and its co-products at the Facilities (as defined below) and marketing such ethanol and its co-products (collectively the "Business");

B.      On the Petition Date (as defined below) Seller commenced a reorganization case by filing a voluntary petition for relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended as of the date hereof, the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court");

C.      Subsequent to the Petition Date Seller has continued in possession of its assets and in the management of its business pursuant to the Bankruptcy Code;

D.      Seller desires to sell to Buyer and Buyer desires to acquire from Seller the Acquired Assets (as defined below) and to assume the Assumed Liabilities (as defined below) upon the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363, 365, 1146 and other applicable provisions of the Bankruptcy Code.

E.      The Acquired Assets and Assumed Liabilities are assets and liabilities of Seller which are to be sold and assumed pursuant to an order of the Bankruptcy Court approving such sale, free and clear of all Liens, Claims and Encumbrances (other than Permitted Encumbrances) pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code, which order will include the authorization for the assumption and assignment of certain executory contracts and unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and upon the terms and subject to the conditions set forth in this Agreement and in accordance with other applicable provisions of the Bankruptcy Code.

F.      The parties now desire to state the terms and conditions of the purchase and sale of the Acquired Assets and the assumption and assignment of the Assumed Liabilities.

**NOW, THEREFORE,** in consideration of the mutual covenants and obligations contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### <u>AGREEMENT</u>

### ARTICLE 1.
### <u>DEFINITIONS.</u>

The following terms shall have the meanings specified below:

"<u>Accounting Referee</u>" shall have the meaning set forth in Section 5.11B.

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Acquired Contracts" shall have the meaning set forth in Section 2.1J.

"Administrative Expenses" shall mean Claims against Seller under 11 U.S.C. 503, whether payable on the Closing Date or thereafter.

"Affiliate" when used in reference to a specified Person shall mean any Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with the specified Person.

"Agreement" shall have the meaning set forth in the Preamble.

"Agstar" shall have the meaning set forth in Section 2.6A.

"Agstar Indebtedness" shall have the meaning set forth in Section 2.6A.

"Allocation Statement" shall have the meaning set forth in Section 5.11A.

"Applicable Law" shall mean any and all laws (including the common law), order, ordinances, constitutions, regulations, statutes, treaties, rules, codes, and Injunction(s) adopted, enacted, implemented, promulgated, issued, entered or deemed applicable by or under the authority of any Governmental Body having jurisdiction over a specified Person or any of such Person's properties or assets.

"Apportioned Obligations" shall have the meaning set forth in Section 8.16.

"Assumed Liabilities" shall have the meaning set forth in Section 2.5B.

"Auction" shall have the meaning set forth in Section 8.2.

"Avoidance Actions" shall mean any and all claims for relief of Seller under chapter 5 of the Bankruptcy Code.

"Bankruptcy Assignment Order" shall have the meaning set forth in Section 8.3.

"Bankruptcy Case" shall mean Seller's Chapter 11 bankruptcy proceedings originally filed with the Bankruptcy Court on October 30, 2009 under Case No. 09-61250-DDO.

"Bankruptcy Code" shall have the meaning set forth in Recital B.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Minnesota or any other court having jurisdiction over the Bankruptcy Case from time to time.

"Bankruptcy Sale Motion" shall have the meaning set forth in Section 8.1.

"Benefit Plans" shall mean any "employee benefit plan" (within the meaning of Section 3(3) of ERISA) or bonus, stock option, restricted stock, stock purchase, stock appreciation, phantom stock, profit participation, profit-sharing, deferred compensation, severance, retirement, disability, medical, dental, health, life or dental insurance, death benefit, incentive, welfare and/or other benefit, compensation, and/or retirement plan, policy, arrangement and/or Contract maintained, sponsored or participated in by Seller.

"Bidding Procedures" shall have the meaning set forth in Section 8.2.

"Breakup Fee" shall have the meaning set forth in Section 8.6.

"Business" shall have the meaning set forth in Recital A.

"Business Day" shall mean any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Minneapolis, Minnesota are authorized by law or other governmental action to close.

"Business Papers and Lists" shall have the meaning set forth in Section 2.1D.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Inventory Adjustment Amount" shall have the meaning set forth in Section 2.7F.

"Buyer Objection Notice" shall have the meaning set forth in Section 2.7C.

"Cash Purchase Price" shall have the meaning set forth in Section 2.6A.

"Claim" shall mean any claim, known or unknown, asserted or unasserted, for damages (including punitive damages), Fines, penalties, assessments, injunctive or other relief, or otherwise relating to or arising out of any Liability, whether or not based on personal injury, property damage, damage to the environment, or other economic loss, and whether in contract or tort, at law or in equity, and whether or not the act or omission giving rise to the claim took place after, on, or prior to, the Closing Date.

"Closing" shall have the meaning set forth in Section 2.8.

"Closing Date" shall have the meaning set forth in Section 2.8.

"Closing Statement" shall have the meaning set forth in Section 2.6C.

"Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor law or regulations issued by the Internal Revenue Service.

"Confidential Information" shall mean any information or compilation of information not generally known to the public or the industry, which is proprietary to Seller, and relating to Seller's procedures, techniques, methods, concepts, ideas, affairs, processes and services, including, but not limited to, information relating to marketing, merchandising, selling, research, development, manufacturing, purchasing, accounting, engineering, financing, costs, customers, plans, pricing, billing, needs of customers and services used by customers, all lists of customers and their addresses, prospects, sales calls, services, prices and the like as well as any specifications, formulas, plans, drawings, accounts or sales records, sales brochures, code books, manuals, trade secrets, knowledge, know-how, pricing strategies, operating costs, sales margins, methods of operations, invoices or statements and the like.

"Contract" shall mean any contract, agreement, obligation, promise, undertaking, instrument, personal property lease or sublease, or license, whether written or oral that is legally binding.

"Cure Costs" shall have the meaning set forth in Section 2.5B(5).

"Damages" shall mean any Claim, demand, Judicial Action, Judgment, loss, Liability, cost or expense.

"Easements" shall have the meaning set forth in Section 2.1C(2).

"Encumbrance" shall mean:

> (i)     with respect to any Tangible Personal Property, any intangible property or any property other than Real Property, any security or other property interest or right, lien, pledge, option, charge, security interest, contingent or conditional sale,

or other title claim or retention agreement or lease or use agreement in the nature thereof, whether voluntarily incurred or arising by operation of law, and including any agreement to grant or submit to any of the foregoing in the future; and

(ii)      with respect to the Real Property, any mortgage, deed of trust, lien, security interest, easement, equitable interests, right-of-way, condemnation or eminent domain proceeding, encroachment, any building, use or other form of restriction, including any restriction on the transfer, receipt of income or exercise of any other attribute of ownership, any lease or sublease, boundary dispute, and agreements with respect to the Real Property including: purchase, sale, right of first refusal, option, construction, building or property service, conditional or contingent sale, use or occupancy, franchise or concession, whether voluntarily incurred or arising by operation of law, or other encumbrances of any nature whatsoever and including any agreement to grant or submit to any of the foregoing in the future.

"Environmental Law" shall mean any federal, state, local or foreign law, common law, treaty, judicial decision, regulation, rule, Judgment, order, decree, injunction, permit, or governmental restriction, or any agreement with any Governmental Body or other third party, whether now or hereafter in effect, relating to (i) the environment, (ii) environmental aspects of ethanol and ethanol co-product production operations, or (iii) pollutants, contaminants, wastes or chemicals or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substances, wastes or materials.

"Environmental Liabilities" shall mean any and all Claims and Liabilities arising in connection with or in any way relating to Seller, the Business (as currently or previously conducted), the Acquired Assets or any activities or operations, occurring or conducted at the Acquired Assets, whether accrued, contingent, absolute, determined, determinable or otherwise, which arise under any Environmental Law.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended and the regulations promulgated thereunder.

"Excluded Assets" shall mean all assets of Seller described or listed in Section 2.3.

"Excluded Contracts" shall have the meaning set forth in Section 2.3A.

"Excluded Environmental Liabilities" shall mean any Environmental Liabilities to the extent they relate to (i) the disposal or transportation, or arrangement for disposal or transportation, prior to the Closing Date, of any Hazardous Material or (ii) any special or consequential damages related to the foregoing item.

"Fine" shall mean any fine or other civil or criminal penalty or assessment imposed by a Governmental Body for violation of any law, statute, ordinance, regulation, Judgment, or order.

"Finished Ethanol" shall mean 190 proof ethanol, 200 proof ethanol and denatured ethanol.

"Guaranty" shall have the meaning set forth in Section 3.8.

"Good Faith Deposit" shall have the meaning set forth in Section 2.6B.

"Governmental Body" shall mean any:

(a) federal, state, local, municipal, foreign or other government;

(b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, board, commission, department, instrumentality, political subdivision, office or other entity, and any court (including a bankruptcy court) or other tribunal); or

(c) multi-national organization or body.

"Hazardous Material" shall mean any pollutant, contaminant, waste, irritant, vapor, soot or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics, including, without limitation, petroleum, its derivatives, byproducts and other hydrocarbons, and any substance, waste or material regulated under any Environmental Law.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated pursuant to that Act.

"Indemnified Party" or "Indemnified Parties" shall mean Seller or Buyer, as the case may be, and its or their respective Affiliates, officers, employees, directors, shareholders, partners, members, or other owners of equity, representatives, and agents.

"Initial Resolution Period" has the meaning set forth in Section 2.7D.

"Injunction" shall mean any injunction (whether temporary, preliminary or permanent), adopted, enacted, implemented, promulgated, issued, entered or deemed applicable by or under the authority of any court or other tribunal.

"Intellectual Property Rights" shall have the meaning set forth in Section 2.1F.

"Inventory" shall mean all Finished Ethanol located on Seller's premises on the Closing Date for which a bill of lading has not yet been issued, all corn located on Seller's premises and fully paid for by Seller, or paid for by Seller and in transit to Seller on the Closing Date, all dry distillers grain and wet distillers grain located at the Facilities for which a bill of lading has not yet been issued, all spare parts located at the Facilities, and all yeast, enzymes, chemicals and denaturant located at the Facilities, and all work-in-process on the Closing Date.

"Inventory Adjustment Payment Date" has the meaning set forth in Section 2.7G.

"Inventory Arbiter" has the meaning set forth in Section 2.7E.

"Inventory Closing Value" means the value of Seller's Inventory, determined in accordance with Schedule 2.7, as of the Closing.

"Inventory Estimated Amount" has the meaning set forth in Section 2.7A.

"Inventory Final Amount" means the Inventory Closing Value, as determined pursuant to Section 2.7.

"Judgment" shall mean any judgment, order, award, or decree of any court, Governmental Body, or arbitrator of any kind, with respect to which all applicable appeal periods have expired.

"Judicial Action" shall mean any action, lawsuit, Claim, proceeding, hearing, arbitration, administrative proceeding (including audit), or investigation (or group of related actions,

lawsuits, Claims, proceedings, hearings, administrative proceedings, or investigations), whether civil or criminal, commenced, brought, conducted or heard by. or before, or otherwise involving, any Governmental Body.

"Knowledge of Seller", "Seller's Knowledge" or any other similar knowledge qualification in this Agreement shall mean to the actual knowledge of Anthony J. Hicks, Chief Executive Officer of Seller.

"Leased Tangible Personal Property" shall have the meaning set forth in Section 2.1B.

"Leases" shall mean only those leases set forth in Schedule 2.1J.

"Liability" shall mean all obligations, whether unliquidated or liquidated, contingent or non-contingent, including, but not limited to, those liabilities that in accordance with generally accepted accounting principles should be either classified as liabilities on, or referred to in footnotes to, audited financial statements of Seller presented in accordance with generally accepted accounting principles, without regard to limiting concepts such as materiality or conclusiveness of such obligations.

"Lien" shall have the meaning given to that term in Section 101(37) of the Bankruptcy Code.

"Material Adverse Effect" shall mean any change, event, or occurrence that individually or in the aggregate (taking into account all other such changes, events or occurrences) has had, or would be reasonably likely to have, (i) a material adverse change in or material adverse effect on the Acquired Assets or the Business (excluding the Excluded Assets and the Excluded Liabilities), in each case taken as a whole, or (ii) a material adverse change in or the ability of Seller to consummate the transactions contemplated by this Agreement, but excluding, in either case, (a) any change or effect to the extent that it results from or arises out of: (x) the filing of the Bankruptcy Case, or (y) the execution, delivery, consummation, performance or announcement of this Agreement, and (b) any change or effect generally applicable to either the industries and markets in which Seller operates, economic or political conditions generally, or the status of securities or financial markets.

"New Markets" shall have the meaning set forth in Section 2.5B(1).

"New Markets Amended and Restated Loan Documents" shall have the meaning set forth in Section 2.5B(1).

"New Markets Indebtedness" shall have the meaning set forth in Section 2.5B(1).

