IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: Otter Tail Ag Enterprises, LLC,<br><br>Debtor. | Case No. 09-61250-DDO<br>Chapter 11 |

**DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT FOR PROPOSED
CHAPTER 11 PLAN OF LIQUIDATION**

Dated: April 29, 2011                    MACKALL, CROUNSE & MOORE, PLC


By: /e/ Timothy D. Moratzka
Timothy D. Moratzka (Atty No. 75036)
Mychal A. Bruggeman (Atty No. 0345489)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, Minnesota  55402
(612) 305-1400

**ATTORNEYS FOR DEBTOR**

# TABLE OF CONTENTS

**I.     INTRODUCTION AND EXECUTIVE SUMMARY** .................................................2

    A.  Summary of Key Events During the Debtor's Bankruptcy Leading to the Liquidation Plan .................................................................................................2

    B.  Summary of the Disclosure Statement ....................................................................4

    C.  Summary of Debtor's Plan .......................................................................................4

    D.  Voting and Plan Confirmation .................................................................................6

**II.    GENERAL INFORMATION REGARDING THE DEBTOR** ...............................8

    A.  Overview and Capital Structure of the Debtor ........................................................8

    B.  The Debtor's Business Operations ...........................................................................9

    C.  Events Leading to Debtor's Bankruptcy Filing ........................................................9

    D.  Events During the Chapter 11 Case .......................................................................10

    E.  The Plan's Payments to the Debtor's Creditors .....................................................12

    F.  Avoidance Actions and Other Litigation ...............................................................14

    G.  Projected Administrative Expenses .......................................................................14

**III.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ......15

    A.  General .....................................................................................................................15

    B.  Cancellation of Indebtedness Income ....................................................................16

    C.  Consequences to Holders of Allowed Unsecured Claims ......................................16

    D.  Consequences to Holders of Equity Interests ........................................................16

    E.  Information Reporting and Backup Withholding ....................................................16

    F.  Importance of Obtaining Professional Tax Assistance ..........................................17

**IV.     FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS TEST**................................................................................17

    A.  Feasibility of the Plan ..........................................................................17

    B.  Best Interests Test ...............................................................................18

**V.      THE SOLICITATION; VOTING PROCEUDRES** ...............................19

    A.  Voting Deadline ..................................................................................19

    B.  Voting Procedures...............................................................................19

    C.  Parties Entitled to Vote ......................................................................19

    D.  Agreements Upon Furnishing Ballots.................................................20

    E.  Waivers of Defects, Irregularities, Etc...............................................20

    F.  Withdrawal of Ballots; Revocation.....................................................20

    G.  Cancellation of Existing Securities.....................................................21

    H.  Recommendation and Conclusion ......................................................21

**THE VOTING DEADLINE TO ACCEPT OR REJECT
THE PLAN IS ____, __ 2011
UNLESS EXTENDED BY ORDER OF THE
UNITED STATES BANKRUPTCY COURT FOR THE
DISTRICT OF MINNESOTA**

<u>**DISCLAIMERS**</u>

THIS DISCLOSURE STATEMENT, THE CHAPTER 11 PLAN OF THE DEBTOR DATED APRIL 29, 2011, THE OTHER EXHIBITS ANNEXED HERETO, THE ACCOMPANYING BALLOTS AND THE RELATED MATERIALS DELIVERED TOGETHER HEREWITH ARE BEING FURNISHED BY THE DEBTOR TO RECORD HOLDERS OF IMPAIRED CLAIMS AND EQUITY INTERESTS KNOWN TO THE DEBTOR, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION BY THE DEBTOR OF VOTES TO ACCEPT THE PLAN AS DESCRIBED HEREIN.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN, THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN DOCUMENTS, AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE INDICATED, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF AND THE DEBTOR UNDERTAKES NO DUTY TO UPDATE THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR

TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTOR IN THIS CHAPTER 11 CASE SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE PLAN DOCUMENTS OR THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR SUCH OTHER DOCUMENT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.

THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR.

## I.     INTRODUCTION AND EXECUTIVE SUMMARY

### A.  SUMMARY OF KEY EVENTS DURING THE DEBTOR'S BANKRUPTCY LEADING TO THE LIQUIDATION PLAN

Otter Tail Ag Enterprises, LLC (the "**Debtor**") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on October 30, 2009 in the United States Bankruptcy Court for the District of Minnesota.

On February 25, 2010, the Debtor initially filed its Chapter 11 Plan of Reorganization and Disclosure Statement.  On June 9, 2010, the Debtor filed an amended Plan and an amended Disclosure Statement.  On June 11, 2010, the Debtor filed a second amended Plan and a second amended Disclosure Statement.  The Debtor's creditor classes voted in favor of the second amended Plan, but the Debtor did not seek confirmation of that Plan.  In order to confirm the second amended Plan, the Debtor needed to raise $12,000,000 of new equity, which it failed to do.

On January 7, 2011, the Debtor filed a motion pursuant to Section 363(b) and 363(f) of the Bankruptcy Code to sell substantially all of its fixed assets including its real property, ethanol plant, manufacturing equipment, and inventories (collectively the "**Transferred Assets**"), free and clear of all liens, claims and encumbrances (the "**Sale Motion**").  The Court approved the Debtor's proposed sale procedures on January 27, 2011, and approved the proposed sale to OTAV LLC, a subsidiary of Green Plains Renewable Energy, Inc., on February 17, 2011 (the "**Sale Order**").  The sale closed on March 24, 2011.

On the closing date of the sale, the value of the total consideration given for the Transferred Assets was $60,113,807.69, which included $55,000,000 for the Debtor's real

property, ethanol plant and equipment; $738,331.00 for prepaid expenses; and $4,375,476.69 for inventory. The Sale Order also provided for the assumption or rejection of all executory contracts and unexpired leases by the Debtor.

A portion of the sale proceeds were used to fully satisfy the claim against the Debtor of AgStar Financial Services, LLC ("**AgStar**"), the Debtor's senior secured lender. The amount paid to AgStar in full satisfaction of its claim was $34,293,344.52, which amount included principal, interest, and late charges calculated through the closing date. As a result, AgStar no longer holds a claim against the Debtor in this bankruptcy.

Under the final asset purchase agreement, OTAV LLC agreed to assume the indebtedness owed by the Debtor to MMCDC New Markets Fund II, LLC ("**NMF**"), another pre-petition secured lender of the Debtor, in the amount of $19,743,602.02, which amounts included principal, interest, and late charges calculated through the closing date. The assumption of the NMF debt reduced the sales proceeds to the Debtor dollar for dollar. As a result of the assumption, NMF no longer has a claim against the Debtor in this bankruptcy.

Additional sale proceeds in the amount of $866,782.00 were paid to the Debtor's financial advisor, Carl Marks Advisory Group, LLC ("**CMAG**"), as a transaction fee, and the Debtor also paid a portion of the closing costs in the amount of $132,876.80. The net proceeds received by the Debtor from the sale totaled $4,160,409.12.

As part of the Sale Motion, the Debtor reached a settlement agreement relating to other secured claims asserted against the Transferred Assets by U.S. Bank National Association as indenture trustee (the **"Trustee"**) for the holders of revenue bonds issued and Otter Tail County (the "**County**") as administrator for holders of general obligation bonds. Pursuant to the Solid Waste Agreement executed by the Debtor, the Trustee, and Otter Tail County and approved by the Court as part of the Sales Procedures Order on January 27, 2011, the Trustee and Otter Tail County received substantially all of the remaining sales proceeds, as well as payment from other assets in exchange for releasing all liens, interests, encumbrances, and claims against the Transferred Assets. The Trustee received payments totaling $10,635,413.38 in exchange for its release of its claims, liens, and encumbrances against the Transferred Assets. Otter Tail County received payments totaling $3,195,941.72 in exchange for its release of its claims, liens, and encumbrances against the Transferred Assets. After receiving these payments, the Trustee and Otter Tail County each only assert deficiency claims against the Debtor, which the Debtor will treat as general unsecured claims under the Plan.

After payment of the sales proceeds and other assets to complete the sale, the Debtor is expected to have $2,500,000.00 remaining to fund this Plan. It is believed that liquidation through this plan will be preferable to liquidation under a Chapter 7 because of the additional administrative costs in appointment of a Chapter 7 Trustee, as well as payment of a commission to a Chapter 7 Trustee.

B. **SUMMARY OF THE DISCLOSURE STATEMENT**

The purpose of this Disclosure Statement is to provide "adequate information" pursuant to Bankruptcy Code § 1125 to entities who hold claims and equity interests to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan. A true and correct copy of the Plan is attached hereto as **Exhibit A**.

By order of the Bankruptcy Court entered on May __, 2011, (the "Disclosure Statement Order"), this Disclosure Statement was approved and held to contain adequate information. A true and correct copy of the Disclosure Statement Order is attached hereto as **Exhibit B**.

This Disclosure Statement provides information regarding the Debtor's history, its projections for the liquidation and distributions of its assets, and its mode of closing the case. The primary purposes of the Plan are to conduct an orderly liquidation of the Debtor's assets and distribute those assets to its creditors.

If the Debtor is not able to consummate the liquidation proposed in the Plan, the court would likely convert the bankruptcy to a Chapter 7, which would increase the costs of liquidation through appointment and payment of a Chapter 7 trustee, and reduce the recovery to the Debtor's creditors. The Debtor believes that the Plan will maximize the return to creditors on their Claims. A copy of the Debtor's Chapter 7 Liquidation Analysis is attached as **Exhibit C**.

The Board of Governors and the Chief Executive Officer of the Debtor approved the solicitation of acceptances of the Plan and all of the transactions contemplated thereby. In light of the benefits to be attained by the holders of claims pursuant to consummation of the transactions contemplated by the Plan, the Debtor's Board of Governors and Chief Executive Officer recommend that such holders of claims vote to accept the Plan. The Debtor's Board of Governors and Chief Executive Officer have reached this decision after considering the alternatives to the Plan that are available to the Debtor.

Accompanying this Disclosure Statement for the purpose of soliciting votes on the Plan are copies of (i) the Plan, (ii) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan, and (iii) a Ballot or Ballots (and return envelope(s)) that you may use in voting to accept or to reject the Plan, or a notice of non-voting status, as applicable.

C. **SUMMARY OF DEBTOR'S PLAN**

Confirmation of a plan by the bankruptcy court makes the plan binding upon the debtor, any entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of

confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

Except as otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the Distributions to be made hereunder shall be in exchange for and in complete satisfaction, discharge, and release of all existing debts and claims against the Debtor, and shall terminate all equity interests, of any kind, nature, or description whatsoever, including any interest accrued on such claims from and after the Petition Date, against or in the Debtor or any of its assets or properties to the fullest extent permitted by Section 1141 of the Bankruptcy Code.

Under the Plan, claims against and equity interests in the Debtor are divided into classes. Certain claims, including Administrative Expense Claims, including Professional Claims, and Priority Tax Claims are not classified, and will receive payment in full. All other claims and equity interests will receive the distributions as described below:

| Class | Claim/ Equity Interest | Impairment | Estimated Aggregate Amount of Allowed Claims or Equity Interests | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|---|
| Class 1 | General Unsecured Claims | Impaired | $12,503,497.73 | A General Unsecured Claim will receive its pro rata share of the liquidation proceeds |
| Class 2 | Equity Interests | Impaired | $45,480,740 | Equity Interests will be cancelled and no payments or property shall be distributed to holders of Equity Interests. |

The Debtor does not believe that there are any remaining secured claims after the closing of the 363 Sale resulted in the full release of the secured claims of AgStar, NMF, the Trustee, and the County. The Debtor is also not aware of any priority unsecured claims or priority tax claims.

The remaining claims against the Debtor are unsecured. The largest general unsecured claims are deficiency claims held by the Trustee and Otter Tail County. The claims by the Trustee and Otter Tail County originally arose under a long-term, secured agreement, generally known as the Solid Waste Facility Lease Agreement (the "**SWF Lease**") which was repayable in total by the Debtor in the same amount of three bond issuances, totaling $26,010,000, by Otter Tail County to finance the construction of Debtor's distillers grains processing facility. The secured portion of this claim has been paid under the Solid Waste Agreement and the Trustee and Otter Tail County have agreed to terminate further obligations under the SWF Lease and have released all liens and encumbrances against the Debtor's assets. The Debtor estimates the remaining deficiency claims, which are treated as general unsecured claims under the Plan, to be $9,364,586.00 for the Trustee and $2,814,058.28 for the County.