"New Markets Loan Documents" shall have the meaning set forth in Section 2.5B(1).

"Other Real Property Interests" shall have the meaning set forth in Section 2.1C(3).

"Owned Real Property" shall have the meaning set forth in Section 2.1C(1).

"Owned Tangible Personal Property" shall have the meaning set forth in Section 2.1A.

"Permits" shall have the meaning set forth in Section 2.1E.

"Permitted Encumbrances" shall have the meaning set forth in Section 3.3.

"Person" shall mean any individual, corporation (including any non-profit corporation), general, limited or limited liability partnership, limited liability company, joint venture, estate, trust, association, organization, or other entity or Governmental Body.

"Petition Date" shall mean October 30, 2009.

"Post-Closing Tax Period" shall have the meaning set forth in Section 8.16A.

"Pre-Closing Tax Period" shall mean (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

"Prepaid Expenses" shall mean all (i) prepaid charges and expenses of Seller and deposits made by Seller (which deposits will be transferred to Buyer at Closing) solely to the extent that such prepaid charges, expenses and deposits (A) relate to natural gas, denaturant, chemicals, utilities, rail or corn, and (B) relate to goods to be provided or utility services to be supplied to or for the benefit of Buyer at any time after Closing.

"Purchase Price" shall have the meaning set forth in Section 2.6A.

"Real Property" shall have the meaning set forth in Section 2.1C.

"Retained Liabilities" shall have the meaning set forth in Section 2.5A.

"Revenue Bond Indenture Trustee" shall have the meaning set forth in Section 3.8.

"Sale Order" shall have the meaning set forth in Section 8.4.

"Sale Procedure Order" shall have the meaning set forth in Section 8.2.

"Schedule" or "Schedules," shall refer to a Schedule or Schedules of and to this Agreement which, the parties agree, modify each of the representations and warranties made in this Agreement.

"Seller" shall have the meaning set forth in the Preamble.

"Seller's Business Records" shall have the meaning set forth in Section 2.3B.

"Seller's Employees" shall mean the employees employed by Seller in connection with the Business at any time.

"Seller Inventory Adjustment Amount" shall have the meaning set forth in Section 2.7F.

"Seller Inventory Statement" shall have the meaning set forth in Section 2.7A.

 "SWF Lease" shall have the meaning set forth in Section 3.8.

"Tax" or "Taxes" (or a derivative thereof) shall mean all income, real property, personal property, sales, use, franchise, production, royalty, aggregate material, occupation, net proceeds, ad valorem, value added, employees' income withholding and social security taxes, imposed by any Governmental Body of the United States or of any foreign country or by any state, municipality, subdivision or instrumentality of the United States or of any foreign country, or by any other taxing authority.

"Trade Payables" means accounts payable obligations of Seller related to the Business or the Acquired Assets.

"WARN Act" shall have the meaning set forth in Section 8.8E.

"Warranties to Seller" shall have the meaning set forth in Section 2.1G.

# ARTICLE 2.
# PURCHASE AND SALE

## 2.1    Acquired Assets.

Upon the terms and subject to the conditions set forth in this Agreement, Seller hereby agrees to sell and Buyer hereby agrees to purchase and, at the Closing, Seller shall assign, transfer, convey, and deliver to Buyer, and Buyer shall acquire and accept, all Seller's right, title and interest in, to and under the assets described in this Section 2.1 (collectively, the "Acquired Assets"). The Acquired Assets shall be free and clear of all Encumbrances, Claims and Liabilities, except Permitted Encumbrances and the Assumed Liabilities. The Acquired Assets are being purchased for the Purchase Price described in Section 2.6, together with the assumption of the Assumed Liabilities described and referenced in Section 2.5B, and subject and pursuant to the terms and conditions of this Agreement. The parties agree that the Acquired Assets comprise all right, title and interest of Seller (if any) in, to and under all of the assets of Seller of every nature, kind and description, tangible and intangible, real or personal, wherever located, whether or not reflected in its business, corporate or other records, other than the Excluded Assets, including but not limited to, the following:

### A.    *Owned Tangible Personal Property.*

"Owned Tangible Personal Property" shall mean all machinery, equipment, tools, motor vehicles, rolling stock and mobile equipment, furniture, furnishings, materials, spare parts and supplies, Inventory, telephone systems, transformers, electrical lines, air compressors, fuel systems, control systems, water treatment systems, business and financial records (other than the Business Papers and Lists), electronic data processing hardware and software (including all upgrades and improvements thereto), signs, advertising materials and other personal property owned by Seller and held or used primarily in connection with the Business, whether or not such item is recorded on any financial statement of the Business, and all such property owned by Seller and located on or in the vicinity of the Real Property being acquired, and including without limitation the Owned Tangible Personal Property set forth on **Schedule 2.1A.**

### B.    *Leased Tangible Personal Property.*

"Leased Tangible Personal Property" shall mean the leasehold interests of Seller in that tangible personal property currently leased by Seller and set forth on **Schedule 2.1B**.

### C.    *Real Property.*

"Real Property" shall mean (i) all lands, buildings, fixtures, chattel property and improvements that Seller owns and occupies, and that are currently used or held for future use primarily in connection with the Business, together with all improvements situated thereon and with all hereditaments and appurtenant rights, privileges and easements thereunto belonging. Real Property shall include, without limitation, all Real Property described as follows:

> (1)    "Owned Real Property" shall mean the Real Property set forth on **Schedule 2.1C(1);**

(2)    "Easements" shall mean the Real Property interests of Seller conferring upon Seller access rights, rights-of-way, and rights to traverse lands, right to use lands for adjacent and sub-adjacent support, drainage and flowage, ingress, egress, storage, or processing, for the construction, maintenance, repair, and replacement of utilities and other improvements, and existing rights of Seller to use lands for any other purposes, as set forth on **Schedule 2.1C(2)**; and

(3)    "Other Real Property Interests" shall mean the other Real Property rights, titles, and interests set forth on **Schedule 2.1C(3)**.

If additional items of Real Property are identified, they shall be deemed to be added to the appropriate Schedule(s). If any item of Real Property listed on one Schedule should be properly listed on another Schedule, the same shall be deemed added to the proper Schedule.

### D.    *Business Papers and Lists.*

"Business Papers and Lists" shall include all right, title, and interest of Seller in and to all files and documents relating primarily to the Acquired Assets, including, but not limited to personnel records of employees of Seller who become employed by Buyer from time to time following the Closing Date, facilities and/or equipment plans and specifications, maintenance records, operating manuals, land use records, maps, surveys, abstracts, certificates of title, title opinions, title insurance commitments, title insurance policies, lists and descriptions. Buyer agrees that Seller shall, upon request, have reasonable access to and permission to copy, at Seller's expense, any Business Papers and Lists that also constitute Seller's Business Records under Section 2.3B.

### E.    *Permits.*

"Permits" shall mean all right, title and interest in and to Seller's permits, licenses, filings, authorizations, approvals, and indicia of authority as issued by any Governmental Body (and all pending applications for approval or renewal of permits to own, construct, operate or maintain any of the Acquired Assets), necessary to operate the Business including without limitation those permits set forth on **Schedule 2.1E**, which shall be transferred to Buyer at the Closing.

### F.    *Intellectual Property Rights.*

"Intellectual Property Rights" means that License of Technology between Delta-T Corporation and Seller dated October 24, 2006, the rights of the licensor under which License of Technology were acquired by Applied Process Technology International LLC from Delta-T Corporation on February 1, 2010.

### G.    *Warranties to Seller.*

"Warranties to Seller" shall mean all rights of Seller under or pursuant to all warranties, representations, or guaranties made by suppliers, manufacturers, and contractors in connection with products sold to or services provided to the Business in connection with or affecting primarily the Acquired Assets.

### H.  *Prepaid Expenses.*

"Prepaid Expenses" shall mean all prepaid expenses and deposits, together with any unpaid interest accrued thereon that (i) relate to natural gas, denaturant, chemicals, utilities, or rail, and (ii) relate to goods to be provided or services to be performed to or for the benefit of Buyer at any time after Closing, including without limitation those Prepaid Expenses listed on **Schedule 2.1H**.

### I.  *Inventory.*

All Inventory on the Closing Date as determined pursuant to Section 2.8A.

### J.  *Acquired Contracts.*

"Acquired Contracts" shall mean all rights and obligations of Seller under those Contracts and Leases set forth on **Schedule 2.1J**. Buyer shall have the right from time to time by written notice to Seller to supplement Schedule 2.1J in order to add thereto Contracts and Leases, provided that Seller shall have caused any payments due under any such additional Contracts or Leases to be made during the period from the Closing to the effective date of such assumption and assignment subject to the limits on Cure Costs set forth in Section 2.5B(5) of this Agreement. Within five (5) days after receipt by Seller of a supplement to Schedule 2.1J, Seller shall provide notice to each non-debtor party to the Contracts and Leases listed in such supplement that it intends to assume and assign the same to Buyer, and shall promptly thereafter take such steps as are necessary and appropriate to effect the assumption and assignment to Buyer of each such additional Contract and Lease.

## 2.2  Transfer of Acquired Assets.

To the maximum extent permitted by the Bankruptcy Code, the Acquired Assets shall be assumed by and assigned to Buyer pursuant to Section 363 and 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), would be legally invalid. If with respect to any Acquired Asset such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 or 365 of the Bankruptcy Code other than as a result of the failure to pay Cure Costs, then such Acquired Asset shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Acquired Assets without any reduction in the Purchase Price. In the case of licenses, certificates, approvals, authorizations, leases, Contracts and other commitments included in the Acquired Assets (i) that cannot be transferred or assigned without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Buyer in endeavoring to obtain such consent and, if any such consent is not obtained, Seller shall, following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, cooperate with Buyer in all reasonable respects to provide to Buyer the benefits thereof in some other manner, or (ii) that

are otherwise not transferable or assignable (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Buyer to provide to Buyer the benefits thereof in some other manner (including the exercise of the rights of Seller thereunder); provided that nothing in this Section shall (x) require Seller to make any expenditure or incur any obligation on its own or on behalf of Buyer for which funds in the full amount of such expenditure or obligation are not provided to Seller by Buyer in advance in cash or (y) prohibit any Seller from ceasing operations or winding up its affairs following the Closing.

## 2.3    **Excluded Assets.**

Seller shall retain, and shall not sell, transfer, convey, assign or deliver to Buyer the following assets and properties (the "Excluded Assets") which, notwithstanding any provision of this Agreement or any other writing to the contrary, shall be excluded from the Acquired Assets:

### A.    *Excluded Contracts.*

"Excluded Contracts" shall mean all rights and obligations under all Contracts to which Seller or its Affiliates is a party, but which is not an Acquired Asset, including without limitation the Contracts set forth on **Schedule 2.3A**. Buyer shall have the right from time to time by written notice to Seller to supplement Schedule 2.3A in order to add thereto Contracts and Leases. Promptly following receipt by Seller of a supplement to Schedule 2.3A, Seller shall file with the Bankruptcy Court and serve on each non-debtor party to the Contracts and Leases listed in such supplement notice of rejection under Section 365 of the Bankruptcy Code.

### B.    *Seller's Business Records.*

"Seller's Business Records" shall mean all of Seller's documents and records, both written and electronic (either files or e-mails) that constitute legal files and records, minute books, limited liability company records, tax returns, and bankruptcy related records and files. In addition, Seller's Business Records shall include documents and records concerning the Business that are necessary for Seller to wind up its affairs, file tax returns or required reports, defend Claims or Liabilities, or are needed for similar purposes; including, without limitation, financial, accounting and audit records, personnel, payroll, employment records, whether or not held by Seller or a third party. If any such document or record fits both the definition of Seller's Business Records and the definition of Business Papers and Lists, the record or document will be treated as Business Papers and Lists, and Seller will have reasonable access to such document or record pursuant to Section 2.1D

### C.    *Benefit Plans.*

All assets held for the benefit of any of the Benefit Plans attributable to Seller's Employees.

### D.    *Rights Under This Agreement.*

All rights of Seller arising under this Agreement or the transactions contemplated hereby, including, but limited to, the Purchase Price.

*E.*  **_Actions under the Bankruptcy Code._**

All rights and Claims of Seller for any action under the Bankruptcy Code, including Avoidance Actions available to it under Sections 544 through 551 of the Bankruptcy Code, of whatever kind or nature, including all proceeds of the foregoing.

*F.*  **_Certain Tax Refunds._**

Any Tax refund or reimbursement due to Seller to the extent related to any Liability that would not arise from, in connection with or incident to an Assumed Liability, including, without limitation, any Tax refund due to Seller from the Minnesota Department of Revenue.

*G.*  **_Goodwill and Other Assets._**

Any goodwill associated with the Business and any other assets, properties or business, of any kind or description, owned or held by Seller which are not Acquired Assets.