Other general unsecured claims totaling $435,153.45 have been filed, and the Debtor estimates that it may dispute up to $140,000.00 of those claims.

A number of entities who were counterparties to executory contracts or unexpired leases that the Debtor rejected during the case could also file claims for payment of rejection damages, which the Debtor would treat as general unsecured claims under the Plan.

A holder of a general unsecured claim will receive a distribution from the liquidation assets pro rata, calculated by the proportion of the principal amount of its unpaid allowed claim as against the total unpaid principal of all allowed claims in the holder's class.

Further details on Debtor's proposed treatment of all classes are found below in the section entitled "Treatment of Specific Classes under Plan."

## D. **VOTING AND PLAN CONFIRMATION**

After carefully reviewing the Plan and this Disclosure Statement, and the exhibits thereto, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your Ballot and return it in the envelope provided so that it is RECEIVED by the Voting Deadline.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

If you have any questions about the procedure for voting your claim or with respect to the packet of materials that you have received or if you did not receive a Ballot and believe that you should have, please contact the Solicitation Agent (i) telephonically or (ii) in writing by (a) hand delivery, (b) overnight mail or (c) first class mail using the information below:

MACKALL CROUSE & MOORE, P.L.C.
ATTN: Timothy D. Moratzka
901 Marquette Avenue, Suite 1400
Minneapolis, MN 55402
Telephone: (612) 305-1400
Facsimile: (612) 305-1414
E-mail: tdm@mcmlaw.com

**THE COURT MUST RECEIVE ORIGINAL BALLOTS ON OR BEFORE 5:00 P.M., PREVAILING CENTRAL TIME, ON _____, 2011 (THE "VOTING DEADLINE"). EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT, BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTOR'S REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

The Debtor reserves the right to amend the Plan after the Voting Deadline. Amendments to the Plan that do not materially and adversely affect the treatment of claims or equity interests may be approved by the Bankruptcy Court at the Confirmation Hearing without the necessity of re-soliciting votes. In the event re-solicitation is required, the Debtor will furnish new solicitation packets that will include new ballots to be used to vote to accept or reject the Plan, as amended.

**THE BANKRUPTCY COURT HAS SET _____ ___, 2011, AT__:00 A.M., PREVAILING CENTRAL TIME, AS THE DATE AND TIME FOR THE HEARING ON CONFIRMATION OF THE PLAN AND TO CONSIDER ANY OBJECTIONS TO THE PLAN. THE CONFIRMATION HEARING WILL BE HELD AT THE UNITED STATES BANKRUPTCY COURT. THE DEBTOR WILL REQUEST CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING.**

**SEVEN DAYS PRIOR TO THE HEARING IS THE LAST DAY TO TIMELY DELIVER AN OBJECTION TO CONFIRMATION OF THE PLAN, AND TEN DAYS PRIOR TO THE HEARING IS THE LAST DAY TO TIMELY MAIL AN OBJECTION. THE OBJECTION MUST BE FILED WITH THE COURT NOT LATER THAN ONE DAY AFTER SERVICE. OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE SERVED SO AS TO BE RECEIVED BY THE FOLLOWING PARTIES ON OR BEFORE THE OBJECTION DEADLINE:**

*Counsel to the Debtor:*
MACKALL CROUNSE & MOORE, P.L.C.
ATTN: Timothy D. Moratzka
901 Marquette Avenue, Suite 1400
Minneapolis, MN 55402
Facsimile: 612-305-1414
E-mail: tdm@mcmlaw.com

*United States Trustee*:
United States Trustee District of Minnesota
1015 U.S. Courthouse
300 S 4th St
Minneapolis, MN 55415
Facsimile: (612) 664-5516

**ANY OBJECTION TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND (A) MUST STATE THE NAME AND ADDRESS OF THE OBJECTING PARTY AND THE AMOUNT OF ITS CLAIM OR THE NATURE OF ITS EQUITY INTEREST AND (B) MUST STATE WITH PARTICULARITY THE NATURE OF ITS OBJECTION. ANY CONFIRMATION OBJECTION NOT TIMELY FILED AND SERVED AS SET FORTH HEREIN SHALL BE DEEMED WAIVED AND SHALL NOT BE CONSIDERED BYTHE BANKRUPTCY COURT**

## II.     GENERAL INFORMATION REGARDING THE DEBTOR

### A.  OVERVIEW AND CAPITAL STRUCTURE OF THE DEBTOR

The Debtor is a Minnesota Limited Liability Company, which was formed on January 27, 2005.  The Debtor filed its initial registration of securities with the Securities and Exchange Commission on January 28, 2008.

### 1.  Debtor's Assets

Prior to the closing of the 363 Sale, the Debtor owned and operated an ethanol production facility, which included a distillers grains processing facility, in Otter Tail County, Minnesota, just outside the city of Fergus Falls.  The Debtor began producing ethanol and distillers grains in May 2008.

Immediately prior to the closing on March 24, 2011, the Debtor's primary assets consisted of its ethanol plant, the process equipment, inventories of input commodities as well as manufactured product, a parts inventory, other personal property, cash, and accounts receivable estimated as follows:

| Assets | Estimated Value |
|---|---|
| Real Property, Plant, Equipment, Licenses, Contracts, Intangibles, & Enterprise Value | $55,000,000.00 |
| Inventory | $4,861,640.77 |
| Prepaid Accounts and Deposits | $738,331.00 |
| Cash | $8,138,030.30 |
| Accounts Receivable (estimated) | $3,800,000.00 |
| **Estimated Total Assets** | **$72,538,052.07** |

Except for cash and accounts receivable, all of the assets listed above were transferred as part of the 363 Sale, with the proceeds disbursed to AgStar, NMF, the Trustee, Otter Tail County, and CMAG, or distributed to the Trustee or Otter Tail County under the Solid Waste Agreement.  As of the effective date of the proposed Plan, the Debtor is expected to have $2,500,000.00 to complete distributions under the Plan and payment of administrative expenses.

### 2.  Equity and Debt Funding for Debtor's Operations

Initial equity investment in the Debtor totaled $44,602,500.00. Current ownership in the Debtor consists of Class A non-preferred equity interests among approximately 966 members each owning various amounts of membership interests.  The total number of Units outstanding is 23,944,000, with a value of approximately $2.00 per unit.  A large portion of ownership consists of Minnesota grain farmers, of which numerous owners reside in the Fergus Falls area.

There are no members that hold 20% or more of the voting power and ownership of the Debtor. The Debtor is not aware of any creditors of the Debtor that are also insiders or affiliates of the Debtor.

Additional capital to fund construction of the Debtor's plant was raised through debt financing by AgStar and NMF in the amount of approximately $60,000,000. As noted above, the claims of the AgStar and NMF were satisfied at the closing of the 363 sale. Additional financing for construction of the distillers grains processing facilities was provided by Otter Tail County through a revenue bond offering in the amount of $20,000,000 and two general obligation bond offerings totaling $6,010,000. The bond offerings were repayable by the Debtor through the SWF Lease to the Trustee and Otter Tail County.

## B. **THE DEBTOR'S BUSINESS OPERATIONS**

The Debtor is not currently operating any business activity. The Debtor has not identified any opportunities to conduct any business in the future.

## C. **EVENTS LEADING TO DEBTOR'S BANKRUPTCY FILING**

In its first nine months of operations as an ethanol plant, the Debtor earned gross revenues of $72,276,413, but incurred significant losses due to instability in the commodities market, particularly in the price of corn. During the summer of 2008, the industry experienced record corn prices, which in the Debtor's case caused significant losses in its first year of operations. To mitigate the rising corn costs and secure product for fiscal 2009, the Debtor executed a number of forward purchase contracts to lock-in future corn prices. The global financial crisis that worsened in late 2008 led to a steep reduction in commodity prices (including ethanol and corn), leaving a shortfall between the market price of corn and the amounts that the Debtor contracted to purchase the corn. The declining global economy negatively impacted not only the Debtor's input costs, but also the prices for its products, as the price of ethanol steeply declined. This gave rise to a situation whereby the Debtor had supply commitments that it was required to honor but could not obtain the required sales to prevent a significant loss.

For the year ended September 30, 2009, the Debtor had revenues of approximately $96,000,000. During fiscal year 2009, the Debtor sold ethanol for an average sales price of $1.53 per gallon, which represents a decrease of $0.75 per gallon from the average sales price for ethanol in fiscal year 2008. Also, during fiscal year 2009, the Debtor sold WDGS for an average of $29.79 per ton, a $4.90 per ton decrease over fiscal year 2008, and the Debtor sold DDGS for an average of $110.48 per ton, a $36.66 per ton decrease over fiscal year 2008.

For the year ended September 30, 2009, the Debtor's cost of goods cold was approximately $96,700,000, or approximately 101% of revenues, and no lower of cost or market adjustment. High corn prices constituted the primary commodity leading to high costs of goods sold.

The Debtor's net loss was approximately $21,500,000 and $8,700,000 for the fiscal years ended September 30, 2009 and 2008, respectively, an increase of 147 percent for fiscal year 2009 over 2008. The increase in the net loss was primarily the result of the continued poor margin situation in the ethanol industry during fiscal year 2009, as well as an impairment of plant and process equipment charge of $12,500,000 during the year.

The Debtor's economic losses reduced its cash available to service its debts to AgStar, NMF, the Trustee and Otter Tail County. As a result, the Debtor discontinued making payments to all parties. The Debtor entered into a short term forbearance agreement with AgStar that expired in June 2009. Throughout the summer, the Debtor negotiated primarily with AgStar and its other lenders to consensually restructure its debt. In August, 2009, AgStar commenced a foreclosure and receivership action in Otter Tail County District Court. The Debtor shortly thereafter received approval from its Board of Governors to proceed with a bankruptcy filing to seek a restructure of its debts under the protection and supervision of the Bankruptcy Court. Prior to filing bankruptcy on October 30, 2009, the Debtor was able to reach a consensual agreement with AgStar to operate for 120 days in bankruptcy and use cash collateral. The parties also discussed a rough outline for a reorganization plan that involved new capital investment which would be agreeable to AgStar and allow the Debtor to emerge from bankruptcy in a better capital position.

### D. EVENTS DURING THE CHAPTER 11 CASE

On October 30, 2009, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and has since been operating its business and managing its assets as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. The Debtor's bankruptcy did not disrupt its operations or require it to "idle" the plant. Until the closing of the 363 Sale, the Debtor operated its ethanol plan at or near full capacity.

In February, 2010, Debtor received permission to continue use of cash collateral through May 31, 2010. On May 27, 2010, the Debtor received permission to continue use of cash collateral through August 31, 2010. To receive permission to use cash collateral through August 31, 2010, the Debtor agreed to make two principal payments to AgStar: a $3,150,000 payment to AgStar to reduce the principal indebtedness on the term loans, and a $981,379 principal payment on the revolving line of credit to reduce the principal balance on the line of credit to $4,000,000 to comply with the borrowing base. In October, 2010, to continue use of cash collateral through completion of a 363 sale, the Debtor agreed to fully reduce the balance of the AgStar revolving line of credit, which required a payment to AgStar of $4,365,003.

Throughout the bankruptcy, the Debtor met the requirements established in the Court's Orders authorizing the Debtor's use of cash collateral. Initially, the Debtor's business performance improved during the bankruptcy, with Debtor generating a profit throughout the bankruptcy case period. Unfortunately, margins turned in early 2010, which reversed some of Debtor's profitability during bankruptcy. Debtor suffered net losses in February, March, and April of 2010 of $1,041,815, $1,784,296, and $358,452, respectively. In 2010, the price of ethanol declined to its lowest level in several years, yet the Debtor continued to operate a modest profit. Margins improved in the second half of 2010.