*H.*  **_Excluded Cash._**

All cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits as of the Closing Date, excluding any deposit amounts included in Prepaid Expenses.

*I.*  **_Accounts Receivable._**

All accounts receivable as of the Closing Date.

*J.*  **_Excluded Personal Property._**

The personal property necessary to administer the assets remaining in Seller's Chapter 11 estate after the Closing Date, as described on **Schedule 2.3J**.

**2.4**  **Assumption and Rejection of Contracts and Leases; Cure Costs.**

*A.*  **_Additional Contracts._**

Seller has represented to Buyer that prior to the date hereof, Seller has not yet rejected or assumed any existing Contracts or Leases pursuant to an order of the Bankruptcy Court. Schedules 2.1J and 2.3A both contain (i) Seller's good faith estimate of the Cure Costs in respect of such Contract or Lease, and (ii) whether such Contract or Lease was entered into on or following the Petition Date. As part of the Bankruptcy Sale Motion described in Section 8.1 Seller shall seek to determine Cure Costs with respect to any Acquired Contract entered into prior to the Petition Date. Notwithstanding the foregoing, prior to the Closing, Buyer may identify any Acquired Contract as one that Buyer no longer desires to have assigned to it and such Contract shall be removed from Schedule 2.1I and included on Schedule 2.3A and for all purposes of this Agreement be deemed to be an Excluded Contract. At any time at least five (5) days prior to the Closing Date, or such later date as the Bankruptcy Court approves the assumption and assignment of the Acquired Contracts and determines the actual Cure Costs for any specific Contract or Lease or Acquired Contract, if any, payable in connection therewith, Buyer may, in its

12

sole discretion, modify Schedule 2.1I to add a Contract or Lease to such Schedule or remove any Contract from such Schedule, for any reason whatsoever.

**B.** *Provision of Materials to Buyer.*

Any motion, application or other court document filed with, and the proposed orders submitted to, the Bankruptcy Court seeking authorization to assume and assign or reject or terminate any Contracts or Leases shall be provided to Buyer in advance of filing (with a reasonable opportunity to review and comment on the same) and shall be in form and substance reasonably satisfactory to Buyer in all material respects. Seller shall make available to Buyer true and complete copies of each of the Contracts and Leases and of each of the Contracts and Leases listed, or required to be listed, in Schedule 2.1I.

**2.5** **Retained and Assumed Liabilities of Seller.**

**A.** *Retained Liabilities.*

Except for Assumed Liabilities described in Section 2.5B below, Seller shall retain and Buyer shall not assume, pay, perform, succeed to or discharge (or cause to be assumed, paid, performed, succeeded to, or discharged) any of Seller's Liabilities, expenses or other obligations (whether known, unknown, fixed, unliquidated, absolute, or contingent), warranties or guaranties, or Claims, including, but not limited to, any Claim or Liability relating to: (i) Excluded Environmental Liabilities; (ii) Seller's performance or lack of performance of or under any Excluded Contract; (iii) any loans to Seller or accounts payable of Seller; (iv) any Judicial Action (other than those relating to Environmental Liabilities that are not Excluded Environmental Liabilities) or Judgment against Seller; (v) any Claim or Liability (other than any Environmental Liability) arising out of allegedly defective products manufactured by Seller or its Affiliates prior to the Closing Date or arising under theories of tortious conduct which conduct occurred prior to the Closing Date; (vi) any Claims, Liabilities or other obligations arising under Benefit Plans, COBRA or any similar agreements with Seller's Employees; (vii) any Claims, Liabilities or other obligations for any Taxes that are attributable to any Pre-Closing Tax Period; (viii) payments owed to any provider of utilities; (ix) obligations of any kind to or on behalf of any of the employees and retirees of Seller, including, without limitation, Liabilities or obligations for wages, accident and sickness benefits, vacation and/or holiday benefits, workers' compensation, and medical/dental/life insurance benefits or Claims with respect to personal injury during the course of employment; (x) Occupational Safety and Health Administration Liabilities or violations; (xi) any costs, expenses, obligations or Liabilities incurred by Seller following commencement of the Bankruptcy Case, whether before or after the Closing; (xii) Seller's obligations to pay Cure costs under Section 2.5B(5); (xiii) any and all obligations or liabilities to pay amounts related to the SWF Lease, regardless if classified as a true lease or financing and any and all obligations under the other Excluded Contracts. All such non-assumed Claims, Liabilities or other obligations, if any, are collectively referred to herein as "Retained Liabilities."

**B.** _Assumed Liabilities._

Buyer agrees to assume at the Closing and to pay, perform and discharge promptly when payment or performance is due or required only those Claims and Liabilities of Seller set forth below (collectively, the "Assumed Liabilities"). Buyer shall not be required to reimburse Seller for any amount paid prior to the Closing Date by Seller to settle, discharge, cure or remediate, in whole or in part, any Assumed Liabilities. Seller hereby acknowledges and agrees that none of the Retained Liabilities shall be assumed by Buyer and that the Retained Liabilities are mutually exclusive of the Assumed Liabilities described herein. The Assumed Liabilities shall be assumed by Buyer as follows:

(1)     Seller's obligation to repay Nineteen Million Seven Hundred Thirty Six Thousand Five Hundred Eighty Three and 00/100 Dollars ($19,736,583), plus any additional interest on the New Markets Indebtedness accruing after November 30, 2010, in indebtedness (the "New Markets Indebtedness") to MMCDC New Markets Fund II, LLC ("New Markets") pursuant to that certain Construction and Term Loan Agreement, dated March 30, 2007, between Seller and New Markets (collectively with all related loan documents, the "New Markets Loan Documents"). Buyer's assumption of the New Markets Indebtedness shall be subject to Buyer and New Markets entering into certain amendments and restatements of the New Markets Loan Documents acceptable to Buyer in its sole discretion (collectively, the "New Markets Amended and Restated Loan Documents"); provided, however, that such amendments and restatements shall not result in Seller continuing to be liable for any New Markets Indebtedness.

(2)     Environmental Liabilities (other than Excluded Environmental Liabilities), including, without limitation, such Claims and Liabilities, arising out of alleged or actual violation of any Environmental Law, any Permit or any contamination of air, soil, surface, or ground water, including damage to the environment affecting, impacting, and relating to the Real Property or the Business:

(3)     Claims, Liabilities and obligations arising out of the use and ownership by Buyer after the Closing Date of any Owned Tangible Personal Property or Leased Tangible Personal Property, Acquired Contracts, Permits, Owned Real Property, Easements, or Other Real Property Interests transferred or assigned to Buyer pursuant to Section 2.2, but in no event shall this be interpreted to include the SWF Lease or obligations thereunder;

(4)     Claims, Liabilities and obligations comprising real property Taxes, personal property Taxes and similar ad valorem Taxes assessed with respect to the Acquired Assets to the extent attributable to a Post-Closing Tax Period, as provided in Section 8.16; and

(5)     Claims, Liabilities and obligations for performance under the Acquired Contracts, Easements, Leases, Permits and Other Real Property Interests

transferred or assigned to Buyer pursuant to Section 2.2, which in no event shall this be interpreted to include the SWF Lease or obligations thereunder; *provided, however,* that all amounts required to be paid or otherwise satisfied to cure all defaults of Seller under the Acquired Contracts, Easements, Permits and Other Real Property Interests ("Cure Costs") transferred or assigned to Buyer pursuant to Section 2.2 at the time of assumption thereof shall be paid by Seller up to an aggregate of Fifty Thousand and 00/100 Dollars ($50,000.00), to be paid out of Seller's existing cash or working capital, with any Cure Costs in excess of such amount to be treated as an Assumed Liability hereunder.

2.6    **Purchase Price.**

   *A.    Purchase Price.*

(i) The purchase price for the Acquired Assets to be paid at the Closing shall be Fifty Five Million and 00/100 Dollars ($55,000,000.00) (the "Purchase Price") in the form of the assumption of the New Markets Indebtedness plus a cash payment equal to the Purchase Price less the New Market Indebtedness (the balance, even if a negative amount, being the "Cash Purchase Price").

(ii) The Purchase Price and the Cash Purchase Price shall thereafter both be increased on the Closing Date by: (i) the Inventory Estimated Amount; (ii) the amount of Prepaid Expenses; and (iii) the dollar amount of taxes allocated to Buyer pursuant to Section 8.16. The Cash Purchase Price shall be payable by wire transfer of immediately available funds at the Closing. It is, however, understood by both Buyer and Seller that Buyer will be financing a significant portion of the Cash Purchase Price through a new lending arrangement between Buyer and AgStar Financial Services, PCA ("AgStar") which arrangement will also be closing on or before the Closing Date of the transaction contemplated by this Agreement. Seller is presently indebted to Agstar in the amount of Thirty Four Million One Hundred Eighty Nine Thousand Three Hundred Ten and 00/100 Dollars ($34, 189,310.00) (plus any additional interest accrued but not yet paid on the Closing Date) under a Master Loan Agreement dated March 28, 2007 and the First, Second and Third Supplements to that Master Loan Agreement, between Seller and AgStar (the "Agstar Indebtedness"). It is agreed that, upon presentation at the closing of proof satisfactory to Seller that Buyer has extinguished all indebtedness and liability by Seller to Agstar under the Agstar Indebtedness by virtue of Buyer closing on its new financing arrangements with Agstar and remitting to Agstar sufficient additional cash consideration to pay the Agstar Indebtedness in full, Buyer shall be entitled to subtract from the amount of the wire transfer to Seller of the Cash Purchase Price, the entire amount owed by Seller under the AgStar Indebtedness on the Closing Date. Promptly upon the calculation and finalization of the Inventory Final Amount pursuant to Section 2.7, Buyer (or Seller in the case where the Inventory Estimated Amount exceeds the Inventory Final Amount) will promptly pay, by wire transfer of immediately available funds, the difference between the Inventory Estimated Amount and the Inventory Final Amount.

### B.  *Good Faith Deposit.*

Simultaneously with the execution of this Agreement by all parties hereto, Buyer will wire transfer immediately available funds to an account designated by Seller in the amount of One Million and 00/100 Dollars ($1,000,000.00)(the "Good Faith Deposit"). The Good Faith Deposit may be retained by Seller and applied at and upon the Closing as a credit against the Cash Purchase Price. If this Agreement is terminated for any reason other than breach by Buyer, the Good Faith Deposit shall be promptly returned (within five (5) Business Days) by wire transfer of immediately available funds to Buyer, provided Buyer shall have fully satisfied its reimbursement obligations under Section 6.6 of this Agreement.

### C.  *Payments on the Closing Date.*

Not later than three (3) Business Days prior to the Closing Date, Seller shall deliver to Buyer a written statement, reasonably satisfactory to Buyer and signed by an officer of Seller (the "Closing Statement"), (i) setting forth the Inventory Estimated Amount, together with reasonable supporting documentation regarding the determination and calculation of such amount, (ii) itemizing each Prepaid Expense and the amount thereof, and setting forth the aggregate amount of the Prepaid Expenses, (iii) itemizing each Specified Trade Payable and indicating for each the applicable vendor or supplier, the dollar amount thereof that has become fixed, the estimated dollar amount thereof that has not become fixed and the contractual date on which payment thereof shall be due, together with invoices or other reasonable supporting documentation therefor, and (v) setting forth the dollar amount of taxes allocated to Buyer pursuant to Section 8.16, together with reasonable supporting documentation regarding the determination and calculation of such amount. Not later than three (3) Business Days prior to the Closing Date, Buyer shall deliver to Seller a written statement, reasonably satisfactory to Sellers (the "Buyer Statement"), (i) itemizing each Cure Cost, (ii) setting forth the dollar amount of taxes allocated to Seller pursuant to Section 8.16, together with reasonable supporting documentation regarding the determination and calculation of such amount. Should Buyer object to any of the amounts or calculations in the Closing Statement, or should Seller object to any of the amounts or calculations in the Buyer Statement, Buyer and Seller shall cooperate in a diligent good faith manner to resolve such objections prior to the Closing, and the Closing Statement or Buyer Statement, as applicable, shall be adjusted prior to the Closing to reflect any changes agreed to by Buyer and Seller prior to the Closing.

### D.  *Discharge of Assumed Liabilities After Closing.*

Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

## 2.7  **Inventory Adjustment.**

### A.  *Inventory Estimated Amount.*

For purposes of the Closing Statement Seller shall first compute a good-faith estimate of the value of Seller's Inventory on the Closing Date based upon Seller's most recent

financial statements available at the time the Closing Statement is prepared, and then multiply this good-faith estimate by 0.9 (the "Inventory Estimated Amount").