The Debtor initially proposed a plan of reorganization on February 25, 2010, which was further amended by subsequent plans, the last being filed on June 11, 2010. Between February and June, 2010, the Debtor undertook extensive negotiations with AgStar, NMF, U.S. Bank as Indenture Trustee, and Otter Tail County, which resulted in a consensual plan between those parties as filed on June 11. The plan required AgStar and NMF to refinance the great majority of existing senior debt, for U.S. Bank as Indenture Trustee to receive $6.5 million as payment in full of the revenue bond debt, and for Otter Tail County to accept an equity stake in the reorganized Debtor.

The Debtor's proposed plan was contingent upon the Debtor raising at least $12 million of new equity for a reorganized entity. The Debtor was ultimately unsuccessful in raising the required new equity by the deadline of mid-August, 2010, and the Debtor did not seek confirmation of the Plan. After discussing various options in the wake of the failure of the plan with its creditors, the Debtor decided to retain a financial advisor to pursue primarily a Section 363 sale strategy with the goal of making it consensual as among its creditors.

Pursuant to Court order, the Debtor engaged CMAG, to help the Debtor determine how best to maximize the value of its assets for the benefit of the estate and the Debtor's creditors. CMAG and the Debtor undertook an intensive effort to identify and seek out entities interested in purchasing the Debtor's businesses, facilitate potential buyers' due diligence, and assist in negotiating an asset purchase agreement. This included gathering financial, industry and corporate information, which were used to prepare an Offering Presentation dated October, 2010 to market the Debtor's business.

The Debtor and CMAG considered, as third-party purchasers, other ethanol producers, gasoline refiners, and other investor groups known by CMAG to have a potential interest in acquiring ethanol assets. CMAG identified potential buyers whose investment criteria and track record made them likely to pursue a transaction with the Debtor. Potential buyers were sent copies of the Offering Presentation upon execution of a confidentiality agreement. Copies of the Offering Presentation were received by twelve potential purchasers. Officers and employees of the Debtor and CMAG participated in due diligence conference calls and in-person meetings with approximately sixteen potential purchasers. CMAG contacted an additional five parties, but those calls did not materialize in active discussions.

On or before January 5, 2011, six bids to purchase some or all of the Debtor's assets were submitted to CMAG. A description of these bids was provided to AgStar, NMF, the Trustee and the County. CMAG subsequently entered into negotiations with several potential purchasers chosen by the Debtor with the advice of CMAG. The negotiations advanced to the point that the Stalking Horse became the focus.

As previously discussed at the beginning of this Disclosure Statement, the Debtor filed a Sale Motion on January 7, 2011, which culminated in an approved Sale Order on February 17, 2011, and the 363 sale closed on March 24, 2011.

## E.  **THE PLAN'S PAYMENTS TO THE DEBTOR'S CREDITORS**

The Plan proposed by the Debtor is a liquidation plan. On March 24, 2011, the Debtor's production of ethanol and related manufacturing operations ceased.  After that time, the Debtor surrendered the plant to the buyer and terminated employees. The Debtor now seeks approval to commence a final liquidation of its assets.  It is expected that the Debtor's Chief Executive Officer, Anthony J. Hicks, will oversee the final liquidation, with the assistance of any professionals deemed necessary to complete the requirements of the Plan.

### 1.  The Debtor as Liquidator.

The Debtor's obligations in completing the plan will be: (a) collecting any additional liquidation assets; (b) making distributions; (c) objecting to Claims, including seeking subordination thereof, and asserting defenses, counterclaims or setoffs thereto for the benefit of the Claim and Interest holders; (d) settling Disputed Claims; (e) filing tax returns for the Debtor; (f) hiring professionals to assist in carrying out its duties; (g) opening and closing bank accounts and (j) taking all action necessary, appropriate or convenient to carry out the duties imposed under the Plan, or under applicable law, and otherwise fulfilling the purpose of the Plan and safeguarding the interests of holders of Claims and Interests.

After the Debtor has carried out such duties, it will cease all operation and be deemed dissolved.

### 2.  Identification of Classes and Anticipated Plan Payments.

The Plan provides for payment in full of all unclassified claims, which include: administrative claims, ordinary course of business claims, twenty-day good claims, priority tax claims, and professional fee claims.  Ordinary course of business claims will be paid in accordance with existing payment terms with the Debtor.  Administrative claims will also be paid on the Effective Date, and professional Fee claims will be paid as soon as reasonably practical after the Effective Date or at the time the Court approves any required fee applications. Because these claims will be paid in full, claimants are not entitled to vote on the Plan.  Debtor is not aware of any applicable twenty-day claims, or priority tax claims.  Debtor is also not aware of any unsecured priority claims or secured claims.

The remaining claims and equity interests are classified and will be paid as provided as below:

### (a)      Class One – General Unsecured Claims

On the Effective Date, the Debtor shall commence liquidation of any non-Cash Liquidation Assets and shall hold all proceeds and existing Cash in the Liquidation Account for Distribution in accordance with the Plan.  In full and final satisfaction of the Allowed Class One Claims, each holder of an Allowed Class One Claim as of the Distribution Record Date shall receive a Pro Rata Distribution from the proceeds of the Liquidation Assets and other Cash as soon as is reasonably practicable.  The initial Distribution may be a final Distribution if all

Allowed Administrative Expense Claims and Liquidation Expenses have been paid, and there are no Disputed Claims. If the Debtor or its professionals anticipate incurring additional Liquidation Expenses at the time of the initial Distribution, the initial Distribution, and any subsequent Distributions, shall occur only after depositing a sufficient amount in the Reserve Account as required by Section 3.01 of the Plan.

Class One is impaired by the Plan and is entitled to vote to accept or reject the Plan.

**(b)** **Class Two – Equity Interests**

The holders of equity interests shall neither receive any distribution nor retain any property under the Plan on account of such claims. Class Two is deemed to reject the Plan and is not entitled to vote.

**3. Treatment of Executory Contracts**.

On the Effective Date, all executory contracts and unexpired leases shall be deemed rejected, except for those executory contracts and unexpired leases that were previously assumed or rejected previously in the Bankruptcy Case or through the Sale Order.

All Allowed Claims arising from the rejection of executory contracts and unexpired leases shall be deemed to be Class One Unsecured Claims. The Confirmation Order shall function as a Final Order authorizing the rejection, as of the Effective Date, of all executory contracts and unexpired leases not previously rejected or assumed. Any Person asserting a Claim arising from the rejection of an executory contract or unexpired lease, who has not previously received notice of such rejection or the Sale Order, must file a proof of Claim with the Clerk of the Court within thirty (30) days after the Confirmation Date and any such Person who fails to timely file such a Claim shall be forever barred, estopped, and enjoined from asserting such Claim and from receiving any property of the Estate or the Debtor on account of such Claim.

**4. Distribution of Sale Proceeds; Funding of the Liquidation Account and any Appropriate Reserve Accounts.**

The Plan requires that on the Effective Date, if not already accomplished, the Debtor shall fund the Liquidation Account with its existing Cash, estimated to be approximately $2,500,000. The Debtor shall also transfer Cash from the Liquidation Account to a Reserve Account to secure payment of U.S. Trustee fees and future Liquidation Expenses in an amount not to exceed $100,000, subject to approval of the court to the extent required by applicable bankruptcy rules with respect to professional fees.

After the Effective Date, if the Debtor liquidates any further Liquidation Assets, the Debtor shall deposit the net proceeds thereof into the Liquidation Account. The Liquidation Assets shall be distributed as follows to fund payments under this Plan, with appropriate reserves deposited in the Reserve Account with respect to Disputed Claims in existence on any Distribution Date.

## F. **AVOIDANCE ACTIONS AND OTHER LITIGATION**

The Debtor has investigated and analyzed possible preference actions pursuant to Section 547 of the Bankruptcy Code. The Debtor's investigation revealed that the Debtor has only made payments to various creditors during the 90-day period before the filing of the Petition in the ordinary course of business.

None of these payments were made beyond the terms for payment specified in the applicable invoice or contract. All payments were made within the normal terms of credit agreements and invoices and therefore the Debtor believes they were made in the ordinary course of business and are not preferential. The Debtor believes that since it continued to do business with all of its pre-petition vendors, that these vendors could also argue a new value defense as well as an ordinary course defense to any payments in the preference period that were not pursuant to the standard invoice terms. The Debtor therefore does not believe there to be any potential of recovery from potential preference actions.

The Debtor does not plan on asserting any preference actions, as it does not believe any other actions would prove of value to the estate given: a) the Debtor is unaware of any preferential payments; b) any potential preferential payment would involved small dollar amounts in controversy relative to the cost of litigation; c) the likely existence of strong ordinary course defenses and potential new value defenses; and d) the fact that the Debtor continued to do business with such vendors. The Debtor reserves its rights, however, to assert other preference actions as counterclaims in any actions brought against it or as a setoff against any claims asserted as administrative priority claims.

The Debtor is not aware of any other avoidance actions pursuant to Chapter 5 of the Bankruptcy Code. The Debtor has not had any significant problems collecting pre- or post-petition receivables and the Debtor is otherwise unaware of any other litigation which may arise outside of bankruptcy. As a result, the Plan does not authorize the Debtor to pursue any Causes of Action without further court approval.

## G. **PROJECTED ADMINISTRATIVE EXPENSES**

The Debtor estimates that it will incur and has incurred and paid the following administrative expenses in connection with the Chapter 11 Case from its filing: a) Mackall, Crounse & Moore, PLC, approximately $600,000 for legal work; b) Boulay Heutmaker & Zibell, Co., $24,000 for auditing; c) Christenson & Associates, PLLP, $97,117.38 for tax and other accounting work; d) Great Plains Appraisal, Inc., $18,000 for an appraisal of the Debtor's assets; e) Pemberton Sorlie Rufer & Kershner Law Office, $340,625.18 for general corporate legal work; f) Fredrikson & Byron, P.A., $180,741.04 for legal work on soliciting new capital investment; g) Carl Marks Advisory Group, LLC, $1,160,021.84 for financial advisor services. The U.S. Trustee quarterly fees throughout the case will total approximately $153,000.

Many of these expenses have been paid prior to the filing of the Plan pursuant to the orders approving the retention of the professionals, and subsequent fee applications.

# III.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.  GENERAL

The following discussion summarizes potential United States federal income tax consequences of the implementation of the Plan to the Debtor and certain holders of claims or equity interests for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to any particular holder of a claim or equity interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

The discussion is based upon the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("**IRS**") as in effect on the date hereof. Legislative, judicial or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or new interpretations may have retroactive effect and could significantly affect the federal income tax consequences of the Plan.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to (i) special classes of taxpayers (such as Persons who are related to the Debtor within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities and holders of claims or equity interests who are themselves in bankruptcy) or (ii) holders not entitled to vote on the Plan, including holders whose claims or equity Interests are to be extinguished without any distribution.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTEREST. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## B.  CANCELLATION OF INDEBTEDNESS INCOME

Under the Tax Code, a taxpayer generally must recognize income from the cancellation of its debt ("**COD Income**"). The Tax Code, however, provides various exceptions to COD Income recognition. Whether a taxpayer that is treated as a partnership for federal income tax

purposes, like the Debtor, has COD Income is determined at the partnership level, while, according to Section 108(d)(6) of the Tax Code, many of the primary exceptions to recognizing COD Income apply at the partner level. These exceptions are not discussed here, but current equity members should consult with their tax advisors regarding certain tax consequences of the Plan.

## C.  CONSEQUENCES TO HOLDERS OF ALLOWED UNSECURED CLAIMS

Pursuant to the Plan, each holder of an Allowed General Unsecured Claim will receive cash in full satisfaction and discharge of its Allowed Claim. The federal income tax consequences of the Plan to the holders of Allowed General Unsecured Claims depends on, among other things, whether the Allowed General Unsecured Claim constitutes a "security" for federal income tax purposes and whether the holder reports income and loss on the accrual or cash basis of accounting.

These claims should not be considered a "security" for federal income tax purposes. As such, a holder that receives cash under the Plan in an amount less than the holder's tax basis in the Allowed General Unsecured Claim may be entitled to a bad debt deduction under Section 166(a) of the Tax Code. Generally, a trade debt creditor reporting on the cash basis has no tax basis in the debt before payment. The rules governing the character, timing, and amount of bad debt deductions emphasize the facts and circumstances of the holder, the obligor (the Debtor), and the indebtedness with respect to which a deduction is claimed. Holders of Allowed General Unsecured Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

## D.  CONSEQUENCES TO HOLDERS OF EQUITY INTERESTS

The cancellation of old equity interests would constitute a disposition of those assets triggering a gain or loss, depending on each member's basis in its membership interest. The gain or loss may be ordinary income or a capital gain or loss, depending on whether the member has qualified to treat the disposition as a capital gain or loss. Members should discuss the consequences of cancellation of their equity interest with the tax advisor.