**B.**      *Inventory Count.*

Seller shall, commencing one day after the Closing Date, conduct a physical count of the Inventory as of the Closing in accordance with the methodology prescribed by Schedule 2.7. Seller shall use commercially reasonable efforts to cause such physical count of the Inventory to be commenced not later than the first Business Day following the Closing Date and completed not later than the fifth Business Day following the Closing Date, and Buyer may have its representatives present during such physical count of the Inventory. Within ten (10) Business Days after the date of completion of such physical count of the Inventory, Seller shall deliver to Buyer a written statement (the "Seller Inventory Statement") setting forth Seller's determination, together with supporting data and calculations, of the Inventory Closing Value. Buyer shall afford Seller such access to the Facilities and books and records of the Business and of Buyer as is necessary, in Seller's reasonable judgment, in connection with the physical count of the Inventory, preparation of the Seller Inventory Statement and resolution of any dispute hereunder with respect to the Inventory Closing Value.

**C.**      *Buyer Objections.*

Unless on or before the third (3rd) Business Day after Buyer's receipt of the Seller Inventory Statement, Buyer delivers to Seller notice disputing the Inventory Closing Value set forth in the Seller Inventory Statement and setting forth in reasonable detail Buyer's determination of the Inventory Closing Value and the basis therefor (such notice, the "Buyer Objection Notice"), the Inventory Final Amount shall be the Inventory Closing Value as set forth in the Seller Inventory Statement.

**D.**      *Resolution of Disputes during Initial Resolution Period.*

If Buyer timely delivers to Seller the Buyer Objection Notice, Buyer and Seller shall, during the period commencing upon Sellers' receipt of the Buyer Objection Notice and ending at 5:00 p.m., Central Time, on the fifth (5th) Business Day thereafter (such period, the "Initial Resolution Period"), work in good faith to resolve any and all disputes with respect to the Inventory Closing Value; *provided* that items not disputed in the Buyer Objection Notice shall be deemed not to be in dispute at any time during the Initial Resolution Period or thereafter. If all disputes with respect to the Inventory Closing Value are resolved during the Initial Resolution Period, the Inventory Final Amount shall be the Inventory Closing Value as agreed upon by Buyer and Seller during the Initial Resolution Period.

**E.**      *Resolution of Disputes after Initial Resolution Period.*

If, immediately after the Initial Resolution Period, any of the items comprising the Inventory Closing Value remain in dispute, Buyer and Seller shall promptly engage an independent certified public accounting firm or independent certified appraisal firm (the "Inventory Arbiter") mutually agreed upon by Buyer and Seller (such agreement not to be unreasonably withheld or delayed by Buyer or Seller) to decide such items and shall

instruct the Inventory Arbiter to render such decision no later than the tenth (10th) Business Day following the date of commencement of such engagement. The Inventory Arbiter shall act as an expert and not as an arbitrator to determine, based solely on the written submissions of Seller and Buyer, and not by independent investigation, only the specific items under dispute by Seller, on the one hand, and Buyer, on the other hand. The decision of the Inventory Arbiter shall include a statement of the Inventory Arbiter's determination of each disputed item and a statement of the Inventory Closing Value reflecting the Inventory Arbiter's determination of all disputed items, shall be set forth in a written report delivered to Seller and Buyer and shall, absent manifest error, be conclusive and binding on both Buyer and Seller. In resolving any disputed item, the Inventory Arbiter shall be bound by the provisions of this Agreement, including Schedule 2.7, and may not assign a value to any item greater than the greatest value for such item or less than the smallest value for such item claimed by either Seller in the Seller Inventory Statement or Buyer in the Buyer Objection Notice, as applicable. If the Inventory Final Amount is not established as provided in Section 2.7C or Section 2.7D, the Inventory Final Amount shall be the Inventory Closing Value set forth in the decision of the Inventory Arbiter.

### F.    *Adjustment Amounts.*

The "Buyer Inventory Adjustment Amount" and the "Seller Inventory Adjustment Amount" are to be determined and delivered as follows: If the Inventory Final Amount exceeds the Inventory Estimated Amount, (i) the Buyer Inventory Adjustment Amount shall be zero, and the Seller Inventory Adjustment Amount shall be the amount of such excess plus interest on such amount at the Applicable Rate from (and including) the Closing Date to (and excluding) the Inventory Adjustment Payment Date, and (ii) Buyer shall deliver to Seller the Seller Inventory Adjustment Amount in cash by wire transfer of immediately available funds; otherwise, (x) the Seller Inventory Adjustment Amount shall be zero, and the Buyer Inventory Adjustment Amount shall be the amount, if any, by which the Inventory Estimated Amount exceeds the Inventory Final Amount, plus interest on such amount at the Applicable Rate from (and including) the Closing Date to (and excluding) the Inventory Adjustment Payment Date, and (y) Seller shall deliver to Buyer the Buyer Inventory Adjustment Amount in cash by wire transfer of immediately available funds.

### G.    *Payment of Adjustment Amounts.*

The delivery by Buyer to Seller of the Seller Inventory Adjustment Amount or the delivery by Seller to Buyer of the Buyer Inventory Adjustment Amount, as applicable, shall be effected within five (5) Business Days after the date on which the Inventory Final Amount is determined pursuant to this Section 2.7 (the date of such delivery, the "Inventory Adjustment Payment Date").

### H.    *Fees and Costs.*

All fees and costs of the Inventory Arbiter shall be borne by and allocated between Sellers, on the one hand, and Buyer, on the other hand, on a pro rata basis based on the relative size of (i) the difference between the Inventory Closing Value as determined pursuant to Section 2.7E and the Inventory Closing Value implied by Seller's written

submission to the Inventory Arbiter, on the one hand, and (ii) the difference between the Inventory Closing Value as determined pursuant to Section 2.7E and the Inventory Closing Value implied by Buyer's written submission to the Inventory Arbiter, on the other hand.

## 2.8 Closing.

Unless the parties agree on a different date or time, the closing ("Closing") shall take place at the offices of Mackall, Crounse & Moore PLC, in Minneapolis, Minnesota, at 10:00 A.M. local time two (2) Business Days after satisfaction or waiver of the conditions set forth with respect to the Closing of the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder in Articles 6 and 7 (the "Closing Date").

### A. *Buyer's Delivery of Balance of Purchase Price.*

At the Closing, Buyer shall deliver to Seller the balance of the Cash Purchase Price (Cash Purchase Price less the Good Faith Deposit) or in the event Cash Purchase Price less Good Faith Deposit is a negative amount, Seller shall deliver to Buyer, by bank check or wire transfer in immediately available funds, in accordance with Seller's instructions.

### B. *Other Deliveries by Buyer and Seller.*

At the Closing, each of Seller and Buyer shall, as applicable, deliver a limited warranty deed, bills of sale and assignment and assumption agreements, all substantially in the relevant forms attached respectively hereto as **Exhibits 2.8(A), (B) and (C)**, and such other good and sufficient instruments of conveyance and transfer, all in forms reasonably satisfactory to Buyer and Seller and their respective counsel, as shall be effective to vest in Buyer all of Seller's right, title, and interest in and to all of the Acquired Assets, to be transferred at the Closing, free and clear of all Claims, Liabilities and Encumbrances including without limitation the Claims described on Schedule 3.5, except Permitted Encumbrances, to assign to Buyer the Acquired Contracts and to effect the assumption of the Assumed Liabilities. The instruments of conveyance of the Real Property will use appropriate legal descriptions consistent with custom and usage within the County of Otter Tail, Minnesota.

## 2.9 Title and Risk of Loss.

Title and risk of loss with respect to the Acquired Assets and the Assumed Liabilities shall transfer to Buyer on the Closing Date; *provided, however*, that in the event of a loss of or Damages to any Acquired Asset which Acquired Asset is not restored by Seller prior to the applicable Closing Date, Buyer shall at the Closing Date be entitled to the proceeds (not applied to the cost of restoration) of any insurance on such Acquired Asset under any insurance policy owned by Seller or its affiliates, and Seller covenants and agrees (a) that it shall promptly make appropriate claims in respect thereof and (b) it shall cooperate (without the necessity of incurring other than nominal costs) with any insurer in respect of any such claim.

# ARTICLE 3.
## REPRESENTATIONS OF SELLER

Seller represents to Buyer that, at and as of the date of this Agreement, the following statements are true and correct in all respects. All representations of Seller are subject to each of the Schedules.

## 3.1    Organization and Good Standing.

Seller is a limited liability company duly authorized, validly existing, and in good standing under the laws of the State of Minnesota. Seller has full power to own its properties and conduct the Business and is duly qualified to transact business as a foreign entity and is in good standing in each state in which the nature of its Business requires it to do so.

## 3.2    Authority Relative to Agreement.

In accordance with and by virtue of the Sale Order by the Bankruptcy Court, (a) Seller will have the full right and authority to enter into this Agreement and consummate or cause to be consummated the sale and transfer of the Acquired Assets and the assignment and assumption of Acquired Contracts hereunder; (b) this Agreement has been, and all of the documents to be delivered by Seller at Closing will be properly executed and will constitute the valid and binding obligations of Seller, respectively, enforceable against it in accordance with their respective terms; and (c) there is no consent required by Seller to enter into this Agreement and consummate or cause to be consummated the sale and transfer of the Acquired Assets and the assignment and assumption of the Acquired Contracts hereunder.

## 3.3    Title to Acquired Assets.

Seller owns or otherwise has the legal right to use all of the Acquired Assets. In accordance with and by virtue of the Sale Order by the Bankruptcy Court, upon transfer of the Acquired Assets to Buyer at Closing, Buyer shall acquire good and valid title thereto free and clear of all Liabilities, Claims and Encumbrances of any kind other than the following (collectively, "Permitted Encumbrances"): (a) Assumed Liabilities and Encumbrances in respect of Assumed Liabilities; (b) those Encumbrances set forth in **Schedule 3.3**; and (c) Encumbrances that are caused by Buyer.

## 3.4    Compliance with Laws.

Except as set forth in **Schedule 3.4**, to Seller's Knowledge:

        (i)      Seller is now, and will on the Closing Date be, in compliance with all applicable Environmental Laws;

        (ii)     There are no conditions caused by Seller's use of the Real Property which might, under any Environmental Law currently in effect, (A) give rise to liability to either Seller or the imposition of a statutory lien, or (B) which would or may require any "Response," "Removal" or "Remedial Action" (as those terms are defined in Environmental Laws) or any other action, including, without limitation, reporting, monitoring, cleanup or contribution by Seller;

        (iii)    During the ownership, use or lease of the Real Property by Seller no Hazardous Materials have been used, handled, generated, processed, treated,

stored, transported to or from, released, discharged or disposed of by Seller or any third party on, about or beneath, the Real Property except in compliance with all applicable Environmental Laws then in effect;

(iv)     There are no above or underground storage tanks or transformers containing or contaminated with PCBs on, about or beneath the Real Property.

(v)     Seller has not received notice or otherwise has knowledge of:

(i)     any unresolved claim, demand, investigation, enforcement, Response, Removal, Remedial Action, statutory lien or other governmental or regulatory action instituted or threatened against Seller or the Real Property pursuant to any of the Environmental Laws;
(ii)     any unresolved claim, demand, suit or action, made or threatened by any Person against Seller or the Real Property relating to (1) any form of damage, loss or injury resulting from, or claimed to result from, any Hazardous Material on, about beneath or arising from the Real Property or, (2) any alleged violation of the Environmental Laws by Seller related to the Business; or
(iii)     any unresolved communication to or from any governmental or regulatory agency arising out of or in connection with Hazardous Materials on, about, beneath, arising from or generated at the Real Property, including, without limitation, any notice of violation, citation, complaint, order, directive, request for information or response thereto, notice letter, demand letter or compliance schedule;

(vi)     No wastes generated by Seller from the Business have ever been directly or indirectly sent, transferred, transported to, treated, stored or disposed of at any site listed or formally proposed for listing on the National Priority List promulgated pursuant to Environmental Laws or to any site listed in any state list of sites requiring or recommended for investigation or clean-up; and

(vii)     Seller has received no notice of any presently alleged violation of or noncompliance with any Applicable Law, relating to the Acquired Assets.

## 3.5     Litigation.

Except as set forth in **Schedule 3.5** or in Seller's Schedules filed in the Bankruptcy Case and other than the Bankruptcy Case and the matters that may arise therein, as of the date hereof, (i) there are no Judicial Actions pending or, to the Knowledge of Seller, threatened against or affecting the operations or conduct of the Business or the use of the properties of the Business, (ii) Seller is not in default, and no condition exists that would constitute a default, with respect to any Judgment affecting or relating to the Business, and (iii) no condemnation or eminent domain proceeding has been commenced or threatened to be commenced against any Acquired Asset. Seller acknowledges and agrees that any Damages related to such Judicial Actions, Judgments or related matters is a Retained Liability.