## E.  INFORMATION REPORTING AND BACKUP WITHHOLDING

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding under certain circumstances. Backup withholding is not an additional tax. Rather, amounts withheld under the backup withholding rules may be credited against a holder's federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally a United States federal income tax return). The Debtor intends to comply with all applicable reporting withholding requirements of the Tax Code.

## F.  IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS OR EQUITY INTERESTS UNDER THE INTERNAL REVENUE CODE; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY, AND (3) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE BASED UPON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## IV.  FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS TEST

### A.  FEASIBILITY OF THE PLAN

In connection with Confirmation of the Plan, Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This is the so-called "feasibility" test.  In this case, the Debtor is seeking to liquidate its assets under a liquidation plan in an orderly manner.  The Debtor does not intend to continue operations, and thus this plan will not be followed by an additional bankruptcy filing.  The Debtor believes that it will have sufficient Liquidation Assets (approximately $2,500,000) to facilitate the payments promised under the Plan, namely guaranteeing payment of all administrative expenses, and a distribution to unsecured creditor claims.

To support its belief in the feasibility of the Plan, the Debtor has prepared a liquidation analysis attached hereto as **Exhibit C** (the "Financial Projections"), which shows the estimates of payments.

Accordingly, the Debtor believes that the Plan complies with Section 1129(a)(11) of the Bankruptcy Code. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Financial Projections were prepared may be different from and may adversely affect the Reorganized Debtor's financial results.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING FINANCIAL PROJECTIONS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTOR'S INDEPENDENT CERTIFIED ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO UNCERTAINTIES AND CONTINGENCIES.

### B. **BEST INTERESTS TEST**

As a requirement to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the best interest of all holders of claims and equity interests that are impaired by the Plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either that all members of an impaired class of claims or equity interests have accepted the Plan or that the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

The creditors also receive a better result under the Plan than Chapter 7 liquidation. A comparison between the Plan and the Chapter 7 liquidation is shown in Exhibit C attached to this Disclosure Statement. There are two variables for creditors that create a different result between Chapter 7 liquidation and a Chapter 11 plan. First, the expenses incurred are estimated to be less in a Chapter 11 Plan because the Debtor will undertake the liquidation with its own employee(s) and professionals already familiar with the bankruptcy. A Chapter 7 trustee may incur additional expenses in familiarizing itself with the case. A Chapter 7 trustee may also conduct certain investigations with respect to the Debtor's assets, books, and records already completed by the Debtor. A Chapter 7 trustee would receive a fee for liquidating the assets in the amount of 3% of the gross liquidation proceeds, which the Debtor would not receive in a Chapter 11 plan. The gross liquidation proceeds are expected to be $2,500,000, and thus a Chapter 7 trustee would automatically earn a fee of $75,000 before payment for any professionals hired by the Chapter 7. In soliciting the Plan, the Debtor may incur greater professional fees and related costs than a Chapter 7 Trustee may incur, but some fees would also be incurred in a procedure to convert the case to a Chapter 7.

Appointment of a Chapter 7 Trustee as opposed to the liquidation plan will also impose an additional delay on distribution of the liquidation assets.

THE DEBTOR BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER RECOVERY TO HOLDERS OF CLAIMS THAN SUCH HOLDERS WOULD RECEIVE IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

# V.   THE SOLICITATION; VOTING PROCEDURES

## A.  VOTING DEADLINE

The period during which Ballots with respect to the Plan will be accepted by the Debtor will terminate on the Voting Deadline. Except to the extent permitted by the Bankruptcy Court, Ballots received after the Voting Deadline will not be counted or otherwise used by the Debtor in connection with the Debtor's request for Confirmation of the Plan (or any permitted modification thereof).

## B.  VOTING PROCEDURES

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, the Debtor will only count the votes of holders of claims. The failure of a holder to deliver a duly executed Ballot will be deemed as an acceptance of the Plan.

Holders of claims should provide all of the information requested by the Ballots and return all Ballots in the return envelope provided with each such Ballot.

## C.  PARTIES ENTITLED TO VOTE

In general, a holder of a claim or equity interest may vote to accept or to reject a plan if the claim or equity interest is "allowed," which means generally that no party-in-interest has objected to such claim or equity interest, and the claim or equity interest is impaired by the Plan. Under Section 1124 of the Bankruptcy Code, a class of claims is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights of the holders of the claim or equity interest within the class or (ii) notwithstanding any legal right to an accelerated payments to holders of such claims or equity interests within the class, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity dates of such claims or equity interests in the class.

If a class will not receive or retain any distribution under the Plan on account of such claims or equity interests, the Bankruptcy Code deems such holders of claims or equity interests in the class to have rejected the Plan, and, accordingly, holders of such claims and equity interests do not actually vote on the Plan.  If a class is not impaired by the Plan, the Bankruptcy Code deems the holders of such claims or equity interests in the class to have accepted the Plan and, accordingly, holders of such claims and equity interests are not entitled to vote on the Plan.

Class One of the Plan is impaired. Therefore, the holders of claims in such classes are being solicited for votes in favor of the Plan.

The Plan provides no distribution or retention of equity to Class Two.  Therefore, it is deemed to reject the Plan and is not entitled to vote.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to Section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## D.  **AGREEMENTS UPON FURNISHING BALLOTS**

The delivery of an accepting Ballot to the Solicitation Agent by a holder of a claim pursuant to one of the procedures set forth above will constitute the agreement of such holder to accept (i) all of the terms of, and conditions to, the solicitation and (ii) the terms of the Plan; provided, however, all parties in interest retain their right to object to confirmation of the Plan pursuant to Section 1128 of the Bankruptcy Code.

## E.  **WAIVERS OF DEFECTS, IRREGULARITIES, ETC.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Solicitation Agent and the Debtor in their sole discretion, which determination will be final and binding. Effective withdrawals of Ballots must be delivered to the Solicitation Agent prior to the Voting Deadline. The Debtor reserves the absolute right to contest the validity of any such withdrawal. The Debtor also reserves the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, be unlawful. The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including of the Ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines. Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## F.  **WITHDRAWAL OF BALLOTS; REVOCATION**

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Solicitation Agent at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the claim(s) to which it relates and the aggregate principal amount represented by such claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Solicitation Agent in a timely manner at the address set forth below.  Prior to the filing of the voting report  on the Plan with the Bankruptcy Court, the Debtor intends to consult with the Solicitation Agent to determine whether any withdrawals of Ballots were received and

whether the Requisite Acceptances of the Plan have been received. As stated above, the Debtor expressly reserves the absolute right to contest the validity of any such withdrawals of Ballots.

A purported notice of withdrawal of Ballots which is not received in a timely manner by the Solicitation Agent will not be effective to withdraw a previously cast Ballot. Any party who has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his or its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether the Requisite Acceptances have been received. The Debtor will pay all costs, fees and expenses relating to the Solicitation, including customary mailing and handling costs.

## G. **CANCELLATION OF EXISTING SECURITIES**

The Debtor is not at this time requesting the delivery of, and neither the Debtor nor the Solicitation Agent will accept, certificates representing any existing securities. All outstanding Class A units of the Debtor will be cancelled on the Effective Date of the Plan.

Notwithstanding the above, the Revenue Bond Indenture shall remain in effect solely for the purpose of preserving the right of the Revenue Bond Indenture Trustee there under to pay expenses and make distributions in accordance with and to preserve all rights of the Revenue Bond Indenture Trustee and Revenue Bondholders there under relative to their respective rights and obligations with respect to each other and/or Otter Tail County, including any priority and lien rights against distributions to the Revenue Bondholders. The Revenue Bond Indenture Trustee shall cause the Revenue Bonds to be cancelled after the Effective Date and after payment of expenses and distribution to the Revenue Bondholders in accordance with the Revenue Bond Indenture.

## H. **RECOMMENDATION AND CONCLUSION**

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives discussed herein. Consequently, the Debtor urges all holders of eligible claims to vote to accept the Plan, and to complete and return their Ballots so that they will be received by the Court on or before _____, 2011.

Dated: <u>April 29, 2011</u>                    MACKALL, CROUNSE & MOORE, PLC


By: <u>/e/ Timothy D. Moratzka</u>
Timothy D. Moratzka (Atty No. 75036)
Mychal A. Bruggeman (Atty No 0345489)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, Minnesota 55402
(612) 305-1400

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: Otter Tail Ag Enterprises, LLC,<br><br>Debtor. | Case No. 09-61250-DDO<br>Chapter 11 |

### SIGNATURE DECLARATION

I. Anthony Hicks, declare under penalty of perjury that I am the Chief Executive Officer of Otter Tail Ag Enterprises, LLC ("OTAE"), make the following declarations under penalty of perjury:

- The information that I have given my attorney in the electronically filed Debtor's 3rd Amended Disclosure Statement is true and correct.

Dated: 4/28/11

OTTERTAIL AG ENTERPRISES, LLC

By_____
   Anthony Hicks
   Chief Executive Officer

Dated: April 28, 2011

MACKALL, CROUNSE & MOORE, PLC

By: /e/ Timothy D. Moratzka
Timothy D. Moratzka (Atty No. 75036)
Mychal A. Bruggeman (Atty No 0345489)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, Minnesota 55402
(612) 305-1400

**ATTORNEYS FOR DEBTOR**

## <u>CERTIFICATE OF SERVICE</u>

On the April 29, 2011, this document was served on parties who receive electronic notice through CM/ECF.


By: /e/ Timothy D. Moratzka
Timothy D. Moratzka (Atty No. 75036)

**EXHIBIT A: PLAN OF LIQUIDATION**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: Otter Tail Ag Enterprises, LLC,<br><br>Debtor. | Case No. 09-61250-DDO<br>Chapter 11 |

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN
(PLAN OF LIQUIDATION)**

Dated: <u>April 29, 2011</u>　　　　　　MACKALL, CROUNSE & MOORE, PLC


By: <u>/e/ Timothy D. Moratzka　　　</u>
Timothy D. Moratzka (Atty No. 75036)
Mychal A. Bruggeman (Atty No 0345489)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, Minnesota  55402
(612) 305-1400

**ATTORNEYS FOR DEBTOR**

# TABLE OF CONTENTS

**ARTICLE I – DEFINITIONS AND RULES OF INTERPRETATION**.....................................1

**ARTICLE II – DESIGNATION, CLASSIFICATION, AND TREATMENT OF CLAIMS AND EQUITY INTERESTS** ...............................................6

Section 2.01 – Treatment of Unclassified Claims.........................................6

Section 2.02 – Designation of Classified Claims and Interests....................................7

Section 2.03 – Treatment of Classified Claims and Interests .....................................7

Section 2.04 – Acceptance or Rejection of the Plan .....................................8

**ARTICLE III – MEANS FOR IMPLEMENTATION OF THE PLAN** ...................................9

Section 3.01 – Distribution of Sale Proceeds; Funding of the Liquidation Account and Any Appropriate Reserve Accounts.............................................9

Section 3.02 – Continued Existence.............................................9

Section 3.03 – Further Authorization.............................................9

Section 3.04 – U.S. Trustee Fees .............................................9

Section 3.05 – Cancellation of Notes, Bonds, Instruments, Debentures and Equity Interests .............................................10

Section 3.06 – Notice of Effective Date.............................................10

**ARTICLE IV – DEBTOR'S LIQUIDATION DUTIES** .............................................10

Section 4.01 – Debtor as Liquidator.............................................10

Section 4.02 – Compensation of Debtor .............................................11

Section 4.03 – Preservation of Causes of Action / Debtor's Belief That There Are No Causes of Action to Pursue .............................................11

Section 4.04 – General Powers .............................................11

Section 4.05 – Duties of the Debtor .............................................11

Section 4.06 – Retention of Professionals; Compensation .....................................12

Section 4.07 – Limitation of Liability of Debtor .............................................12