### 3.6 Contracts and Leases.

Except as set forth in Sections 2.1B and 2.1J, Seller is not assigning or transferring any rights or obligations under any Contracts or Leases. Seller has agreed to assume and assign to Buyer all Acquired Contracts pursuant to Section 365 of the Bankruptcy Code. Seller has delivered a true and accurate copy of each of the Acquired Contracts set forth on Schedule 2.1J each as supplemented from time to time pursuant to Section 2.1J. Schedule 2.1J (as supplemented) contains a complete and accurate list showing dates, parties, subject matter and term of each of the Acquired Contracts. Except as shown on Schedules 2.1J (as supplemented), since the Petition Date Seller has not received any claim or threat that Seller has breached, nor has Seller done or failed to do any act which by lapse of time or notice or both would constitute a breach of or default under, any of the terms or conditions of any Acquired Contract.

### 3.7 Corn Contracts.

Although Buyer is not acquiring the Amended and Restated Agreement Regarding Corn Procurement of January 1, 2009 between CHS, Inc. and Otter Tail Ag Enterprises, LLC and that agreement is an Excluded Contract under Section 2.3A, Buyer recognizes that CHS, Inc. is continuously entering purchasing corn on an ongoing basis on behalf of Seller, and has been authorized to enter into fixed basis contracts for deliveries through March 31, 2010. In order to promote an orderly transition from operations by Seller to operations by Buyer, Buyer agrees to assume Seller's obligations to purchase corn under all outstanding fixed basis contracts that may exist on the Closing Date for deliveries subsequent to the Closing Date. Buyer shall not be obligated, however, to assume any fixed price corn contracts, and Seller agrees to specificly instruct CHS, Inc. not to enter into any fixed price corn contracts on Seller's behalf.

### 3.8 The SWF Lease.

The Seller is also indebted under a long-term, secured agreement, generally known as the Solid Waste Facility Lease Agreement (the "SWF Lease") which is repayable in total by Seller in the same amount of three bond issuances by Otter Tail County to finance the construction of Seller's distillers grains processing facility. The first bond offering consisted of $20,000,000 of subordinate exempt facility revenue bonds. U.S. Bank National Association (the "Revenue Bond Indenture Trustee") is the indenture trustee for this bond offering. Otter Tail County further completed two issuances of general obligation tax abatement bonds totaling $6,010,000. The payments due under the SWF Lease equal the total amount of the three bond offerings. Otter Tail County has assigned its interest in $20,000,000 of the payments due under the SWF Lease to the Revenue Bond Indenture Trustee. Otter Tail County remains entitled to payment in the principal amount of $6,010,000 under the SWF Lease. The Seller has also executed a guaranty agreement in favor of the Revenue Bond Indenture Trustee, whereby it guaranteed repayment of the $20,000,000 with respect to the Revenue Bonds ("Guaranty"). The payments under the Guaranty are secured by a mortgage and security interest in favor of the Revenue Bond Indenture Trustee covering the Seller's ethanol plant, related real property, and equipment. The Seller and Revenue Bond Indenture Trustee dispute the value of this property and the extent of the applicable liens. Pursuant to the SWF Lease and the Guaranty, the Revenue Bond Indenture Trustee asserts a claim against the Seller in the amount of $20,000,000. Pursuant to the SWF Lease, Otter Tail County asserts a claim against the Seller in the amount of $6,010,000. The Seller is asserting in the Bankruptcy Court that the SWF Lease is not a true lease, but rather a security agreement which secures the repayment of the bond offerings. The Revenue Bond

Indenture Trustee and Otter Tail County dispute the Debtor's characterization of the SWF Lease, and assert that it is a true lease and thus, it is an executory contract that must be assumed or rejected by the Debtor. For purposes of this Agreement the SWF Lease is deemed a security agreement securing the repayment of the bond offerings. At Closing, in accordance with and by virtue of the Sale Order by the Bankruptcy Court Seller shall convey to Buyer good and valid title to the property, free and clear of (i) the SWF Lease and all liens related to or securing the SWF Lease; (ii) the interests of the Revenue Bond Indenture Trustee; (iii) the interests of Otter Tail County; and (iv) the mortgage and security interest securing the Guaranty.

**3.9    Brokers and Finders.**

Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Agreement or the transactions contemplated by the Agreement for which Buyer is or will become liable, and Seller shall indemnify and hold harmless Buyer from any claims with respect to any such fees or commissions, in each case except to the extent that such fees, commissions and other similar payments constitute Assumed Liabilities.

**3.10    Real Property Disclosures.**

> (i)    Seller has no Knowledge of any real property interest held by Seller used or useful in the conduct of the Business which is not listed in Schedules 2.1C(1), 2.1C(2), and 2.1C(3).

> (ii)    Except as disclosed on **Schedule 3.10**, to the Knowledge of Seller, water, sanitary sewer, storm sewer, drainage, electric, telephone, gas, and other public utility lines and systems serve the Real Property, with capacity and in a manner adequate for the present use thereof and are directly connected to the lines and/or the other facilities of the respective public authorities or utility companies providing such services or accepting such discharge, either adjacent to the Real Property or through easements or rights of way appurtenant to and forming a part of the Real Property.

> (iii)    Except as disclosed on **Schedule 3.10**, to the Knowledge of Seller, no portion of the Real Property relies on any facilities (other than facilities of public utility and water companies) located on any other property not included in the Real Property to fulfill (i) any zoning, building code or other municipal or governmental requirement, or (ii) for structural support or the furnishing to the improvements included in the Real Property of any essential building systems or utilities, including, without limitation, electrical, plumbing, mechanical and heating, ventilating and air conditioning systems; and no building or other improvement not included in any part of the Real Property relies on any part of the Real Property to fulfill any zoning, building code or other municipal or governmental requirement or for structural support or the furnishing to such building or improvement of any essential building systems or utilities.

**3.11    Restrictions on Doing Business.**

Except as set forth in the Acquired Contracts, Seller is not party to, and the Business or the Acquired Assets are not bound by, any agreement or understanding that would restrict or limit

Seller's or Buyer's right to carry on any business or activity or to solicit business from any Person in any geographical area or otherwise to conduct its business as Buyer may determine.

### 3.12 Records.

The books of account and operating records of Seller are complete and correct in all material respects and have been maintained in accordance with sound business practices, and there have been no transactions involving the Acquired Assets or the Business which properly should have been set forth therein and which have not been accurately so set forth.

### 3.13 Permits.

Schedule 2.1E attached hereto and made a part hereof lists all permits issued to or held by Seller. To Seller's Knowledge, Seller is in substantial compliance with the terms of each permit, and there is no pending or, threatened, cancellation, termination, non-renewal or revocation of any such permit.

### 3.14 Taxes.

Seller has in accordance with all applicable laws filed all Tax Returns which are required to be filed by Seller. Seller has paid all ad valorem taxes on the Real Property as such taxes became due and payable. All Taxes which Seller is required by law to withhold and collect have been duly withheld and collected, and have been paid over, in a timely manner, to the proper authorities to the extent due and payable. There are no post-petition transactions which might or could result in additional Taxes of any nature to Seller for which an adequate reserve has not been provided on Seller's balance sheet.

### 3.15 Employment Matters.

There are no collective bargaining agreements to which Seller is a party. There is no pending or, to Seller's Knowledge, threatened strike, slowdown, picketing, work stoppage or pending application for certification of a collective bargaining agent involving Seller or the Facilities.

### 3.16 No Other Representations or Warranties.

Buyer acknowledges that, except for the representations contained in this Article and the certificate delivered pursuant to Section 6.1, neither Seller nor any other person on behalf of Seller makes any express or implied representation or warranty with respect to Seller or the Acquired Assets or with respect to any information provided by or on behalf of Seller to Buyer. Neither Seller nor any other person will have or be subject to any liability or indemnification obligation to Buyer or any other person resulting from the distribution to Buyer or use by Buyer of any such information, including any information, documents, projections, forecasts or other material made available to Buyer in any "data room", confidential information memoranda or management presentations in expectation of or in connection with this Agreement or the transactions contemplated by this Agreement. In connection with the investigation by Buyer, Buyer has received or may receive from Seller certain projections, forward-looking statements and other forecasts and business plans. Buyer acknowledges that there uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans (including the reasonableness of all assumptions underlying such estimates, projections and

other forecasts and plans) and that Buyer acknowledges that Seller makes no representation or warranty with respect to such estimates, projections, forecasts or plans.

### 3.17 Acquired Assets "AS IS".

Buyer agrees that (a) Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Buyer's own investigation of the Acquired Assets and the representations and warranties of Seller set forth in this Article and (b) neither Seller nor any estate broker or other representative of Seller has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets, any part of the Acquired Assets, the financial performance of the Acquired Assets or the Business, or the physical condition of the Acquired Assets other than the representations of Seller set forth in this Article. Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Acquired Assets "AS IS' and "WITH ALL FAULTS' subject only to the representations of Seller set forth in this Article. Buyer agrees that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon Buyer's own investigation of all such matters, and that Buyer assumes all risks with respect thereto. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, SELLER MAKES NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE ACQUIRED ASSETS.

## ARTICLE 4.
## REPRESENTATIONS OF BUYER

Buyer represents to Seller that, at and as of the date of this Agreement, the following statements are true and correct in all respects:

### 4.1 Organization and Good Standing.

Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of Delaware. As of the Closing Date, Buyer will be fully qualified to do business in the State of Minnesota.

### 4.2 Authority Relative to Agreement.

Buyer has the full right and authority and has obtained any and all consents required to carry on its business as now conducted, to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement and all of the documents to be delivered by Buyer at Closing have been and will be authorized and properly executed, and constitute and will constitute the valid and binding obligations of Buyer, enforceable in accordance with their respective terms.

### 4.3 Conflicts and Pending Action.

The execution and delivery by Buyer of this Agreement and the consummation of the transactions contemplated herein does not (and with the passage of time, the giving of notice or both, will not) conflict with, violate, constitute an event of default, require the consent of any Governmental Body or result in the creation of an Encumbrance or other interest under (a) the

Certificate of Formation or Operating Agreement of Buyer; (b) any Applicable Law applicable to Buyer; or (c) any mortgage, indenture, lease, Contract or other agreement binding on Buyer. There is no Judicial Action pending, or, to Buyer's knowledge, threatened against or affecting Buyer, which challenges or seeks to prevent or impair Buyer's ability to execute or perform its obligations under this Agreement.

## 4.4    Availability of Funds.

As of the Closing, Buyer will have sufficient cash in immediately available funds to pay the Purchase Price and all costs, fees and expenses to be paid by Buyer pursuant to this Agreement.

## 4.5    Brokers and Finders.

Buyer has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Agreement or the transactions contemplated by the Agreement for which Seller is or will become liable, and Buyer shall indemnify and hold harmless Seller from any claims with respect to any such fees or commissions.

## 4.6    Buyer's Knowledge.

Notwithstanding any representation or warranty set forth by Seller in this Agreement or any certificate delivered to Buyer, Buyer and its Affiliates do not know or are not aware of any information that would be reasonably expected to result in any representation and warranty by Seller set forth herein to have been false or incorrect when made.

<strong>ARTICLE 5.<br>PRECLOSING COVENANTS OF THE PARTIES</strong>

The parties hereby agree to take or perform the following actions on or before the Closing Date:

## 5.1    Accuracy of Representations.

Each of the parties hereto shall refrain from taking any action that would render any representation made by such party pursuant to Article 3 or Article 4 (as the case may be) of this Agreement materially inaccurate in any respect (whether taken singularly or in the aggregate) as of the Closing Date.

## 5.2    Notices.

Seller will promptly notify Buyer, and Buyer will promptly notify Seller, in each case in writing and in accordance with Section 11.5: (a) of all Claims threatened, brought, asserted, or commenced against Seller or Buyer, after execution of this Agreement as the case may be, or their respective managers, members, officers, directors, or employees (i) involving the transactions contemplated by this Agreement, or (ii) that are reasonably likely to have a Material Adverse Effect on the Acquired Assets; (b) of any failure by Buyer or Seller to obtain, or of any refusal of a third party to grant, any material Permit or assignment necessary to transfer the Acquired Assets; and (c) of all Claims after execution of this Agreement arising from a material violation by Seller of any Applicable Law relating to Hazardous Material and relating to the Acquired Assets. If at any time (x) Buyer becomes aware of any material breach by Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Seller, or (y) Seller becomes aware of any breach by Buyer of any representation,

warranty, covenant or agreement contained herein and such breach is capable of being cured by Buyer, the party becoming aware of such breach shall promptly notify the other party, in writing, in accordance with Section 11.5, of such breach. Upon such notice of breach, the breaching party shall have 30 days to cure such breach prior to the exercise of any remedies in connection therewith.

## 5.3 Interim Operations by Seller.

From the date hereof until the earlier of Closing or the termination of this Agreement in accordance with Section 10.1 hereof, except as may be required by the Bankruptcy Court and the Bankruptcy Case, Seller agrees (subject to the prior consent of Buyer, which consent shall be granted in its sole discretion):

### A. Conduct of Business.

Seller shall continue to conduct the business in ordinary course of operations, including but not limited to, ordinary repairs, maintenance, and shutdowns, and to preserve the Acquired Assets in the ordinary course provided unintentional damage to or destruction of the Acquired Assets shall not be a breach of this Section 5.3A, unless such damage or destruction is resulting from the negligence of Seller, its employees, representatives or agents.