Section 4.08 – Reliance by Debtor.............................................12

Section 4.09 – Reporting and Notice .............................................12

**ARTICLE V – PROVISIONS REGARDING DISTRIBUTIONS** ............................................13

    Section 5.01 – No Distribution In Excess of Allowed Amount of Claim ...................................13

    Section 5.02 – Time and Method of Distributions .....................................................................13

    Section 5.03 – Means of Payment ..............................................................................................13

    Section 5.04 – Disputed Claims .................................................................................................13

    Section 5.05 – Distribution Record Date; Delivery of Distribution ..........................................13

    Section 5.06 – Fractional Dollars; *De Minimis* Distribution.....................................................14

    Section 5.07 – Undeliverable Distributions ...............................................................................14

    Section 5.08 – Setoff ..................................................................................................................14

    Section 5.09 – Withholding Taxes .............................................................................................15

**ARTICLE VI – TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...........................................................................................................................15

**ARTICLE VII – CONDITIONS PRECEDENT** ............................................................................15

    Section 7.01 – Conditions to Effective Date ..............................................................................15

    Section 7.02 – Waiver of Conditions .........................................................................................16

    Section 7.03 – Effect of Non-Occurrence of the Effective Date ................................................16

**ARTICLE VIII – EFFECT OF CONFIRMATION** .....................................................................16

    Section 8.01 – Binding Effect ....................................................................................................16

    Section 8.02 – Release by the Debtor of AgStar, NMF, Revenue Bondholders and Otter Tail County....................................................................................................................16

    Section 8.03 – Injunction ...........................................................................................................17

    Section 8.04 – Exculpation.........................................................................................................17

**ARTICLE IX – RETENTION OF JURISDICTION**....................................................................17

    Section 9.01 – Jurisdiction of the Bankruptcy Court .................................................................17

**ARTICLE X – MISCELLANEOUS**..............................................................................................19

    Section 10.01 – Notices..............................................................................................................19

    Section 10.02 – Governing Law..................................................................................................19

    Section 10.03 – Term of Injunction or Stays .............................................................................19

Section 10.04 – Closing of the Chapter 11 Case ................................................................. 20

Section 10.05 – Modifications and Amendments ................................................................ 20

Section 10.06 – Exclusive Right to Modify Plan ............................................................... 20

Section 10.07 – Effectuating Documents; Further Transactions .......................................... 20

Section 10.08 – Withdrawal or Revocation ....................................................................... 20

Section 10.09 – Severability ............................................................................................ 21

Section 10.10 – Headings ............................................................................................... 21

# CHAPTER 11 PLAN OF LIQUIDATION FOR THE DEBTOR

Otter Tail Ag Enterprises, LLC (the "Debtor"), proposes the following plan of liquidation (the "Plan") for the resolution of the Debtor's outstanding claims and equity interests.

**ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ THIS PLAN IN ITS ENTIRETY. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN THIS PLAN, THE PLAN PROPONENT RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## ARTICLE I

## DEFINITIONS AND RULES OF INTERPRETATION

The following terms used in the Plan shall have the respective meanings defined below:

**(1)** **Administrative Expense Claim** means an Allowed Claim for payment of an administrative expense of any kind specified in Section 503(b) of the Bankruptcy Code and entitled to priority payment pursuant to Section 507(a)(2) of the Bankruptcy Code, including (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the Debtor's business, including wages, salaries, or commissions for services rendered after the Petition date, and taxes incurred after the Petition Date; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses approved, awarded or allowed under Sections 330(a) or 331 of the Bankruptcy Code, (c) Claims of suppliers under Section 503(b)(9) of the Bankruptcy Code, and (d) all Allowed Claims that are entitled to be treated as Administrative Expense Claims pursuant to a Final Order of the Bankruptcy Court.

**(2)** **Allowed** means, with respect to any Claim or Interest, proof of which was timely and properly filed or, if no proof of Claim or proof of Interest was filed, which has been or hereafter is listed by the Debtor on the Schedules as liquidated in amount and not disputed or contingent and, in either case, as to which no objection to allowance has been interposed, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder or otherwise be deemed to be Allowed pursuant to the terms of this Plan.

**(3)** **AgStar** means AgStar Financial Services, PCA.

**(4)** **AgStar Credit Agreements** means the (a) Construction and Term Note dated March 28, 2007; (b) an Amended and Restated Term Revolving Note dated June 23, 2008; (c) an Amended and Restated Revolving Line of Credit Note dated June 23, 2008; (d) the Master Loan Agreement dated March 28, 2007; (e) the First Supplement to the Master Loan Agreement dated as of March 28, 2007; (f) the Amended and Restated Master Loan Agreement dated as of June 23, 2008; (g) the Amended and Restated Second Supplement to the Master Loan Agreement

1

dated as of June 23, 2008; (h) the Second Amended and Restated Third Supplement to the Master Loan Agreement dated as of June 23, 2008; (i) a Mortgage, Security Agreement and Assignment of Rents and Leases dated March 28, 2007; (j) an Amended and Restated Mortgage, Security Agreement, and Assignment of Rents and Leases dated June 23, 2008; (k) a Security Agreement dated March 28, 2007; and (l) all other agreements, instruments, notes, guarantees, and other documents executed in connection therewith, including without limitation, all collateral and security documents executed by the Debtor in favor of AgStar.

(5) **AgStar Claims** means the former Claims of Ag Star relating to the AgStar Credit Agreements that have been paid in full in connection with the sale of the Debtor's assets pursuant to the Sale Order, which Claim is deemed an Allowed Claim in the amount of $0 for purposes of this Plan.

(6) **Avoidance Actions** means any actions, causes of action, claims, demands, suits or rights, created or arising in favor of the Debtor or its estate under the Bankruptcy Code, including all claims, rights and causes of action arising under Section 510 or under any of Sections 542 through 553 of the Bankruptcy Code.

(7) **Bar Date** means March 15, 2010, the date established by the Court as the last date for all creditors, other than governmental entities, to file proofs of claim against the Debtor, and April 28, 2010, the date established by the Court as the last date for governmental entities to file proofs of claim against the Debtor. The "Bar Date" for persons and entities claiming damages from the rejection of an executory contract or unexpired lease is May 23, 2011, which is thirty days after the Debtor served the Sale Order on holders of rejected executory contracts and unexpired leases. The term "Bar Date" also includes the deadline for filing Administrative Expense Claims, except for those Administrative Claims and Liquidation Expenses related to administering the liquidation of the Debtor's remaining assets, or otherwise winding-up the Debtor's business affairs, which date shall be thirty (30) days after the Effective Date.

(8) **Business Day** means any day, excluding Saturdays, Sundays, and legal holidays, on which the Bankruptcy Court is open.

(9) **Causes of Action** means any and all of the Debtor's and the Estate's Claims, causes of action, suits, proceedings, liabilities, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, torts, penalties, statutory violations, agreements, promises, variances, set off or recoupment rights, trespasses, damages, or judgments, whether asserted or unasserted, liquidated or unliquidated, arising under federal statutory or common-law or under the statutory or common-law of any state, territory, or other governmental unit (as that term is defined at Code § 101(27)), based on any act or omission or other event occurring prior to the Effective Date, including Avoidance Actions and any Claims acquired following the Petition Date.

(10) **Cash** means legal tender of the United States of America.

(11) **Chapter 11 Case** means the Bankruptcy of the Debtor, docketed as Case No. 09-61250-DDO in the Bankruptcy Court for the District of Minnesota.

**(12)     Claim** means a "claim," as defined in Section 101(5) of the Bankruptcy Code, against the Debtor, whether or not asserted, whether or not the facts of or legal bases therefore are known or unknown, and specifically including, without express or implied limitation, any rights under Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, any claim of a derivative nature, any potential or unmatured contract claim and any contingent claim.

**(13)     Claims Objection Deadline** means the last day for filing objections to Claims against the Debtor, which date shall be the later of thirty (30) days after the Effective Date of the Plan or the filing of the proof of claim for the Claim, unless extended by order of the Court for cause.

**(14)     Confirmation Date** means the date that the Court enters an Order on the Court's docket confirming this Plan.

**(15)     Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**(16)     County Bond Claim** means the Claim held by Otter Tail County against the Debtor under the County Bond Documents, which shall be deemed an Allowed Claim in the amount of $6,010,000 less any amounts received prior to the Effective Date pursuant to the Sale Order or the Stipulation.

**(17)     County Bond Documents** means the (a) Lease Agreement as of May 1, 2007 between Otter Tail County, whose interest in payments there under was partially assigned to the Revenue Bond Indenture Trustee, and the Debtor dated May 1, 2007; (b) Mortgage, Security Agreement and Assignment of Rents and Leases dated May 1, 2007 granted by the Debtor to the Otter Tail County in the original principal amount of $6,010,000; and (c) all other agreements, instruments, notes, guarantees, and other documents executed in connection therewith, including without limitation, all collateral and security documents executed by the Debtor in favor of Otter Tail County.

**(18)     Disputed**, with respect to a Claim, means a Claim as to which an objection has been or may be timely filed by a party-in-interest with standing and which objection has not been withdrawn or determined by a Final Order and which is not the subject of a compromise or settlement as described in this Plan.

**(19)     Distribution** means a distribution or payment under the Plan to the holders of Allowed Claims.

**(20)     Distribution Date** means any date that the Debtor, in its sole discretion, deems it appropriate to make a distribution or payment to holders of Allowed Claims, so long as sufficient Liquidation Assets are available to warrant a Distribution in the reasonable judgment of the Debtor and subject to the Debtor's right to delay Distributions.

**(21)     Distribution Record Date** means a date established by the Confirmation Order that will be the date of determination as to the holder of a Claim for purposes of Distributions under this Plan.

**(22)** **Effective Date** means the first Business Day occurring at least fifteen (15) days after the Confirmation Date, on which all of the conditions set forth in Section 7.01 of the Plan have been satisfied.

**(23)** **Estate** means the bankruptcy estate of the Debtor, the scope of which is determined by reference to Section 541 of the Bankruptcy Code.

**(24)** **Final Distribution Date** means the date on which the Debtor makes the final Distribution of the Liquidation Assets in accordance with the Plan.

**(25)** **Final Order** means an order of the Court which has not been timely appealed or, if appealed, no stay of the order's effectiveness has been entered.

**(26)** **General Unsecured Claim** means any Claim that: (a) is not an Administrative Expense Claim, Priority Tax Claim, Secured Claim, Other Secured Claim or Priority Unsecured Claim; or (b) is otherwise determined by the Bankruptcy Court to be not secured by any property of the the Estate.

**(27)** **Interests** means the limited liability company membership interests in the Debtor.

**(28)** **Lease Agreement** means that Lease Agreement for lease of the solid waste disposal facility dated May 1, 2007 between the Debtor and Otter Tail County, whose interest was assigned to the Revenue Bond Indenture Trustee.

**(29)** **Liquidation Account** means the account established to hold Cash and proceeds of other Liquidation Assets converted to Cash by the Debtor.

**(30)** **Liquidation Assets** means all property of the the Estate, excluding any assets or property sold or distributed to any person other than the Debtor pursuant to the Sale Order and Stipulation.

**(31)** **Liquidation Expenses** means the actual and anticipated reasonable, ordinary costs and expenses of the Debtor, including, without limitation, (a) payment of, or reimbursement of the Debtor for, any and all wages, salary, costs, expenses (including, without limitation, accountants', attorneys' or other professionals' fees and expenses for services provided to the Debtor), and liabilities incurred by the Debtor in connection with the performance of its duties in connection with the Debtor.

**(32)** **NMF** means MMCDC New Markets Fund II, LLC

**(33)** **NMF Credit Agreements** means the (a) a Senior Loan Note dated March 30, 2007; the (b) a Subordinated Note dated March 30, 2007; (c) the Construction and Term Loan Agreement dated March 30, 2007; (d) a Mortgage, Security Agreement and Assignment of Rents and Leases dated March 30, 2007; and (e) all other agreements, instruments, notes, guarantees, and other documents executed in connection therewith, including without limitation, all collateral and security documents executed by the Debtor in favor of NMF.

**(34)    NMF Claim** means the former Claims of NMF relating to the NMF Credit Agreements that have been released in connection with the sale of the Debtor's assets pursuant to the Sale Order, which Claim is deemed an Allowed Claim in the amount of $0 for purposes of this Plan.