### B. Contractual Obligations.

Seller shall duly and punctually pay and perform all of its post-petition contractual obligations under the Acquired Contracts and Trade Payables in accordance with the terms thereof.

### C. Material Changes.

Seller shall be entitled to make changes in the Owned Tangible Personal Property, repairs or improvements to the Owned Tangible Personal Property or the Owned Real Property, and other capital improvements that have been budgeted in the Cash Collateral Operating Budget. In addition, Seller shall be entitled to make any other changes, repairs or capital improvements expressly approved by the Seller's secured lenders. Seller shall not, however, make any other changes or capital improvements in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) individually, or Fifty Thousand and 00/100 Dollars ($50,000.00) in the aggregate, during the period beginning on the date of this Agreement through and including the Closing Date without the prior written approval of Buyer.

### D. Encumbrances or Transfers.

Seller shall not sell, transfer or otherwise dispose of, and except as provided in this Agreement or pursuant to existing contracts or commitments, Seller shall not create an Encumbrance (other than a Permitted Encumbrance) on, any Acquired Asset, or grant any right with respect to any Acquired Asset, or enter into any renewals, extensions, amendments, or modifications of any Acquired Contracts (other than in the ordinary course of business). Seller shall not enter into any material transactions not in the ordinary course of business, or waive any of Seller's material rights in each case with respect to any of the Acquired Assets.

### E.    *Agreements.*

Seller shall not make any commitment to take any actions prohibited by this Section 5.3.

### F.    *Material Adverse Effect.*

Seller shall not take any other actions which, individually or in the aggregate, would have or would likely cause a Material Adverse Effect on the Acquired Assets.

### G.    *Applicable Laws.*

Seller will conduct itself and the Business in accordance with the requirements of Applicable Laws, including the Bankruptcy Code and all orders of the Bankruptcy Court.

## 5.4    Closing Conditions.

The parties each shall use their reasonable efforts to fulfill all of the conditions set forth in this Agreement over which they have control or influence and to consummate the transactions contemplated herein.

## 5.5    Buyer's Access to Information and Records Before Closing.

In order that Buyer may conduct a supplemental business review of the Business and the Acquired Assets, Seller shall give Buyer and its employees, counsel, accountants, advisors, agents and other authorized representatives reasonable access, throughout the period from the date hereof until the Closing Date, to Seller's properties, books, Contracts, commitments, customers, suppliers, distributors, records, and Business Papers and Lists and shall furnish to Buyer during such period such information concerning the Business as Buyer may reasonably request. Representatives of Buyer shall be allowed to have reasonable access to employees of the Business, and to accountants, consultants, agents and other representatives of Seller involved in the Business. Any investigation pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller. Seller shall use its reasonable efforts to facilitate any environmental due diligence requested by Buyer.

## 5.6    Government Filings.

Promptly after the execution of this Agreement, Buyer and Seller shall cooperate to make all applications and filings and submit such other information requested or required by the Governmental Bodies identified on Schedule 2.1E, in connection with the transfer to Buyer of the Acquired Assets, including the Permits. Each party shall promptly report to the other the fact and general nature of any inquiries from or substantive decision by any such Governmental Body concerning the transactions contemplated by this Agreement.

## 5.7    HSR Act.

As soon as practicable ( and, in any event, within five (5) Business Days following entry of the Sale Procedure Order, if required, Buyer and Seller shall each prepare and file any notifications required to be filed under the HSR Act with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice, and request early termination of the waiting period under the HSR Act. Buyer and Seller shall promptly respond to any requests for additional information or documents in connection with such filings. Buyer and Seller shall equally split the payment of the applicable filing fee under the HSR Act, and each party shall be responsible for its own costs and expenses of preparing the HSR Act filings.

**5.8    Exclusive Dealing.**

As an inducement for Buyer to incur expenses and to proceed with the arrangements for the proposed transactions, Seller and its managers, members, officers, advisors and agents (collectively, the "Representatives") agree that during the period from the date of this Agreement is executed until the date it is terminated in accordance with ARTICLE 10 of this Agreement, none of Seller nor any Representative shall solicit an offer from any third party for all or any portion of the assets which are the subject of this Agreement; provided, however, that Seller may (i) continue negotiations with third parties regarding the sale of such assets with which it has had discussions or negotiations and an executed confidentiality agreement prior to the date hereof; and (ii) enter into negotiations or discussions with third parties regarding the sale of such assets with any party which initiates the initial contact with Seller and executes a confidentiality agreement with Seller.  Notwithstanding any provision herein to the contrary, neither Seller nor any Representative shall solicit offers from third parties, except as permitted by court order. Further, during the period from the date this Agreement is executed until the date it is terminated in accordance with ARTICLE 10 of this Agreement, Seller or its Representatives will promptly (within 24 hours) notify Buyer if they become aware of any contact between Seller or its Representatives and any other person regarding any such discussions, offers, proposals or any related inquiries.

**5.9    Updating of Schedules.**

If any information comes to the attention of any party to this Agreement prior to a Closing that suggests that the information contained in any of the Schedules relevant to Closing will be incorrect or obsolete at Closing, that party will communicate the information to the other party in writing and the parties will endeavor to agree on an update or correction of the applicable Schedule(s) at or before Closing.

**5.10    Insurance Policies.**

The parties acknowledge that **Schedule 5.10** sets forth a list and a description of each of the policies of insurance held by or for the benefit of Seller with respect to the Business. Seller shall keep such policies in full force and effect in such amounts and policy coverages through the Closing Date.

**5.11    Tax Allocation of Assets.**

    ***A.        Allocation Statement.***

    Not later than 90 days after Closing, Buyer will deliver to Seller a proposed statement (the "Allocation Statement") allocating the Purchase Price among the Acquired Assets in accordance with Section 1060 of the Code.

    ***B.        Objection to Allocation Statement.***

    If within 30 days after the delivery of the Allocation Statement, Seller notifies Buyer in writing that Seller objects to the allocation set forth in the Allocation Statement, Buyer and Seller shall use commercially reasonable efforts to resolve such dispute within 20 days. In the event that Buyer and Seller are unable to resolve such dispute within 20 days, Buyer and Seller shall, within 15 days after such 20-day period, jointly retain a nationally recognized accounting firm (the "Accounting Referee") to resolve the disputed items. The Accounting Referee shall resolve such disputed items as soon as practicable,

but in any case no later than 30 days from the date of engagement. Upon resolution of the disputed items, the allocation reflected on the Allocation Statement shall be adjusted to reflect such resolution. The costs, fees and expenses of the Accounting Referee shall be borne by the party whose proposed allocation is farthest from the final allocation chosen by the Accounting Referee.

### C.  *Binding Effect of Allocation Statement.*

Seller and Buyer agree to be bound by the Allocation Statement and act in accordance therewith in the preparation, filing and audit of any Tax return (including, without limitation filing Form 8594 with its federal income Tax return for the taxable year(s) that includes the Closing Date. Not later than 30 days prior to the filing of their respective Forms 8594 relating to this transaction, each party shall deliver to the other party a copy of its Form 8594.

**5.12   Access after Closing.**

### A.  *Books and Records Acquired by Buyer.*

Buyer covenants and agrees to preserve the books and records (including computer data containing such books and records) of Seller acquired hereunder for one year following the Closing Date. On and after the Closing Date, Buyer will afford promptly to Seller and its agents reasonable access to its properties, books, records, employees and auditors to the extent necessary to permit Seller to determine any matter relating to its rights and obligations hereunder or any other reasonable business purpose related to the Excluded Assets, the Retained Liabilities or to any period ending on or before the Closing Date; *provided* that any such access by Seller shall not unreasonably interfere with the conduct of the business of Buyer. Seller will hold, and will use its reasonable efforts to cause its managers, members, officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning Buyer or the Business provided to them pursuant to this Section. Seller shall bear all of the out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees, but excluding reimbursement for general overtime, salaries and employee benefits) reasonably incurred in connection with any document retrieval hereunder.

### B.  *Books and Records Not Acquired by Buyer.*

Seller covenants and agrees to preserve the books and records of Seller not acquired by Buyer under this Agreement until the earlier of (i) one year following the Closing Date or (ii) until the completion and the administration of the Bankruptcy Case (the "Termination Date"). On and after the Closing Date and until such Termination Date, Seller will afford promptly to Buyer and its agents reasonable access to its books of account, financial and other records (including, without limitation, accountant's work papers), information, employees and auditors to the extent necessary or useful for Buyer in connection with any audit, investigation, dispute or litigation or any other reasonable business purpose relating to the Business, the Acquired Assets or the Assumed Liabilities; *provided* that any such access by Buyer shall not unreasonably interfere with the conduct of Seller's

affairs. Buyer shall bear all of the out-of-pocket costs and expenses (including, without limitation, attorneys' fees, but excluding reimbursement for general overhead, salaries and employee benefits) reasonably incurred in connection with the foregoing. Prior to disposing of any such books and records, Seller shall give Buyer at least thirty (30) days prior written notice and the opportunity to review, make copies and take possession of such books and records scheduled for disposal.

## ARTICLE 6.
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer to consummate the Closing under this Agreement shall be subject to the satisfaction, on or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Buyer:

### 6.1    Representations and Warranties; Certificate.

All representations and warranties of Seller contained in this Agreement shall have been true and complete when made and shall be true and complete at and as of the Closing Date, except to the extent any inaccuracies do not result in a Material Adverse Effect on the Business taken as a whole; and Seller shall furnish Buyer with a certificate to such effect, dated the Closing Date.

### 6.2    Performance by Seller; Certificate.

Seller shall have performed and complied in all material respects with all agreements and conditions required by this Agreement to be performed and complied with by them before or on the Closing Date, and there shall have been delivered to Buyer a certificate to such effect, dated the Closing Date.

### 6.3    Certified Resolutions.

Buyer shall have received copies of authorizations and/or resolutions, as the case may be, of Seller's respective boards of directors, managers or other governing board, certified by an authorized officer, authorizing the execution, delivery, and performance of this Agreement and the transactions contemplated herein by Seller, and authorizing the signatory officers of Seller to execute this Agreement and all of the documents to be executed and delivered by Seller at Closing.

### 6.4    No Material Adverse Change.

There shall have occurred no (i) material adverse change to the Acquired Assets, or (ii) conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or (iii) appointment of a Trustee under the Bankruptcy Code to administer the Bankruptcy Case (iv) dismissal of the Bankruptcy Case.

### 6.5    Instruments of Sale, Etc.

The Buyer shall each have received a certified copy of the Sale Order and a Limited Warranty Deed, a Bill of Sale, an Assignment and Assumption Agreement in forms attached as Exhibits 2.8A, and 2.8B, and such other instruments of sale, transfer, release, and assignment, all in forms reasonably satisfactory to the respective counsel for Buyer and Seller, as are necessary or appropriate to vest in Buyer all of Seller's right, title, and interest in and to all of the Acquired

Assets and to confirm the SWF lease is not a true lease and eliminate any and all obligations with respect to the SWF Lease.

## 6.6 Sale Order.

Seller shall have obtained the Sale Order, with all the terms and conditions specified in Exhibit 8.4 and such Sale Order shall have been entered by the Bankruptcy Court and shall be in full force and effect.

## 6.7 Bankruptcy Assignment Order.

Seller shall have obtained the Bankruptcy Assignment Order and such Bankruptcy Assignment Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall authorize the assumption and assignment of the Acquired Contracts to Buyer.

## 6.8 Assumed Indebtedness Documents.

Buyer shall have received the New Markets Amended and Restated Loan Documents executed by New Markets in accordance with Section 2.5B(1).

## 6.9 HSR Act.

If applicable, the waiting period applicable to the consummation of the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated.

## 6.10 Permits.

Buyer shall have received approval of the transfer or reissuance to Buyer of all permits and licenses necessary to conduct the Business from those entities with jurisdiction over such matters.

## ARTICLE 7.
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller to consummate the Closing under this Agreement shall be subject to the satisfaction, on or before the Closing Date, of all of the following conditions, any one or more of which may be waived by Seller:

## 7.1 Representations and Warranties Accurate; Certificate.

All representations and warranties of Buyer contained in this Agreement shall have been true and complete in all material respects when made and shall be true and complete in all material respects at and as of the Closing Date. Buyer shall furnish Seller with a certificate to such effect, dated the Closing Date.

## 7.2 Performance by Buyer; Certificate.

Buyer shall have performed and complied in all material respects with all agreements and conditions required by this Agreement to be performed and complied with by it on or before the Closing Date, and there shall have been delivered to Seller a certificate to such effect, dated the Closing Date.