**(35)    Petition Date** means October 30, 2009.

**(36)    Priority Tax Claim** means any allowed unsecured claim of a governmental unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

**(37)    Priority Unsecured Claim** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in Section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

**(38)    Pro Rata Share** means the proportion that the amount of any Claim bears to the aggregate amount of such Claim and all other Claims in the same Class entitled to Distributions from the same source of Cash, including Disputed Claims.

**(39)    Reserve Account** means the account to which the Debtor shall deposit a sufficient amount of funds from Liquidation Assets to fund payment of Administrative Claims and Liquidation Expenses incurred during the liquidation and to reserve for payment of Disputed Claims.

**(40)    Revenue Bondholders** means the holders of the Revenue Bonds.

**(41)    Revenue Bonds** means, the Otter Tail County, Minnesota Subordinate Exempt Facility Revenue Bonds, Series 2007A in the outstanding principal amount of $20,000,000 issued under the Revenue Bond Indenture.

**(42)    Revenue Bond Claim** means the claim held by the Revenue Bond Indenture Trustee on behalf of the Revenue Bondholders under the Revenue Bond Documents, which shall be deemed an Allowed Claim in the amount of $20,000,000 less amounts received on or before the Effective Date pursuant to the Sale Order and the Stipulation.

**(43)    Revenue Bond Documents** means the (a) Revenue Bond Indenture; (b) Lease between Otter Tail County, whose interest in payments thereunder was partially assigned to the Revenue Bond Indenture Trustee, and the Debtor dated May 1, 2007; (c) Guaranty Agreement dated May 3, 2007; (d) Mortgage, Security Agreement and Assignment of Rents and Leases dated May 1, 2007 granted by Debtor to the Revenue Bond Indenture Trustee in the amount of $20,000,000; and (e) all other agreements, instruments, notes, guarantees, and other documents executed in connection therewith, including without limitation, all collateral and security documents executed by the Debtor in favor of the Revenue Bondholders or the Revenue Bond Indenture Trustee.

**(44)    Revenue Bond Indenture** means the Trust Indenture, dated as of May 1, 2007, by and between the Revenue Bond Indenture Trustee, as indenture trustee, and Otter Tail County, Minnesota, as issuer of the Revenue Bonds.

**(45)** **Revenue Bond Indenture Trustee** means U.S. Bank National Association in its capacity as indenture trustee under the Revenue Bond Documents.

**(46)** **Sale** means the sale of certain assets of the Debtor approved by the Bankruptcy Court pursuant to the Sale Order.

**(47)** **Sale Order** means the order approving the Sale of the Debtor's assets entered on February 17, 2011.

**(48)** **Schedules** means the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs filed on or about October 30, 2009.

**(49)** **Secured Claim** means a Claim held by any entity to the extent of the value, as set forth in the Plan, as agreed to by the holder of such Claim and the Debtor, or as determined by a Final Order of the Bankruptcy Court pursuant to the Section 506(a) of the Bankruptcy Code, of any interest in property of the Estate securing such Claim; *provided, however,* that a Secured Claim shall not include any portion of the Claim that exceeds the value of the interest in property of the Estate securing such Claim.

**(50)** **Stipulation** means that Stipulation and Agreement for Sale and Liquidation of Assets of Otter Tail Ag Enterprises, LLC dated as of January 5, 2011, by and among the Debtor, the Revenue Bond Indenture Trustee and the County, which was approved by the Court by order dated January 28, 2011.

<u>**ARTICLE II**</u>

**DESIGNATION, CLASSIFICATION, AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

This Plan designates all claims against or interests in the Debtor as an unclassified claim under Section 2.01 or as a classified claim under Section 2.02.

**Section 2.01** <u>**Treatment of Unclassified Claims.**</u>

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

**(a)** <u>**Administrative Expense Claims**</u>

The Debtor expects that its obligations for Allowed Administrative Expense Claims will falls into two categories: (i) Claims for postpetition obligations incurred in the ordinary course of the Debtor's business, primarily Liquidation Expenses; and (ii) Claims of (A) the Debtor's professionals for compensation and reimbursement of expenses and (B) any entity who seeks compensation or reimbursement for professional services pursuant to Bankruptcy Code §§ 503(b)(3) or (b)(4).

Unless previously paid pursuant to the Sale Order, each holder of an Allowed Administrative Expense Claim shall receive Cash from the Liquidation Account equal to the

lesser of (A) the unpaid portion of such Allowed Administrative Expense Claim, without interest, and (B) such other amount agreed to by such holder on the later of (i) the Effective Date; (ii) the date such Allowed Administrative Expense Claim becomes due and payable under the terms governing the transaction underlying the Allowed Administrative Expense Claim; and (iii) as soon as practicable after the subject Administrative Expense Claim becomes Allowed. Claims for professional fees may be paid consistent with prior orders of the Court, the local rules of the Court, or upon approval by the Court, if required.

**(b)** **Priority Tax Claims**

To the extent there are any unpaid Priority Tax Claims, each holder of a Priority Tax Claim, shall receive payment in full in Cash from the Liquidation Account on the Effective Date, or as soon as practicable after the Priority Tax Claim becomes Allowed. The Debtor is not aware of any Priority Tax Claims.

**Section 2.02** **Designation of Classified Claims and Interests.**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtor. A Claim or Interest is placed in a particular class for the purposes of voting on the Plan and of receiving Distributions pursuant to the Plan only to the extent that such claim or interest is an Allowed Claim or Allowed Interest in that class and such claim or interest has not been paid, released, or otherwise settled prior to the Effective Date. The Debtor is not aware of any Secured Claims or Priority Unsecured Claims, and as such has not designed classes for these types of Claims.

**(a)** **Class One – General Unsecured Claims**

Class One consists of the General Unsecured Claims, including the County Bond Claim and the Revenue Bond Claim. For the avoidance of doubt Class One does not include the AgStar Claim or the NMF Claim and includes only the portions of the County Claim and the Revenue Bond Claim that have not been paid on or before the Effective Date pursuant to the Sale Order and the Stipulation, which amounts so paid are not covered by this Plan. Class One also consists of parties claiming rejection damages from the Debtor's rejection of executory contracts or unexpired leases who hold Allowed Claims. Class One is an impaired class and is entitled to vote on the Plan.

**(b)** **Class Two – Equity Interests**

Class Two consists of the holders of Interests. Class Two is presumed to reject the Plan as the class receives no Distribution under the Plan nor retains any property interest in the Debtor.

**Section 2.03** **Treatment of Classified Claims and Interests.**

The treatment with respect to each class of Claims and Interests provided for in this Section shall be in full and complete satisfaction, release and discharge of such Claims and Interests against the Debtor and the Estate. The Debtor shall only make distributions on account

of Allowed Claims. A claim that is disputed by the Debtor as to its amount only shall be deemed Allowed in the amount the Debtor admits owing and Disputed as to the remainder.

**(a)**     **Class One – General Unsecured Claims.**

On the Effective Date, the Debtor shall commence liquidation of any non-Cash Liquidation Assets and shall hold all proceeds and existing Cash in the Liquidation Account for Distribution in accordance with the Plan. In full and final satisfaction of the Allowed Class One Claims, each holder of an Allowed Class One Claim as of the Distribution Record Date shall receive a Pro Rata Distribution from the proceeds of the Liquidation Assets and other Cash as soon as is reasonably practicable. The initial Distribution may be a final Distribution if all Allowed Administrative Expense Claims and Liquidation Expenses have been paid, and there are no Disputed Claims. If the Debtor or its professionals anticipate incurring additional Liquidation Expenses at the time of the initial Distribution, the initial Distribution, and any subsequent Distributions, shall occur only after depositing a sufficient amount in the Reserve Account as required by Section 3.01 of the Plan.

Class One is impaired by the Plan and is entitled to vote to accept or reject the Plan.

**(d)**   **Class Two - Equity Interests**

The holders of equity Interests shall neither receive any Distribution nor retain any property under the Plan on account of such claims. Class Two is deemed to reject the Plan and is not entitled to vote.

**Section 2.04**   **Acceptance or Rejection of the Plan.**

**(a)**     **Classes Deemed to Accept the Plan**

No classes are deemed to accept the Plan

**(b)**     **Acceptance by Impaired Classes**

Class One is impaired under the Plan and thus the holders of Claims in such classes must vote on the Plan. An impaired class of Claims has accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such class that have timely and properly voted to accept or reject the Plan.

**(c)**     **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

To the extent that any impaired class votes to reject the Plan or is deemed to have rejected it, the Debtor may request confirmation of the Plan under Section 1129(b) of the Bankruptcy Code.

# ARTICLE III

## MEANS FOR IMPLEMENTATION OF THE PLAN

**Section 3.01**          **Distribution of Sale Proceeds; Funding of the Liquidation Account and any Appropriate Reserve Accounts.**

The Sale Order and Stipulation provides for distribution of certain amounts obtained by the Debtor in connection with the Court authorized sale of its assets or otherwise held by the Debtor. These amounts have been distributed and are not the subject matter of this Plan.  On the Effective Date, if not already accomplished, the Debtor shall fund the Liquidation Account with its existing Cash, estimated to be approximately $2,500,000.  The Debtor shall also transfer Cash from the Liquidation Account to a Reserve Account to secure payment of U.S. Trustee fees and future Liquidation Expenses in an amount not to exceed $100,000, subject to approval of the court to the extent required by applicable bankruptcy rules with respect to professional fees.

After the Effective Date, if the Debtor liquidates any further Liquidation Assets, the Debtor shall deposit the net proceeds thereof into the Liquidation Account.  The Liquidation Assets shall be distributed as stated in Section 2.03 to fund payments under this Plan, with appropriate reserves being maintained with respect to Disputed Claims or unpaid Administrative Expense Claims in existence on any Distribution Date. After all such Disputed Claims have been resolved or paid, and all Allowed Administrative Expense Claims have been paid, any balance of the Reserve Account shall be paid in accordance with Section 2.03.

**Section 3.02**          **Continued Existence.**

On the Effective Date, the Debtor shall operate only for the purposes of carrying-out this Plan, and shall cease all regular operations.  After substantial completion of Plan requirements, Debtor shall notify the Bankruptcy Court.  After such filing, the Debtor shall be deemed dissolved for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtor or payments to be made in connection therewith; provided that, in its sole discretion, the Debtor may (but shall not be required to) file with the Office of the Secretary of State for the applicable certificate of dissolution.

**Section 3.03**          **Further Authorization.**

The Debtor shall be entitled to seek such orders, judgments, injunctions, and rulings as it deems necessary to carry out and further the intentions and purposes, and give full effect to the provisions of the Plan.

**Section 3.04**          **U.S. Trustee Fees.**

All fees payable pursuant to chapter 123 of title 28, United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date. Any statutory fees accruing after the Effective Date shall be paid prior to any final Distribution.

**Section 3.05**        **Cancellation of Notes, Bonds, Instruments, Debentures and Equity Interests.**

Unless previously cancelled or assumed and assigned by the Sale Order, on the Effective Date, except as otherwise provided in this Plan, the Sale Order or the Confirmation Order, (a) the Revenue Bonds and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtor shall be cancelled and extinguished, (b) the obligations of the Debtor under any agreements, documents, indentures or certificates of designation governing the Bonds and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtor that are impaired under this Plan shall be, and are hereby, discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by the Interest holders, officers or directors of the Debtor or by any other Person, and (c) the Interests shall be cancelled (and all securities convertible or exercisable for or evidencing any other right in or with respect to the Interests) without any conversion thereof or distribution with respect thereto.

Notwithstanding the foregoing or any other contrary term or provision provided in the Plan, (a) the discharge of the obligations of the Debtor under the Bonds, any bonds, notes, indentures or other instruments, documents or agreements, and (b) the Revenue Bond Indenture shall continue in effect solely for the purposes of (i) maintaining all of the protections the Revenue Bond Indenture Trustee enjoys as against the holders of the Revenue Bonds to receive Distributions under the Plan; and (ii) allowing and preserving the rights of the Revenue Bond Indenture Trustee to make Distributions in satisfaction of Allowed Revenue Bond Claims, but in all cases subject to the terms and conditions of the Revenue Bond Indenture. As of the Effective Date, the Revenue Bonds shall be surrendered to the Revenue Bond Indenture Trustee in accordance with the terms of the Revenue Bond Indenture. All surrendered and cancelled Revenue Bonds held by the Revenue Bond Indenture Trustee shall be disposed of in accordance with the applicable terms and conditions of the Revenue Bond Indenture.