### 7.3 Certified Resolutions.

Seller shall have received copies of resolutions of Buyer's members, certified by an authorized officer of Buyer, authorizing the execution, delivery, and performance of this Agreement and all of the other documents to Buyer at the Closing and the transactions contemplated herein and therein by Buyer.

## ARTICLE 8.
## ADDITIONAL COVENANTS

Buyer and Seller further agree to the following:

### 8.1 Motion in Bankruptcy Court.

Within two (2) Business Days following the date hereof, Seller shall file with the Bankruptcy Court a motion (the "Bankruptcy Sale Motion") in the substantially the same form as **Exhibit 8.1** attached hereto seeking approval of the Sale Procedure Order, the Bankruptcy Assignment Order and the Sale Order and setting a hearing in the Bankruptcy Case regarding the Bankruptcy Sale Motion (the "Sale Hearing"), all of which must include terms not inconsistent with this Agreement. Seller shall use reasonable efforts to promptly procure the entry of the Sale Procedure Order by the Bankruptcy Court and to perform such other acts as may be necessary to permit Seller to convey the Acquired Assets to the Buyer as required by this Agreement. Seller shall keep Buyer fully informed of the status of its efforts to obtain the Sale Procedure Order. Seller shall give Buyer reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Procedure Order and Buyer shall have the right to attend and be heard at any such hearings.

### 8.2 Sale Procedure Order.

The obligations of Buyer to consummate the purchase of the Acquired Assets under this Agreement shall be subject to the provisions of an order of the Bankruptcy Court (the "Sale Procedure Order"). The Sale Procedure Order will: (i) approve sale procedures and bidding protections in connection with the sale of substantially all of the Seller's assets pursuant to Sections 363 and 365 of the Bankruptcy Code; (ii) schedule an auction (the "Auction") and a hearing to consider approval of the sale of substantially all of the Seller's assets; and (iii) grant related relief. Seller shall use its best efforts so that the Bankruptcy Court, as part of its Sale Procedure Order: (a) schedules a hearing to approve this Agreement, (b) requires the payment of the Breakup Fee and Expense Reimbursement in accordance with the terms of Section 8.6 hereof, (c) requires a deposit in the amount of the Good Faith Deposit in accordance with Section 2.6B hereof, and (d) approves bidding procedures governing the Auction in form and substance not materially inconsistent, from the Buyer's perspective, to the bidding procedures included in **Exhibit 8.1** (the "Bidding Procedures").

### 8.3 Bankruptcy Assignment Order.

An order of the Bankruptcy Court shall authorize the assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Acquired Contracts ("the "Bankruptcy Assignment Order"). The Acquired Contracts will be identified on an exhibit to the Bankruptcy Sale Motion. Such exhibit shall set forth the amounts necessary to cure defaults under each of such Acquired Contracts as determined by Seller based on Seller's books and records. In cases in which Seller

is unable to establish that a default exists based upon a review of its books and records, or other relevant information, the relevant cure amount shall be set at $0.00.

## 8.4     The Sale Order.

The sale contemplated under this Agreement will be approved pursuant to an order of the Bankruptcy Court (the "Sale Order") entered pursuant to Sections 363 and 365 of the Bankruptcy Code, in part: (i) approving this Agreement and authorizing the transactions contemplated under this Agreement; (ii) authorizing the transfer to Buyer of all of the Acquired Assets, including the Real Property, pursuant to Section 363 of the Bankruptcy Code, free and clear of all Liabilities, Claims and Encumbrances, except Permitted Encumbrances; (iii) authorizing and directing the assumption by Seller and the assignment to Buyer of the Acquired Contracts and the Leases pursuant to this Agreement and Section 365 of the Bankruptcy Code; (iv) containing a finding that Buyer is a buyer in good faith under Section 363(m) of the Bankruptcy Code; (v) containing a finding that Buyer has complied with and has not violated Section 363(n) of the Bankruptcy Code; (vi) confirming that Buyer is acquiring the Acquired Assets free and clear of the Excluded Assets and all Claims, Liens, Encumbrances, Liabilities  and any other liabilities of the Seller other than the Assumed Liabilities; (vii) waiving the ten-day stay provisions of Bankruptcy Rules 6004 and 6006; (viii) providing that there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure; and otherwise substantially in the form contained in **Exhibit 8.4** with such changes as Buyer finds acceptable.  Seller and Buyer hereby acknowledge and agree that this Agreement and the Closing provided for hereunder is subject to the approval of the Bankruptcy Court.

## 8.5     Obtaining the Bankruptcy Assignment Order and the Sale Order.

Seller shall use reasonable efforts to promptly procure the entry of the Bankruptcy Assignment Order and the Sale Order by the Bankruptcy Court and to perform such other acts as may be necessary to permit Seller to convey the Acquired Assets to the Buyer as required by this Agreement. Seller shall keep Buyer fully informed of the status of its efforts to obtain the Bankruptcy Assignment Order and the Sale Order. Seller shall give Buyer reasonable advance notice of any hearings regarding the motions required to obtain the issuance of these orders and Buyer shall have the right to attend and be heard at any such hearings. If, on or before March 31, 2011, either (i) the terms and conditions contained in the Sale Order shall not have been complied with to the extent necessary such that the Sale Order is and shall remain effective without any material amendments thereto, or (ii) the Sale Order shall not be in substantially the form proposed in Exhibit 8.1, then, Buyer shall have the right to terminate this Agreement by written notice to Seller in accordance with the provisions ofArticle 10.

## 8.6     Breakup Fee.

Seller hereby acknowledges and agrees that the execution and delivery by Buyer of this Agreement may result in competing offers of greater aggregate value to Seller and its bankruptcy estate, and that there is significant value and benefit to Seller and its bankruptcy estate in having received this Agreement and in having Buyer pursue the closing of the proposed transaction to the benefit of Seller and its bankruptcy estate.  The parties also acknowledge that Buyer has and will continue to incur significant expense and spend significant management resources in the pursuit of this transaction and in the preparation of the definitive documentation therefore. Accordingly, the parties hereto agree, subject to Bankruptcy Court approval, that Seller shall pay to Buyer the sum of (i) Buyer's actual, documented out of pocket expenses, not to exceed One

Hundred Thousand and 00/100 Dollars ($100,000), and (ii)One Million and 00/100 Dollars ($1,000,000.00) (the "Breakup Fee"), in the event that (x) a competing or other offer is approved by the Bankruptcy Court on or before April 15, 2011; (y) that Seller withdraws its motion for the Bankruptcy Court approval of the transaction contemplated by this Agreement; or (z) Seller fails or refuses to close the transactions contemplated hereunder after receiving Bankruptcy Court approval. The Breakup Fee shall be payable at the closing of a transaction from a competing or other offer or otherwise within ten (10) days of the foregoing event, without the necessity for further approval of the Bankruptcy Court, as an administrative expense with a priority superior to that of any other expense of the estate. In the event that the transactions contemplated by this Agreement are consummated between Seller and Buyer, no Breakup Fee shall be payable to Buyer. The Breakup Fee shall be payable to Buyer in accordance with this Section 9.4 as an administrative expense under Section 503(b) of the Bankruptcy Code entitled to priority under Section 507(a)(1) of the Bankruptcy Code.

**8.7    No Assumption.**

Buyer does not assume or agree to pay, or indemnify Seller, or any other Person against any Liability, obligation, or expense of Seller relating to the Acquired Assets in any way except, and only to the extent, expressly provided for herein or in the documents executed at each Closing. Moreover and notwithstanding any other provision of this Agreement, Buyer does not agree to assume any obligation of Seller except with respect to the Assumed Liabilities.

**8.8    Seller's Employees.**

**A.    *No Obligation to Hire.***

Except as otherwise provided herein, at or before the Closing, Seller will either have terminated Seller's Employees or moved Seller's Employees off the Real Property. Seller agrees that, except as otherwise provided herein, Buyer shall assume no Liability with respect to any of Seller's Employees and shall have no obligation to hire any of Seller's Employees. If Buyer does choose to hire any former or current Seller's Employee, and such Seller's Employees accept Buyer's offer of employment, Buyer shall not be required to notify Seller. With respect to such Seller's Employees, Buyer shall not be required to give credit for past service with Seller for the purposes of determining compensation, vesting in, eligibility for or the amount of benefits from any Benefit Plan, or any hospital, medical, dental or disability plan, any paid vacation or sick leave, or any life insurance benefits, or any for any other purpose.

**B.    *Severance Benefits.***

Buyer shall have no obligation to make severance payments to any Employees of Seller by virtue of said Employee's termination of employment with or by Seller prior to or as of the Closing.

**C.    *Seller's Employment Agreements.***

Buyer shall not have any responsibility or Liability under (i) any Benefit Plan, (ii) any collective bargaining agreement with any representative of any employee or (iii) any individual written agreement between Seller and any of its Employees setting forth specific terms of employment duration or compensation or benefits, including, without limitation, any termination agreement, or any agreement for parachute payments.

**D.** **_No Rights to Employment._**

Nothing expressed or implied in this Agreement shall confer upon any of Seller's Employees or any beneficiary, dependent, legal representative or collective bargaining agent of such employees any right or remedy of any nature or kind whatsoever under or by reason of this Agreement, including without limitation any right to employment or to continued employment for any specified period, at any specified location or under any specified job category, or any working condition, rule or practice.

**E.** **_Plant Closing Laws._**

Seller shall be responsible for any notification that may be required under the WARN Act (the "WARN Act") or such other federal, state or local laws.

**8.9** **Further Assurances.**

Following the Closing, Seller and Buyer will use reasonable efforts, upon request of the other party, to do, execute, acknowledge, and deliver, or cause to be done, executed, acknowledged, and delivered, all such further acts, assignments, transfers, conveyances, powers of attorney, and assurances. Seller will at Buyer's request, use reasonable efforts to obtain all authorizations or consents that may reasonably be required for the conveyance, transfer, assignment, and delivery to Buyer, or to their respective successors and assigns, or for aiding and assisting in collecting or reducing to possession, any or all of the Acquired Assets to be transferred hereunder, all costs and expenses incurred in connection with this Section 8.9 shall be paid by the party incurring such expense provided, however, that all such costs associated with the transfers of Permits (excluding unpaid fees which constitute pre-petition obligations of Seller) shall be borne by Buyer. Buyer shall cause the evidences of transfers to Buyer of the Real Property and certificated motor vehicles included in the Acquired Assets to be recorded in the appropriate public records. Seller authorizes Buyer to record the evidences of transfer of the Acquired Assets to Buyer under this Agreement. Further, Seller shall use reasonable efforts to obtain and deliver to Buyer termination of any and all UCC-1 financing statements, satisfactions of any and all mortgages and other liens in order to record the removal of Encumbrances (other than Permitted Encumbrances) on the Acquired Assets.

**8.10** **Cooperation with Respect to Regulatory Matters.**

Upon execution of this Agreement, Buyer and Seller shall promptly proceed to file (at Buyer's sole cost and expense) all applications, consent requests and associated documentary material required by or necessary to obtain all approvals of any Governmental Body necessary to complete the transactions contemplated by this Agreement or to effect the transfer of any Permit set forth on Schedule 2.1E. Buyer and Seller shall use their reasonable efforts to cooperate with each other to assist in the submittal and advocacy necessary for the approval of and with respect to such applications or petitions (including their presence at conferences and hearings).

**8.11** **Cooperation in Tax Proceedings.**

The parties will provide each other with such assistance as may reasonably be requested by any of them in connection with the completion and filing of any form, preparation of any Tax return, any audit or other examination by any Taxing authority, or any judicial or administrative proceedings relating to Liability for Taxes relating to the Acquired Assets or the transactions contemplated by this Agreement. Each party will retain and provide the others with any records

or information that may be relevant to such return, audit, examination, proceedings, or determination. Such assistance shall include making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and shall include providing copies of any relevant Tax returns and supporting work schedules subject to the limitations contained in Section 8.18, the party requesting assistance hereunder shall reimburse the others for reasonable out-of-pocket expenses incurred in providing such assistance.

**8.12    Cooperation in Litigation.**

If, after the Closing Date, any party shall require the participation of officers and employees employed by any other party or any records or files transferred or retained by a party, to aid in the defense or prosecution of a Judicial Action or Claim with respect to the Acquired Assets or the transaction contemplated by this Agreement, and so long as there exists no conflict of interest between the parties with respect to such Judicial Action or Claim, each party shall use its reasonable efforts to make such officers and employees, records, and files available to participate in such defense or prosecution, *provided* that (a) except as required pursuant to the provisions of Section 8.18 of this Agreement, the party requiring the participation of such officers or employees shall pay all reasonable out-of-pocket costs, charges, and expenses arising from such participation, and (b) with respect to records and files, the requesting party shall, upon five (5) Business Days' notice, be granted access to such records and files only during regular business hours, and shall pay all reasonable out-of-pocket expenses, charges, and expenses arising from such access.