**Section 3.06**        **Notice of Effective Date.**

On or before the third (3rd) Business Day following the Effective Date, the Debtor shall electronically file with the Court a notice of occurrence of the Effective Date and provide such notice to the Revenue Bond Trustee, and Otter Tail County via electronic mail.

## ARTICLE IV

## DEBTOR'S LIQUIDATION DUTIES

**Section 4.01**        **Debtor as Liquidator.**

The Debtor shall be responsible in all actions to complete this Plan.

**Section 4.02** **Compensation of Debtor.**

Any remaining officers and employees of Debtor shall receive compensation in the form of wages or salary for services rendered in an amount equal to the their usual and customary hourly rate then in effect, multiplied by the hours they expend in fulfillment of their duties on behalf of the Debtor. The Debtor shall also be reimbursed for any expenses reasonably incurred in the performance of its duties. Payment of such compensation and expense reimbursement shall be made on a bi-weekly basis before Distributions are made.

**Section 4.03** **Preservation of Causes of Action / Debtor's Belief that there are no Causes of Action to Pursue.**

Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, and subject to the terms of the Plan, the Debtor and the Estate shall retain all Causes of Action that the Debtor has the right to assert immediately prior to the Effective Date.

Notwithstanding this provision preserving Causes of Action, the Debtor has conducted a reasonable investigation, and is not aware at this time of any Causes of Action. The Debtor does not intend to conduct any further investigation to identify any Causes of Action. The Debtor shall not be authorized to pursue any Causes of Action, other than objecting to a Disputed Claim. If the Debtor becomes aware of any Causes of Action, it must obtain approval from the Court before investigating or pursuing such any Causes of Action.

**Section 4.04** **General Powers.**

The powers and authorities of the Debtor include, without limitation: (a) collecting and liquidating the Liquidation Assets; (b) making Distributions; (c) objecting to Claims, including seeking subordination thereof, and asserting defenses, counterclaims or setoffs thereto; (d) settling Disputed Claims; (e) filing tax returns for the Debtor; (f) hiring professionals to assist in carrying out its duties; (g) opening and closing bank accounts and (j) taking all action necessary, appropriate or convenient to carry out the duties imposed under the Plan, or under applicable law, and otherwise fulfilling the purpose of the Plan and safeguarding the interests of holders of Claims and Interests.

**Section 4.05** **Duties of the Debtor.**

The Debtor shall exercise such of the rights and powers vested in it in by the Plan and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.

**Section 4.06**   **Retention of Professionals; Compensation.**

The Debtor may employ one or more professionals or agents to assist with its duties and may pay the agents or professionals a reasonable fee in consideration for such assistance. Such professionals may include, without limitation, the professionals retained by the Debtor prior to the Effective Date. Such professionals shall not be required to file applications for allowance and payment of compensation and reimbursement of expenses with the Bankruptcy Court. Any such agent or professional employed in accordance with this subsection shall be employed at the will of the Debtor and may be terminated or replaced by the Debtor at any time, with or without cause.

**Section 4.07**   **Limitation of Liability of Debtor.**

Debtor shall maintain its D&O policy until this Plan is substantially complete.

The Debtor shall have no duty other than to the holders of Claims, and only to the extent of the Allowed Claims, in the management of the Liquidation Assets. The Debtor, and its respective officers, directors, professionals, members, agents and representatives shall not be liable except for the performance of duties and obligations specifically set forth in the Plan and no implied covenants or obligations shall be read into the Plan against the Debtor, and its respective officers, directors, professionals, members, agents and representatives. The Debtor shall not be liable for any error of judgment made in good faith or made by an agent, professional, or attorney-in-fact of the Debtor, unless it shall be proven that the Debtor was grossly negligent in ascertaining the pertinent facts or performing any duty or obligation.

**Section 4.08**   **Reliance by Debtor.**

Except as otherwise provided herein:

 (a)  the Debtor may rely, and shall be protected in acting upon, any resolution, certificate, statement, installment, opinion, report, notice, request, consent, order, or other paper or document reasonably believed by him to be genuine and to have been signed or presented by the proper party or parties except as otherwise provided in the Plan;

 (b)  the Debtor shall not be liable for any action reasonably taken or not taken by it in accordance with the advice of a professional retained by the Debtor.

**Section 4.09**   **Reporting and Notice.**

Monthly, beginning on the first Business Day of the first month anniversary of the Effective Date, the Debtor shall file a report with the Court as to its assets, liabilities and activities during the prior month including a statement of all amounts paid for compensation of professionals and the Debtor.

The Debtor shall furnish tax information to the holders of Class One Unsecured Claims and Class Two Interests as required by law. As soon as practicable after substantial completion

of the Plan, the Debtor shall provide to the holders of Claims a final account and report of the liquidation.

# ARTICLE V

## PROVISIONS REGARDING DISTRIBUTIONS

**Section 5.01**         **No Distribution In Excess of Allowed Amount of Claim.**

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim will receive, in respect of such Claim, Distributions under this Plan in excess of the Allowed Amount of such Claim. No distributions shall be made to parties that do not have Allowed Claims.

**Section 5.02**         **Time and Method of Distributions.**

The Debtor will make the Distributions to holders of Allowed Claims required under the Plan. Whenever any Distribution to be made under the Plan is due on a day other than a Business Day, such Distribution shall be made, without interest, on the immediately succeeding Business Day, but any such Distribution will have been deemed to have been made on the date due. The Debtor shall continue to make Distributions out of the Liquidation Account up to and including the Final Distribution Date, on which date it will make the final Distribution under this Plan. Notwithstanding any contrary provisions herein Distributions on account of Revenue Bond Claims shall be made to the Revenue Bond Indenture Trustee for further Distribution to holders of the Revenue Bonds in accordance with and subject to the terms and provision of the Revenue Bond Indenture.

**Section 5.03**         **Means of Payment.**

All payments made pursuant to this Plan shall be in Cash and by any means reasonably selected by the Debtor, including check or wire transfer.

**Section 5.04**         **Disputed Claims.**

No payments or other Distribution of any kind will be made on account of any Claim until such Claim becomes an Allowed Claim and then only to the extent that such Claim is an Allowed Claim. As required by Section 3.01, the Debtor shall establish and maintain a amount in the Reserve Account sufficient to pay Disputed Claims that may subsequently become Allowed Claims, as determined by the Debtor in its sole discretion. To the extent a Disputed Claim becomes an Allowed Claim after any initial Distributions, a Distribution shall be made in respect of such Allowed Claim within 30 days after such claim becomes an Allowed Claim. Notwithstanding the foregoing, any holder of both an Allowed Claim(s) and a Disputed Claim(s) may receive the appropriate payment or Distribution on the Allowed Claim(s), although, except as otherwise agreed by the Debtor in its sole discretion, no payment or distribution shall be made on the Disputed Claim(s) until such dispute is resolved by settlement or Final Order.

**Section 5.05**         **Distribution Record Date; Delivery of Distributions.**

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided

herein, the Debtor shall not have any obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and distribute proceeds, securities, property, notices and other documents only to those holders of Allowed Claims who are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. Debtor shall be entitled to recognize and deal for all purposes under this Plan with only those Claim holders stated on the official Claims register, or in the Debtor's books and records, as of the close of business on the Distribution Record Date.

**Section 5.06** **Fractional Dollars; _De Minimis_ Distributions.**

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. No payment shall be made on account of any Distribution less than fifty dollars ($50) with respect to any Allowed Claim unless a request therefor is made in writing to the Debtor of such payment on or before thirty (30) days after the Effective Date.

**Section 5.07** **Undeliverable Distributions.**

**(a)** **Holding of Undeliverable Distributions**

If any Distribution hereunder to any holder is returned as undeliverable, it shall be deposited into the Reserve Account, and no further Distributions shall be made to such holder unless and until the Debtor is notified in writing of such holder's then-current address. All entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Debtor to locate any holder of an Allowed Claim.

**(b)** **Failure to Claim Undeliverable Distributions**

Any holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a Distribution within thirty (30) days from and after the date such Distribution is returned as undeliverable shall have such holder's Claim discharged and shall be forever barred from asserting any such Claim against the Debtor.

**Section 5.08** **Setoff.**

The Debtor may, in accordance with the provisions of the Plan, Section 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to this Plan on account of such Claim (before any Distribution is made on account of such Claim), the Claims, rights and Causes of Action of any nature that the Debtor may hold against the holder of such Allowed Claim and not released or extinguished by this Plan

.

**Section 5.09**          **Withholding Taxes.**

Any federal or state withholding taxes or other amounts required to be withheld under any applicable law will be deducted and withheld from any Distributions made pursuant to this Plan. All holders of Claims will be required to provide to the Debtor any information necessary to effect the withholding of such taxes. Notwithstanding the foregoing, each holder of an Allowed Claim that is to receive a Distribution hereunder will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such Distribution, including withholding tax obligations in respect of in-kind (non-Cash) Distributions. Any party issuing an instrument or making an in-kind (non-Cash) Distribution under this Plan has the right, but not the obligation, to refrain from making such Distribution until the Person to which the Distribution is to be made has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligation.

**ARTICLE VI**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

On the Effective Date, all executory contracts and unexpired leases shall be deemed rejected, except for those executory contracts and unexpired leases that were previously assumed or rejected previously in the Bankruptcy Case or through the Sale Order.

All Allowed Claims arising from the rejection of executory contracts and unexpired leases shall be deemed to be Class One Unsecured Claims. The Confirmation Order shall function as a Final Order authorizing the rejection, as of the Effective Date, of all executory contracts and unexpired leases not previously rejected or assumed. Any Person asserting a Claim arising from the rejection of an executory contract or unexpired lease, who has not previously received notice of such rejection or the Sale Order, must file a proof of Claim with the Clerk of the Court within thirty (30) days after the Confirmation Date and any such Person who fails to timely file such a Claim shall be forever barred, estopped, and enjoined from asserting such Claim and from receiving any property of the Estate or the Debtor on account of such Claim.

**ARTICLE VII**

**CONDITIONS PRECEDENT**

**Section 7.01**          **Conditions to Effective Date.**

Each of the following conditions must occur and be satisfied on or before the Effective Date for the Plan to be effective on the Effective Date:

(a)     The Court shall have entered the Confirmation Order, in form and substance reasonably acceptable to the Debtor, and the Confirmation Order shall have become a Final Order;

(b)     Any conditions to the Effective Date shall have been satisfied or waived by the party entitled to do so;

(c)      All other actions and documents necessary to implement the Plan as of the Effective Date shall have been effected and/or duly executed and delivered; and

(d)      All payments required to be paid to the County and the Revenue Bond Trustee under the terms of the Stipulation and Sale Order shall have been paid.

**Section 7.02**      **Waiver of Conditions.**

The Debtor may waive the conditions to the effectiveness of this Plan as set forth in this Article VII, except for condition (d).

**Section 7.03**      **Effect of Non-Occurrence of the Effective Date.**

If the Confirmation Order is vacated, this Plan shall be null and void in all respects and nothing contained in this Plan shall: (1) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor; (2) prejudice in any manner the rights of the Debtor or any other party; or (3) constitute an admission, acknowledgment, offer or, undertaking by the Plan Proponent in any respect.

## ARTICLE VIII

## EFFECT OF CONFIRMATION

**Section 8.01**      **Binding Effect.**

The Plan shall be legally binding upon and inure to the benefit of the Debtor, the Estate, the holders of Claims, the holders of Interests, and their respective successors and assigns.

**Section 8.02**      **Release by the Debtor of AgStar, NMF, Revenue Bondholders and Otter Tail County.**

For good and valuable consideration, on the Effective Date and except as otherwise provided herein, the Debtor, the Estate and any person seeking to exercise the rights of the Estate, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to section 1123 of the Bankruptcy Code, does hereby release AgStar, NMF, the Revenue Bondholders, and Otter Tail County from any and all Claims and Causes of Action, including, without limitation, any Avoidance Actions that the Debtor or its Estate would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person or entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place before the Effective Date.