**8.13    Removal of Excluded Personal Property.**

Seller shall use commercially reasonable efforts (but without any obligation to expend funds or incur liabilities) to remove excluded personal property, whether or not identified on Schedule 2.3J, from the Real Property on or before ten (10) days after the Closing Date. Buyer agrees to grant Seller access to any facilities which comprise Acquired Assets and which are reasonably necessary or required in connection with such removal.  If the excluded personal property is not removed by the date set forth in this Section, Buyer will have the right to remove the excluded personal property.

**8.14    Filing Reports and Making Payments.**

Seller shall timely file all required reports and notices with each and every applicable Governmental Body and timely make all payments due and owing to each Governmental Body, except to the extent the amount due arose prior to the Petition Date, including, but not by way of limitation, any filings, notices and/or payments required by reason of the transactions contemplated by this Agreement, until Closing. After the Closing, Buyer shall timely file all required reports and notices with each and every applicable Governmental Body and timely make all payments arising from Buyer's actions after the Closing Date due and owing to each such Governmental Body, including, but not by way of limitation, any filings, notices and/or payments required by reason of the transactions contemplated by this Agreement.

**8.15    Confidential Information.**

Seller agrees that after the date hereof, it shall keep secret all Confidential Information regarding the Acquired Assets and the Assumed Liabilities and that it will not directly or indirectly use or disclose the same to any Person without first obtaining the written consent of Buyer, except to

the extent that such information can be shown to have been (i) previously known on a non-confidential basis by Seller, (ii) in the public domain through no fault of Seller or its Affiliates or (iii) later lawfully acquired by Seller from sources other than those related to their prior ownership of the Business. Seller's obligation to keep secret all Confidential Information regarding the Acquired Assets and Assumed Liabilities shall be satisfied if it exercises the same care with respect to such information as it would take to preserve the confidentiality of its own similar information. The parties agree that the remedy of Damages at law for the breach by any party of the covenant contained in this Section is an inadequate remedy. In recognition of the irreparable harm that a violation by any party of any of the covenants, agreements or obligations arising hereunder would cause the Buyer or the other party or parties, each party agrees that in addition to any other remedies or relief afforded by law, an Injunction against an actual or threatened violation or violations may be issued against them and every other Person concerned thereby, it being the understanding of the parties that both Damages and Injunction shall be proper modes of relief and are not to be considered alternative remedies.

## 8.16    Proration.

### A.        *Ad valorem Taxes.*

All real property Taxes, personal property Taxes and similar ad valorem obligations as well as assessments, both general and special payable with respect to the Acquired Assets for a taxable period which includes (but does not end on) the Closing Date, (collectively, the "Apportioned Obligations") shall be apportioned between Seller, on the one hand, and Buyer, on the other hand, based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period after the Closing Date (with respect to any such taxable period, the "Post-Closing Tax Period"). Seller shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Pre-Closing Tax Period, and Buyer shall, in accordance with Section 2.5B(4), be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period.

### B.        *Tax Proration.*

At the Closing the Apportioned Obligations shall be prorated on the basis of the latest rate and valuation information available from the Governmental Body collecting such Apportioned Obligations and the prorated amount owed by Seller shall be deducted by the Buyer as a credit against the Purchase Price.

### C.        *Utilities and Other Trade Payables Proration.*

Seller shall pay all utilities and other Trade Payables related to the Business and Acquired Assets through the Closing Date. Prior to the Closing Date, Buyer and Seller shall jointly notify the providers of utility services and any other vendors that may otherwise bill for goods and services provided during periods straddling the Closing Date, that ownership will transfer on the Closing Date and that they should, if necessary, arrange for a meter reading on the Closing Date or otherwise divide their billing determinants effective on the Closing Date, so that they can commence billing Buyer for services provided after the Closing Date and bill Seller for any services provided before the Closing Date that have not already been paid by the Closing Date.

**8.17    Rejection of Excluded Contracts and Excluded Leases.**

Following the Closing, except to the extent such Excluded Contracts are necessary to Seller's Bankruptcy Estate, Seller shall reject, and seek approval of the Bankruptcy Court to such rejection, of the Excluded Contracts set forth on Schedule 2.3(a), as supplemented from time to time, as well as such of the Excluded Leases as shall be (a) related to the Business, and (b) subject to rejection under section 365 of the Bankruptcy Code. Buyer shall have no obligation to pay any amounts under any such Excluded Contract or Excluded Lease after it has been set forth on Schedule 2.3(a) (as supplemented from time to time) regardless of when such Excluded Contract or Excluded Lease is actually rejected pursuant to Section 365 of the Bankruptcy Code.

**8.18    Costs for Cooperative Obligations.**

Seller agrees to use all reasonable efforts to comply with its obligations under Sections 8.9, 8.10, 8.11, 8.12 and 8.14 provided such efforts do not impose undue burdens on the Seller's bankruptcy estate. In the event Seller determines that any request of Buyer under the aforementioned Sections would impose an undue burden on the Seller's bankruptcy estate, Seller shall so notify Buyer and Seller shall be excused from further performance unless Buyer agrees to pay the reasonable costs and expenses incurred in fulfilling Buyer's request.

**ARTICLE 9.**
**INDEMNIFICATION**

**9.1    Indemnity by Buyer.**

Buyer agrees to indemnify, defend, and hold entirely harmless Seller and its Indemnified Parties with respect to and from any and all Damages that Seller or such Indemnified Parties may suffer, sustain, incur, or otherwise become subject to (either directly or indirectly as a result of Seller suffering, sustaining, incurring, or otherwise becoming subject to same) arising out of, based upon or otherwise in respect of:

>  (i)    any breach of or failure, partial or total, to perform with respect to, any representation, warranty, covenant or agreement of Buyer required by this Agreement or contained in this Agreement or in any certificate, schedule, or other document delivered to Seller by Buyer pursuant to the provisions of this Agreement;

>  (ii)    the failure of Buyer to assume, pay, perform and discharge the Assumed Liabilities from and after the Closing Date; or

>  (iii)    any fees owed any broker, finder, consultant, investment banker, or any other Person retained by Buyer, arising out of or in connection with this Agreement or the transactions contemplated by this Agreement.

**9.2    Other Remedies.**

Nothing contained in this ARTICLE 9 shall be in lieu of, or constitute a waiver of, any remedies at law or in equity that either Buyer or Seller may otherwise have against the other.

**9.3** **Defense of Claims.**

**A.** *Notice of Claim.*

If any Claim is asserted against an Indemnified Party to which the indemnifications contained in this Agreement or any Exhibit hereto shall apply, or to which the Indemnified Party proposes to assert that these indemnifications apply, then, the Indemnified Party shall give reasonably prompt notice of the Claim to the indemnifying party. The failure to so notify such party shall not relieve such party from any duty to indemnify which otherwise might exist with regard to such Claim, except to the extent that the indemnifying party is materially prejudiced by the failure of the other party to give timely notice.

**B.** *Cooperation by Indemnified Party.*

In the event the indemnifying party assumes the defense of a Claim, the Indemnified Party shall cooperate and make available to it (and its representatives) all employees, information, books and records reasonably necessary or useful in connection with the defense, *provided* that the Indemnified Party is reimbursed by the indemnifying party for out-of-pocket expenses incurred by the Indemnified Party in providing such assistance.

**C.** *Participation in Defense by Indemnifying Party.*

After the indemnifying party has received notice from the Indemnified Party pursuant to this Section that a Claim has been asserted against the other party, the indemnifying party shall have the right, upon giving written notice to the other party, to participate in the defense of such Claim and, to the extent it shall wish, to assume the defense of the Claim, at its own expense, through an attorney selected by it satisfactory to the Indemnified Party, which approval shall not be unreasonably withheld; provided, however, that the indemnifying party shall not be permitted to assume the defense of the Claim, if (i) the indemnifying party is also a party to the proceeding giving rise to the Claim and the Indemnified Party determines in good faith that joint representation would be inappropriate, or (ii) the indemnifying party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to defend such Claim and provide indemnification with respect to such Claim. If the indemnifying party fails to give prompt notice of such election, or does not meet the requirements in the previous sentence for assuming the defense of the Claim, the Indemnified Party may defend against the Claim with its own attorney without waiver of its rights under this Section as to indemnification for losses incurred.

**D.** *Rights of Indemnifying Party.*

If the indemnifying party receives such notice and is permitted to assume the defense of the Claim, the Indemnified Party agrees to cooperate and make available to it and its representatives all employees, information, books and records necessary or useful in connection with the defense. In the event the indemnifying party shall have assumed the defense of a Claim, the indemnifying party shall have the sole right to compromise and settle the Claim without the Indemnified Party's consent provided (i) there is no finding or admission of any violation of Applicable Law by the Indemnified Party (or any Affiliate thereof) or any violation of the rights of any Person and no effect on any other

claims that may be made against the Indemnified Party, and (ii) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party;,

### E. *Indemnifying Party Bound.*

If the indemnifying party defends or agrees in writing to compromise or settle any such Claim, it shall be bound by any ultimate Judgment, award or settlement as to the existence and amount of the Claim, and the amount of said Judgment or settlement shall be conclusively deemed for all purposes of this Agreement to be a Liability on account of which the Indemnified Party is entitled to be indemnified pursuant to this Article.

### F. *If the indemnifying party does not assume the defense of a Claim:*

    (1)    the Indemnified Party alone shall have the right to conduct such defense;

    (2)    the Indemnified Party shall have the right to compromise and settle the Claim without the prior consent of the indemnifying party; and

    (3)    if it is ultimately determined by a court of competent jurisdiction that the Claim or loss which shall form the basis of such Judgment or settlement is one that is validly an obligation of the indemnifying party , the indemnifying party shall be bound by an ultimate Judgment or settlement as to the existence and amount of the Claim, and the amount of said Judgment or settlement shall be conclusively deemed for all purposes of this Agreement to be a Liability on account of which the Indemnified Party is entitled to be indemnified pursuant to this Article.

### G. *Attorney's fees.*

The party prevailing in any action concerning enforcement of these indemnification rights shall be entitled to reasonable attorney's fees and costs from the other party.

### H. *Defenses where there is a Breach by Buyer.*

Any term of this Agreement providing (1) that Buyer shall have no liability in respect of the Retained Liabilities or (2) that Buyer did not assume a Liability under this Agreement, shall not serve as a defense to any claim for indemnification by Seller arising out of the breach by Buyer of any representation or warranty contained in this Agreement.

**ARTICLE 10.**
**TERMINATION**

### 10.1 Termination Events.

This Agreement may, in the manner hereinafter provided, be terminated and abandoned upon the occurrence of any of the following events:

### A. *Mutual Consent.*

This Agreement may be terminated by mutual consent of Buyer and of Seller.

### B. *Closing Not Occurred.*

Provided Buyer is not in breach of its obligations hereunder, this Agreement may be terminated by Buyer if the Closing shall not have been consummated on or before April 15, 2011.

### C. *Third Party Transaction.*

This Agreement may be terminated by Seller if Seller executes a definitive agreement with a third party for the acquisition of all or substantially all of the Acquired Assets pursuant to the Bid Procedures set forth in the Sale Procedure Order.

### D. *Effectiveness of APA in the Event Buyer is Back-Up Bidder.*

Notwithstanding Section 10.1C above, in the event that the Buyer is selected as back-up bidder after an Auction conducted pursuant to the Sales Procedure Order, the Buyer may not terminate this APA until the earlier of 48 hours after the sale of assets has closed to a third-party purchaser or 30 days after a hearing approving the Sale Order.

### E. *Seller's Termination Rights.*

 (1) Provided Seller (i) is in possession of another Qualified Bid received by Seller in accordance with the procedures set forth in the Sale Procedure Order; and (ii) is not otherwise in breach of its obligations hereunder, this Agreement may be terminated by Seller if the Closing shall not be consummated on or before April 15, 2011.

 (2) Provided Seller is not in breach of its obligation hereunder, this Agreement may be terminated by Seller at any time on or after April 15, 2011.

## 10.2 Notice.

The party desiring to terminate this Agreement pursuant to Section 10.1(other than pursuant to Section 10.1A) shall give notice of such termination to the other party or parties in accordance with Section 11.5.

## 10.3 Effect of Termination.

In the event of termination of this Agreement pursuant to Section 10.1, this Agreement shall become null and void and have no effect (other than the provisions of Sections 2.7,2.8A, 8.6, ARTICLE 9, and Section 10.1, all of which shall expressly survive termination for a period of one (1) year from the Closing Date), and except for (a) Seller's payment of the Break-Up Fee and Expense Reimbursement under Section 8.6 and (b) the return of the Good Faith Deposit to Buyer in accordance with Section 2.6B, neither Seller or Buyer, or their respective Affiliates or respective representatives, shall have any liability whatsoever with respect to this Agreement.