**Section 8.03**       **Injunction.**

Except as otherwise expressly provided for in the Plan or the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, and provided that the Effective Date occurs, the entry of the Confirmation Order will permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability that is subject to the Plan from taking any of the following actions in respect of such Claim, debt or liability: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Debtor; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against the Debtor; (c) creating, perfecting or enforcing in any manner directly or indirectly, any lien or encumbrance of any kind against the Debtor; (d) asserting any setoff or offset of any kind, directly or indirectly, against any debt, liability or obligation due to the Debtor; and (e) proceeding in any manner in any place whatsoever, including employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

**Section 8.04**       **Exculpation.**

To the fullest extent authorized or provided by the Bankruptcy Code, and provided that the Effective Date occurs, upon the Effective Date and subject to Section 8.03 of the Plan, neither the Indenture Bond Trustee, the County, AgStar, NMF, the Debtor's professionals, nor any of their respective officers, directors, members, attorneys or other advisors (including financial advisors)(collectively, the "**Exculpated Parties**") shall have or incur liability for any claims, obligations, rights, or Causes of Action for any act or omission in connection with, relating to, or arising out of, the Debtor's Chapter 11 Case, including, without limitation, the sale of substantially all of the Debtor's assets, or the Plan, the negotiation, formulation, and preparation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or of the property to be distributed under the Plan, except for acts or omission which constitute willful misconduct or gross negligence and provided, further, that (i) no Exculpated Party shall be released from (a) its express obligations, if any, under this Plan, or under any other document or agreement between any Exculpated Parties (excluding the Debtor), or (b) from any claims, liabilities or obligations related to transactions, acts and omissions unrelated to (1) the Chapter 11 Case, or (2) with respect to any general bank depository or similar bank service obligations owed by any Exculpated Party to any other person or third party, and (ii) nothing in this Section 8.04 shall modify the rights of the Revenue Bond Trustee under the Revenue Bond Indenture.

## ARTICLE IX

### RETENTION OF JURISDICTION

**Section 9.01**       **Jurisdiction of the Bankruptcy Court.**

After the Confirmation Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Debtor, the Estate, and the Chapter 11 Case until such Chapter 11 Case is closed, for the following purposes:

**(a)** to hear and determine any and all pending or future proceedings regarding the allowance, disallowance or subordination of Claims or regarding the Debtor's and the Estate's rights of recoupment and/or setoff;

**(b)** to consider and act on the compromise and settlement of any Claim against the Estate; provided, however, that there shall be no requirement that the Debtor seek Court approval of compromises and settlements except as provided herein;

**(c)** to hear and determine all pending or future controversies, suits, and disputes that may arise under the Plan, including controversies arising in connection with the interpretation or construction of the Plan or any documents intended to implement the provisions of the Plan;

**(d)** to hear and determine any and all applications of professional persons for the allowance of compensation and reimbursement of expenses incurred prior to or on the Confirmation Date;

**(e)** to consider and rule upon any proposed modifications of the Plan;

**(f)** to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in any order of the Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan and to implement and effectuate the Plan;

**(g)** to determine such other matters that may be provided for in the Confirmation Order or other orders of the Court, all as authorized under the provisions of the Bankruptcy Code or any other applicable law;

**(h)** to enforce all orders, judgments, injunctions, and rulings entered in connection with the Chapter 11 Case;

**(i)** to hear and determine all applications, adversary proceedings, disputes, controversies and contested matters arising under Chapter 11 of the Bankruptcy Code or arising in or related to the Chapter 11 Case;

**(j)** to hear and determine disputes and controversies regarding title to property of the Estate or the Debtor;

**(k)** to issue such orders as may be necessary or appropriate in aid of Confirmation, and to facilitate consummation of the Plan, including orders requiring parties to fulfill their obligations as specified in the Plan; and

**(l)** to consider and act upon any Claim or Cause of Action by or against the Debtor, the Revenue Bond Trustee, or their respective agents, attorneys, financial advisers, or representatives, arising under or in connection with the Chapter 11 Case or the Plan.

# ARTICLE X

## MISCELLANEOUS

**Section 10.01**          **Notices**.

Any notice required or permitted to be provided to the Debtor under the Plan shall be in writing and served by overnight courier service or by certified mail, return receipt requested, addressed as follows:

> **The Debtor**
>
> Mackall, Crounse, & Moore, PLC
> c/o Timothy D. Moratzka, Esq.
> 111 Marquette Avenue, Suite 1400
> Minneapolis, MN 55402
> Phone: (612) 305-1400
> Fax: (612) 305-1414

**Section 10.02**          **Governing Law**.

Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and the Bankruptcy Rules, the laws of the State of Minnesota shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan.

**Section 10.03**          **Term of Injunctions or Stays**.

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Sections 105(a) or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date shall continue in full force and effect until the Final Distribution Date and the Estate, and the Debtor shall be entitled to all of the protections afforded thereby. The Court shall have the power to grant such additional and supplemental stays as may be necessary or appropriate to protect and preserve the Liquidation Assets or to permit the just and orderly administration of the Estate. The Liquidation Assets shall remain property of the Estate until distributed in accordance with this Plan, and no entity shall at any time have any claim to or interest in any asset of the Estate except to the extent that such entity is the holder of an Allowed Claim entitled to Distributions under this Plan. On and after the Effective Date, the provisions of the Plan shall be binding upon the Debtor, the Estate, all holders of Claims, all holders of Interests, and all other parties in interest in the Chapter 11 Case, in each case whether or not such entities hold Claims which are impaired and whether or not such entities have accepted the Plan.

**Section 10.04**          **Closing of the Chapter 11 Case.**

When all Disputed Claims filed against the Debtor have become Allowed Claims or have been disallowed by Final Order, and all remaining assets of the Debtor have been liquidated and converted into Cash (other than those assets abandoned by the Debtor, and such Cash has been Distributed in accordance with this Plan, or at such earlier time as the Debtor deems appropriate, the Estate shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**Section 10.05**          **Modifications and Amendments.**

The Debtor reserves the right to alter, amend, or modify the Plan as contemplated by Section 1127 of the Bankruptcy Code. The Plan may be modified, before or after Confirmation, without notice or hearing, or on such notice and hearing as the Court deems appropriate, if the Court finds that the proposed modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard to the proposed modification. Without limiting the foregoing, the Plan otherwise may be modified after notice and hearing. In the event of any modification at or before Confirmation, any votes in favor of the Plan shall be deemed to be votes in favor of the Plan as modified, unless the Court finds that the proposed modification materially and adversely affects the rights of all or certain creditors that cast votes.

**Section 10.06**          **Exclusive Right to Modify Plan.**

The Debtor shall retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to, or modifications of, the Plan until and including the Confirmation Date.

**Section 10.07**          **Effectuating Documents; Further Transactions.**

The Debtor shall be authorized to execute, deliver, file, and/or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**Section 10.08**          **Withdrawal or Revocation.**

The Debtor may withdraw or revoke this Plan at any time prior to the Confirmation Date. If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then this Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

**Section 10.09**          **Severability.**

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of this Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtor, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered of interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**Section 10.10**          **Headings.**

Headings are used in this Plan for convenience and reference only, and shall not constitute a part of this Plan for any other purpose.

Dated: <u>April 29, 2011</u>                     MACKALL, CROUNSE & MOORE, PLC


By: <u> /e/ Timothy D. Moratzka      </u>
Timothy D. Moratzka (Atty No. 75036)
Mychal A. Bruggeman (Atty No 0345489)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, Minnesota  55402
(612) 305-1400

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: Otter Tail Ag Enterprises, LLC, | Case No. 09-61250-DDO |
| Debtor. | Chapter 11 |

### SIGNATURE DECLARATION

I. Anthony Hicks, declare under penalty of perjury that I am the Chief Executive Officer of Otter Tail Ag Enterprises, LLC ("OTAE"), make the following declarations under penalty of perjury:

- The information that I have given my attorney in the electronically filed Debtor's 3rd Amended Proposed Chapter 11 Plan of Liquidation is true and correct.

Dated: ___4/28/11___

OTTERTAIL AG ENTERPRISES, LLC

By_____
    Anthony Hicks
    Chief Executive Officer

Dated: April 28, 2011

MACKALL, CROUNSE & MOORE, PLC

By: /e/ Timothy D. Moratzka
Timothy D. Moratzka (Atty No. 75036)
Mychal A. Bruggeman (Atty No 0345489)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, Minnesota 55402
(612) 305-1400

### ATTORNEYS FOR DEBTOR

## <u>CERTIFICATE OF SERVICE</u>

  On April 29, 2011, this document was served on parties who receive electronic notice through CM/ECF.


       By: /e/ Timothy D. Moratzka
       Timothy D. Moratzka (Atty No. 75036)

1382350.1-MAB

**EXHIBIT B: ORDER APPROVING DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES**

**EXHIBIT C: LIQUIDATION PROJECTIONS AND LIQUIDATION ANALYSIS**

## Liquidation Analysis

**Chapter 11 Liquidation Plan**

| | |
|---|---|
| | $ 2,500,000 |
| Cash | |
| | $ 2,500,000 |
| **Estimated Gross Liquidation Proceeds Available for Distribution** | |
| | |
| **Less: Wind Down Costs** | $      10,000 |
| Payroll[1] | $    125,000 |
| Administrative Expenses[2] | $      13,000 |
| U.S. Trustee Fees[3] | $    148,000 |
| **Total Liquidation Costs** | |
| | |
| | **$ 2,352,000** |
| **Net Liquidation Proceeds Available for Unsecured Creditors Under Chapter 11 Plan** | |

| | **Estimated Value** |
|---|---|
| **Chapter 7 Liquidation Plan** | |
| | $ 2,500,000 |
| Cash | |
| | $ 2,500,000 |
| **Estimated Gross Liquidation Proceeds Available for Distribution** | |
| **Less: Wind Down Costs** | $      75,000 |
| Trustee's Fees[4] | $    125,000 |
| Administrative Expenses[5] | $      13,000 |
| U.S. Trustee Fees | $    213,000 |
| **Total Liquidation Costs** | |
| | |
| | **$ 2,287,000** |
| **Net Liquidation Proceeds Available for Unsecured Creditors Under Chapter 11 Plan** | |

**Estimated Value**

_____

## Footnotes to Liquidation Analysis

A summary of the assumptions used by Debtor and Debtor's management in preparing the liquidation analysis is set forth below. Debtor reserves the right to update prior to the Confirmation Hearing.

**Note 1 - Payroll**

Payroll consists of consulting fees paid at an hourly rate similar to their salaries prior to the closing of the 363 Sale for the Debtor's CEO Anthony Hicks, and controller, Shannon Dirkes, for any tasks required under the Liquidation Plan.

**Note 2 – Administrative Expenses**

The Administrative Expenses consist almost entirely of professional fee claims by the Debtor's law firms of Mackall, Crounse, and Moore, PLC, and Pemberton, Sorlie, Rufer & Kershner Law Office, and accounting firm of Christiansen & Associates, PLLP, and any miscellaneous expenses incurred in the liquidation or solicitation process, which are estimated at $125,000.

**Note 3 – Quarterly U.S. Trustee Fee**

The Debtor must pay a quarterly fee to the U.S. Trustee's Office based on the amount of disbursements made during the quarter. The Debtor estimates that it will disburse $2,500,000, which would equate to a U.S. Trustee's fee of $13,000.

**Note 4 – Trustee Fees**

Trustee Fees are estimated to equal 3% of the Gross Proceeds available for distribution, which would total $75,000. For the purposes of the liquidation analysis, the Debtor assumes that the Trustee would not seek to continue paying Hicks or Dierks to complete any employment tasks consistent with the liquidation.

**Note 5 – Administrative Expenses**

The Debtor assumes that a Chapter 7 Trustee will employ an accounting and legal professional to assist in the liquidation process, investigate the Debtor's financial affairs, and administer the estate. The Debtor believes that those costs would be similar to the costs incurred by the Debtor's existing professionals but possibly a little higher since the Debtor has already conducted such investigations, but the Trustee may not pay costs as part of a solicitation process in a plan. Therefore, the administrative costs are estimated to be around the same amount.